No. 12-57302

_____

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

_____

CINDY LEE GARCIA,

Plaintiff-Appellant

v.

GOOGLE, INC., YOUTUBE LLC, et al., Defendants-Appellees

and

NAKOULA BASSELEY NAKOULA, an individual, a.k.a. Sam Bacile, et al.,

Defendants.

_____

On Appeal from the United States District Court

for the Central District of California

D.C. No. 2:12-cv-08315-MWF-VBK

_____

# REPLY BRIEF OF APPELLANT CINDY LEE GARCIA

_____

M. Cris Armenta (State Bar No. 177403)       Credence Sol (State Bar219784)
The Armenta Law Firm APC                      La Garenne
11900 W. Olympic Boulevard Suite 730          86200 Chauvigny, France
Los Angeles, CA 90064                         Tel: 06 74 90 22 08
Tel: (310) 826-2826 cris@crisarmenta.com      email: credence.sol@sol-law.com

# **<u>TABLE OF CONTENTS</u>**

I.    PRELIMINARY STATEMENT ..................................................................... 3

II.   ARGUMENT ............................................................................................... 5

    A.    Cindy Lee Garcia is the "Author" of Her Performance .......................... 5

    B.    Cindy Lee Garcia's Performance Was Not a Work for Hire, Nor Was
She Anyone's Employee ................................................................................. 15

    C.    Appellant Did Not Sign Any Release Relinquishing Her Copyright
Interests in Her Performance .......................................................................... 13

    D.    Appellant Has Shown The Likelihood of Irreparable Harm ................... 14

        1.    Ms. Garcia's Life is in Grave Danger As a Direct Result of Her
Perceived Continued Promotion of the Film By Its Posting on YouTube ...... 14

        2.    Appellant Has Not Unreasonably Delayed in Seeking Relief ......... 19

        3.    The Equities Tip Decidedly in Favor of Cindy Lee Garcia ............ 22

III.   CONCLUSION ............................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**<u>Federal Statutes</u>**           **<u>Pages</u>**

18 U.S.C. § 101...................................................................... 11

18 U.S.C. § 1621.................................................................... 13

**<u>Cases</u>**           **<u>Pages</u>**

<u>Aalmuhammed v. Lee,</u>
202 F.2d 1227, 1233-1234 (9th Cir. 2000) ...........................................6,7

<u>Cohen v. Cowles Media Co.,</u>
501 U.S. 663 (1991).......................................................... 23

<u>Community for Creative Non-Violence v. Reid,</u>
490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) .................. 6,12

<u>Cybermedia, Inc. v. Symantec Corp.,</u>
19 F. Supp. 2d 1070, 1078 (N.D. Cal. 1998)..................................... 21

<u>Earth Island Inst. v. Mosbacher,</u>
785 F. Supp. 826 (N.D. Cal. 1992)................................................... 14

<u>Effects Associates, Inc. v. Cohen,</u>
908 F.2d 555 (9th Cir. 1990) ..................................................10,11

<u>Facenda v. N.F.L. Films, Inc.,</u>
542 F.3d 1007 (2008) ....................................................... 8,9

<u>Fleet v. CBS, Inc.,</u>
50 Cal. App. 4th 1911, 1919-1920 (1996) ...........................................8,9

<u>In re Capital Cities/ABC, Inc.,</u>
918 F.2d 140, 144 (11th Cir. 1990)……………………………….24

Laws v. Sony Music Entm't, Inc.,
448 F.3d 1134, 1137 (9th Cir. 2006) .......................................................8

New York Times v. United States,
403 U.S. 713 (1971)............................................................................ 22

Perfect 10 v. Google, Inc.,
653 F.3d 976 (9th Cir. 2011) ............................................................ 17,18

Rent-A-Center, Inc. v. Canyon Television & Applicant Rental, Inc.,
944 F.2d 597 (9th Cir. 1991). ............................................................ 19

Religious Technology Center v. Netcom On-Line Communications
Services, Inc.,
907 F. Supp. 1361, 1383 (N.D. Cal. 1995)........................................ 24

Rodde v. Bonta,
357 F.3d 988 (9th Cir. 2003) ............................................................ 15

Security Farms v. International Bhd. Of Teamsters,
124 F.3d 999, 1017 (9th Cir. 1997) ...................................................... 13

Tom Doherty Assocs. v. Saban Entm't,
60 F.3d 27, 38-39 (9th Cir.  1995)...................................................... 20,21

I.    <u>**PRELIMINARY STATEMENT**</u>

Under existing law, an actor performing in a dramatic work is the author of his or her performance and retains the copyright in that performance (much like a musician) until and unless she assigns that right to another party or has participated in a production as either an employee or in a writing confirming the performance was a "work for hire."  Contrary to Appellee's unsubstantiated assertion, none of these scenarios exist with respect to Cindy Lee Garcia's performance in "Desert Warrior."  Appellant was not an employee, she did not sign a work for hire agreement and she did not assign her interests in her dramatic performance to anyone.  The United States Trademark and Copyright Office have confirmed that this is the law in the United States, when it encouraged other countries to join in the WIPO Treaty on Audio Visual Performances to conform with existing United States law on the subject of audiovisual performances.

Even if Appellant granted an implied license for her license to be used in the benign adventure film called "Desert Warrior," once the scope of that implied license was breached by the use of her performance in a bigoted hate film, the analysis of her performance reverts to one under the Copyright Act.

Appellant also proved the likelihood of irreparable harm, in that the inclusion of her performance into the film trailer "Innocence of Muslims" has

made her and her family a direct target for death or rape.  She has received numerous written credible threats, as explained further by national security and counterterrorism expert UCLA Professor Abou El Fadl.  The opinions provided by Professor El Fadl are uncontroverted – Appellees submitted no evidence to rebut Professor El Fadl's conclusions that Appellant is in "grave danger" because of the hateful and bigoted message she is perceived to have endorsed.  He also opines that her very efforts to remove her performance from YouTube and her possibility of success in that regard is be conduct that is presently keeping her alive.

An order barring Appellees as contributory copyright infringers from displaying her performance will not stifle free speech about any topic of significance.   The public at large and Appellees will retain their First Amendment right to speak about the film or any of the topics it covers. Indeed, the United States Supreme Court confirms that copyright protects the *form* of expression, not the content of expression, so that if Appellees wish to use their substantial platform to shout a bigoted message from the rooftops, they retain their First Amendment right to do so.  This is not a prior restraint case.  This is a copyright case.   Appellant is entitled to an order restraining the further publication of her copyright performance.  Further, her performance is not *de minimis*, as Professor El Fadl concluded that it is her

distorted performance where she is seen calling the Prophet Mohammed a child molester goes to the "very heart" of the film trailer.

## II.  **ARGUMENT**

### A.    **Cindy Lee Garcia is the "Author" of Her Performance**

In their answering brief, Appellees attempt to make hay out of Ms. Garcia's restraint in seeking an injunction only as to the part of the Film that contains her performance, sneering that Ms. Garcia "does not claim a copyright interest in the entirety of the Film … [and] that the Film is not a "joint work" between [Ms. Garcia] and Mr. Yousseff.  (Ans. Br. at 15.)  These observations, though, are beside the point, which is this:  *Ms. Garcia seeks only to enjoin the unauthorized posting of her own performance*.  While Appellees complain that this cannot be done "without impacting the rights of others" (Ans. Br. at 15 n.7), in fact they do not explain who these "others" are, nor do they explain why any filmmaker with the ability to edit a video could not simply edit out Ms. Garcia—the filmmakers in this case were certainly able to edit *in* hate speech in a manner that made it appear to be coming out of Ms. Garcia's mouth.

More importantly, Appellees are simply wrong when they claim that Ms. Garcia is not an "author" of her creative performance for the purpose of enjoining its unauthorized posting, a point that Ms. Garcia has made again and

again, yet Appellees continue to rely on the same inapplicable case law, apparently laboring under the apprehension that if they say something again and again, eventually their wish will come true.[1]

The most egregious example of this wishful thinking is embodied in Appellees' heavy reliance on the case of *Aalmuhammed v. Lee*, 202 F.3d 1227, 1233 (9th Cir. 2000) (*cited in* Ans. Br. at 16) which is inapposite, and, to the extent that it is on point at all, it supports Ms. Garcia's position. Specifically, Appellees incorrectly argue that *Aalmuhammed* stands for the proposition that the only person entitled to copyright protection is "the mastermind" of the work, whatever that means. But *Aalmuhammed* is not on point at all. That case involved a dispute between Spike Lee and many major production companies and studios involved in the making of *Malcolm X*, on the one hand, and Jefri Almuhammad, a Muslim documentarian whom

---

[1] For example, *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (*cited in* Ans. Br. at 16), the case Appellees cite for the proposition that the "author" of a creative work is "the" (singular) "person who translates an idea into a fixed, tangible expression entitled to copyright protection" is not even a case that is about defining whether a film actor can claim a copyright in her performance. Rather, that case took up the issue of whether a sculptor who created a statue on an oral commission from a nonprofit unincorporated association was the association's "employee" for the purposes of determining whether the sculpture was a "work for hire." *Id.* The Supreme Court held that the sculptor was not an employee, and remanded the case to the district court to determine whether the parties had intended to be joint authors who would co-own the copyright. *Id.*

*Malcolm X* star Denzel Washington asked for assistance in preparation for Mr. Washington's role, on the other. *Aalmuhammed*, 202 F.3d at 1229. The district court dismissed Mr. Almuhammad's copyright and other claims. *Id.* According to the Ninth Circuit, Mr. Almuhammad submitted evidence that he reviewed the script and suggested revisions that would make the script more historically and religiously accurate, provided translation services, participated in post-production, and met with Islamic organizations to persuade them of the accuracy of the completed film. *Id.* at 1229-1230. Mr. Almuhammad sued the defendants when they credited him as an "Islamic Technical Consultant" rather than as a writer; he claimed that *Malcolm X* was a "joint work" and that he therefore co-owned the copyright. *Id.* at 1230. In contrast, as Appellees themselves admit (and mock Ms. Garcia for her agreement with them), this case does not involve a "joint work."

Even if *Almuhammed* were on point, it would support Appellant's case, not Appellees'. The Ninth Circuit in *Almuhammad* reviewed the plaintiff's contributions and noted that the evidence showed that the plaintiff "rewrote several specific passages" and an unspecified number of "scenes" that appeared in the finished work, and that those items "would have been independently copyrightable." *Id.* at 1231. *That work was a full-length feature film: in other words, in Almuhammad the Ninth Circuit expressly*

*stated that a person who makes even a small creative contribution relative to the length of the finished work may assert a copyright interest in that contribution.* To the extent that *Aalmuhammad* asserts to the contrary, it is clear that that court could not come to a decision as to which of the many people involved in the making of a film is the "author" under the Copyright Act – while the court suggested producers, directors, "star[s]," and screenwriters, it never actually made a decision on that issue. *Id.* at 1233. Appellees' heavy emphasis on Cindy Lee Garcia's standing as a supporting actor unworthy of equal protection under the copyright laws[2] overstates *Almuhammad*'s holding. Moreover, in light of the *fatwa* that has been put on Ms. Garcia's head as the result of her having been made to appear to recite the incredibly incendiary lines at the heart of the Film's message, it is grossly offensive.

The same flaw dooms Appellees' argument that Ms. Garcia's reliance on *Fleet v. CBS, Inc.*, 50 Cal. App.4th 1911 (1996), and *Laws v. Sony Music Entm't., Ind.*, 448 F.3d 1134 (9th Cir. 2000), is misplaced due solely to the brevity of her performance. (Ans. Br. at 18-19.) The Third Circuit soundly rejected this reasoning in the case of *Facenda v. N.F.L. Films, Inc.*, 542 F.3d

---

[2] Such as, for example, actresses Anne Hathaway (*Les Misérables)*, Judi Dench (*Shakespeare in Love)*, and Brenda Smith (*Network)*, all of whom won the Academy Award for Best Supporting Actress for appearances of as little as *five minutes* in a *full length feature length film.*

1007 (2008).  There, the Third Circuit agreed that the plaintiffs in the *Fleet* and *Laws* cases could not complain when their performances were "exploited" for the very reason that the plaintiffs delivered them (acting in a movie and singing in a recording respectively).  *However*, in *Facenda*, a case involving the issue of whether a state right of publicity statute conflicted with federal copyright law, *Facenda*, 542 F.3d at 1033, the plaintiff complained that his performance, delivered for the purpose of sports commentary, had been "transmuted" by the NFL "into part of a pitch for a computer game." *Facenda*, 542 F.3d at 1031, citing 1 NIMMER ON COPYRIGHT § 1.01[B][3][v][iv][II], at 1-88-2(18) (citing *Fleet* and *Laws*).  That is exactly what happened here:  Ms. Garcia gave a dramatic performance for a film allegedly titled *Desert Warrior*, which allegedly was a "desert adventure" story – and Yousseff and his agents "transmuted" her performance by inserting in post-production lines that made her an unwilling spokeswoman for anti-religious hate speech.[3]  Similarly, the district court for the Western District of Tennessee, citing *Fleet*, held in a case involving an actor who

---

[3] The Third Circuit specifically stated that it did not disagree with the Ninth Circuit, but simply held that the facts in the *Facenda* case were different than those in *Laws* because in *Facenda*, as in this case, the plaintiff did not seek to enforce a right that she had contracted away.  *Facenda*, 542 F.3d at 1032.

dressed up as "Loose Slot Louie" for a casino advertising campaign, that as

soon as he

> willingly dressed up in the ... costume and knowingly appeared as
> this character in Defendants' advertisements, his performance
> became a 'dramatic work' that was 'fixed in a tangible medium
> of expression,'

and therefore, the subject matter of his claims fell within the scope of

copyright law. *Stanford*, 430 F.Supp.2d at 757 (citing *Fleet*).[4]

Appellees also ignore the impact of controlling Ninth Circuit case law,

*Effects Associates, Inc. v. Cohen, et al.*, 908 F.2d 555 (9th Cir. 1990) (*cited in*

Ans. Br. at 25), that eviscerates their argument that only individuals with

marquee billing may copyright their creative contributions to a movie.  In

*Effects Associates* the Ninth Circuit held that an individual who created

*special effects* for a film, but (like Appellant) had signed no written agreement

transferring copyright of his creative contribution, retained ownership of his

copyright. *Effects Associates*, 908 F.2d at 558.  Quite simply, it is the law of

the land, as the Ninth Circuit has recognized, that "[t]he Supreme Court and

this circuit … have refused to permit moviemakers to sidestep" the Copyright

Act's requirement that a copyright be transferred in writing – whether the

---

[4] The court ultimately denied the plaintiff's motion to remand his case
to state court, holding that both the requirements of copyright preemption had
been satisfied.  *Stanford*, 430 F.Supp.2d at 759.

creator is Tom Cruise or Cindy Lee Garcia.[5]  *See id.*  Moreover, to the extent that Appellees claim that Ms. Garcia provided an "implied license" under *Effects Associates* for Mr. Yousseff to post the Film, they tellingly have nothing to say about the hundreds of third parties entirely unrelated to the film and with no copyright interest that Appellees have attempted to defend, who have posted the Film on YouTube, and which Appellees also refuse to remove.  And as this Court noted in *Effects*, once the scope of the implied license for use of a copyrighted work is breached, the claim reverts to one under the Copyright Act.  *See Effects*, 420 F. Supp. 2d at n.5.

### B.    Cindy Lee Garcia's Performance Was Not a Work for Hire, Nor Was She Anyone's Employee

Without even addressing the relevant standard, Appellees conclude that Appellant's performance was a "work for hire." (Ans. Br. at 21-22.)  A "work for hire" requires either that the performed have been an employee or written agreement that the work was "for hire."  18 U.S.C. § 101 (defining "work for hire").   Clearly, there was no written agreement designation the work was one "for hire," except for the *forged* documents on which Appellees incredibly rely.  As to whether Appellant was an "employee,"  Appellees conclude that

---

[5] Perhaps one of the reasons that the Ninth Circuit has hewn so closely to the Copyright Act's writing requirement is the incredible burden on the judiciary that would result from stretching the requirements of the Copyright Act to evaluate creative contributions to movies on a case-by-case basis where no writing is in evidence transferring copyright.

an actor who responds to a casting call and was hired "merely as an actress for a role" is an employee. This is not the law. *See, e.g.*, *Cmty. For Non-Creative Violence v. Reid*, 490 U.S.730 (1989) (identifying factors to determine whether artist is employee or independent contractor for purposes of the copyright act.).

Like the sculptor in *Community for Non-Creative Violence*, Appellant was engaged in a skilled occupation – acting. *See id.* Appellant was retained for a *very* short period of time. In Appellant's case, she was retained only for 2-3 days. *Compare id.* (sculptor retained for less than two months, which Supreme Court called "relatively short period of time"). During and after her performance, Yousseff retained no rights to assign her more work. *See id.* (same). The amount Appellant was paid was dependent on her completing a specific job – performing the lines for a specific character. *See id.* (same). Creating films is not a regular line of business for Youseff – in fact, the evidence before the court shows that his most regular line of business was either committing financial fraud in a line of "business" that landed him in federal prison or spending time in federal prison. *See id.* Further, although not completely dispositive, Appellant was paid a single fee with no deduction made for Social Security taxes, income taxes or other benefits. *See id.* If Appellees' interpretation of the law (that a "mere" actor providing a

12

performance) becomes an employee of the producer, the entire manner in which Hollywood and the media does business will be forever changed.

### C. Appellant Did Not Sign Any Release Relinquishing Her Copyright Interests In Her Performance

Appellees astonishingly rely on a "Cast Deal Memo" and "Release" that not only was submitted to the district court without leave to do so after briefing on the Motion for Preliminary Injunction was complete, but more significantly, has been proven to be a forgery. One would hope that at the time Appellees and their counsel first submitted the "Cast Deal Memo" and "Release" to the district court on November 8, 2012, for the December 3, 2012, hearing, they were unaware that the documents were forgeries, having been perhaps sold a bill of goods by convicted fraudster Youseff. However, Appellant has since provided both the district court and the Appellees and their counsel with the unrefuted declaration of a well-respected document examiner who has concluded, without any equivocation, that the documents are forgeries. Despite having in hand the unrefuted declaration and opinion of James Blanco, Appellees actually rely on the forged documents in the Answering Brief. 18 U.S.C. § 1621 (false declarations criminalized); *Security Farms v. International Bhd. Of Teamsters*, 124 F.3d 999, 1017 (9th Cir. 1997) (affirming Rule 11 sanctions against lawyer who failed to make further inquiry once on notice that declarations might be false). The only admissible

evidence before the Court on this issue is Ms. Garcia's declaration that she signed no such release. *ER 194.* This is consistent with the testimony of the other actors who performed in the Film. *ER 241-242.*[6]

### D. Appellant Has Shown The Likelihood of Irreparable Harm

#### 1. Ms. Garcia's Life is in Grave Danger As a Direct Result of Her Perceived Continued Promotion of the Film By Its Posting on YouTube.

Appellees argue that Appellant has not shown the likelihood of irreparable harm. In *Earth Island Inst. v. Mosbacher*, 785 F. Supp. 826 (N.D. Cal. 1992), which this Court affirmed, 929 F. 2d. 1449 (9th Cir. 1991), the district court found that the

> risk of unnecessary *dolphin* deaths and injury is a sufficient display of irreparable harm to justify the entry of a preliminary injunction.

---

[6]     Appellant does not agree with Appellees' footnote 10, that if this Court reverses, it should remand for further proceedings. On the record before this Court, this Court is entitled to reverse and order the district court to grant the order for a preliminary injunction, particularly in this case, where Appellant's very life is in danger. This tactic of Appellees is simply another attempt to further delay Appellant's relief (and in the meanwhile generate millions more of YouTube page views). This shameless tactic has continued since September of 2012; after achieving delay, Appellees then claim that *Appellant* has unjustifiably "delayed" and therefore is not entitled to relief. See AER (documenting Appellees' continued gamesmanship delay tactics, i.e. requesting complaint be amended, requesting an entire week due to one lawyer's travel schedule, opposing expedited review by this Court, requesting delayed briefing before this Court).

(emphasis added).  Risk of death is indeed a showing of irreparable harm.

*See, e.g., Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2003) (enjoining closure of

medical facility because of risk of harm or death to disabled patients).

Appellees dismiss the death and rape threats made on Appellant's

family by characterizing them as mere "indignities." (Ans. Br. at 31.)  They

also characterize the *fatwa* and order to kill her as persons merely "wishing

harm" against her.  (Ans. Br. at 31.).  Appellees' incredibly insensitive

characterizations aside, the factual showing that Appellant's life is in grave

danger is more than sufficient:

- An Egyptian cleric pronounced: "I issue a fatwa and call on the Muslim youth in America and Europe to do this duty, which is to kill the director, the producer and the actors and everyone who helped and promoted the film." *ER 249.*

- The head of security for the Los Angeles Superior Court agreed that Appellant and her lawyer are in danger.  *ER 196-197.*

- Appellant is not even allowed to set foot into an international airport, being instead escorted by police in a squad car to board an airplane. *ER 197.*

- Written messages from strangers "I would Like to Kill" those involved in the movie; "Dear the end is near;" "She will be Killed." *ER 197-198.*

- A written threat to rape her daughter.  *ER 249*

An expert in issues of national security and counterterrorism, UCLA Professor Abou El Fadl, has concluded that "Ms. Cindy Lee Garcia is, in fact, in grave danger." *El Fadl Decl. ¶ 17; ER 250.* Professor El Fadl explains that the fatwa issued by the Egyptian cleric "can be incredibly meaningful to those that follow that particular imam." <u>*Id.*</u> He goes on to explain that "more than fatwas that are reported to or by the media, what concerns me to a much greater degree are unannounced or secretive calls by extremist and fanatic groups to inflict harm upon Ms. Cindy Lee Garcia." *El Fadl Decl. ¶ 17; ER 250.* He also concludes that her efforts to pull the film trailer off YouTube will help her in terms of her believability of her message condemning the film and its message. *El Fadl Decl. ¶ 21; ER 252*. Appellees provided the district court with *no evidence* to refute Professor El Fadl's opinion. Their only defense has been to belittle the gravely dangerous situation in which their refusal to remove the Film has placed Ms. Garcia.

Indeed, Appellees blame *Ms. Garcia* for her predicament (much like rape defendants often attempt to defend themselves by criticizing the length of their victim's skirt) and claim that she is to blame for the death threats because she has informed the media that she condemned the film. *Ans. Br. at 33*. There is no evidence to support that statement – it is merely inflammatory argument. The only *evidence* before the Court on that issue may be found in

Professor El Fadl's declaration in which he states that the 15 seconds of Appellant's performance "goes to the heart of the trailer's message, which likely is why it is Cindy Lee Garcia, apparently to a greater degree than some other actors who appeared in the video, who is receiving credible death threats." *El Fadl Decl. ¶ 25; ER 253*. The only admissible evidence shows that it was her *performance* and the continued perception that she is promoting the trailer's hateful message is the direct cause of the threats on her life. *El Fadl Decl. ¶ 25; ER 253*.

Appellees claim that the showing that Appellant's life is in danger as a direct result of her association with the Film on YouTube is insufficient to warrant a preliminary injunction because "The Copyright Act does not provide a remedy for these types of injuries." *Ans. Br. at 26.* This is because, they argue, "The Copyright Act does not provide a remedy for injury to reputation, emotional harm and psychic and physical injuries." *Ans. Br. at 26*. As the Court held in *Perfect 10 v. Google, Inc.*, the plaintiff alleging irreparable harm must show that the conduct it seeks to enjoin has a nexus to the claimed forthcoming harm. *Perfect 10 v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011). In *Perfect 10*, the injunction was denied because the plaintiff's potential financial ruin as a result of Google's conduct was not causal – the court held that the plaintiff was in financial ruin anyway and failed to submit

any evidence that any customers refused to do business with it as a result of Google's conduct. *Id.* at 982. By contrast, in this case, there is no evidence that Appellant's life was in danger until her performance was made viral in the Middle East and garnered substantial governmental and media attention. And, Appellant has submitted evidence and expert opinion that the threats on her life are a direct result of the continued posting of the Film on YouTube. The injuries she seeks to avoid – damage to her reputation, unfair forced promotion of a hateful Film, and death – will be avoided if any injunction issues.

Appellees comparison of *Perfect 10* to this case is very misleading. In *Perfect 10*, Appellees explain, the court declined injunctive relief because the proprietary images of Appellant that Google was distributing were freely available elsewhere. Appellees then go on to claim that

> [s]ince the Film was posted in July 2012, it has been viewed and
> copied by countless individuals.

For this proposition, Appellees cite to Paragraph 3 of the First Amended Complaint. *Ans. Br. at 29*. A review of the First Amended Complaint reveals *no allegation* that the Film is being shown in any other form than YouTube. In fact, the only allegations remotely close to this are the allegations against the DOE defendants, who are identified as additional posters of the Film on *YouTube. FAC ¶ 22, ER 8*. The only evidence contained in the record shows

that the posting of the Film is only on YouTube and that removal of the Film

containing Appellant's copyrighted performance from YouTube might save

her life and will restore her right to be free from being unfairly associated with

such a hateful piece of bigoted speech that has caused havoc for her and for

others around the world.  Contrary to the assertions of Appellees, the Ninth

Circuit has held that the threat of injury to reputation "may support a finding

of irreparable harm, so long as it is not too speculative." *Rent-A-Center, Inc.*

*v. Canyon Television & Applicant Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991).

Appellant has certainly made a strong showing that her public association

with the hateful trailer has affected her reputation – she has been forced to

move, barred from entering airports, lost work, and been name-called and

threatened with death.  A greater threat of harm to the reputation of an

ordained Christian minister is hard to imagine.

### 2.    Appellant Has Not Unreasonably Delayed in Seeking Relief

Appellees argue that Appellant unreasonably delayed in seeking relief

and that because they have succeeded in posting the Film in the interim

worldwide to tens of millions of viewers, no injunctive relief should issue.

As to the issue of delay, the parties agree that the trailer was first posted to

YouTube in July of 2012.   The video received no attention and caused no

problems for Appellant or the world until September 11, 2012, when the

consulate in Benghazi was attacked. Obviously, even though Appellant's copyright was being infringed, she did not fully understand the impact that the Film would later have on her safety. It was not until after September 11, 2012, when media camped outside Ms. Garcia's home and her name and address were publicized, that her life was put in grave danger, according to the death threats she personally received

Even if the two months during which the Film trailer was posted and nothing happened could be construed as "delay," a two-month lapse is hardly an unjustifiable delay. *See, e.g., Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 38-39 (9th Cir. 1995) (four-month lapse between time plaintiff found out about infringing property not unreasonable delay because plaintiff was not a lawyer and did not understand his legal rights). Similarly, Appellant in this case is not a lawyer, and there is no basis to conclude that she understood her legal rights. In the cases in which injunctive relief was denied for delay, the court found that the plaintiffs were well aware of their legal rights and delayed because they had concluded that their rights were not violated. *See Tom Doherty*, 60 F.3d at 37-38. There is no evidence from which the district court could even infer that Appellant, who received a mere $500 for her performance and who works as an actress and a Christian ordained minister,

had any understanding of her legal rights between July 2012 and the time that she first sought legal relief.

That said, once she had legal counsel, she sought relief in the Los Angeles Superior Court within 9 calendar days of September 11, 2012; when that court refused to hear her claims on the grounds that any state-based claims were immunized by the Communications Decency Act., Ms. Garcia then immediately sought relief in federal court under a copyright theory. *Garcia Decl. ¶ 15; ER 196-197; Armenta Decl. ¶ 2, ER 487.* She filed her application for a temporary restraining order on October 17, 2012, only after: (1) Appellees' counsel Tim Alger requested that Appellant amend the Complaint to add Mr. Youseff's real name once Mr. Yousseff admitted that he had been using aliases; (2) Appellees'counsel Tim Alger requested that no TRO be filed during a time he indicated he would be unavailable; and (3) Google issued its final denial of Appellant's takedown notices under the Digital Millennium Copyright Act ("DMCA") on October 4, 2012. *Hardy Decl. ¶ 11 ("YouTube's Final Response); ER 416-417.* The law is clear that "a reasonable delay caused by Plaintiff's good faith efforts to investigate" the case will not preclude the required showing. *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 38-39 (9th Cir. 1995); *Cybermedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1078 (N.D. Cal. 1998) (discussing effect of delay

on injunction in copyright context). Appellant's decision to wait to seek injunctive relief until Appellees issued their final takedown denial was consummately reasonable. Had Appellees complied with the DMCA and taken down the infringing content, this action would have been completely unnecessary.

Accordingly, the "delay" between the final takedown denial issued on October 4, 2012 was neither lengthy nor unreasonable. Within *one business day* of the final takedown denial¸ Appellant's counsel met and conferred with defense counsel concerning the request for injunctive relief. *Armenta Decl. ¶ 8, ER. 717.* Appellees' counsel claimed that he would not be available between October 11 and October 16 and requested that nothing be filed that would require him to respond during that time period. *Id.* Appellant filed her request for relief on October 17, 2012. *Armenta Decl. ¶ 10, ER 717.* This documented sequence of events shows no delay on the part of Appellant that warrants precluding injunctive relief.

### 3.     The Equities Tip Decidedly in Favor of Cindy Lee Garcia

The injunction against continued publication of infringing copyrighted content is not an unconstitutional prior restraint. *New York Times v. United States*, 403 U.S. 713 (1971) (Brennan, J., concurring). This is because copyright cases deal with restraint of the *form of expression, not the ideas*

*expressed. Id.* at 726. Appellees, including Youseff (once he is released from prison), are free to plaster the Internet with their message that they believe the prophet Mohammed was a child molester – they simply cannot use Appellant's copyrighted performance to do it, particularly in light of the fact that Mr. Yousseff and his agents have admitted that they bastardized Ms. Garcia's creative performance to make it appear as though she said those words, even though in reality she did not. There is no evidence that removal of the copyrighted performance from YouTube will stifle anyone's speech about the Film, its message, or the convicted fraudster that purportedly made it. And if this Court agrees that an injunction may be issued, Appellees certainly have the resources and the platform to ensure that speech on the topic is robustly continued. Notably, Appellees have not cited a single case in which a court refused to enjoin a copyright infringer based on the First Amendment. Indeed, the Supreme Court has directly addressed this issue:

> "***Notwithstanding the Federal Constitution's First Amendment, the press – like others interested in publishing—may not publish copyrighted material without obeying the copyright laws***."

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) (emphasis added).

Accordingly, Appellees' prior restraint analysis is frivolous.

   None of the cases cited by Appellees concerning the application of the prior restraint doctrine arise in the copyright context, except for *Religious*

*Technology Center v. Netcom On-Line Communications Services, Inc.*, 907 F.

Supp. 1361, 1383 (N.D. Cal. 1995), which Appellees either failed to read in

its entirety or intentionally mischaracterized.  In *Religious Technology*, the

district court refused the issuance of an injunction it issued against an

individual who sought to criticize the late L. Ron Hubbard, the founder of

Scientology, by posting portions of Hubbard's copyrighted works.  *Id. at*

1365-1366. The district court specifically left open the issue as to whether the

online provider for the forum, NetCom, was liable for contributory

infringement, depending on whether "it knew or should have known" the

content was infringing.  *Id.* at 1374.  Significantly, this case was decided long

before the passage of the DMCA, which now provides copyright owners a

specific manner in which a copyright owner may place the online provider *on*

*notice* that the content is infringing (a procedure that Ms. Garcia pursued over

and over again, to no avail) and provides a safe harbor for that provider to take

the content down.  Moreover, as to the district court's view on the interplay

between copyright and the First Amendment in *Religious Technology*:

> Netcom argues that plaintiffs' theory of liability contravenes the
> first amendment, as it would chill the use of the Internet because
> every access provider or user would be subject to liability when a
> user posts an infringing work to a Usenet newsgroup. While the
> court agrees that an overbroad injunction might implicate the
> First Amendment, see In re Capital Cities/ABC, Inc., 918 F.2d
> 140, 144 (11th Cir. 1990), imposing liability for infringement

24

where it is otherwise appropriate does not necessarily raise a First Amendment issue.

*Id.* at 1377.  In this case, it is appropriate to impose copyright liability because once Appellant's takedown agent sent multiple takedown notices to Appellees and Appellees refused to remove the content, Appellees were on direct and actual notice that they were contributory copyright infringers.   Despite knowing that they were infringing on Appellant's dramatic performance, they insisted that the performance continue to be broadcasted around the world, creating grave danger to Appellant.

## III.    <u>CONCLUSION</u>

Based on the foregoing, Appellant respectfully requests that this Court REVERSE the trial court's denial of her request for a preliminary injunction and enter a preliminary injunction; in the alternative, Appellant requests that this Court remand this matter to the district court for the entry of the preliminary injunction.

Dated: February 28, 2013                    Respectfully submitted,


\_\_\_\_\_/s/ M. Cris Armenta\_\_\_\_\_
Maria Cristina Armenta
**Attorney for Petitioner**
**Cindy Lee Garcia**

.

26

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing brief complies with the requirements of Ninth Circuit Rule 32.  The brief has been prepared in proportionally spaced typeface using Times New Roman 14-point type.  According to the word processing system used to prepare the brief, the word count of this brief is 5321 words, not counting those items excludable under Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

Dated: February 28, 2013                    Respectfully submitted,

_____/s/ M. Cris Armenta_____
Maria Cristina Armenta
Attorney for Petitioner
Cindy Lee Garcia

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF System on February 28, 2013.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 28, 2013

/s/ Heather Rowland

**Heather Rowland**
