No. 12-57302

---

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

---

CINDY LEE GARCIA, Plaintiff-Appellant

v.

GOOGLE, INC., YOUTUBE LLC, et al., Defendants-Appellees, and

NAKOULA BASSELEY NAKOULA, a.k.a. Sam Bacile, et al., Defendants.

---

On Appeal from the United States District Court
from the Central District of California
D.C. No. 2:12-cv-08315-MWF-VBK

---

## APPELLANT CINDY LEE GARCIA'S BRIEF IN RESPONSE TO

## SUA SPONTE BRIEFING ORDER RE STAY

---

M. Cris Armenta (SBN 177403)          Credence Sol (SBN 219784)
The Armenta Law Firm APC              La Garenne
11900 W. Olympic Blvd. Ste. 7`30      86200 Chauvigny
Los Angeles, CA 90064                 France
Tel: (310) 826-2826                   Tel: 06 74 90 22 08
cris@crisarmenta.com                  credence.sol@orange.fr

1

## CIRCUIT RULE 27-3 CERTIFICATION

Pursuant to Ninth Circuit Rule 27-3, counsel for Appellant Cindy Garcia state:

1.    The telephone numbers, email addresses, and office addresses of the attorneys for the parties are:

| | |
|---|---|
| M. Cris Armenta<br>THE ARMENTA LAW FIRM, APC<br>11900 W. Olympic Blvd, Suite 730<br>Los Angeles, CA 90064<br>Tel: (310) 826-2826 x108<br>cris@crisarmenta.com<br><br>Credence Sol<br>La Garenne<br>86200 Chauvigny, France<br>Tel: 06 74 90 22 08<br>credence.sol@orange.fr<br><br>Jason Armstrong<br>The Law Office of Jason Armstrong<br>611 West Main St.<br>Bozeman, MT 59715<br>Tel: (406) 587-2085<br>armstronglaw@mac.com<br><br>*Counsel for Appellant*<br>*Cindy Lee Garcia* | Neal Kumar Katyal<br>Christopher Handman<br>Dominic F. Perella<br>Sean Marotta<br>HOGAN LOVELLS US LLP<br>555 Thirteenth St., N.W.<br>Washington, D.C. 20004<br>Tel: (202) 637-5600<br>neal.katyal@hoganlovells.com<br><br>Timothy Alger<br>Sunita Bali<br>PERKINS COIE LLP<br>3150 Porter Dr.<br>Palo Alto, CA 94306<br>Tel: (650) 838-4334<br>talger@perkinscoie.com<br>sbali@perkinscoie.com<br><br>*Counsel for Appellees*<br>*Google, et al.* |

2.    Appellant/Plaintiff hereby responds Court's order for a brief on the parties' positions regarding the Court's *sua sponte* call for a vote on whether to convene an *en banc* rehearing of Google's request for a stay of

the panel's prior order, as amended, directing Google and YouTube to remove all or part of a film entitled *Innocence of Muslims* from its platforms worldwide and to prevent further uploads. As directed by the Court, this brief is limited to the issue of the stay order; it addresses the substantive issues raised by the Court's opinion only to the extent necessary to explain why the Court's previous denial of an emergency stay was appropriate.

## TABLE OF CONTENTS

CIRCUIT RULE 27-3 CERTIFICATE ........................................................2

TABLE OF AUTHORITIES .........................................................................i

INTRODUCTION AND BACKGROUND ...................................................4

ARGUMENT – THE TAKEDOWN ORDER SHOULD BE UPHELD
PENDING THIS COURT'S DISPOSITON OF A PETITION FOR
REHEARING EN BANC OR A PETITION FOR CERTIORARI.................11

A.    Legal Standard .................................................................................11

B.    Google Does Not Have a First Amendment Right to Violate Ms.
      Garcia's Copyright .........................................................................13

C.    This Court's Order Is Not a "Prior Restraint"..............................15

D.    Because Ms. Garcia is Likely to Prevail on the Merits, The Takedown
      Order is Appropriate, in Light of All the Circumstances .......................21

      1.    Ms. Garcia has a protectable copyright interest in her dramatic
            performance ................................................................................21

      2.    The length of time that Ms. Garcia appeared in the film is
            irrelevant to the legal issue of her copyright interest....................25

      3.    The majority applied the appropriate standard for issuance of a
            prohibitory preliminary injunction (and thus, for denial of a
            stay).............................................................................................27

      4.    Google's unauthorized use of Ms. Garcia's dramatic
            performance is not a "fair use" ....................................................30

      5.    It was entirely proper for the Court to issue a preliminary
            injunction where, as here, Ms. Garcia showed a "likelihood" of
            success: a definitive finding of liability is neither required nor
            appropriate ................................................................................37

CONCLUSION................................................................................................40

## TABLE OF AUTHORITIES

**Federal Statutes**                                    **Pages**

17 U.S.C. § 502 (a). ........................................................... 15

17 U.S.C. §§ 101, 102(a) ................................................... 21

17 U.S.C. § 107.............................................................31, 33

**Secondary Authorities**                       **Pages**

U.S. CONST., Art I, Sec. 8, cl. 8 ...................................13,17

17 U.S.C.A. § 102 Ann. (Notes of Comm. On the Judiciary, House Report No. 94-1476).......................................................... 23

BLACK'S LAW DICTIONARY 855 (9th ed.2009)................................. 28

**Cases**                                                   **Pages**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001) ............................................18, 40

*Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 422 (D.N.J. 2005)........................................... 26

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) .......... 30

*Copyright and the First Amendment: A Gathering Storm?*, 19 ASCAP COPYRIGHT LAW SYMPOSIUM 43, 78 (1971).................. 15

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979) ................................................. 27

*Douglas International Corp. v. Baker*, 335 F.Supp. 282 (S.D.N.Y. 1971) ....................................................... 20

*Dr. Seuss Enterprises, L.P. v. Penguin Books, USA, Inc.*, 924 F.Supp. 1559, 1575 (S.D. Cal. 1996) ........................................ 16

*Dr. Seuss Enterprises, L.P.v. Penguin Books USA, Inc.*, 109 F. 3d. 1394 (9th Cir. 1997) ......................................................... 18

*Effects Associates, Inc. v. Cohen*, 908 F. 2d 555, 557 (9th Cir. 1990) ...................................................... 9

*Eldred v. Ashcroft*, 537 U.S. 186, 219-220 (2003) ......................................................... 13

*Eldred v. Ashcroft*, 537 U.S. 186, 221, 123 S. Ct. 769 (2003) ........................................ 27

*Ford v. Wainright,*
477 U.S. 399, 411 (1986).................................................................. 40

*FTC v. Neovi, Inc,*
604 F.3d 1150 (9ᵗʰ Cir. 2010) ......................................................... 28

*Gilliam v. American Broadcasting Companies, Inc.,*
538 F.2d 14 (2d Cir. 1976) ............................................................... 19

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
471 U.S. 539, 560 (1985)........................................ 14-17,30,32,34,37

*Humane Soc'y. v. Gutierrez,*
558 F.3d 896, 896 (9th Cir.2009) .................................................... 12

*Idaho State University Faculty Ass'n. v. Idaho State University,*
857 F.Supp.2d 1055, 1057 n.1 (D. Id. 2012).................................... 38

*In re Capital Cities/ABC, Inc.,*
918 F.2d 140, 143-144 (11ᵗʰ Cir. 1990).....................................17,19

*Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.,*
75 F. Supp. 2d 1290, 1295 (D. Utah 1999) ...................................... 27

*Inter alia, Stanley v. University of S. Cal.,*
13 F.3d 1313, 1320 (9ᵗʰ Cir. 1984) .................................................. 27

*Jules Jordan Video, Inc. v. 144942 Canada, Inc.,*
617 F.3d 1146 (9ᵗʰ Cir 2010) .......................................................... 21

*Kelly v. Gilbert,*
437 F.Supp. 201, 204 (D. Mont. 1976)............................................. 38

*Lair v. Bullock,*
697 F.3d 1200, 1203 ........................................................................ 11

*L.A. News Serv. v. KCAL-TV Channel 9,*
108 F.3d 1119, 1122 (9ᵗʰ Cir. 1997) ................................................ 34

*L.A. News Serv. v. Reuters Television Int'l.,*
149 F.3d 987, 993 (9ᵗʰ Cir. 1998) .................................................... 34

*Leadsinger, Inc. v. BMG Music Publishing,*
512 F.3d 522, 531 (9ᵗʰ Cir. 2008) .................................................... 36

*Lesley v. Spike TV,*
241 Fed. Appx. 357 (9ᵗʰ Cir. 2007).................................................. 21

*Marvin Worth Productions v. Superior Films Corp.,*
319 F.Supp. 1269 (S.D.N.Y. 1970) .................................................. 20

*Mehrig v. KFC Western, Inc.,*
516 U.S. 479, 484 (1996)................................................................. 28

*Metro-Golwdwyn-Mayer, Inc. v. Showcase Atlanta CoOp.Productions*,
479 F.Supp. 351 (N.D. Ga. 1979)........................................................ 20

*Monge v. Maya Magazines, Inc.*,
688 F.3d 1164, 1173-75, 1181 (9th Cir. 2012)........................... 33,34,36

*Morris v. Young*,
925 F.Supp.2d 1078, 1084 (C.D. Cal. 2013) ..................................... 30

*New Era Publications International, ApS v. Henry Holt & Co.*,
873 F.2d 576, 584 (2d Cir. 1989),
*cert. denied* 493 U.S. 094, 110 S.Ct. 1168,
107 L.Ed.2d 1071 (1990)................................................................... 16

*New York Times Co. v. United States*,
403 U.S. 713, 716 n.*, 91 S.Ct. 2140, 2147 n.**, 29 L.Ed.2d 822
(1971) ................................................................................................. 17

*New York Times Co*,
403 U.S. at 731 n.1 ........................................................................... 26

*Nken v. Holder*,
556 U.S. 418, 427 (2009).................................................................. 12

*Park Village Apartment Tenants Ass'n. v. Mortimer Howard Trust*,
636 F.3d 1150 (9th Cir. 2011) ......................................................... 40

*Perfect 10 v. Google, Inc.*,
416 F. Supp.2d 828, 653 F.3d 976 (9th 2011)............................. 28,29

*Perfect 10 v. Google, Inc.*,
416 F.Supp.2d 828, 837 (C.D. Cal. 2006).................................... 28,29

*Religious Technology Center v. Netcom On-Line Communication
Services, Inc.*,
923 F.Supp. 1231 (N.D. Cal. 1995).................................................. 16

*Ringgold v. Black Entertainment Television, Inc.*,
126 F.3d 70 (2d Cir. 1997) .......................................................... 30,35

*Salinger v. Random House, Inc.*,
811 F.2d 90 (2d Cir. 1987) ............................................................... 19

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
81 F.2d 49, 56 (2d Cir.), cert. denied 298 U.S. 669,
56 S. Ct. 835, 80 L.Ed. 1392 (1936)................................................. 26

*Sony*,
464 U.S. at 451, 104 S.Ct. 774 ....................................................... 34

*Stewart v. Abend*,
495 U.S. 207, 236, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) ........... 30

*Universal City Studios v. Film Ventures International,*
543 F.Supp. 1134 (C.D. Cal. 1982) ............................................. 19,20

*Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.,*
824 F.Supp.2d 1003, 1008 (C.D. Cal. 2011) ..................................... 38

*Winter v. Natural Resources Defense Council, Inc.,*
555 U.S. 7, 19 (2008) ........................................................ 12

*Worldwide Church of God v. Philadelphia Church of God, Inc.,*
227 F.3d 1110, 1115-1116 (9th Cir. 2000) ........................................ 31

## INTRODUCTION AND BACKGROUND

*"Dear the end is near."*

This is just one of the thousands of threats that Cindy Lee Garcia received after her benign performance in what convicted fraudster Nakoula Basseley Nakoula told her was an adventure film, *Desert Warrior*. Instead, unbeknownst to Ms. Garcia, Nakoula used part of her *Desert Warrior* performance and dubbed over another part to give the false impression that she had called the Prophet Mohammed a "child molester" and then inserted it, without her consent or knowledge, into a different film entitled *Innocence of Muslims*. The film was then posted on YouTube, and violent protests broke out around the world.  The anger against Ms. Garcia was particularly intense, because although her appearance in the film was brief, Nakoula made it appear as though she had delivered one of the film's most inflammatory lines.  She became the target of vile, gruesome, and— according to law enforcement and court security personnel —credible threats, of which the following are only a small sample:

> *"I am ready to die for MUHAMMAD (PBUH) and I would Like to Kill all Those Who Contributed in the Shape of Acting or Financially or any other Kind of Support in Shameless Movie."*

\* \* \*

4

*"cindy lee I want to kill you."*

\*    \*    \*

*"if I find u anywhere I will fuck you deep bitch"*

\*    \*    \*

*"the whole world is after you@gonna rape your adopted daughter, what calamity you have brought upon thyself?"*

\*    \*    \*

*"ill kill who ever have hand in insulting my prophet"*

\*    \*    \*

*"Hey u bitch why u make the movie innocence of muslims. Delete this movie otherwise I am the mafia don"*

\*    \*    \*

*"it is my obligation that I tell you abut the true way … now your wish … search on true way … death is near to you"*

\*    \*    \*

*"are u made u r dirty bitch I kill u stop the film otherwise kill u"*

In addition to these "freelance" death threats, Ms. Garcia was immediately made the subject of an Egyptian "fatwa," a religious order of execution. Worse yet, the media disclosed the location of Ms. Garcia's residence when journalists camped outside her home. Soon, not only Ms. Garcia, but also her family members and friends, received numerous threats of death and harm, which continue to the present day. Ms. Garcia was forced to flee her home. She cannot travel without substantial security. She has been escorted through courthouses by armed guards, and her very presence creates such a security risk that she has been banned from La Guardia International

5

Airport.  In short, Ms. Garcia's life has changed in ways that most people cannot imagine, all because a convicted fraudster lied to trick her into appearing in a film that then went "viral" on Google and YouTube's worldwide platforms.

According to renowned Muslim scholar and counterterrorism expert Professor Abou El Fadl, a law professor and chair of the Islamic Studies Program at UCLA, Cindy Lee Garcia's life is forever changed, and the only reason that she is still alive is her public battle to have her performance taken down from YouTube.  According to the head of security at the Los Angeles Superior Court, even Ms. Garcia's lawyers must exercise extreme caution, because the people who have issued the threats to Ms. Garcia, her family, and her associates, "are very patient."  Plaintiff's lead counsel was warned that she and Ms. Garcia are in grave danger; counsel has been advised to inform courthouse security whenever she visits the Los Angeles Superior Court, even on unrelated matters.

After Ms. Garcia learned what had been done to her performance, she begged YouTube and Google (collectively, "Google") to remove the film from YouTube, both because the content of the film violates Google's

official policy against exhibiting hate speech[1] or copyright infringement[2] on

YouTube, and because she never granted Nakoula an express or implied

license to use her performance in his propaganda film.  Prior to filing this

lawsuit, Ms. Garcia sent twelve separate DMCA notices asking for a

takedown of copies of the film that contained her performance.  Google

refused to honor them.  Even after Ms. Garcia explained the nature of her

interest and the terrible danger that she was in, Google turned a deaf ear.

Indeed, for all of Google's professed concern about the "public interest" in

this case, not a single individual representing Google has ever expressed a

word of concern for Ms. Garcia's safety in the face of the many death threats

---

[1]     YouTube users are prohibited from uploading "material that is copyrighted … unlawful, obscene, defamatory, libelous, threatening, pornographic, harassing, hateful, racially or ethnically offensive or encourages conduct that would be considered a criminal offense …"  ER 313.  According to a lawyer for Google, "We encourage free speech and defend everyone's right to express unpopular points of view.  But *we don't permit hate speech*, speech which attacks or demeans a group based on race or ethnic origin [or] *religion*…"  ER 317 (emphasis added).

[2]     Google's own attorneys have testified, in another infringement case, that "Once YouTube receives a notification of alleged infringement that substantially complies with the DMCA's requirements, we act promptly to remove the identified material from our service or disable access to it."  ER 292.  In other words, YouTube failed to follow its own procedure in connection with Garcia's takedown notices. Indeed, it appears that YouTube unapologetically refuses to follow its own procedures when it is inconvenient to do so.  Perhaps this is because since its inception, YouTube's entire advertising-supported business model has been predicated on driving traffic to its site, even when the material contained therein infringes on the copyrights of others.

that she continues to receive solely because Google insists on continuing to exhibit the video. Quite the opposite: Eric Schmidt, Google's chairman responded to requests to remove the video: "We believe the answer to bad speech is more speech … it will stay up." ER 489, 496.

In fact, Google has behaved in a way that is indifferent at best—and contemptuous at worst—notwithstanding the existence of the known and credible threats to Ms. Garcia's life. For example, Google has dehumanized, minimized, and derided Ms. Garcia's performance as, variously, "de minimis," a mere "5 second appearance," and "minuscule," despite the fact that she was made to appear to accuse the Prophet Mohammad of being a child molester.[3]

Fortunately, in spite of Google's attempts to demean Ms. Garcia as a "little person" unworthy of concern, the majority opinion found that Ms.

_____

[3] Google has consistently downplayed the role that its refusal to take down the video has played in endangering Ms. Garcia's safety and indeed, her life. As this Court noted in its opinion reversing the district court:

> It is not irrelevant that the harm Garcia complains of is death or serious bodily harm, which the dissent fails to mention. Death is an 'irremedial and unfathomable' harm, and bodily injury is not far behind. To the extent the irreparable harm injury is at all a close question, we think it best to err on the side of life.

(Opinion at 17 (citation omitted).) Google, on the other hand, has chosen to "err" by posting snide messages on YouTube trivializing Ms. Garcia's appearance in the film, completely ignoring the peril that its actions have caused Ms. Garcia while mocking the Court in the process. Declaration of M. Cris Armenta ("Armenta Decl."), ¶ 2, Ex. A (takedown message).

8

Garcia is likely to succeed on the merits of her copyright claim. Just as significantly, the judges on the panel took Ms. Garcia's situation seriously, and balanced her intellectual property interests and her interest in her life and safety over Google's business interests. It is important to note that the panel's opinion in this matter does not establish any new doctrine of copyright law. Rather, as the panel acknowledged, the reason that this situation presents a somewhat unique case is not because of the law, but because of the facts. The long-established practice of the film industry is to obtain either a work-for-hire agreement or a waiver and assignment of intellectual property rights—but Nakoula completely ignored that practice, despite this Court's prior guidance on the issue.[4] Instead, he committed gross fraud for the purpose of obtaining Ms. Garcia's performance, thus invalidating any implied license that she might otherwise have granted. The Court's order, as amended, is narrowly tailored and recognizes that on these facts, there is a clear likelihood that Ms. Garcia will prevail under the well-established law against copyright infringement.

---

[4] *See Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) ("Common sense tells us that agreements should routinely be put in writing. This simple practice prevents misunderstandings by spelling out the terms of a deal in black and white, forces parties to clarify their thinking and consider problems that could potentially arise, and encourages them to take their promises seriously because it's harder to backtrack on a written contract than on an oral one. Copyright law dovetails nicely with common sense by requiring that a transfer of copyright ownership be in writing.").

In its previous two stay requests,[5] Google trumpeted its purportedly altruistic motive in continuing to exhibit the film: the First Amendment. However, Google overlooks the fact that Ms. Garcia's copyright interests are also constitutionally protected, and that the courts have long acknowledged that there is no First Amendment right to violate copyright. Google is well aware that Ms. Garcia has not mounted a legal challenge to Google's right to express hatred for Islam. Ms. Garcia only complains that her copyright interests cannot be violated in a manner that results in speech that she detests being falsely attributed to her.

Clearly, the panel balanced the risk to Ms. Garcia's life against Google's business interests, and chose Ms. Garcia's life. No harm will befall Google and YouTube if they comply with the order, other than perhaps a loss of ad revenue. The takedown order does not stifle public dialogue: because the takedown order *only* affects those versions of the film that infringe on Ms. Garcia's copyright—i.e., those versions that contain her performance—there is nothing in the order preventing re-posting of the film

---

[5]    The Court's most recent briefing order gives Google a ***fifth*** bite at the apple in this case:  first, in its opposition brief on the merits of the appeal; second, in its emergency stay request just prior to the issuance of the Court's opinion; third, in its *subsequent* emergency stay request just after the issuance of the Court's opinion; fourth, in its soon-to-be-filed petition to have this entire matter reheard *en banc*; and fifth, in its response to the Court's *sua sponte* request; of course, Google also opposed Ms. Garcia's motion for a preliminary injunction in the district court.

in a version that omits Ms. Garcia. Accordingly, the second order protects

Ms. Garcia's copyright interest while also allowing the free reproduction of

the video, albeit without the "5 seconds" of footage that Google casts as

"minuscule" when convenient.

## **ARGUMENT**

### **THE TAKEDOWN ORDER SHOULD BE UPHELD PENDING THIS COURT'S DISPOSITION OF A PETITION FOR REHEARING EN BANC OR A PETITION FOR CERTIORARI**

### A.    **Legal Standard**

This Court has been asked to vote on whether to revisit the order

denying a stay of the takedown order. The legal standard to issue a stay

pending Google's request for an *en banc* hearing of this case is committed to

the Court's sound discretion. *Lair v. Bullock*, 697 F.3d 1200, 1203 ("A stay

is not a matter of right ... it is instead an exercise of judicial discretion ... that

is dependent upon the circumstances of the particular case.") (citations

omitted).[6] Google bears the burden of showing that it is entitled to have that

discretion exercised in its favor. *Id.* ("The party requesting a stay bears the

---

[6]    After conducting a diligent but ultimately fruitless search for binding authority on the appropriate standard of review at this procedural juncture in this Court, Ms. Garcia agrees with Google's observation, contained in its prior Emergency Motion for a Stay, that the law interpreting the standard for stays pending a petition for certiorari is analogous to the instant case. (Google's Second Motion for Stay at 5, n.1.)

11

burden of showing that the circumstances justify an exercise of this Court's discretion.") (citation omitted).  Specifically, Google must demonstrate that it is likely to succeed on the merits, that it will be irreparably injured without a stay, that Ms. Garcia will not be "substantially" injured by a stay, and that the public interest lies in enabling global access to *Innocence of Muslims*.[7]  It is especially unlikely that Google will be able to make such a showing because, according to YouTube's *own* policies, practices and procedures, it routinely pulls content off its platforms that consist of copyright infringement or religious hate speech.  *Innocence of Muslims* happens to be both.

For the reasons set forth below, *passim*, Google cannot meet its burden to show that the circumstances of this case—which, as Google would like the Court to forget, involve threats of death and serious bodily injury to Ms. Garcia—justify the "intrusion into the ordinary processes of administration and judicial review" represented by a stay.  *Nken v. Holder*, 556 U.S. 418, 427 (2009).  Not only is Google unlikely to succeed on the merits, the risk of irreparable and/or substantial injury is borne exclusively

---

[7]     Requests for stays pending appeal are subject to the same analyses as requests for preliminary injunctions. *Humane Soc'y. v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009) (setting forth the requirements for issuance of a stay pending appeal and citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 19 (2008), which addressed the issuance of a preliminary injunction).

by Ms. Garcia, not Google.  Finally, given that it is Ms. Garcia, not Google, who is threatened with "threats of physical harm and even death" (Opinion at 18), and that the First Amendment does not protect copyright infringement (*cf. Eldred v. Ashcroft*, 537 U.S. 186, 219-220 (2003)), public interest considerations weigh decidedly in Ms. Garcia's favor.

**B.    Google Does Not Have a First Amendment Right to Violate Ms. Garcia's Copyright**

In its previous requests for a stay, Google suggested that because the public is (morbidly) interested in *Innocence of Muslims*, the company's right to continue to profit from its exhibition is a constitutional issue.  Should Google continue to advance that argument, it would continue to be wrong.  Neither Google nor the "public" have a First Amendment interest in this copyright dispute, and injunctive relief is entirely appropriate.

It has been established since the earliest days of our country that freedom of expression does not include the right to infringe on the copyrighted works—to wrongfully profit from the creative labor—of other people. U.S. CONST., Art I, Sec. 8, cl. 8 ("To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.").

Lest Google attempt to create any misunderstanding on this issue, the Court should take heed of the Supreme Court's extremely blunt explanation

13

of the intersection of the First Amendment and copyright law: to wit, there is *no* conflict between copyright law and the First Amendment because the Copyright Act *specifically distinguishes* between the expression of ideas (which are not copyrightable and which are protected by the First Amendment) and creative works fixed to a tangible medium (which *are* copyrightable and therefore may not be infringed by third parties, even if they really, really want to do so). *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560 (1985). In that case, the Supreme Court also explicitly observed, "copyright laws are not restrictions on freedom of speech as copyright protects only forms of expression and not the ideas expressed." *Harper & Row*, 471 U.S. at 556, 105 S.Ct. at 2228, citing 1 Nimmer § 1.10[B][2].

To the extent that Google may attempt to argue that Ms. Garcia's copyright deserves less protection because of the public interest in the film, Google is also wrong. The Supreme Court rejected this very argument, in a copyright case involving a fair use defense, as follows:

> It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public. Such a notion ignores the major premise of copyright and injures author and public alike. '[T]o propose that fair use be imposed whenever the 'social value [of dissemination] ... outweighs any detriment to the artist,' would be to propose depriving copyright owners of their right in the

property precisely when they encounter those users who could afford to pay for it.

*Harper & Row*, 471 U.S. at 559, 105 S.Ct. at 2230, citing Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and its Predecessors*, 82 COLUM.L.REV. 1600, 1615 (1982). As one commentator has noted, "If every volume that was in the public interest could be pirated away by a competing publisher, ... the public [soon] would have nothing worth reading." Sobel, *Copyright and the First Amendment: A Gathering Storm?*, 19 ASCAP COPYRIGHT LAW SYMPOSIUM 43, 78 (1971).

## C.    This Court's Order Is Not a "Prior Restraint."

Google has previously attacked the notion of a preliminary injunction in this case on the grounds that it would be an unconstitutional "prior restraint." ER 638-641. This argument, too, is unmeritorious. As an initial matter, Ms. Garcia notes that the availability of a preliminary injunction for copyright infringement is so well established in American law that it is memorialized in the Copyright Act itself. *See* 17 U.S.C. § 502(a) ("Any court having jurisdiction of a civil action arising under [the Copyright Act] may… grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."). Although the inclusion of the preliminary injunctive remedy in the Copyright Act, in and of itself, does not definitively defeat a prior restraint argument, it is

15

worth noting that Section 502(a), as part of the 1976 Copyright Act, was passed against a background of well-established First Amendment law, including the law of fair use and prior restraint, of which Congress was  well aware.  Indeed, in a case that was decided several years prior to the 1976 Act, Justice Brennan noted that copyright cases are inapposite to the issue of prior restraint because copyright cases deal with restraint of the *form* of expression, *not* the ideas expressed.  *See New York Times Co. v. United States*, 403 U.S. 713, 716 n.\*, 91 S.Ct. 2140, 2147 n.\*\*, 29 L.Ed.2d 822 (1971) (Brennan, J., concurring); *see also Dr. Seuss Enterprises, L.P. v. Penguin Books, USA, Inc.*, 924 F.Supp. 1559, 1575 (S.D. Cal. 1996) ("The Supreme Court has shown no receptivity to First Amendment arguments in the copyright context; to the contrary, it has noted that 'the Framers intended copyright itself to be the engine of free expression' by supplying 'the economic incentive to create and disseminate ideas.'"), citing *Harper & Row*, 471 U.S. at 558, 105 S.Ct. at 2229.

In addition to the statutory authorization of preliminary injunctions in cases such as this one, the case law has rejected the "prior restraint" argument on multiple occasions.  The case of *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 923 F.Supp. 1231 (N.D. Cal. 1995), is instructive here.  In that case, associates of the controversial

16

Church of Scientology filed a copyright infringement action against an

individual who had posted materials, in which the Church held a copyright,

on the Internet.  The plaintiff's requested a preliminary injunction, and the

defendant argued, among other things, that a preliminary injunction would

act as a prior restraint on his right to free speech.  The court decisively

rejected that argument and issued a preliminary injunction:

> The Supreme Court has recognized that the Copyright Act itself
> embodies a balance between the rights of copyright holders,
> guaranteed by the Constitution, U.S. Const. art. I, § 8, and the
> protections of the First Amendment. *See Harper & Row*, 471
> U.S. at 557-60, 105 S.Ct. at 2229-30; *In re Capital Cities/ABC,
> Inc.*, 918 F.2d 140, 143-44 (11th Cir. 1990). The doctrine of fair
> use already considers First Amendment concerns. *New Era
> Publications International, ApS v. Henry Holt & Co.*, 873 F.2d
> 576, 584 (2d Cir. 1989), *cert. denied* 493 U.S. 094, 110 S.Ct.
> 1168, 107 L.Ed.2d 1071 (1990) (rejecting defendant's argument
> that First Amendment concerns precluded granting an
> injunction, though finding other equitable considerations
> dictated denial of injunctive relief). Because [the defendant] is
> able to continue to criticize the Church and use its published
> and unpublished works to the extent allowed by the doctrine of
> fair use and because the injunctive relief sought is no broader
> than necessary to protect plaintiffs' copyrights, [the
> defendant's] First Amendment interests have been adequately
> considered.

The same is true in this case.  As noted above, Ms. Garcia has never

advanced the argument that Google or anybody else should not be permitted

to criticize Islam or to comment on this controversy.  Nor has Google ever

advanced a "fair use" defense.[8]  Moreover, the Court's order makes it

perfectly clear that Google may criticize Islam and/or comment on the film,

and that it may host content on its platforms that contains such criticism and

comment.  The Court even *narrowed* its original order *sua sponte* to make it

perfectly clear that the *only* thing that the order prevents Google from doing

is violating Ms. Garcia's copyright.  Because the order is narrowly drawn to

cover *only* those postings of the film that constitute copyright infringement,

it does not fall afoul of the prior restraint doctrine.  *See also A&M Records,*

*Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001) (rejecting First

Amendment challenge to preliminary injunction against copyright infringer

on the grounds that "First Amendment concerns in copyright are allayed by

the presence of the fair use doctrine... Users of copyrighted material that are

not fair uses are rightfully enjoined.") (citations omitted); *Dr. Seuss*

*Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997)

(preliminary injunction of parody that was "likely" to infringe copyright in

children's books was not prior restraint; court characterized defendant's

prior restraint argument as a "last resort").

Finally, this Court is requested to note that Eleventh Circuit has also

considered and rejected the proposition that a preliminary injunction against

---

[8] Because Ms. Garcia anticipates that Google may make such an argument
during this round of briefing, she preemptively addresses the issue.

copyright infringement represents an unlawful prior restraint.[9]  *See, e.g., In re Capital Cities/ABC, Inc.*, 918 F.2d 140, 143-144 (11th Cir. 1990).  In *Capitol Cities/ABC, Inc.*, the defendant argued that a preliminary injunction against the broadcast of a "made-for-TV" movie that infringed plaintiff's copyright would constitute a prior restraint.  The Eleventh Circuit rejected this argument for two reasons.  First, it noted that "the Copyright Act clearly contemplates injunctive relief to 'prevent' infringement," and cited a slew of cases from various jurisdictions in which the federal courts have issued preliminary injunctions to prevent infringement. 918 F.2d at 143, 143 n.9, citing *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987) (directing district court to preliminarily enjoin biography of author J.D. Salinger that contained unauthorized copies of Salinger's protected expression), *supplemented by* 818 F.2d 252 (2d Cir. 1987); *Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14 (2d Cir. 1976) (directing district court to preliminarily enjoin broadcast of *Monty Python* television program that, as in this case, distorted the copyright holder's performance); *Universal City Studios v. Film Ventures International*, 543 F.Supp. 1134 (C.D. Cal. 1982) (issuing preliminary injunction against film *Great White*, which court

---

[9]     Indeed, there appears to be no federal circuit court that has held that a preliminary injunction in a copyright case *ipso facto* constitutes a prior restraint.

found substantially similar to copyrighted film *Jaws*); *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-Op. Productions*, 479 F.Supp. 351 (N.D. Ga. 1979) (enjoining performance of musical production similar to *Gone With the Wind*); *Douglas International Corp. v. Baker*, 335 F.Supp. 282 (S.D.N.Y. 1971) (enjoining production of stage play concerning the life of Lenny Bruce); *Marvin Worth Productions v. Superior Films Corp.*, 319 F.Supp. 1269 (S.D.N.Y. 1970) (enjoining exhibition of biographical film about Lenny Bruce that infringed copyrighted materials). Second, the Eleventh Circuit noted that an order allowing the infringer to express the content of an infringed work (i.e., its *ideas*) in an alternative fashion that "does not infringe the copyrighted owner's protected manner of expression" would be suitably limited so as to not constitute an unlawful prior restraint. Of course, that is exactly what happened here: the Court, after thoughtful consideration both of the merits of the case and, apparently, the language of its initial order, narrowed the injunction against Google so that Google would *only be enjoined against infringing Ms. Garcia's copyright*. Google's right to broadcast any other material it likes related to, consisting of, or endorsing the ideas contained in *Innocence of Muslims* is unrestricted.

**D.    Because Ms. Garcia is Likely to Prevail on the Merits, The Takedown Order is Appropriate, In Light of All the Circumstances**

1.    <u>Ms. Garcia has a protectable copyright interest in her dramatic performance.</u>

Under the Copyright Act, dramatic works are copyrighted once they are affixed to a tangible medium of expression.  17 U.S.C. § 101, 102(a). Google claims that "an acting performance" is not among the list of copyrightable works.  However, this Circuit has already acknowledged that a performer has a copyright interest in his or her contribution contained within a copyrightable medium. *See Jules Jordan Video, Inc. v. 144942 Canada, Inc.,* 617 F.3d 1146 (9th Cir. 2010) ("we think it is clear that federal copyright law preempts a claim alleging misappropriation of one's voice when the entirety of the allegedly misappropriated vocal performance is contained within a copyrighted medium"); *Lesley v. Spike TV*, 241 Fed. Appx. 357 (9th Cir. 2007) (acting performance copyrightable if it was created by author and if it "possesses at least some minimal degree of creativity"). Ms. Garcia's performance easily meets this requirement, and more.  As the Court concluded in its opinion in this case, an actor must "live his part inwardly, and then … give to his experience and external embodiment …that embodiment includes body language, facial expression and reactions to other actors and elements of a scene."  Opinion at 8 (citation omitted).

21

Not only did Ms. Garcia "live" her part and deliver facial expressions, intonation and vehemence in the anger that she portrayed in the role of a mother protecting her daughter from an inappropriate marriage, but she even changed the lines of the script, thus rendering her performance an even greater expression of her own creativity. According to the *Desert Warrior* script, which Ms. Garcia attached to her Complaint, *see* ER 25, she was to deliver the following lines: "Are you crazy?  Is your George crazy?  Your daughter has not yet reached her 13th year yet.  George must be fifty-five years old by now!"  However, in the video—which is also part of the record at ER 491—Ms. Garcia delivers a different version of the line, one that she crafted, which states, "Our daughter is but a child, and he is fifty-five years old!"[10]

The dissent view was that Ms. Garcia cannot be an "author" for purposes of the copyright law because as an actor, she read lines written by others and therefore, did not engage in an act of creation.  Opinion at 25.  Respectfully, however, Ms. Garcia believes that the dissent did not view nor address the manner of her performance nor the creative changes that she made to the script itself. *See* Opinion at 25.

---

[10] This portion of Ms. Garcia's performance was not overdubbed.  *See* ER 491.

Even the United States Patent and Trademark Office has taken the official position that "Under U.S. law, actors and musicians are considered to be 'authors' of their performances[,] providing them with copyright rights."  United States Patent and Trademark Office (USPTO), "Background and Summary of The 2012 WIPO Audiovisual Performances Treaty," June 2012, available at http://www.uspto.gov/news/WIPO_AVP_TREATY_FACT_SHEET.pdf.  Ms. Garcia respectfully suggests that the dissent's reasoning is not persuasive and overlooks the key differences between the script (the creation of the purported filmmaker) and the performance that she actually delivered.  According to the annotations to the Copyright Act, the list set forth in Section 102 as to what types of works are "copyrightable" (e.g., literary works, works of pantomime, and so on) are illustrative in nature.  17 U.S.C.A. § 102 Ann. (Notes of Comm. On the Judiciary, House Report No. 94-1476) (also noting that "The copyrightable elements in a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performances are captured and on the part of the recording producer for setting it up."). In other words, when it passed the Copyright Act, Congress *specifically* contemplated that both the performer[11] and the producer would be "authors" under the Act:

_____

[11]     Who can dispute that actors infuse their creativity into their gestures

23

> The second sentence of section 102 [this section] lists seven broad categories that the concept of "works of authorship" is said to "include." *Id.* "The use of the word "include," as defined in section 101 [section 101 of this title], makes clear that the listing is "illustrative and not limitative," and that the seven categories do not necessarily exhaust the scope of "original works of authorship" that the bill is intended to protect. Rather, the list sets out the general area of copyrightable subject matter, but with sufficient flexibility to free the courts from rigid or outmoded concepts of the scope of particular categories. The items are also overlapping in the sense that a work falling within one class may encompass works coming within some or all of the other categories. In the aggregate, the list covers all classes of works now specified in section 5 of title 17 [former section 5 of this title]; in addition, it specifically enumerates "pantomimes and choreographic works.

*Id.* Even if the dissent's view was correct and a dramatic performance that

consists of reciting lines written by another is not protected under the

Copyright Act, the record in this case shows that Ms. Garcia's performance

was more than a rote line reading. As noted above, the record has been clear

---

and line deliveries, such as Jack Nicholson with his signature eyebrow-lifting smile, or former Gov. Arnold Schwarzenegger with his announcement that "I'll be back" in *Terminator,* or Clark Gable with his dismissal of Vivian Leigh ("Frankly, my dear, I don't give a damn") at the end of *Gone With the Wind*? It is not the duration of an actor's performance that defines "authorship." The legislative history of the Copyright Act unequivocally demonstrates the performer *is* an author—the next questions become whether the performance was a "work for hire," whether the performer was an employee and whether a sufficient license existed to transfer the rights to the performance. In this factually extraordinary case, none of the questions can be answered in the affirmative. This is not a case of a bit actor or an extra objecting to editing or inclusion in a anticipated project, and it will not result in the "parade of horribles" that Google claims. The reason for this is because the vast majority of filmmakers have long used standardized contracts providing for the transfer of performers' rights. There is nothing untoward or offensive to the Copyright Act or the First Amendment about protecting the reasonable expectations of the performer in this extraordinary situation.

since the outset of this case: although Ms. Garcia was given a script with lines that she was to deliver, her actual performance (which, the Court is reminded, is not the same as the mutilated version that Google is currently exhibiting) demonstrates that Ms. Garcia in fact did exercise creative control by rewriting her lines. Accordingly, even if the dissenting opinion's more narrow view of the categories of copyrightable works is correct, in this case Ms. Garcia's creative contribution renders her work clearly protectable.

> **2.** **The length of time that Ms. Garcia appeared in the film is irrelevant to the legal issue of her copyright interest.**

Since the issuance of the Court's order, Google has chosen to ridicule Ms. Garcia in its YouTube blocking notices as a mere actress with a "5-second appearance." As noted in the introductory section of this brief, Ms. Garcia's appearance in the video is highly relevant because, first of all, her short appearance is the most inflammatory in the film and as Professor El Fadl declared, "goes to the very heart" of the incendiary film as a whole. ER 251. Certainly, the individuals who threatened to gruesomely rape and murder Ms. Garcia and her daughter did not consider Ms. Garcia to be less culpable due to her relatively short amount of screen time.

Nor does the law condone infringement where, as here, the infringing portion within a larger work is relatively small. "A taking [of another's intellectual property] may not be excused merely because it is insubstantial

25

with respect to the infringing work. As Judge Learned Hand cogently remarked, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.), *cert. denied* 298 U.S. 669, 56 S. Ct. 835, 80 L.Ed. 1392 (1936).

Any suggestion that an injunction was improper, or that the panel overstepped by ordering an immediate takedown because this matter involves copyright, should similarly be rejected. The annals of American law are replete with cases in which the courts have affirmed that media outlets may properly be enjoined from infringing the copyright of others. *See, e.g., New York Times Co*, 403 U.S. at 731 n.1 (White, J. and Stewart, J., concurring) (asserting that "no one denies" that injunctive relief is appropriate to prevent newspapers from violating copyright); *see also Arista Records, Inc. v. Flea World, Inc*., 356 F. Supp. 2d 411, 422 (D.N.J. 2005) (refusing to allow defendant to argue that a copyright owner's enforcement actions had a "chilling effect" on its First Amendment rights, because "the First Amendment is generally a protection of free speech against intrusion by the government, not as among and between private parties"). Injunctive relief in this or any other copyright case works no infringement at all on the right of speakers to convey *their own* ideas to others, provided that they do

not "borrow" somebody else's original performance to do so, as Nakoula and Google did here. *See, e.g., Eldred v. Ashcroft,* 537 U.S. at 221, 123 S.Ct. 769 (2003) ("The First Amendment securely protects the freedom to make—or decline to make—one's own speech; it bears less heavily when speakers assert the right to make other people's speeches."); *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979) ("The First Amendment is not a license to trammel on legally recognized rights in intellectual property."); *Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.,* 75 F. Supp. 2d 1290, 1295 (D. Utah 1999) ("[T]he First Amendment does not give defendants the right to infringe on legally recognized rights under the copyright law.").

3.     <u>The majority applied the appropriate standard for issuance of a prohibitory preliminary injunction (and thus, for denial of a stay).</u>

Ms. Garcia anticipates that Google will anchor itself to the dissenting opinion in this case and argue that in deciding to issue the preliminary injunction (and subsequently, to deny a stay of its order), the Court should have applied the "particularly disfavored" standard that applies to "mandatory" preliminary injunctions. *See* Opinion at 19-21, citing, *inter alia*, *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1984). If Google adopts this approach, it will be wrong: under the settled law of this

27

circuit, the Court's narrowly tailored relief constituted a *prohibitory* injunction, not a mandatory one. *See, e.g., Mehrig v. KFC Western, Inc.,* 516 U.S. 479, 484 (1996) (noting that a prohibitory injunction merely "restrained" a party from further illegal conduct, where mandatory injunction, in toxic clean-up context, required cleanup of prior toxic waste); *see* BLACK'S LAW DICTIONARY 855 (9th ed.2009) (defining "prohibitory injunction" as an injunction that "forbids or restrains an act," and "mandatory injunction" as an injunction that "orders an affirmative act or mandates a specified course of conduct"), cited with approval in *FTC v. Neovi, Inc.,* 604 F.3d 1150 (9th Cir. 2010). Here, the nature of the Court's current order clearly reveals it is prohibitive in nature—it merely restrains Google from engaging in any further infringing conduct. *See, e.g., Perfect 10 v. Google, Inc.,* 416 F. Supp.2d 828 (C.D. Cal. 2006) (despite Google's attempt to characterize copyright infringement injunction as mandatory, court held that it was prohibitory, because it would require Google to cease its allegedly infringing activities, and any active steps Google might have to undertake to comply would merely be the means of discontinuing such activities.), *rev'd on other grounds* 653 F.3d 976 (9th Cir. 2011). As an initial matter, Ms. Garcia notes that the *Stanley* case, upon which the dissent relied, is not a copyright-infringement case. It was an Equal Pay Act case in

which the plaintiff had requested a preliminary injunction to force the University of Southern California to install her as head women's basketball coach, at a salary of $28,000 per year more than she had previously received in that position.

The fact that this case involves preliminary relief for copyright infringement, not for employment discrimination, is an important distinction, and it is a distinction of which Google is undoubtedly aware. In the case of *Perfect 10 v. Google, Inc.*, 416 F.Supp.2d at 837, the Central District of California held that an injunction that ordered Google to cease "allegedly infringing activities" would be "essentially prohibitory in nature … Whatever active steps Google might have to undertake would merely be the means of discontinuing acts of infringement."[12]  Similarly, in this case, the Court only ordered Google to cease and desist from further conduct that consisted of infringing activity.  Google wishes to view the order as mandatory because Google is essentially a massive automated machine—but copyright law is flexible enough to adapt to current technology.  If Google

---

[12]      Although *Perfect 10* was later reversed on the grounds that the plaintiff in that case had not shown a causal link between the infringement of its copyright and any irreparable harm that it might have suffered, the Central District's holding on the prohibitory nature of an injunction for preliminary relief from copyright infringement was not disturbed.  653 F.3d 976 (9th Cir. 2011).

was infringing by showing the film in a new theatre every night to a live

audience, it could not characterize the injunction as mandatory.   The same

result applies here.

> 4.   Google's unauthorized use of Ms. Garcia's dramatic
>      performance is not a "fair use."

Ms. Garcia anticipates that Google may attempt to argue that due to

the public interest that has been excited by *Innocence of Muslims*, its

continued exhibition of Ms. Garcia's performance is "fair use."[13]  It is not.[14]

The purpose of the fair use doctrine, which the Supreme Court has

characterized as an "equitable rule of reason," *see Harper & Row*, 471 U.S.

at 560, 105 S.Ct. 2218 (citations omitted), is to prevent courts from rigidly

applying the copyright laws in a way that would "stifle the creativity which

that law is designed to foster."  *Campbell v. Acuff-Rose Music, Inc.*, 510

U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting *Stewart v.

Abend*, 495 U.S. 207, 236, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990)).  The

---

[13]   By claiming that Ms. Garcia's performance is minuscule or de minimis, Google appears to implicate a fair use defense.  *Cf. Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997) ("*de minimis* might be considered relevant to the defense of fair use").

[14]   Ms. Garcia notes that fair use is an affirmative defense on which Google bears the burden of proof.  *See, e.g., Morris v. Young*, 925 F.Supp.2d 1078, 1084 (C.D. Cal. 2013) (characterizing fair use as an affirmative defense on which the defendant bears the burden of proof).  Because Google has not yet filed an answer to the Complaint in this matter, it is not yet clear whether Google intends to assert a fair use defense.

fair use doctrine does *not* work to force speech by copyright holders, such as Ms. Garcia, who may prefer not to distribute their works. *See Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1115-1116 (9th Cir. 2000) (copyright owner's withdrawal of copyrighted book from distribution did not give rise to free speech considerations supporting alleged infringer's claim of fair use, because case did not involve abuse of the copyright owner's monopoly as an instrument to suppress facts, and owner had right not to distribute book during term of copyright).

In addition to the law of the Ninth Circuit disallowing abuse of the "fair use" doctrine to force unwilling copyright holders to "speak," the fair use doctrine does not apply here for another reason: the characterization of "fair use" as an equitable doctrine does not render it so elastic as to encompass Google's purely proprietary use of and interest in Ms. Garcia's performance. Under the Copyright Act, "fair use" protects *only* those infringing uses made for "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research[.]" 17 U.S.C. § 107. There is nothing in the court record in this case that would indicate that Google or any primary infringer posted Ms. Garcia's performance for any of the purposes listed in section 107. Google's only true interest in posting Ms. Garcia's performance is to

31

make money from advertising revenue.  Google has never argued that its

mere posting of the trailer, with no accompanying critique or analysis, is the

type of creative act that the fair use doctrine typically protects.

Even if Google could show that simply postings of the performance,

copies that do not include any additional creative efforts, somehow

constituted "news reporting,"[15] it still could not show fair use, because the

YouTube postings do not meet the statutory standard.  That standard is as

follows:

> In determining whether the use made of a work in any
> particular case is a fair use the factors to be considered shall
> include—
>
> (1) the purpose and character of the use, including whether such
> use is of a commercial nature or is for nonprofit educational
> purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation
> to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value
> of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding
> of fair use if such finding is made upon consideration of all the
> above factors.

---

[15] *See Harper & Row,* 471 U.S. at 557, 105 S.Ct. 2218  (the promise of
copyright would be an empty one if it could be avoided merely by dubbing
the infringement a fair use "news report" of the work).

17 U.S.C. § 107. The recent case of *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012), in which this Court held that mere publication of photos that were "tantalizing and even newsworthy" for commercial purposes did not constitute fair use, provides a noteworthy explanation of the relevant statutory factors, along with certain "judicially-created consideration[s]."

With respect to the first factor, "purpose and character of the use," the *Monge* court held that news reporting "is not sufficient itself to sustain a per se finding of fair use." 688 F.3d at 1173.[16] To the extent that Google simply relies on the "reporting" factor of the Copyright Act, then, that alone cannot

---

[16]    *The 1961 Report of the Register of Copyrights on General Revision of the U.S. Copyright Law* cites examples of activities that courts have regarded as fair use:

> quotation of excerpts in a review or criticism for purposes of illustration of commentary; quotation of short passages in a scholarly or technical work for illustration or clarification of the author's observations; use in a parody of some of the content of the work parodied; summary of an address or article, with brief quotations, in a news report; reproduction by a library of a portion of a work to replace part of a damaged copy; reproduction by a teacher or student of a small part of a work to illustrate a lesson; reproduction of a work in legislative or judicial proceedings or reports' incidental and fortuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported.

*Innocence of Muslims* is none of these things; and Google can hardly argue that it has not commercially exploited its own sites and the increased traffic to its platforms that has resulted from its hosting of *Innocence of Muslims*.

justify a fair use finding. On the related issue of the "judicially-created consideration" of whether a report is "transformative," the court noted that "mere rebroadcast [is] not in itself transformative." *Id.* at 1174, citing *L.A. News Serv. v. Reuters Television Int'l.*, 149 F.3d 987, 993 (9th Cir. 1998); *L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997). That, of course, is exactly what Google did in this case: it merely rebroadcast the film. There is nothing about the postings of *Innocence of Muslims* that constitute any "comment[] on [Ms. Garcia's] work." *Monge*, 688 F.3d at 1175. Instead, it was a purely commercial venture, which the Supreme Court has held is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright" and that "tends to weigh against a finding of fair use." *Id.* at 1176, citing *Sony*, 464 U.S. at 451, 104 S.Ct. 774; and *Harper & Row*, 471 U.S. at 562, 105 S.Ct. 2218. Accordingly, the postings do not qualify for fair use protection as a news report.

With respect to the second factor, the "nature of the copyrighted work," the court looks to whether the copyright work is creative and whether or not it has been published. *Monge*, 688 F.3d 1164. Here, because—as explained in the panel's opinion—Ms. Garcia imbued her performance with the substantial creativity required to "live" a character, her work was indeed

creative. Moreover, as set forth above, Ms. Garcia contributed additional creativity to her performance when she rewrote certain portions of her dialogue and delivered those lines rather than the ones that were in the script provided to her. In addition, it is undisputed that Ms. Garcia's work was "published"—it was affixed to the medium of film. Accordingly, the second factor weighs against fair use.

The third factor is the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." This factor, too, weighs in Ms. Garcia's favor. In a case from the Second Circuit that is notable for holding that a much less consequential infringement than that involved in this case was not *de minimis*, the court determined that the use of a copyrighted *poster* for a total of 27 seconds in the background of the TV show *Roc* was *not* de minimis. The court held that poster was clearly visible and recognizable with sufficient observable detail for the "average lay observer" to view the artist's imagery and colorful style. *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997) ("The legal maxim '*de minimis non curat lex*' (sometimes rendered, 'the law does not concern itself with trifles') insulates from liability those who cause insignificant violations of the rights of others."). Because Ms. Garcia's performance, although it was brief, goes to "the very heart of" the incendiary

35

message in *Innocence of Muslims*, the use of her performance is hardly insignificant.  Her performance is readily identifiable, given that media camped out in front of her house after the video went "viral."  And, one needs only look to the *effects* that her performance has had—forcing her to go into hiding, to move, and to be subjected to gruesome threats and a fatwa for her execution—to see that the relationship between her appearance in the film and the film as a whole is substantial indeed.

Finally, the Court should look to the effect of the use on the potential market for Ms. Garcia's work.  In the Ninth Circuit, the likelihood of market harm may be "presumed" when the intended use is, as in this case, for commercial gain, although that presumption is not rigidly applied in every case. *See Leadsinger, Inc. v. BMG Music Publishing*, 512 F.3d 522, 531 (9th Cir. 2008) (so holding), *cited in Monge*, 688 F.3d at 1181 (determining market harm "in the first instance" on the grounds that the Supreme Court has admonished against presumptions related to the fourth fair use factor).  Undoubtedly Google will argue that there is no market effect in this case, because Ms. Garcia is a new and obscure actress.  However, market effect is not measured by the fame of the copyright holder.  Rather, the Supreme Court has held that the market impact factor implicates the author's right to decide "whether and in what form to release his work." *Id.* at 1182, citing

36

*Harper & Row*, 471 U.S. at 553, 105 S.Ct. 2218. As the *Monge* court noted, there is no telling what the future may bring. In that case, the court reasoned that the copyright holders might later change their minds about selling the photographs at the heart of that case, which were unauthorized photographs of their wedding. In this case, Ms. Garcia's notoriety may well create a market for her performance that might not have existed before. Either way, it is up to Ms. Garcia—not Google—to make the decision about whether or not to exploit her performance, at least during the term of her copyright. Accordingly, the "effect on the market" factor does not weigh in Google's favor.

>   5.   <u>It was entirely proper for the Court to issue a preliminary injunction where, as here, Ms. Garcia showed a "likelihood" of success: a conclusive finding of liability is neither required nor appropriate.</u>

Google has suggested, in its two earlier motions for a stay of the Court's order, that a preliminary injunction is improper because the Court did not hold that Ms. Garcia is *certain* to win her case. Specifically, Google argued that this case is "doubtful"—and therefore that injunctive relief is inappropriate—because the Court's opinion contained the term "fairly

37

Case: 12-57302    03/12/2014    ID: 9013384    DktEntry: 49    Page: 43 of 47

debatable."[17]

As an initial matter, Ms. Garcia notes that because this case came before the Court on the denial of a *preliminary* injunction, there is nothing inappropriate about acknowledging the possibility that Ms. Garcia may not ultimately prevail. *Certainty of success* is not the standard for issuance of a preliminary injunction: the standard is whether a copyright plaintiff makes a clear showing, *see Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.*, 824 F.Supp.2d 1003, 1008 (C.D. Cal. 2011), of a *likelihood* of success. *See, e.g., Idaho State University Faculty Ass'n. v. Idaho State University*, 857 F.Supp.2d 1055, 1057 n.1 (D. Id. 2012) (in case involving challenge to email restrictions, holding that preliminary injunctions are issued on a showing of "likelihood" of success; there is no final resolution at the preliminary injunction stage); *Kelly v. Gilbert*, 437 F.Supp. 201, 204 (D. Mont. 1976) (in case involving challenge to compelled appearance before grand jury, holding that "it is not necessary to show the absolute certainty of success for issuance of the preliminary injunction."). Indeed, not only would it have been inappropriate for the panel to "raise the bar" with respect to the legal standard (which is what Google seems to request), but given that the

---

[17]   Although Google repeats this phrase *seven times* in its brief (Google's Second Emergency Motion for Stay at 1, 4, 7, 10), in fact, the Court's opinion only uses it once.

appellate court does not play the role of a factfinder, it would have been inappropriate for the Court to have opined with certainty as to the ultimate disposition of this case by the district court.

At any rate, the Court should be aware that Google's characterization of the panel's opinion as being somehow equivocal on the likelihood of success issue, which is based entirely on the appearance of the two-word phrase "fairly debatable" once in the 18-page opinion, is misleading at best. According to Google, the appearance of those two words (in an opinion of more than 18 pages) shows that the facts and the law are not really in Ms. Garcia's favor and indeed, that those two little words render her *entire case* "doubtful." (Google's Second Motion for Emergency Stay at 7.) What Google does not fairly discuss, however, is the context of the supposedly dispositive phrase. Here is what the Court actually said:

> We need not and do not decide whether every actor has a copyright in his performance within a movie. It suffices for now to hold that, while the matter is fairly debatable, Garcia is likely to prevail.

(Opinion at 10.) When one reads the *entire sentence*, along with the preceding sentence, it becomes clear that the Court was saying that "whether *every actor* has a copyright in his performance within a movie" is "fairly debatable," but that in *this* case—which is the only one being litigated

39

today—the likely outcome is clear.[18]  Accordingly, *Park Village Apartment Tenants Ass'n. v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011), the case that Google has previously cited for the proposition that any uncertainty as to a case's ultimate outcome bars the issuance of a preliminary injunction, is inapplicable.[19]

## CONCLUSION

Based on the foregoing, Appellant respectfully requests that this Court DECLINE to rehear *en banc* the Court's order of February 28, 2014, denying a stay of the Court's prior orders, as amended, directing Google and

---

[18]     Ms. Garcia notes that Google has misunderstood the standard of review that the Court was required to apply in reviewing the district court's ruling.  In its second stay motion, Google argued that because the Court uttered the words "fairly debatable" (an argument that itself is founded on a reading comprehension failure), it was prohibited from overturning the district court, because the proper standard of review was "abuse of discretion".  (Google's Second Motion for Stay at 7.)  Google cites no authority for this proposition, but that is of no matter.  Not only is Google wrong for having misread the Court's opinion, it is wrong about the standard of review that bound the panel, which with respect to questions of law, was actually a *de novo* standard.  *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 091, 1096 (9th Cir. 2002) (*cited in* Opinion at 5.)

[19]     *Park Village* is a case that is factually very different than this one.  In *Park Village*, unlike here, the plaintiffs "have not made *any* showing that they are likely to be harmed" by the defendants' conduct. 636 F.3d at 1160-61.  Google, along with the rest of the world, knows full well that that is not the case.  In the words of the Court, "death is an irremediable and unfathomable harm, and bodily injury is not far behind." (Opinion at 17, citing *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).)

YouTube to remove immediately all or part of the film entitled *Innocence of Muslims* from its platforms worldwide and to prevent further uploads.

Dated: March 12, 2014                    Respectfully submitted,


___/s/ M. Cris Armenta_____
M.  Cris Armenta

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(B) and (C) of the Federal Rules of Civil Procedure, the undersigned hereby certifies that the foregoing brief, including this certificate, contains no more than 8078 words.

Dated: March 12, 2014                    Respectfully submitted,


___/s/ M. Cris Armenta_____
M. Cris Armenta
Attorney for Petitioner
Cindy Lee Garcia