No. 12-57302

IN THE

# United States Court of Appeals
# for the Ninth Circuit

CINDY LEE GARCIA,

Plaintiff-Appellant,

v.

GOOGLE INC. AND YOUTUBE, LLC,

Defendants-Appellees,

On Appeal from the United States District Court
for the Central District of California, CV-12-8315-MWF (VBKx)
District Judge Michael W. Fitzgerald

## GOOGLE INC. AND YOUTUBE, LLC'S BRIEF IN RESPONSE TO SUGGESTION OF REHEARING EN BANC

TIMOTHY L. ALGER
SUNITA BALI
PERKINS COIE LLP
1305 Porter Drive
Palo Alto, California 94306
(650) 838-4334
TAlger@perkinscoie.com
Sbali@perkinscoie.com

March 12, 2014

NEAL KUMAR KATYAL
CHRISTOPHER T. HANDMAN
DOMINIC F. PERELLA
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Defendants-Appellees
Google Inc. and YouTube, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................4

REASONS WHY REHEARING EN BANC SHOULD BE GRANTED .............12

I.    THE PANEL'S DENIAL OF A STAY IMPLICATES
QUESTIONS OF EXCEPTIONAL IMPORTANCE THAT
SHOULD BE CONSIDERED BY THE EN BANC COURT .....................12

II.    THE PANEL SHOULD HAVE GRANTED A STAY PENDING
DISPOSITION OF GOOGLE AND YOUTUBE'S
REHEARING PETITION ...........................................................13

    A.    Google And YouTube Are Likely To Prevail On
Rehearing En Banc Because The Panel Broke With
Precedent When It Entered A Mandatory Injunction
Gagging Speech.................................................................14

    B.    Google And YouTube Are Likely To Prevail On
Rehearing En Banc Because The Panel's Copyright
Analysis Went Astray And Created Unworkable Rules ....................21

        1.    The Copyright Office Disagrees With The Panel
Majority On The Merits, And Its Position Is Entitled
To Significant Weight................................................21

        2.    Garcia Owns No Copyright .....................................23

            a.    Garcia's performance is not a separately
copyrightable "work" .....................................23

            b.    Garcia is not an "author" ...............................28

            c.    Even if Garcia were an author, she would at
most be a *joint* author .....................................32

        3.    Garcia Granted Youssef An Implied License .........................33

i

**TABLE OF CONTENTS—Continued**

<u>Page</u>

4.    The Majority's Opinion Is Unworkable....................................35

C.    Google, YouTube, And The Public Interest Will Be Irreparably Harmed Unless The Panel's Injunction Is Stayed .................................................................................38

D.    Garcia Will Not Be Harmed By A Stay ...............................................40

CONCLUSION ........................................................................................43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page

CASES:

*Aalmuhammed* v. *Lee*,
  202 F.3d 1227 (9th Cir. 2000) ...................................................28, 29

*Asset Marketing Sys., Inc.* v. *Gagnon*,
  542 F.3d 748 (9th Cir. 2008) ...........................................................33

*Board of Educ., Island Trees Union Free Sch. Dist. No. 26* v. *Pico*,
  457 U.S. 853 (1982)..........................................................................39

*Blue Chip Stamps* v. *Manor Drug Stores*,
  421 U.S. 723 (1975)..........................................................................35

*Burrow-Giles Lithographic Co.* v. *Sarony*,
  111 U.S. 53 (1883).............................................................................28

*City of San Diego* v. *Roe*,
  543 U.S. 77 (2004) ............................................................................39

*Cole* v. *Oroville Union High Sch. Dist.*,
  228 F.3d 1092 (9th Cir. 2000) ..........................................................19

*Community for Creative Non-Violence* v. *Reid*,
  490 U.S. 730 (1989)..........................................................................30

*Connick* v. *Myers,*
  461 U.S. 138 (1983)..........................................................................39

*Earth Island Inst.* v. *Carlton*,
  626 F.3d 462 (9th Cir. 2010) ............................................................20

*Effects Assoc. Inc.* v. *Cohen*,
  908 F.2d 555 (9th Cir. 1990) ............................................................33

*Eldred* v. *Ashcroft*,
  537 U.S. 186 (2003)..........................................................................18

*Elrod* v. *Burns*,
  427 U.S. 347 (1976)..........................................................................38

# TABLE OF AUTHORITIES—Continued

Page

*Farris* v. *Seabrook*,
　　677 F.3d 858 (9th Cir. 2012) ...................................................19

*Flexible Lifeline Sys., Inc.* v. *Precision Lift, Inc.*,
　　654 F.3d 989 (9th Cir. 2011) ...............................................17, 32, 38

*Kyjen Co., Inc.* v. *Vo-Toys, Inc.*,
　　223 F. Supp. 2d 1065 (C.D. Cal. 2002) .......................................29, 30

*Lair* v. *Bullock*,
　　697 F.3d 1200 (9th Cir. 2012) ...............................................40

*Lakedreams* v. *Taylor*,
　　932 F.2d 1103 (5th Cir. 1991) .............................................29, 30

*Leiva-Perez* v. *Holder*,
　　640 F.3d 962 (9th Cir. 2011) .........................................2, 3, 3, 14

*Martinez* v. *Mathews*,
　　544 F.2d 1323 (5th Cir. 1976) ...............................................16

*McCormack* v. *Hiedeman*,
　　694 F.3d 1004 (9th Cir. 2012) ...............................................20

*McDermott* v. *Ampersand Pub., LLC*,
　　593 F.3d 950 (9th Cir. 2010) ...............................................18

*Meadows* v. *Dominican Republic*,
　　817 F.2d 517 (9th Cir. 1987) ...............................................21

*Microsoft* v. *Commissioner*,
　　311 F.3d 1178 (9th Cir. 2002) ...............................................25

*O Centro Espirita Beneficiente Uniao Do Vegetal* v. *Ashcroft*,
　　389 F.3d 973 (10th Cir. 2004) (en banc) .....................................16

*Oddo* v. *Ries*,
　　743 F.2d 630 (9th Cir. 1984) .............................................26, 27

iv

## TABLE OF AUTHORITIES—Continued

Page

*Overstreet* v. *United Bhd. of Carpenters & Joiners of Am.*,
  409 F.3d 1199 (9th Cir. 2005) ................................................................2, 18, 19

*Park Vill. Apartment Tenants Ass'n* v. *Mortimer Howard Trust*,
  636 F.3d 1150 (9th Cir. 2011) ................................................................15, 16

*Perfect 10, Inc.* v. *Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011) ................................................................41, 42

*Preferred Commc'ns, Inc.* v. *City of Los Angeles*,
  754 F.2d 1396 (9th Cir. 1985) ................................................................18

*Professional & Exec. Leasing* v. *Commissioner*,
  862 F.2d 751 (9th Cir. 1988) ................................................................31

*Psenickska* v. *Twentieth Century Fox Film Corp.*,
  409 Fed. App'x 368 (2d Cir. 2009) ................................................................35

*Sammartano* v. *First Judicial Dist. Court*,
  303 F.3d 959 (9th Cir. 2002) ................................................................18

*Snyder* v. *Phelps*,
  131 S. Ct. 1207 (2011) ................................................................39

*Sports Form, Inc.* v. *United Press Intern., Inc.*,
  686 F.2d 750 (9th Cir. 1982) ................................................................19

*Stanley* v. *Georgia*,
  394 U.S. 557 (1969) ................................................................38

*Stanley* v. *University of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994) ................................................................2, 15

*Sunward Elecs., Inc.* v. *McDonald*,
  362 F.3d 17 (2d Cir. 2004) ................................................................16

*Taylor* v. *Freeman*,
  34 F.3d 266 (4th Cir. 1994) ................................................................16

# TABLE OF AUTHORITIES—Continued

<u>Page</u>

*Thomson* v. *Larson*,
  147 F.3d 195 (2d Cir. 1998) ................................................................32

*Transwestern Pipeline Co.* v. *17.19 Acres of Property*
  *Located in Maricopa Cty.*, 550 F.3d 770 (9th Cir. 2008).................................16

*United Commercial Ins. Serv., Inc.* v. *Paymaster Corp.*,
  962 F.3d 853 (9th Cir. 1992) ................................................................34

*United States* v. *Parish*,
  308 F.3d 1025 (9th Cir. 2002) ...............................................................21

*Valle Del Sol Inc.* v. *Whiting*,
  709 F.3d 808 (9th Cir. 2013) ................................................................38

*Video Software Dealers Ass'n* v. *Schwarzenegger*,
  556 F.3d 950 (9th Cir. 2009), *aff'd sub nom. Brown* v.
  *Entm't Merchants Ass'n*, 131 S. Ct. 2729 (2011)...........................................38

*Winter* v. *NRDC*,
  555 U.S. 7 (2008).............................................................................14

**STATUTES:**

17 U.S.C. § 101 ................................................................................*passim*

17 U.S.C. § 102.............................................................................24, 25

17 U.S.C. § 102(a) .............................................................................23

17 U.S.C. § 102(a)(2).........................................................................24

17 U.S.C. § 102(a)(3).........................................................................24

17 U.S.C. § 102(a)(6).........................................................................24

17 U.S.C. § 102(a)(7).........................................................................24

17 U.S.C. § 201(a) .............................................................................23

17 U.S.C. § 201(b) .............................................................................30

# TABLE OF AUTHORITIES—Continued

Page

17 U.S.C. § 203.................................................................................37

17 U.S.C. § 204(a) ...........................................................................33

17 U.S.C. § 302(a) ...........................................................................37

17 U.S.C. § 411(a) ...........................................................10, 11, 22

RULES:

Fed. R. App. P. 35(a) .........................................................................2

Fed. R. App. P. 35(a)(1)......................................................................3

Fed. R. App. P. 35(a)(2)................................................................2, 12

Fed. R. App. P. 41(d)(1) .............................................................12, 13

ADMINISTRATIVE MATERIALS:

I.R.S. Tech. Mem. 8202020 (Sept. 30, 1981)...............................31

Rev. Rul. 57-155, 1957-1 C.B. 333 (1957)...................................31

LEGISLATIVE MATERIALS:

H.R. Rep. No. 94-1476 (1976)..................................................22, 25

S. Rep. No. 473 (1975) ...................................................................25

OTHER AUTHORITIES:

Jacob Bernstein, *Woody Allen Skips His Film's Premiere Party*,
    N.Y. Times, Jul. 24, 2013 .........................................................34

*Brazil Court Orders YouTube to Remove Anti-Islam Film*,
    Reuters, Sept. 26, 2012 ...............................................................6

Tamim Elyan, *Egyptian Backer of Prophet Film Says Sorry About Deaths*,
    Reuters, Sept. 12, 2012 ...............................................................5

# TABLE OF AUTHORITIES—Continued

Page

Mohammad Ghazal, *Google Blocks Access to Anti-Islam Film Trailer in
Jordan*, The Jordan Times, Sept. 22, 2012 ..........................................6

Eric Goldman, *In Its "Innocence of Muslims" Ruling, the Ninth Circuit is
Guilty of Judicial Activism*, Technology & Marketing Law Blog
(Feb. 27, 2014) ................................................................37, 38

*Google Blocks Singapore Access to Anti-Islam Film*, Agence France-Presse,
Sept. 21, 2012 ....................................................................6

Google, *Transparency Report* ........................................................6

Jonathan Handel, *Hollywood Experts Divided on Implications of 'Muslims'
Ruling*, The Hollywood Reporter, Feb. 28, 2014 ................................36

Mark Litwak, *Do Your Actors Own Your Film?*,
Independent Filmmaker Project (Mar. 3, 2014) ...................................34

Andrew McDiarmid, *U.S. Court Fumbles First Amendment, Orders Global
Takedown of 'Innocence of Muslims*, Feb. 27, 2014 ............................39

Claire Miller, *Google Has No Plans to Rethink Video Status*,
N.Y. Times, Sept. 14, 2012 ......................................................6

3 Melville B. Nimmer & David Nimmer,
*Nimmer on Copyright* (1989)..................................................24, 27

Seger & Whetmore, *From Script to Screen: The Collaborative
Art of Filmmaking* (2004) .......................................................25

*Turkey to Block "Innocence of Muslims" On YouTube*, The Associated
Press, Sept. 26, 2012..............................................................6

Iɴ Tʜᴇ

# United States Court of Appeals
# for the Ninth Circuit

————————

## No. 12-57302

————————

Cɪɴᴅʏ Lᴇᴇ Gᴀʀᴄɪᴀ,

Plaintiff-Appellant,

v.

Gᴏᴏɢʟᴇ Iɴᴄ. ᴀɴᴅ YᴏᴜTᴜʙᴇ, LLC,

Defendants-Appellees.

————————

On Appeal from the United States District Court
for the Central District of California, CV-12-8315-MWF (VBKx)
District Judge Michael W. Fitzgerald

————————

## GOOGLE INC. AND YOUTUBE, LLC'S BRIEF IN RESPONSE TO SUGGESTION OF REHEARING EN BANC

————————

## INTRODUCTION

Late last month, a divided panel of this Court silenced free speech based on a novel, and mistaken, theory of copyright law. The panel majority held that an actress who appeared in a film for all of five seconds likely had a separate copyright in her brief performance. And it ordered Google and YouTube to scrub her appearance—and thus, effectively, the film—from their networks altogether.

The U.S. Copyright Office has since illuminated how wrong the panel majority's view of the law was: Just days ago, the Office rejected the very copyright claim at issue in this case, explaining that federal law does not allow "a

1

copyright claim by an individual actor or actress in his or her performance contained within a motion picture." ADD46-47. Although the panel lacked the authoritative guidance of the Copyright Office when it ruled, the en banc Court is not so hamstrung. It should grant rehearing and follow the Copyright Office's lead.

Make no mistake why rehearing is warranted: The panel's refusal to stay its sprawling injunction sets a dangerous precedent that gives copyright plaintiffs ammunition to seek immediate takedowns of protected speech. That is a drastic change to the status quo and a "question of exceptional importance" worthy of en banc review. Fed. R. App. P. 35(a)(2). Moreover, the panel's refusal to issue a stay also is wrong on the merits—a critical point given the importance of the underlying questions in this case. Fed. R. App. P. 35(a). A stay should have issued because Google and YouTube are at least " 'reasonably likely,' " *Leiva-Perez* v. *Holder*, 640 F.3d 962, 967 (9th Cir. 2011), to succeed in challenging both the panel's injunction and its copyright analysis.

First, as for the injunction: This Circuit has held that mandatory injunctions may issue only if the facts and law "clearly favor" the movant, *Stanley* v. *Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994), and that injunctions gagging speech require movants to hit a threshold that is higher still, *see Overstreet* v. *United Bhd. of Carpenters & Joiners of Am.*, 409 F.3d 1199, 1208 n.13 (9th Cir. 2005). The majority here ignored those limitations and imposed a speech-silencing injunction

despite conceding that the case's merits are "*fairly debatable*," ADD10 (emphasis added)—a concession irreconcilable with the "clearly favor" test. Indeed, the majority went further and held that the District Court abused its discretion. Google and YouTube are "reasonably likely," *Leiva-Perez*, 640 F.3d at 967, to obtain en banc review and reversal of that decision because only that disposition will "maintain uniformity of the court's decisions." Fed. R. App. P. 35(a)(1).

Second, as for the copyright analysis: The majority's holding is contrary to the Copyright Act and breaks with precedent of this Court, the Supreme Court, and other circuits. It also contradicts the expert judgment of the Copyright Office, which has since ruled that "*Ms. Garcia has no separable claim to copyright authorship in her performance.*" ADD47 (emphasis added). And it has triggered deep concern in the film and video industries— industries centered in this Circuit—because it empowers even minor players in films to wrest away control of those films' distribution. Google and YouTube are at least "reasonably likely" to obtain review and reversal of that decision, too. *Leiva-Perez*, 640 F.3d at 967.

Indeed, even Plaintiff agrees that this is a critically important case: She told the panel that its ruling on the copyright question would "impact the entire entertainment industry." Opening Br. 29. She was right. The panel's refusal to grant a stay pending a rehearing petition—a refusal that is bound up with the panel's serious overreach on the merits—calls out for en banc review and reversal.

3

# BACKGROUND

**The Video.**  YouTube is a video-sharing website on which individual users upload, share, and view videos.  In July 2012, one user, defendant Mark Basseley Youssef, uploaded a 13-minute-and-51-second video entitled "Innocence of Muslims" to YouTube.com.  ER64, ER893.  As described in Plaintiff's Complaint, the video portrays the Prophet Mohammed, the founder of Islam, "as a child molester, sexual deviant, and barbarian."  ER64.

Plaintiff Cindy Lee Garcia is an actress who appears in "Innocence of Muslims" for five seconds.  ER69, ER193.[1]  Garcia did not produce the film or write the script she performed; Youssef did.  ER65.  Nor did Garcia direct her performance; Alan Roberts, a professional director Youssef hired, did.  ER241.  Garcia's creative contribution—at most—was to deliver lines written by Youssef and to "seem[] concerned" while doing so, just as Youssef's script dictated.  ER85.

Garcia says she believed she was participating in a shoot for an action film called "Desert Warrior."  ER69.  She claims, however, that Youssef overdubbed her lines during post-production to make it look as if Garcia's character referred to Mohammed as a child molester.  *Id.*

---

[1]  Because of the panel's take-down order, "Innocence of Muslims" is no longer on YouTube.  However, if the Court wishes to view the film, it is available at many other sites on the Internet.  Google will not list the URLs in this public document, but would be happy to file a representative list under seal at the Court's request.

**Reaction.**  An Arabic version of the video became famous in the Muslim world after it was broadcast on Egyptian television, sparking protests and violence. ER64; ER247.  Both the video and the protests surrounding it were the subject of extensive English- and Arabic-language coverage.  *See* ER247.  The video prompted public dialogue on- and off-line, including numerous responsive essays and videos critiquing "Innocence of Muslims" and its message.  Others embraced that message, including one backer who saw it as "highlight[ing] discrimination against Christians" by Muslims.  Tamim Elyan, *Egyptian Backer of Prophet Film Says Sorry About Deaths*, Reuters, Sept. 12, 2012[2]; ER247.

"Innocence of Muslims" drew even more attention when the Obama Administration cited it as the flashpoint for the 2012 attack on the U.S. consulate in Benghazi, Libya.  ER64.  Former U.S. Ambassador Susan Rice's statements defending that claim are considered to have played a role in her decision to withdraw her name from consideration for Secretary of State.  Congress also questioned then-Secretary of State Hillary Clinton about the film at hearings on the Benghazi attacks.  Appellees' Motion for Judicial Notice ¶¶ 1-3.

---

[2] *Available at* http://www.reuters.com/article/2012/09/12/us-libya-ambassador-egypt-promoter-idUSBRE88B18R20120912.

In the wake of the international protests, multiple countries—including

Brazil,[3] Turkey,[4] Singapore,[5] and Jordan[6]—ordered YouTube to take the video

down.  In the United States, things played out differently (until the panel's order

last month).  Although the Obama Administration asked YouTube to evaluate

whether "Innocence of Muslims" violated YouTube's terms of use, YouTube

determined that the video did not and left it accessible on its platform.  *See* ER64;

*see also* Claire Miller, *Google Has No Plans to Rethink Video Status*, N.Y. Times,

Sept. 14, 2012[7]; Google, *Transparency Report* (detailing government inquiries).[8]

**Garcia's Lawsuits.**  Garcia asserts that following the international outcry

surrounding the film, she received death threats from outraged Muslims.  ER197.

---

[3] *Brazil Court Orders YouTube to Remove Anti-Islam Film*, Reuters, Sept. 26, 2012, *available at* http://uk.reuters.com/article/2012/09/26/uk-protests-brazil-idUKBRE88P05G20120926.

[4] *Turkey to Block "Innocence of Muslims" On YouTube*, The Associated Press, Sept. 26, 2012, *available at* http://www.huffingtonpost.com/2012/09/26/turkey-innocence-muslims-youtube_n_1915514.html.

[5] *Google Blocks Singapore Access to Anti-Islam Film*, Agence France-Presse, Sept. 21, 2012, *available at* http://sg.news.yahoo.com/singapore-asks-google-block-access-islam-film-054710633.html.

[6] Mohammad Ghazal, *Google Blocks Access to Anti-Islam Film Trailer in Jordan*, The Jordan Times, Sept. 22, 2012, *available at* http://jordantimes.com/google-blocks-access-to-anti-islam-film-trailer-in-jordan.

[7] *Available at* http://www.nytimes.com/2012/09/15/world/middleeast/google-wont-rethink-anti-islam-videos-status.html?_r=0.

[8] *Available at* http://www.google.com/transparencyreport/removals/government/US/?p=2012-12.

In response, Garcia—in her own words—"went public" to speak out against the film. ER196.

In addition to combating Youssef's speech with her own counter-speech, Garcia also sued. On September 19, 2012, Garcia filed an action against Youssef, Google, and YouTube in California state court and sought an *ex parte* temporary restraining order requiring "Innocence of Muslims" to be taken down from Google and YouTube's networks. ER645-661. The court denied her application, holding that she had not shown any likelihood of success on her claims. ER662-663.

Garcia voluntarily dismissed her state-court suit, ER664-667, and brought suit in federal court. ER1-62. As amended, Garcia's Complaint asserted copyright claims against Google and YouTube for allegedly infringing on Garcia's copyright. ER63-122. She sought a temporary restraining order requiring YouTube to remove the film. ER135-170. The District Court denied the request on the ground that "the alleged infringement seems to have commenced almost three months ago" and converted her application to a motion for a preliminary injunction. ER601-602.

Briefing on Garcia's motion proceeded in the normal course. During the briefing, YouTube and Google obtained from Youssef a release apparently signed by Garcia releasing all of her rights—including copyrights—in her performance. ER791-801. Garcia challenged the veracity of the release. ER818. In light of the

7

factual dispute, the District Court elected not to consider the release in adjudicating Garcia's preliminary-injunction application.  ER891.

On November 30, 2012, the District Court denied Garcia's motion, finding she had proven neither irreparable harm nor likelihood of success on the merits. ER892-94.  The court concluded that because the video had been available on YouTube for months, had been widely disseminated elsewhere on the web, and had received relentless media coverage, Garcia had not shown how a preliminary injunction "would prevent any alleged harm."  ER893.  In addition, it concluded that Garcia was unlikely to succeed on the merits for two reasons:  she had not shown that she was the "author" of her performance, as the Copyright Act requires; and even if she were an author, she had granted the film's author an implied license to integrate her performance into the film.  ER894.  Garcia appealed.

**Proceedings on appeal.**  In this Court, Garcia again did not seek expedited briefing or argument.  The case was argued and submitted on June 26, 2013, before Chief Judge Kozinski and Judges Gould and N.R. Smith.

On February 19, 2014—nearly eight months after the appellate argument and over 19 months after Youssef first uploaded "Innocence of Muslims" to YouTube—the panel issued a sweeping order that was at that point unaccompanied by any written opinion.  The panel directed Google and YouTube to take down "all copies" of the video "from YouTube.com and from any other platforms under

8

Google's control" within 24 hours and to "take all reasonable steps to prevent further uploads of 'Innocence of Muslims' to those platforms." ADD39. The panel's order also specifically prohibited Google from disclosing the existence of the order until the merits opinion issued. *Id.*

Google sought an emergency stay, which the panel denied. ADD41. The pre-opinion takedown order and gag, it stated, were necessary to "prevent a rush to copy and proliferate the film before Google can comply with the order." *Id.*

**The Panel Opinion.** The panel issued its opinion seven days after its injunction order. Over an 18-page dissent, the majority held that the District Court had abused its discretion in declining to issue a preliminary injunction. ADD1-19.

The majority wrote that, based on her five-second, overdubbed appearance in the film, Garcia "may have a copyright." ADD10. From that equivocal premise, it held that she was likely to succeed, even though it conceded that the question was "fairly debatable" and "rarely litigated." ADD7-10. The majority also held that Garcia likely would suffer irreparable harm absent an injunction. ADD15-18.

Judge Smith dissented. Emphasizing that mandatory injunctions should be denied "unless 'the facts and law *clearly favor* the moving party,' " Judge Smith found the outcome insufficiently clear to grant an injunction that bans speech— much less to conclude that the District Court abused its discretion. ADD20 (citation omitted). He also rejected the majority's copyright analysis, concluding

9

that Garcia's acting performance was not a "work" and that, even if it were, she was not its "author." He wrote that the majority's contrary holding "decline[d] to apply the most relevant precedent in this circuit on the question before it"—*Aalmuhammed* v. *Lee*, 202 F.3d 1227 (9th Cir. 2000)—and "read[] the authorship requirement out of the Copyright Act and the Constitution." ADD26.

**Post-Opinion Proceedings.** Google and YouTube again moved for a stay. The panel denied the motion, but modified its injunction such that it "does not preclude the posting or display of any version of 'Innocence of Muslims' that does not include Cindy Lee Garcia's performance." ADD43. Days later, a judge of this Court *sua sponte* called for a vote on whether to rehear the stay motion en banc.

**Garcia's Copyright Application.** While this lawsuit was pending, Garcia also was pursuing her copyright on another front. On September 25, 2012, she filed an application with the U.S. Copyright Office in order to comply with 17 U.S.C. § 411(a), which requires such an application as a prerequisite to any copyright infringement suit. On December 18, 2012, however, the Copyright Office wrote to Garcia's lawyer and informed her that, barring further information from Garcia, Garcia was not entitled to register a copyright. ADD44. "For copyright registration purposes, a motion picture is a single integrated work," it wrote. "Assuming Ms. Garcia's contribution was limited to her acting performance, we cannot register her performance apart from the motion picture."

10

*Id.* The Copyright Office informed Garcia's lawyer that unless she could provide further information about Garcia's role, her application would be rejected. *Id.* Garcia responded by asking the Copyright Office to delay its adjudication of her application until after the panel ruled in this case. ADD45.

On March 6, 2014, the Copyright Office issued a letter rejecting Garcia's application. ADD46.[9] It explained that "the U.S. Copyright Office * * * views dramatic performances in motion pictures to be only part of the integrated work—the motion picture" and that the Office's "longstanding practices *do not allow a copyright claim by an individual actor or actress in his or her performance contained within a motion picture*." ADD46-47 (emphasis added). The Office also explained why it was inappropriate for it to delay its ruling during the pendency of this case. Citing 17 U.S.C. § 411(a), it wrote that "Congress expressly envisioned that registration decisions by the Register of Copyrights would precede adjudication in the courts" so that the courts have the benefit of the Copyright Office's decision and so that the Office can intervene to defend that decision. *Id.* When applicants institute lawsuits prior to the Copyright Office's decision, it explained, "the Register's statutory right to intervene in an action instituted pursuant to a refusal to register is nullified." *Id.*

---

[9] The Office's registration decision and accompanying materials are agency records appropriate for judicial notice. Google and YouTube have filed a motion asking the Court to take judicial notice of these materials.

## REASONS WHY REHEARING EN BANC SHOULD BE GRANTED

## I. THE PANEL'S DENIAL OF A STAY IMPLICATES QUESTIONS OF EXCEPTIONAL IMPORTANCE THAT SHOULD BE CONSIDERED BY THE EN BANC COURT.

The Court will consider in due course whether to rehear the panel's merits opinion en banc. But the panel's refusal even to briefly stay its mandatory injunction separately presents "question[s] of exceptional importance" that warrant the en banc Court's consideration now. Fed. R. App. P. 35(a)(2).

The panel's order requires Google and YouTube to take down and keep down Garcia's performance in "Innocence of Muslims" from all its platforms worldwide. ADD43. And it requires them to do so before they have even had a chance to seek en banc review. *Id.* As far as we are aware, the panel's order is unprecedented in a copyright case. In the normal course, a timely rehearing petition stays the mandate—and thus the effectiveness of any relief a panel orders—until disposition of the petition. Fed. R. App. 41(d)(1).

The panel claimed that its pre-mandate removal order was the only way to "prevent a rush to copy and proliferate the film before Google can comply" with the injunction. ADD41. That claim is unpersuasive. "Innocence of Muslims" remains available on non-YouTube sites notwithstanding the panel's take-down order and Google's compliance with it. *See supra* at 4 n.1. Those who wish to proliferate the film have ample copies to work from. The panel's order thus

12

gagged YouTube's constitutionally protected speech on a matter of deep public importance, *see infra* at 39, without even achieving a cognizable benefit.

The panel's refusal to stay the effect of its order pending further review also creates a dangerous precedent. The panel's rush-to- proliferate justification presumably applies to *any* video that has been thought (in a "fairly debatable" sense) to infringe an author's copyright. Under the panel's new rule, any copyright plaintiff would have grounds to request an immediate takedown of potentially infringing materials, even if his adversaries sought further review. That would stand Rule 41(d)(1) on its head. This Court should rehear the stay denial en banc and grant the stay.

## II.    THE PANEL SHOULD HAVE GRANTED A STAY PENDING DISPOSITION OF GOOGLE AND YOUTUBE'S REHEARING PETITION.

The panel did not explain why it denied a stay of its injunction pending a petition for rehearing. However, it presumably applied the four stay factors—likelihood of success, irreparable harm to Google and YouTube, balance of equities, and the public interest—and determined that a stay was not warranted. That determination itself warrants en banc review and reversal. The panel's decision to grant a mandatory injunction gagging speech breaks with this Court's decisions and those of the Supreme Court. Its copyright analysis likewise is at odds with authority and with the copyright statute. And the remaining factors

13

favor a stay.  The panel should have held that Google and YouTube are

" 'reasonably likely' " to succeed in challenging its decision, *Leiva-Perez*, 640

F.3d at 967,[10] and thus should have stayed its order.

To be clear:  Based on her allegations, Garcia is a sympathetic plaintiff, and she may have claims against Youssef or others on fraud, contract, or other theories. But the matter before this Court involves only one type of claim: "a copyright action."  ADD16.  Copyright cannot be repurposed to provide the relief she seeks.

**A.   Google And YouTube Are Likely To Prevail On Rehearing En Banc Because The Panel Broke With Precedent When It Entered A Mandatory Injunction Gagging Speech.**

The majority's decision reshapes this Court's rules for issuing mandatory preliminary injunctions.  Even a typical preliminary injunction must clear a high hurdle, for it "is an extraordinary remedy never awarded as of right," demanding a "clear showing that the plaintiff is entitled to relief."  *Winter* v. *NRDC*, 555 U.S. 7, 22, 24 (2008).  But here, binding Circuit law required the panel to ratchet up that already-high bar three times more:  First, because the injunction is mandatory, the panel had to conclude that the law and facts "clearly favor" Garcia.  Second, because the injunction gags speech, the panel had to conclude that Garcia had made a "particularly strong showing" of likely success and harm.  And third, the

---

[10] We analogize to the standard for stays pending petitions for certiorari because this Court does not appear to have a standard for stays pending a rehearing petition.

panel had to conclude that the District Court abused its discretion in finding that Garcia had not cleared these extraordinary hurdles.

It would be hard to invent a procedural posture less favorable for reversing a district court's decision. And that is precisely why the panel's decision declining to stay its injunction is so well-suited for en banc review: The panel majority conceded that the merits are "fairly debatable"—and yet it reversed the district court and granted a mandatory injunction restricting speech anyway. That decision amounts to a clean break from precedent. A plaintiff with a "fairly debatable" case obviously has not shown that the law and facts "clearly favor" her; nor has she made a "particularly strong showing" of likely success. Moreover, district courts' denials of injunction motions should not be deemed abuses of discretion in "fairly debatable" cases. The panel should have stayed its injunction pending further review.

1.    Mandatory injunctions are "particularly disfavored under the law of this Circuit." *Stanley*, 13 F.3d at 1320. That is because such injunctions " 'go[] well beyond simply maintaining the status quo *pendente lite*' "; they require the enjoined party to take affirmative action. *Id.* (citation omitted). As a result, the Court has insisted that mandatory-injunction requests should be "denied unless the facts and law *clearly favor* the moving party." *Id.* (emphasis added). This Court has reaffirmed that rule verbatim in case after case. *See*, *e.g.*, *Park Vill. Apartment*

15

*Tenants Ass'n* v. *Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011);

*Transwestern Pipeline Co.* v. *17.19 Acres of Property Located in Maricopa County*,

550 F.3d 770, 776 (9th Cir. 2008).  Nor does this Court stand alone.  *See O Centro*

*Espirita Beneficiente Uniao Do Vegetal* v. *Ashcroft*, 389 F.3d 973, 975-976 (10th

Cir. 2004) (en banc) (same); *Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 24

(2d Cir. 2004) (same); *Taylor* v. *Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)

(same); *Martinez* v. *Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (same).

Applying the "clearly favor" test, this Court has held that mandatory

injunctions may not issue in "doubtful cases."  *Park Vill.*, 636 F.3d at 1160.  But

the panel majority fled from that rule here.  On a key merits question—whether

Garcia has a copyright in her brief performance—the majority conceded that the

case is "fairly debatable."  ADD10.  When the law supporting a claim is only

"fairly debatable," it does not "clearly favor" that claim.

Nor was the majority's "fairly debatable" concession a glancing

misstatement.  Throughout its opinion, the majority acknowledged that some

dispositive issues were close, presented open questions, or have not yet been

litigated.  The majority recognized, for example, that the question whether an actor

obtains a copyright is "rarely litigated," and it cited zero cases resolving that

question on the merits as it did.  ADD7.  It recognized that a key factual

question—whether Garcia signed away any rights she had in the film—is contested

and unresolved.  ADD12 n.6.  And it recognized that a potentially dispositive *legal* question—whether Garcia can meet the requirement that the performance be "fixed * * * by or under the authority of the author," 17 U.S.C. § 101—likewise remains unresolved. [11]  ADD7 n.4.  Yet it imposed a sweeping speech-restraining injunction without settling any of these matters, and without giving the district court the chance to evaluate them on remand.  *Cf. Flexible Lifeline Sys., Inc.* v. *Precision Lift, Inc.*, 654 F.3d 989, 1000 (9th Cir. 2011) (remanding for further findings rather than granting injunction where district court applied wrong legal framework).

The majority did not acknowledge this Circuit's mandatory-injunction precedent, even though it was the lead point in Judge Smith's dissent.  *See* ADD19.  The majority's silence is telling.  Judge Smith correctly explained that the "*Stanley* standard counseling extreme caution when considering granting a mandatory preliminary injunction is premised on principles of judicial restraint," and that the majority "abandon[ed] restraint" in this case.  ADD37.

2.     The majority's mandatory injunction is all the more troubling because it gags speech.  This Court has held that "where * * * there is at least some risk that constitutionally protected speech will be enjoined, only a particularly strong showing of likely success, and of harm to the defendant as well, could suffice" to

---

[11]  The majority claimed that "neither party raised" this issue.  But Google and YouTube argued in their merits brief that to qualify as an "author" entitled to copyright protection, one must be "the person who translates an idea into a fixed, tangible expression."  Br. 16 (citation omitted).

justify an injunction.  *Overstreet*, 409 F.3d at 1208 n.13; *accord Sammartano*

v. *First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).  And the Court has

made clear that that "particularly strong showing" is "a higher bar than usual[ly] is

set for those seeking injunctive relief."  *McDermott* v. *Ampersand Pub., LLC*, 593

F.3d 950, 957-58 (9th Cir. 2010).

Here, there is clearly a "risk that constitutionally protected speech will be

enjoined."  *Overstreet*, 409 F.3d at 1208 n.13.  Films are protected speech, *infra* at

38, and that protection applies to media platforms like Google and YouTube that

host films just as it does to a film's creator, *see Preferred Commc'ns, Inc.* v. *City

of Los Angeles*, 754 F.2d 1396, 1410 n.10 (9th Cir. 1985).  The panel should have

required Garcia to clear the "higher bar" applicable in free-speech cases.

The majority discounted this concern, stating that "the First Amendment

doesn't protect copyright infringement."  ADD18 (citing *Eldred* v. *Ashcroft*, 537

U.S. 186, 219-220 (2003)).  But that truism does not resolve the issue.  The

question at this juncture is *whether* there has been a copyright violation at all.  As

the dissent recognized—and the majority acknowledged—"the case at bar does not

present copyright infringement *per se*," but instead a mere possibility of

infringement of five seconds in a 14-minute work.  ADD37; *id.* at 10.  That

distinction matters.  It is one thing to ban speech that violates a law; it is quite

another to ban speech that has been *alleged* to violate a law, before that determination has even been made.

If the Court were to conclude that constitutionally protected speech may sometimes be enjoined based on the mere possibility of copyright infringement, it should require that possibility to be a very strong one. That, after all, is the point of *Overstreet*: When probability is at play, First Amendment concerns mean the Court cannot simply rely on more-likely-than-not preponderance standards. In not requiring Garcia to make a "particularly strong showing of likely success," *Overstreet*, 409 F.3d at 1208 n.13, the panel contravened Circuit precedent.

3.    These two factors standing alone would be enough to have denied Garcia's preliminary-injunction request, and therefore to warrant a stay of the panel's injunction. But here, the majority had a third hurdle to clear. Because the District Court denied Garcia's motion for a preliminary injunction, the majority could only reverse that decision under a higher standard still: that the District Court abused its discretion. *Cole* v. *Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1097-98 (9th Cir. 2000). As this Court has emphasized time and again, it will not reverse a district court's preliminary-injunction decision "simply because the appellate court would have arrived at a different result if it applied the law to the facts of the case." *Sports Form, Inc.* v. *United Press Int'l, Inc.*, 686 F.2d 750 (9th Cir. 1982); *accord, e.g.*, *Farris* v. *Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

19

The majority failed to heed that limitation. For instance, it brushed aside the District Court's conclusion (at ER893) that Garcia was dilatory in seeking a preliminary injunction, undermining her claim of harm. ADD15-16. The majority likewise paid no heed to the District Court's conclusion that removing Garcia's performance from YouTube would not prevent the harms of which she complained. *Id.* Instead, the majority reached its own conclusions as if it were evaluating the record in the first instance.

As the dissent recognized, ADD34-35, that freewheeling approach conflicts with this Circuit's settled practice. Because "[t]he assignment of weights to particular harms is a matter for district courts to decide," *Earth Island Inst.* v. *Carlton*, 626 F.3d 462, 475 (9th Cir. 2010), a district court's harm-related findings constitute an abuse of discretion "only if 'illogical, implausible, or without support in inferences that may be drawn' " from the record. *McCormack* v. *Hiedeman*, 694 F.3d 1004, 1017 (9th Cir. 2012) (citation omitted). In overruling the District Court's irreparable-harm conclusions by "substitut[ing] its own explanation" of why the record favors Garcia, ADD34, the majority deviated from this Court's guidance. Moreover, given that the majority acknowledged that its own rule was "fairly debatable," ADD10, it could not at the same time "say that the district court abused its discretion" in concluding otherwise. *United States* v.

20

*Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002); *accord Meadows* v. *Dominican Republic*, 817 F.2d 517, 521 (9th Cir. 1987).

**B.    Google And YouTube Are Likely To Prevail On Rehearing En Banc Because The Panel's Copyright Analysis Went Astray And Created Unworkable Rules.**

The panel also should have entered a stay for a second reason:  Google and YouTube are (at least) reasonably likely to succeed in showing that the panel erred in its copyright analysis.  As the U.S. Copyright Office has now explained, Garcia has no claim for infringement of her five-second performance because she owns no copyright in that performance.  But even if she did have a copyright, Garcia still would have no claim for infringement because she granted Youssef an implied license to use any copyrighted material.

1.    <u>The Copyright Office Disagrees With The Panel Majority On The Merits, And Its Position Is Entitled To Significant Weight.</u>

The Copyright Office has succinctly explained the primary flaw in the panel majority's opinion:  Garcia has no copyright in her brief performance because her performance was never a stand-alone, but was instead indisputably intended to be merged into a unitary whole.  Ex. 1 at 10.  As the Office explained—and as we set forth in more detail below—"[w]hile a novelist, playwright, or screenwriter may create distinct works that are later adapted or incorporated into a motion picture, * * * an actor or actress's performance in the making of a motion picture is an integrated part of the resulting work, the motion picture as a whole."  *Id.*  The

Office explained that that view is supported by the text of the Copyright Act as well as by the Act's legislative history, which states that movies typically are a single joint work. *Id.* (citing H.R. Rep. 94-1476 at 120). It concluded that letting Garcia register a copyright in her five-second performance would contradict "[t]he U.S. Copyright Office's longstanding practices." *Id.*

The Copyright Office's refusal carries significant weight. The Office's refusal to register a copyright is "entitled to judicial deference if reasonable." *Batjac Prods. Inc.* v. *GoodTimes Home Video Corp.*, 160 F.3d 1223, 1230 (9th Cir. 1998) (quotation marks omitted). Indeed, Congress strove to ensure that the Office's registration decisions are taken into account by the courts: Once the Office rejects an application, the claimant can only sue on the purported copyright "if" she has served the Office with the complaint. 17 U.S.C. § 411(a). (Google and YouTube have no knowledge of Garcia having done so here.) At that point, the Office has the statutory right to intervene to defend its refusal, *see id.*—a right violated here because judicial determination preceded the Office's decision.

The Copyright Office's refusal, in short, underscores that the majority's opinion is worse than "fairly debatable"; it is wrong. We explain why in more detail below.

2.  <u>Garcia Owns No Copyright.</u>

Garcia's claim to a copyright fails for a number of independent reasons. First and foremost, she never owned a copyright in her performance.

> a.  *Garcia's performance is not a separately copyrightable "work."*

"Innocence of Muslims" is a copyrightable "work." But Garcia has emphatically disclaimed any ownership interest in that work, even as a joint author. *See* ADD6 ("Garcia doesn't claim a copyright interest in 'Innocence of Muslims' itself"). Instead, Garcia claims—and the panel majority held—that she has a copyright in "her own performance within the film" that is distinct from the copyright in the film as a whole. ADD7. That is incorrect.

i.  Not every performance is a "work" protected by a copyright. Rather, copyright protection extends only to "original *works* of authorship[.]" 17 U.S.C. § 102(a) (emphasis added). The term "work" is ubiquitous in the Copyright Act, and the way it is used confirms—over and over again—that there can be no copyright unless the expression qualifies as a "work." *See id.* § 102(a)(1)-(8) ( "[w]orks of authorship include" eight specific categories of "works"); *id.* § 201(a) ("[c]opyright in a work protected under this title vests initially in the author or authors of the work"); *id.* § 101.

The statutory text demonstrates that a fleeting five-second appearance on screen generally would not constitute a separate copyrightable "work."[12] The first indication comes from Section 102. That provision defines "[w]orks of authorship" to "include" "motion pictures and other audiovisual works." 17 U.S.C. § 102(a)(6). The clear implication is that it is the motion picture as a whole—not its constituent parts—that constitutes a copyrightable "work." That inference is confirmed by other provisions of Section 102. *See*, *e.g.*, *id.* § 102(a)(7) ("sound recording" is one "work[] of authorship," even though songs usually embody multiple people's creative efforts);[13] *id.* § 102(a)(2) (same with "musical works"); *id.* § 102(a)(3) (same with "dramatic works").

To be sure, Section 102 states that the universe of copyrightable works "include[s]" the eight listed categories, *id.* § 102, and "[t]he terms 'including' and 'such as' are illustrative and not limitive," *id.* § 101. Nonetheless, the listed

---

[12] This is not to say that an actor's contributions could never be such that the actor would be the author (or a co-author) of the *film as a whole*. They could. *See infra* at 32. But, as noted previously, Garcia has expressly disclaimed co-authorship of "Innocence of Muslims" as a whole.

[13] For this reason, the panel erred when it stated (without citation) that "Sinéad O'Connor can claim a copyright in her performance of 'Nothing Compares 2 U' even though the song was written by Prince." ADD9 n.5. Neither O'Connor nor anyone else could claim a copyright in her "performance." Rather, such a copyright would be limited to a "sound recording[]" or an "audiovisual work[]" capturing O'Connor's performance, and, without more information, it is not possible to say whether O'Connor or someone else (such as the director or producer), or both, would own the copyright to such a work. 17 U.S.C. § 102(a)(6) & (a)(7); *see also Nimmer on Copyright* § 2.10.

24

categories share certain characteristics, and those shared characteristics illuminate the meaning of the general term "works of authorship." *See Microsoft* v. *Commissioner*, 311 F.3d 1178, 1184 (9th Cir. 2002) (words in a list must be judged by the company they keep). An acting performance such as Garcia's is not remotely similar to anything in Section 102's illustrative list. It is not a work.[14]

    ii. The copyright concept of the "joint work" confirms that "Innocence of Muslims" is a single work. Motion pictures are quintessential collaborative efforts. *See* Seger & Whetmore, *From Script to Screen: The Collaborative Art of Filmmaking* (2004). In copyright law, such collaborative efforts are called "joint works." 17 U.S.C. § 101. The statute defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." *Id*. And the committee reports on the Copyright Act expressly includes "*motion picture[s]*" among their examples of such joint works. H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 120 (1976) (emphasis added); *accord* S. Rep. No. 473, 94th cong., 1st Sess. 103-04 (1975). So it was here. Despite the controversy over its message, Youssef's film

---

[14] There are, of course, situations in which a larger copyrighted work is comprised of freestanding pieces that are themselves separately copyrighted works. *See* 17 U.S.C. § 101 (defining "collective work"). But "Innocence of Muslims" is not sensibly analogized to a short-story collection or any other collective work. Rather, like the vast majority of motion pictures, it is a single "work."

was typical in how it was made:  Everyone understood that their contributions

would be part of a unitary whole.  That unitary whole was a single work.

That explains why Garcia, and the panel, had to twist copyright law into new

shapes to reach the outcome they sought.  Youssef was at least a joint author of

"Innocence of Muslims."  And critically, as a joint author, *he had the right to post

the movie to You Tube and to license others to do so*.  *See Oddo* v. *Ries*, 743 F.2d

630, 633 (9th Cir. 1984).  To prevail, therefore, Garcia could not accept that a

movie is a single work and argue that she was a joint author.  Instead, she had to

ask this Court to go where no court had ever gone, and the panel agreed.  It created

a new species of copyrighted work:  the performance that was created as a

contribution to a unitary whole and yet somehow is separately copyrightable.

There is no such creature, as the Copyright Office's rejection letter to Garcia

explains.  The majority was wrong to imagine that movies are nothing more than

dozens—if not hundreds—of separately copyrighted "works" hopefully stitched

together by contracts and implied licenses.  As this Court said in *Richlin* v. *Metro-

Goldwyn-Mayer Pictures, Inc.*:  "A motion picture is a work to which many

contribute; however, those contributions ultimately merge to create a unitary

whole."  531 F.3d 962, 975 (9th Cir. 2008).

iii.  The panel majority's approach would trigger bizarre real-world

consequences.  For one thing, under Garcia's theory—that she has a copyright in

26

her performance, but is not a joint author—it is possible for a director to own the copyright to scattered bits and pieces, but not all, of his or her own film. Francis Ford Coppola, for example, might own the copyright to "The Godfather"—minus a six-second piece here, and a 30-second piece there, and a two-minute portion at the end. Federal law does not make Swiss cheese of copyrights in this way.

For another, it is black-letter law that one co-author has no ability to prevent another from using or licensing a joint work in ways that she finds objectionable. *Oddo*, 743 F.2d at 633; 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.10[A][1][a] (1989). Thus even if Garcia and Youssef were co-authors of the entire film "Innocence of Muslims"—which Garcia admits is not the case—she would be powerless to prevent Youssef from uploading the film to YouTube or licensing others to do so. Yet under the majority's approach, Garcia was granted precisely that power on the theory that she was the sole owner of *five seconds* of "Innocence of Muslims." The majority's unprecedented holding turns joint authorship law on its head.

It is no answer to say, as the panel's amended order did, that Garcia's "only" entitlement is to require Google to remove "any version of 'Innocence of Muslims' that * * * include[s] Cindy Lee Garcia's performance." ADD43. There will be many instances in which it simply is not feasible to remove a particular actor's performance from a film—for example, where the actor appears in the background

27

of important scenes throughout the film.  Moreover, it is bizarre to imagine a

platform like YouTube as an editor of user content, and difficult in any event to

imagine how it could excise a performance from a film without disturbing the

rights of other copyright holders.

<em>b.     Garcia is not an "author."</em>

Even if Garcia's performance were a separate copyrightable "work," Garcia

would not own a copyright here because she would not be the work's author.  That

is so for two reasons.  First, Garcia does not meet the authorship standard because

she "had no creative control over the script or her performance."  ADD25 (Smith,

J., dissenting).  Second, any work here was a "work made for hire."

i.  The Supreme Court has defined an "author as the person to whom

the work owes its origin and who superintended the whole work, the 'master

mind.' "  *Aalmuhammed*, 202 F.3d at 1233 (quoting *Burrow-Giles Lithographic Co.*

*v. Sarony*, 111 U.S. 53, 61 (1883)).[15]  This standard "requires more than a minimal

---

[15] The panel majority dismissed *Aalmuhammed* on the ground that it "only
discusses what is required for a contributor to a work to assert joint ownership over
the *entire* work."  ADD8. Not so. As *Aalmuhammed* recognized, "[b]y statutory
definition, a 'joint work' requires 'two or more authors.'" 202 F.3d at 1232
(quoting 17 U.S.C. § 101). As a result, the *Aalmuhammed* court was required to—
and in fact did—articulate "general principles of authorship that assist in analyzing
Garcia's interest in her acting performance." ADD23 (Smith, J., dissenting).
*Aalmuhammed* thus is relevant here.   And it underscores the fundamental
unworkability of the majority's decision.  In *Aalmuhammed*, after all, the plaintiff
submitted evidence that he provided voice-overs and other contributions to the hit
film *Malcolm X*.  202 F.3d at 1230.  Under the majority's view of things, that

28

creative or original contribution to the work." *Id.* at 1233. Rather, an author is a person with "creative control." *Id.* at 1232. By contrast, "the creator of a work at another's direction, without contributing intellectual modification, is not an author." *Kyjen Co., Inc.* v. *Vo-Toys, Inc.*, 223 F. Supp. 2d 1065, 1068 (C.D.Cal. 2002); *accord Lakedreams* v. *Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991) (artist was not an "author" because "[w]hile the final artwork may have been slightly different from the text and drawings initially given to [him]," the project's directors "directed the changes themselves").

This understanding of authorship is tied closely to the Copyright Act's definition of fixation. The Act teaches that a work is "fixed" when it is placed in a tangible medium of expression "by or under the authority of the author." 17 U.S.C. § 101. In other words, the "author" is the person with the power to control how the work is fixed. That control is wielded by the "master mind" of the work or the one who has "artistic control," not an actress with a small role such as Garcia. *Aalmuhammed*, 202 F.3d at 1232.

Garcia cannot satisfy the creative-control standard for authorship because she "had no creative control over the script or her performance." ADD25 (Smith, J., dissenting). "Garcia was not the originator of ideas or concepts. She simply acted out others' ideas or script." *Id.* In fact, Garcia's own Complaint describes Youssef

means he could have sought an injunction *completely blocking distribution of Malcolm X* unless and until his contributions were stripped from the film.

as "the writer and producer of the Film," who both "managed" and "was in charge of all aspects of production." ER65. Youssef's control extended all the way down; his script, for example, directed Garcia to "seem[] concerned" while delivering her lines. ER85. Garcia thus was at most "the creator of a work at another's direction," *Kyjen*, 223 F. Supp. 2d at 1068, and to the extent she deviated from her directions, Youssef "directed the changes" himself, *Lakedreams*, 932 F.2d at 1108. Garcia's exceptionally minor contribution cannot qualify her as an "author."

ii. Garcia also was not an author for a second reason: Any separately copyrightable work by Garcia would be a work made for hire, and in such cases "the employer or other person for whom the work was prepared is considered the author of the work." 17 U.S.C. § 201(b).

As relevant here, a "work made for hire" is one "prepared by an employee within the scope of his or her employment." *Id.* § 101. The Supreme Court has held that that phrase "should be understood in light of the general common law of agency." *Community for Creative Non-Violence* v. *Reid*, 490 U.S. 730, 741 (1989). The controlling question is whether the hiring party had sufficient "right[s] to control the manner and means by which the product is accomplished" to make the worker an employee rather than an independent contractor. *Id.* at 751.

Here, Youssef had such control. As Judge Smith explained, " 'most contributions to a motion picture are created as works made for hire." ADD32

(citation omitted), and Garcia's performance was no exception. Garcia conceded that "Youssef 'managed all aspects of production,' controlling both the manner and means of making the film, including the scenes featuring Garcia." *Id.* In addition, "[t]he bulk of the other factors also suggest that Garcia is an employee," including the fact that Youssef "provided the instrumentalities and tools, dictated the filming location," and "decided when and how long Garcia worked[.]" *Id.* Thus "[t]he central factor of control and many other factors 'weigh heavily' *for* finding an employment relationship." ADD33.

The majority's contrary finding conflicts with long-standing Internal Revenue Service practice. Like the Copyright Act, the tax code uses a common-law test to determine who is an employee. *See Professional & Exec. Leasing* v. *Commissioner*, 862 F.2d 751, 753 (9th Cir. 1988). In applying that test, the Service has held for decades that a film actress—even one that "deliver[s] a few sentences of dialogue from a script written by a professional writer"—is "an employee" of the film producer. Rev. Rul. 57-155, 1957-1 C.B. 333 (1957); *see also* I.R.S. Tech. Mem. 8202020 (Sept. 30, 1981).[16]

---

[16] Section 101 also contemplates that parties can agree in writing that a contribution will be a work for hire. In this case, Google submitted such a written agreement to the District Court, and Garcia contested its authenticity. *See supra* at 7-8. But rather than remand so the District Court could consider the effect of that key document, the panel majority plowed ahead and imposed its injunction, then refused to stay it. The panel should have remanded for the District Court to

31

   *c.* *Even if Garcia were an author, she would at most be a* joint *author.*

Finally, even if Garcia's performance could constitute a separately copyrightable work, Garcia would be at most a co-author of that work. The majority disagreed because a work is joint only "if the authors involved in its creation *intend* that it be so." ADD7 n.3. And on the intent question, the majority viewed Garcia's assertions that she did not intend to merge her contributions with Youssef's as conclusive. *Id.*

But the "intention standard is not strictly subjective." *Thomson* v. *Larson*, 147 F.3d 195, 201 (2d Cir. 1998). Rather, it turns on "factual indicia" and objective signs. *Id.* And viewed objectively, Garcia intended to merge her contributions with Youssef's. She appeared on set, understood her creative contribution would be merged with Youssef's as scriptwriter and producer, and delivered her lines. ER193-194. That is enough to show that Garcia intended her contributions to merge with Youssef's into a unitary joint work.

To be sure, the better view is that Youssef hired Garcia to help create *Youssef's* work, such that she has no authorial role at all. This is established by the factual allegations in Garcia's own Complaint. *See supra* at 4, 31. But at minimum, there can be no credible suggestion that Youssef was simply helping

---

resolve this critical factual dispute *before* imposing an injunction silencing speech. *See Flexible Lifeline*, 654 F.3d at 1000.

Garcia create *her own* independent work.  Thus the most Garcia could possibly assert even with respect to her own performance is co-author status.  And that is fatal to her infringement claim because, as we have explained, Youssef as co-author would have every right to post Garcia's performance to YouTube without her permission.  *Supra* at 26.

### 3.  Garcia Granted Youssef An Implied License.

Even if Garcia owned a copyright, there still would be no infringement here because she granted Youssef an implied license to use the footage of her performance.

Although the Copyright Act provides that "[a] transfer of copyright ownership" must be in writing, 17 U.S.C. § 204(a), its definition of that term specifically exempts "a nonexclusive license" to use the work, *id.* § 101.  Such a license " 'may be granted orally' " or may be " 'implied from conduct.' "  *Effects Assoc. Inc.* v. *Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (citation omitted); *see also Asset Marketing Sys., Inc.* v. *Gagnon*, 542 F.3d 748, 755 (9th Cir. 2008).

The panel majority agreed that, at minimum, Garcia "granted Youssef an implied license" to use any copyrightable aspects of her performance.  ADD13.  It also recognized that "[a]ny such license must be construed broadly," because otherwise "actors could leverage their individual contributions into de facto authorial control over the film."   ADD13-15.  And yet the panel majority held that

33

Youssef exceeded the implied license's scope because his film "differ[ed] so radically from anything Garcia could have imagined when she was cast." *Id.*

In so holding, the majority put a limitation on Garcia's nonexclusive license that Garcia never did: that she consented to use of her performance for all purposes *except* ones she did not contemplate. But that is not the way contractual agreements work. Courts cannot give effect to licensors' "unexpressed intent." *United Commercial Ins. Serv., Inc.* v. *Paymaster Corp.*, 962 F.3d 853, 857 (9th Cir. 1992). Although Garcia avers that she asked Youssef about the movie's content, she never claims that she expressed to Youssef—by words or conduct—that use of her performance was conditioned on that description of the content, or that Youssef could not exercise final authorial control over the finished product. *See* ER194-195. *See* ER194-195.

The majority's except-in-circumstances-the-actor-couldn't-have-imagined caveat on implied licenses creates a dangerous precedent. Many performers know little about the project in which they are appearing. Woody Allen famously gives his actors only their own lines. Jacob Bernstein, *Woody Allen Skips His Film's Premiere Party*, N.Y. Times, Jul. 24, 2013. Many other productions do not give full scripts to every extra and day player. Mark Litwak, *Do Your Actors Own Your Film?*, Independent Filmmaker Project (Mar. 3, 2014).[17]    And there are entire

---

[17] *Available at* http://www.ifp.org/resources/do-your-actors-own-your-film/.

genres—mockumentaries, exposés—that involve misleading people about the nature of the project. *See Psenickska* v. *Twentieth Century Fox Film Corp.* 409 Fed. App'x 368 (2d Cir. 2009) (per curiam) (discussing the *Borat* mockumentary).

The majority also stated that this case is different because Youssef "lied to Garcia * * * and she agreed to perform in reliance on that lie." ADD14. But here too, the case's unusual facts obscure the difficulties of application such a test would invariably present. What sorts of lies count (or do not)? Are some lies too trivial, even if the plaintiff relied on them, and what metric are courts to use in conducting that assessment? How would reliance be proved?

The majority's vague definition of the outer bounds of actors' implied licenses will create mischief within the industry. And even if standards could be articulated, the majority's entire framework "permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, 741 (1975).

### 4. The Majority's Opinion Is Unworkable.

The panel majority's rules are not just wrong; they are also unworkable. They would wreak havoc on movie studios, documentary filmmakers, and creative enterprises of all types by giving their most minor contributors potential control over their works. As commentators have noted, the majority's decision means

35

"anyone whose expression appears in a film and who doesn't have a signed work-for-hire agreement has a sufficiently plausible copyright claim to wave around the threat of an injunction to shut down distribution."  Jonathan Handel, *Hollywood Experts Divided on Implications of 'Muslims' Ruling*, The Hollywood Reporter, Feb. 28, 2014.[18]

The panel brushed aside this problem, asserting that copyright interests in the vast majority of films are covered by contract or the work-for-hire doctrine. ADD11.  But that view fails to take account of the breathtaking transformation during the past decade in content creation—much of which takes place in a decentralized, bottom-up ecosystem.  In an age of instant uploads, "every schmuck with a videocamera" really *can* hope to be "a movie mogul," communicating with countless viewers.  ADD13.  Most of the millions of amateur filmmakers and their collaborators who upload videos to the Internet do not have bulletproof written agreements.  That means anyone who happens to appear in even the most fleeting manner will now have a credible claim to demand payment and block distribution.

Indeed, even when it comes to larger-scale professional filmmakers, the majority's assurances ring hollow.  Many professional filmmakers try to obtain releases and assignments from participants.  But perfection is impossible and long-term retention and location of these agreements is often difficult.  The majority's

---

[18] *Available at* http://www.hollywoodreporter.com/thr-esq/hollywood-experts-divided-implications-muslims-684607.

approach opens the door to an extra in *Gone With the Wind*[19] contacting Warner

Brothers and demanding that it purge his performance from every copy of the film

in its inventory unless it can find a work-for-hire agreement in its files.

Nor does the implied-license regime solve the problem, despite the

majority's suggestion. ADD13-15. For one thing, a case-by-case implied-license

regime means "actors can claim copyright and set up a fact dispute that will be

hard to predict and expensive to resolve." Eric Goldman, *In Its "Innocence of

Muslims" Ruling, the Ninth Circuit is Guilty of Judicial Activism*, Technology &

Marketing Law Blog (Feb. 27, 2014).[20] Moreover, any "nonexclusive * * * license

of copyright" is subject to termination 35 years after the initial grant. 17 U.S.C.

§ 203. If actors were to terminate their nonexclusive implied licenses, continuing

distribution of older movies could be imperiled.

Finally, whatever may be said for a court's ability to resolve the fact-bound

implied-license disputes that the panel majority's rule will invite, content hosts like

YouTube are most certainly ill-suited to do so. How is YouTube (or any content

host) to get to the bottom of what a person in a video "could have imagined when

she was cast" or whether the filmmaker "lied to" her, much less whether the actor

"agreed to perform in reliance on that lie?" ADD14. Under the panel majority's

---

[19] Copyright protection lasts for the author's life plus 70 years. 17 U.S.C. § 302(a).

[20] *Available at* http://blog.ericgoldman.org/archives/2014/02/in-its-innocence-of-muslims-ruling-the-ninth-circuit-is-guilty-of-judicial-activism-garcia-v-google.htm.

approach, the only realistic choice would be to "err on the side of actors' assertions" and defer to the copyright claim—and thus remove content that is not in fact that claimant's to control. Goldman, *supra*. That is a threat to the marketplace of speech.

### C.     Google, YouTube, And The Public Interest Will Be Irreparably Harmed Unless The Panel's Injunction Is Stayed.

The panel likewise should have recognized that Google, YouTube, and the American public will suffer irreparable harm if its sweeping injunction is not stayed. Even though "Innocence of Muslims" enjoys full First Amendment protection, *see Video Software Dealers Ass'n* v. *Schwarzenegger*, 556 F.3d 950, 958 n.11 (9th Cir. 2009), *aff'd sub nom. Brown* v. *Entm't Merchants Ass'n*, 131 S. Ct. 2729 (2011), the majority's ruling forces Google and YouTube to remove it from their platforms. That alone satisfies the irreparable-harm prong because " '[t]he loss of First Amendment freedoms, for even minimal periods, unquestionably constitutes irreparable injury.' " *Valle Del Sol Inc.* v. *Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (quoting *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976)).

Staying the injunction also is in the public interest—a separate factor of the stay test. *See Flexible Lifeline*, 654 F.3d at 994. The Supreme Court has emphasized that the right to receive information exists "regardless of [the information's] social worth" and is "fundamental to our free society." *Stanley* v. *Georgia*, 394 U.S. 557, 564 (1969). That right is at its apex where, as here, the

38

information bears on "matters of public concern"; such information "is at the heart of the First Amendment's protection." *Snyder* v. *Phelps*, 131 S. Ct. 1207, 1215 (2011) (quotation marks omitted); *Connick* v. *Myers,* 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.") (quotation marks omitted).

"Innocence of Muslims" has featured prominently in recent public discourse regarding foreign policy and religion.  It has been "the subject of extensive international debate about free expression online."  Andrew McDiarmid, *U.S. Court Fumbles First Amendment, Orders Global Takedown of 'Innocence of Muslims,'* Feb. 27, 2014.[21]  In short, it has been "the subject of legitimate news interest," *City of San Diego* v. *Roe*, 543 U.S. 77, 83-84 (2004), and thus bears on matters of public concern.  Even Garcia concedes this point.  Garcia Reply Br. 4. And the panel's gag order would eliminate the film from public view via Google-controlled platforms—an action akin to "the removal of books from the shelves of a [ ] library," which the Supreme Court has held to "contract the spectrum of available knowledge" and thus undermine "the spirit of the First Amendment." *Board of Educ., Island Trees Union Free Sch. Dist. No. 26* v. *Pico*, 457 U.S. 853,

---

[21] *Available at* https://www.cdt.org/blogs/andrew-mcdiarmid/2702us-court-fumbles-first-amendment-orders-global-takedown-%E2%80%98innocence-muslim.

39

866-67 (1982). The public interest accordingly favors a stay of the panel's injunction.

Finally, should this ruling remain on the books, the task of trying to sort out who consented to what will chill speech. It is entirely possible that some distributors will err on the side of caution and take down anything that might potentially be a copyright violation under the panel's holding. *See supra* at 37-38. The threat to free speech from such reasoning is palpable.

### D.     Garcia Will Not Be Harmed By A Stay.

On the flip side, while Garcia's allegations understandably generate concern, it is unclear what harm she would suffer if the panel's injunction were stayed pending disposition of the impending rehearing petition.

To weigh against the irreparable harm Google and YouTube will suffer without a stay, the stay must " '*substantially* injure the other parties interested in the proceeding.' " *Lair* v. *Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (emphasis added; citation omitted). Garcia has argued that a stay harms her because "as soon as the order or opinion [was] available to the public," she was "free from the fatwa and terror she has endured since a fatwa was issued against her." Garcia Opp. to Appellees' Mot. for Emergency Stay 9. But that assertion has no factual support. Garcia has not shown that the fatwa has been lifted by dint of the panel's take-down order. Nor has Garcia shown that delaying the video's removal from

40

YouTube and other Google platforms for a short period while the Court considers whether to take the case en banc will change her situation in any substantial way.

Garcia herself has implicitly recognized time is not of the essence in this matter.  Throughout the more than 14 months this appeal has been pending, Garcia never sought an injunction pending appeal or even expedited briefing and argument.  Garcia's willingness to let the appeal play out in the normal course proves that it would not "substantially injure" her to leave "Innocence of Muslims" available on YouTube while Google and YouTube seek en banc review.[22]

Moreover, limiting public access to "Innocence of Muslims" will not sever Garcia's connection with the film and therefore will not redress her alleged injuries. That fact should have foreclosed the panel from issuing the injunction in the first place, *see Perfect 10, Inc.* v. *Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011) (movant must show "sufficient causal connection" between the irreparable harm it alleges and the injunctive relief it seeks), and it also demonstrates why Garcia will not be harmed by a stay.  The panel failed to recognize how widely the video has circulated outside of Google's platforms; it remains accessible on many sites. *Supra* n.1.  Removing the video from Google platforms thus will not eliminate it

---

[22] Should en banc rehearing on the merits be granted, Google and YouTube would seek a highly expedited briefing schedule.

from the Internet.[23]  In addition, tens of thousands of web pages that do not contain Garcia's performance nonetheless document the video's contents and her relationship to the project:  A search of Westlaw's "News" database reveals 445 articles mentioning Garcia by name and a Google search returns 959,000 hits.

As Judge Smith said at oral argument, the injunction is unlikely to mitigate any risks Garcia faces—it "won't put the toothpaste back in the tube."  Oral Arg. at 30:45-30:47.  That is yet another reason why the injunction never should have issued.  *See Perfect 10,* 653 F.3d at 981.  And it means Garcia cannot demonstrate that a short delay in implementing the panel's order "substantially" worsens her situation.  *Lair*, 697 F.3d at 1203.  The balance of equities favors Google and YouTube.

---

[23] The panel majority blamed Google for an absence of evidence on this point, ADD17, but the burden was on *Garcia* to show that the injunction she sought would remedy her alleged harm.  *Perfect 10*, 653 F.3d at 982.

## CONCLUSION

For the foregoing reasons, rehearing en banc should be granted and the panel's injunction stayed.

Respectfully submitted,

/s/ Neal Kumar Katyal

TIMOTHY L. ALGER
SUNITA BALI
PERKINS COIE LLP
1305 Porter Drive
Palo Alto, California 94306
(650) 838-4334
TAlger@perkinscoie.com
Sbali@perkinscoie.com

NEAL KUMAR KATYAL
CHRISTOPHER T. HANDMAN
DOMINIC F. PERELLA
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

March 12, 2014

*Counsel for Defendants-Appellees*
*Google Inc. and YouTube, LLC*

## CERTIFICATE OF COMPLIANCE

I certify that the attached brief is proportionately spaced, has a typeface of 14 points or more, and contains 9,988 words.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 12, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

**ADDENDUM**

# TABLE OF CONTENTS

Page

**PANEL ORDERS:**

Panel Opinion......................................................................................ADD1

Panel Pre-Opinion Takedown Order (Feb. 19, 2014)....................................ADD38

Panel Order Denying Pre-Opinion Emergency Stay Motion
    (Feb. 21, 2014)...........................................................................ADD40

Panel Order Denying Post-Opinion Emergency Stay Motion
    (Feb. 28, 2014)...........................................................................ADD42

**COPYRIGHT OFFICE DOCUMENTS:**

Letter from Laura Lee Fischer, Chief, Performing Arts Division, U.S.
    Copyright Office, to M. Cris Armenta, Counsel for Cindy Lee Garcia
    (Dec. 18, 2013) ..........................................................................ADD44

Letter from M. Cris Armenta, Counsel for Cindy Lee Garcia, to Laura Lee
    Fischer, Chief, Performing Arts Division, U.S. Copyright Office (Mar.
    13, 2013) ...................................................................................ADD45

Letter from Robert J. Kasunic, Associate Register of Copyrights and
    Director of Registration Policy and Practices, U.S. Copyright Office, to
    M. Cris Armenta, Counsel for Cindy Lee Garcia (Mar. 6, 2014) .............ADD46

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CINDY LEE GARCIA, *Plaintiff-Appellant,* v. GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company, *Defendants-Appellees,* and NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; MARK BASSELEY YOUSSEF; ABANOB BASSELEY NAKOULA; MATTHEW NEKOLA; AHMED HAMDY; AMAL NADA; DANIEL K. CARESMAN; KRITBAG DIFRAT; SOBHI BUSHRA; ROBERT BACILY; NICOLA BACILY; THOMAS J. TANAS; ERWIN SALAMEH; YOUSSEFF M. BASSELEY; MALID AHLAWI, *Defendants.* | No. 12-57302 D.C. No. 2:12-cv-08315-MWF-VBK OPINION |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

**ADD1**

Argued and Submitted
June 26, 2013—Seattle, Washington

Filed February 26, 2014

Before: Alex Kozinski, Chief Judge, Ronald M. Gould
and N. Randy Smith, Circuit Judges.

Opinion by Chief Judge Kozinski;
Dissent by Judge N.R. Smith

## SUMMARY[*]

### Copyright / Preliminary Injunction

The panel reversed the district court's denial in a copyright case of a preliminary injunction requiring the removal from YouTube.com of an anti-Islamic film that used a performance that the plaintiff made for a different film.

The panel concluded that the plaintiff established a likelihood of success on the merits of her claim of infringement of her performance within the film because she proved that she likely had an independent interest in the performance and that the filmmaker did not own an interest as a work for hire and exceeded any implied license to use the plaintiff's performance.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the plaintiff established the likelihood that irreparable harm would result if an injunction did not issue because she was subject to death threats and took action as soon as she began receiving the threats. The plaintiff also established sufficient causal connection between the infringement of her copyright and the harm she alleged.

The panel also held that the balance of the equities and the public interest weighed in favor of injunctive relief.

Dissenting, Judge N.R. Smith wrote that the facts and law did not clearly favor issuing a mandatory preliminary injunction to the plaintiff. He wrote that the plaintiff did not establish a likelihood that she had a copyrightable interest in her acting performance, nor did she clearly show that the performance was not a work made for hire. In addition, the district court did not abuse its discretion in its ruling on irreparable harm, and the balance of the equities and the public interest did not favor the issuance of a preliminary injunction.

---

**COUNSEL**

M. Cris Armenta (argued), The Armenta Law Firm APC, Los Angeles, California and Credence Sol, Chauvigng, France, for Plaintiff-Appellant.

Timothy L. Alger (argued) and Sunita Bali, Perkins Coie LLP, Palo Alto, California, for Defendants-Appellees.

---

4                    GARCIA V. GOOGLE, INC.

**OPINION**

KOZINSKI, Chief Judge:

While answering a casting call for a low-budget amateur film doesn't often lead to stardom, it also rarely turns an aspiring actress into the subject of a fatwa. But that's exactly what happened to Cindy Lee Garcia when she agreed to act in a film with the working title "Desert Warrior."

The film's writer and producer, Mark Basseley Youssef—who also goes by the names Nakoula Basseley Nakoula and Sam Bacile—cast Garcia in a minor role. Garcia was given the four pages of the script in which her character appeared and paid approximately $500 for three and a half days of filming. "Desert Warrior" never materialized. Instead, Garcia's scene was used in an anti-Islamic film titled "Innocence of Muslims." Garcia first saw "Innocence of Muslims" after it was uploaded to YouTube.com and she discovered that her brief performance had been partially dubbed over so that she appeared to be asking, "Is your Mohammed a child molester?"

These, of course, are fighting words to many faithful Muslims and, after the film aired on Egyptian television, there were protests that generated worldwide news coverage. An Egyptian cleric issued a fatwa, calling for the killing of everyone involved with the film, and Garcia soon began receiving death threats. She responded by taking a number of security precautions and asking that Google remove the video from YouTube.

In all, Garcia filed eight takedown notices under the Digital Millenium Copyright Act. *See generally* 17 U.S.C.

**ADD4**

§ 512. When Google resisted, she supplied substantive explanations as to why the film should be taken down. Google still refused to act, so Garcia applied for a temporary restraining order seeking removal of the film from YouTube, claiming that the posting of the video infringed her copyright in her performance.[1] The district court treated the application as a motion for a preliminary injunction, and denied it because Garcia had delayed in bringing the action, had failed to demonstrate "that the requested preliminary relief would prevent any alleged harm" and was unlikely to succeed on the merits because she'd granted Youssef an implied license to use her performance in the film.

## I. Discussion

While we review the denial of a preliminary injunction for abuse of discretion, *Alliance for the Wild Rockies* v. *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011), the "legal premises underlying a preliminary injunction" are reviewed de novo. *A&M Records, Inc.* v. *Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002). In granting or denying a preliminary injunction, the district court must consider four factors: a plaintiff's likely success on the merits, the likelihood that irreparable harm will result if an injunction doesn't issue, the balance of equities and the public interest. *Winter* v. *Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The district court

---

[1] Although Garcia's suit also named the film's producers, only Google, which owns YouTube, answered the complaint.

found against Garcia on the first two factors and didn't consider the last two.[2]

## A. Likelihood of Success on the Merits

Garcia doesn't claim a copyright interest in "Innocence of Muslims" itself; far from it. Instead, she claims that her performance within the film is independently copyrightable and that she retained an interest in that copyright. To succeed on this claim, Garcia must prove not only that she likely has an independent interest in her performance but that Youssef doesn't own any such interest as a work for hire and that he doesn't have an implied license to use her performance.

### 1. An Independent Copyright Interest

A film is typically conceived of as "a joint work consisting of a number of contributions by different 'authors.'" 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.05 at 6–14 (1990). Garcia argues that she never intended her performance to be part of a joint work, and under our precedent she doesn't qualify as a joint author. *See*

---

[2] The dissent suggests that we must defer to the district court's statement that "the nature of [Garcia's] copyright interest is not clear." But we defer to a lower court's *decision*, not its equivocation.

It's worth noting what the district court's three-page order doesn't do: It doesn't decide whether Garcia has a copyright interest in her performance, whether her performance is a "work," whether Garcia is the "author" of her performance or whether her performance is a work for hire. Nor does it address the balance of the equities or the public interest, despite the fact that a district court must "weigh in its analysis the public interest implicated by [an] injunction, as *Winter* now requires." *Stormans, Inc.* v. *Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

GARCIA V. GOOGLE, INC.                    7

*Aalmuhammed* v. *Lee*, 202 F.3d 1227, 1231–36 (9th Cir. 2000).   But just because Garcia isn't a joint author of "Innocence of Muslims" doesn't mean she doesn't have a copyright interest in her own performance within the film.[3]

Whether an individual who makes an independently copyrightable contribution to a joint work can retain a copyright interest in that contribution is a rarely litigated question.  *See Thomson* v. *Larson*, 147 F.3d 195, 206 (2d Cir. 1998) (dismissing similar argument on procedural grounds); *see also* David Nimmer, Address, *Copyright in the Dead Sea Scrolls: Authorship and Originality*, 38 Hous. L. Rev. 1, 186–87 & n.942 (2001).  But nothing in the Copyright Act suggests that a copyright interest in a creative contribution to a work simply disappears because the contributor doesn't qualify as a joint author of the entire work.   17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium . . . .").  Where, as here, the artistic contribution is fixed, the key question remains whether it's sufficiently creative to be protectible.[4]

Google argues that Garcia didn't make a protectible contribution to the film because Youssef wrote the dialogue

---

[3] Although the dissent claims that "Garcia's interest in her acting performance may best be analyzed as a joint work with Youssef," Dissent 23 n.3, it doesn't explain why.  A work is joint only if the authors involved in its creation *intend* that it be so.  *See* 17 U.S.C. § 101.  Garcia expressly disclaims such intent and there is no evidence in the record that Youssef intended to create a joint work.

[4] Neither party raised the issue of whether the author of a dramatic performance must personally fix his work in a tangible medium.  Because the question is not properly before us, we do not decide it.  The parties are free to raise it in the district court on remand.

8                 GARCIA V. GOOGLE, INC.

she spoke, managed all aspects of the production and later dubbed over a portion of her scene.  But an actor does far more than speak words on a page; he must "live his part inwardly, and then . . . give to his experience an external embodiment."  Constantin Stanislavski, *An Actor Prepares* 15, 219 (Elizabeth Reynolds Hapgood trans., 1936).  That embodiment includes body language, facial expression and reactions to other actors and elements of a scene.  *Id.* at 218–19.  Otherwise, "every shmuck . . . is an actor because everyone . . . knows how to read."  Sanford Meisner & Dennis Longwell, *Sanford Meisner on Acting* 178 (1987).

An actor's performance, when fixed, is copyrightable if it evinces "some minimal degree of creativity . . . 'no matter how crude, humble or obvious' it might be."  *Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (quoting 1 *Nimmer on Copyright* § 1.08[C][1]).  That is true whether the actor speaks, is dubbed over or, like Buster Keaton, performs without any words at all.  *Cf.* 17 U.S.C. § 102(a)(4) (noting "pantomimes and choreographic works" are eligible for copyright protection).  It's clear that Garcia's performance meets these minimum requirements.

*Aalmuhammed* isn't to the contrary because it does not, as the dissent would have it, "articulate[] general principles of authorship."  Dissent 25.  *Aalmuhammed* only discusses what is required for a contributor to a work to assert joint ownership over the *entire* work:  "We hold that authorship is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution."  202 F.3d at 1232.  *Aalmuhammed* plainly contemplates that an individual *can* make a "copyrightable contribution" and yet not become a joint author of the whole work.  *Id.*  For example, the author

**ADD8**

GARCIA V. GOOGLE, INC.                9

of a single poem does not necessarily become a co-author of the anthology in which the poem is published.  It makes sense to impose heightened requirements on those who would leverage their individual contribution into ownership of a greater whole, but those requirements don't apply to the copyrightability of all creative works, for which only a "minimal creative spark [is] required by the Copyright Act and the Constitution."  *Feist Publ'ns*, 499 U.S. at 363.[5]

Nor does *Midler* v. *Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988), speak to the problem before us.  First, of course, *Midler* isn't a copyright case at all—it's a right of publicity case that happens to discuss copyright in the context of preemption, not infringement.  Second, *Midler* discusses the copyrightability of a performer's *voice*—not her performance. *See* 849 F.2d at 462.  A performer's voice is analogous to her image, which we've said "is not a work of authorship" under the Copyright Act.  *Downing* v. *Abercrombie & Fitch*, 265 F.3d 994, 1004 (9th Cir. 2001).  But that doesn't answer the question of whether the artist's creativity, expressed *through* her voice or image, is protected by copyright.  Just because someone's voice—its particular timber and quality—can't be copyrighted, doesn't mean that a performance made using that voice can never be protected. In fact, many vocal performances *are* copyrighted. *See, e.g.*,

---

[5] Our decision today does not "read[] the authorship requirement out of the Copyright Act and the Constitution."  Dissent 26.  An author "in a constitutional sense" is one "'to whom anything owes its origin; originator; maker.'"  *Feist Publ'ns*, 499 U.S. at 346 (quoting *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U.S. 53, 58 (1884)).  In other words, the creator of copyrightable artistic expression is an author.  Which is why, for example, Sinéad O'Connor can claim a copyright in her performance of "Nothing Compares 2 U" even though the song was written by Prince.

10          GARCIA V. GOOGLE, INC.

*Laws* v. *Sony Music Entm't, Inc.*, 448 F.3d 1134, 1141 (9th Cir. 2006).

Recognizing that Garcia may have a copyright interest in her performance isn't the end of the inquiry. A screenplay is itself a copyrightable creative work and a film is a derivative work of the screenplay on which it is based. *See Gilliam* v. *Am. Broad. Cos.*, 538 F.2d 14, 20 (2d Cir. 1976); *see also* 17 U.S.C. § 101; 2 *Nimmer on Copyright* § 2.10[A] n.8. Where, as here, an actor's performance is based on a script, the performance is likewise derivative of the script, such that the actor might be considered to have infringed the screenwriter's copyright. And an infringing derivative work isn't entitled to copyright protection. *See* 17 U.S.C. § 103(a); *see also U.S. Auto Parts Network, Inc.* v. *Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012).

Of course, by hiring Garcia, giving her the script and turning a camera on her, Youssef implicitly granted her a license to perform his screenplay. *See Effects Assocs., Inc.* v. *Cohen*, 908 F.2d 555, 558–59 (9th Cir. 1990). This doesn't mean that Garcia owns a copyright interest in the entire scene: She can claim copyright in her own contribution but not in "preexisting material" such as the words or actions spelled out in the underlying script. 17 U.S.C. § 103(b); *see also U.S. Auto Parts Network, Inc.*, 692 F.3d at 1016. Garcia may assert a copyright interest only in the portion of "Innocence of Muslims" that represents her individual creativity, but even if her contribution is relatively minor, it isn't de minimis. *See Feist*, 499 U.S. at 359, 363. We need not and do not decide whether every actor has a copyright in his performance within a movie. It suffices for now to hold that, while the matter is fairly debatable, Garcia is likely to prevail.

**ADD10**

GARCIA V. GOOGLE, INC.                    11

As the above discussion makes clear, any analysis of the rights that might attach to the numerous creative contributions that make up a film can quickly become entangled in an impenetrable thicket of copyright. But it rarely comes to that because copyright interests in the vast majority of films are covered by contract, the work for hire doctrine or implied licenses. *See* F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures Under U.S. Copyright Law*, 49 UCLA L. Rev. 225, 238, 317–18, 327–33 (2001). Here, Google argues that Garcia's performance was a work made for hire or, alternatively, that she granted Youssef an implied license to use her performance in "Innocence of Muslims."

## 2. Work For Hire

Under the work for hire doctrine, the rights to Garcia's performance vested in Youssef if Garcia was Youssef's employee and acted in her employment capacity or was an independent contractor who transferred her interests in writing. *See* 17 U.S.C. §§ 101, 201(b); *see also Cmty. for Creative Non-Violence* v. *Reid*, 490 U.S. 730, 751 (1989).

The "term 'employee'" refers "to a hired party in a conventional employment relationship," and the question of employment is analyzed under traditional principles of agency. *Reid*, 490 U.S. at 743, 751. Garcia's case is a good example of why it is difficult to categorize an actor, particularly one in a small role, as a conventional employee. Youssef hired Garcia for a specific task, she only worked for three days and she claims she received no health or other traditional employment benefits. *See id.* at 751–52. As we've recognized, this difficulty is why 17 U.S.C. § 101 "specifically addresses the movie . . . industr[y], affording

**ADD11**

12                GARCIA V. GOOGLE, INC.

moviemakers a simple, straightforward way of obtaining ownership of the copyright in a creative contribution—namely, a written agreement." *Effects Assocs.*, 908 F.2d at 558. Youssef didn't obtain a written agreement,[6] and Garcia simply doesn't qualify as a traditional employee on this record.

The dissent believes Garcia was an employee primarily because "Youssef controll[ed] both the manner and means of making the film, including the scenes featuring Garcia" and Youssef "was engaged in the business of film making at the time." Dissent 32. But there's no evidence in the record that Youssef directed the film or that he controlled the manner in which any part of the film—much less Garcia's scene—was shot. In fact, Youssef has claimed only that he wrote the screenplay.

There's nothing in the record to suggest that Youssef was in the "regular business" of making films. *Reid*, 490 U.S. at 752. He'd held many jobs, but there's no indication he ever worked in the film industry. And there's no evidence he had any union contracts, relationships with prop houses or other film suppliers, leases of studio space or distribution agreements. The dissent would hold that Youssef was in the "regular business" of filmmaking simply because he made "Innocence of Muslims." But if shooting a single amateur

---

[6] Neither party claims that Garcia signed a work for hire agreement. In the district court, Google produced an agreement, purportedly signed by Garcia, that transferred all of her rights in her performance to the film's producers. Garcia responded by submitting the declaration of a handwriting expert opining that Garcia's signature had been forged. The district court didn't address the agreement or its authenticity.

film amounts to the regular business of filmmaking, every schmuck with a videocamera becomes a movie mogul.

### 3.  Implied License

A non-exclusive license may be implied from conduct and arises where a plaintiff "create[s] a work at defendant's request and hand[s] it over, intending that defendant copy and distribute it." *Effects Assocs.*, 908 F.2d at 558. We've found an implied license where the plaintiff's contribution to a film or other work would otherwise be worthless or of "minimal value." *Id.* at 559; *see also Oddo* v. *Ries*, 743 F.2d 630, 634 (9th Cir. 1984). That is the case here. Garcia auditioned for a role in a particular film, was paid for her performance and had every reason to believe Youssef would eventually release the film. Without an implied license, the performance for which she was paid would be unusable. Therefore, we agree with Google that Garcia granted Youssef an implied license.

Any such license must be construed broadly. If the scope of an implied license was exceeded merely because a film didn't meet the ex ante expectation of an actor, that license would be virutally meaningless. *See Foad Consulting Grp., Inc.* v. *Azzalino*, 270 F.3d 821, 837–38 (9th Cir. 2001) (Kozinski, J., concurring). A narrow, easily exceeded license could allow an actor to force the film's author to re-edit the film—in violation of the author's exclusive right to prepare derivative works. *See* 17 U.S.C. § 106(2). Or the actor could prevent the film's author from exercising his exclusive right to show the work to the public. *See* 17 U.S.C. § 106(4). In other words, unless these types of implied licenses are

14          GARCIA V. GOOGLE, INC.

construed very broadly, actors could leverage their individual contributions into de facto authorial control over the film.[7]

Nevertheless, even a broad implied license isn't unlimited. *See Oddo*, 743 F.2d at 634. Garcia was told she'd be acting in an adventure film set in ancient Arabia. Were she now to complain that the film has a different title, that its historical depictions are inaccurate, that her scene is poorly edited or that the quality of the film isn't as she'd imagined, she wouldn't have a viable claim that her implied license had been exceeded. But the license Garcia granted Youssef wasn't so broad as to cover the use of her performance in *any* project. Here, the problem isn't that "Innocence of Muslims" is not an Arabian adventure movie: It's that the film isn't intended to entertain at all. The film differs so radically from anything Garcia could have imagined when she was cast that it can't possibly be authorized by any implied license she granted Youssef.

A clear sign that Youssef exceeded the bounds of any license is that he lied to Garcia in order to secure her participation, and she agreed to perform in reliance on that lie. Youssef's fraud alone is likely enough to void any agreement he had with Garcia. *See* 26 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 69:4 (4th ed. 2003). But even if it's not, it's clear evidence that his inclusion of her performance in "Innocence of Muslims"

---

[7] Construing such implied licenses narrowly would also undermine our joint authorship jurisprudence. Most actors don't qualify as joint authors. *See Aalmuhammed*, 202 F.3d at 1232–33. Yet, if any actor who doesn't like the final version of a movie could keep it from being released, he'd have more control over the film than a joint author. *See* 1 *Nimmer on Copyright* § 6.10[A][1][a], at 6–36 ("[A] joint owner may exploit the work himself, without obtaining the consent of the other joint owners.").

exceeded the scope of the implied license and was, therefore, an unauthorized, infringing use.

The situation in which a filmmaker uses a performance in a way that exceeds the bounds of the broad implied license granted by an actor will be extraordinarily rare. But this is such a case. Because it is, Garcia has demonstrated that she's likely to succeed on the merits of her claim. *Winter*, 555 U.S. at 20.

**B. Irreparable Harm**

Garcia argues that she suffers irreparable harm both because of the ongoing infringement of her copyright and because that infringement subjects her to continuing, credible death threats. Irreparable harm isn't presumed in copyright cases. *Perfect 10, Inc.* v. *Google, Inc.*, 653 F.3d 976, 980–81 (9th Cir. 2011). Therefore, Garcia must show that the damage to her reputation and threats against her life constitute irreparable harm.

The district court found that Garcia failed to make this required showing, primarily because she didn't bring suit until several months after "Innocence of Muslims" was uploaded to YouTube. It's true that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc.* v. *Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). But this is so because a preliminary injunction is based "'upon the theory that there is an urgent need for speedy action'" and by "'sleeping on its rights a plaintiff demonstrates [a] lack of'" urgency. *Lydo Enters., Inc.* v. *City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quoting *Gillette Co.* v. *Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)).

16          GARCIA V. GOOGLE, INC.

There's no dispute that, here, Garcia took legal action as soon as the film received worldwide attention and she began receiving death threats—in other words, as soon as there was a "need for speedy action." *Id.* Because the need for immediate action didn't arise until she was threatened, Garcia wasn't dilatory in bringing the lawsuit.

The harm Garcia complains of is real and immediate. *See City of L.A.* v. *Lyons*, 461 U.S. 95, 111 (1983). She has provided unrefuted evidence that the threats against her are ongoing and serious, she has already been forced to take significant security precautions when traveling and she moved to a new home and relocated her business as a safety measure. Although past injuries aren't sufficient to establish irreparable harm for purposes of an injunction, *id.* at 103, Garcia has amply demonstrated that, absent an injunction, she'll continue to suffer concrete harms—whether in the form of ongoing security requirements or actual harm to her person.

Beyond establishing that she faces an imminent harm, Garcia must show a "sufficient causal connection" between that harm and the conduct she seeks to enjoin such that the injunction would effectively curb the risk of injury. *Perfect 10*, 653 F.3d at 981–82. Despite her understandable focus on the threats against her life, Garcia has brought a copyright action. Therefore, she needs to show that the harm she alleges is causally related to the infringement of her copyright.

She's made such a showing. Youssef's unauthorized inclusion of her performance in "Innocence of Muslims" undisputedly led to the threats against Garcia. Google argues that any harm arises solely out of Garcia's participation in

"Innocence of Muslims" and not out of YouTube's continued hosting of the film. But Garcia has shown that removing the film from YouTube will help disassociate her from the film's anti-Islamic message and that such disassociation will keep her from suffering future threats and physical harm. Although Google asserts that the film is so widespread that removing it from YouTube will have no effect, it has provided no evidence to support this point.[8] Taking down the film from YouTube will remove it from a prominent online platform—the platform on which it was first displayed—and will curb the harms of which Garcia complains.

It is not irrelevant that the harm Garcia complains of is death or serious bodily harm, which the dissent fails to mention. Death is an "irremediable and unfathomable" harm, *Ford* v. *Wainwright*, 477 U.S. 399, 411 (1986), and bodily injury is not far behind. To the extent the irreparable harm inquiry is at all a close question, we think it best to err on the side of life.

## C. Balance of the Equities and The Public Interest

Youssef lied to Garcia about the project in which she was participating. Her performance was used in a way that she

---

[8] Contrary to the dissent's suggestion, Garcia's affidavit doesn't establish that the film has been "widely discussed and disseminated." Dissent 34. It states only that Garcia reached out to the media to let the world know that she "d[id] not condone the film." We reject the dissent's uncharitable argument that Garcia should be penalized for attempting to protect her life and reputation by distancing herself from "Innocence of Muslims." We also reject Google's preposterous argument that any harm to Garcia is traceable to her filing of this lawsuit. Any publicity generated by Garcia's lawsuit is a necessary product of her attempt to protect herself and her legal rights after Google refused to do so.

18          GARCIA V. GOOGLE, INC.

found abhorrent and her appearance in the film subjected her to threats of physical harm and even death. Despite these harms, and despite Garcia's viable copyright claim, Google refused to remove the film from YouTube. It's hard to see how Google can defend its refusal on equitable grounds and, indeed, it doesn't really try. Instead, it argues that an injunction would be inequitable because of the overwhelming public interest in the continued hosting of "Innocence of Muslims" on YouTube.

The problem with Google's position is that it rests entirely on the assertion that Garcia's proposed injunction is an unconstitutional prior restraint of speech. But the First Amendment doesn't protect copyright infringement. *Cf. Eldred* v. *Ashcroft*, 537 U.S. 186, 219–220 (2003). Because Garcia has demonstrated a likelihood of success on her claim that "Innocence of Muslims" infringes her copyright, Google's argument fails. The balance of equities therefore clearly favors Garcia and, to the extent the public interest is implicated at all, it, too, tips in Garcia's direction.

\*          \*          \*

This is a troubling case. Garcia was duped into providing an artistic performance that was used in a way she never could have foreseen. Her unwitting and unwilling inclusion in "Innocence of Muslims" led to serious threats against her life. It's disappointing, though perhaps not surprising, that Garcia needed to sue in order to protect herself and her rights.

But she has sued and, more than that, she's shown that she is likely to succeed on her copyright claim, that she faces irreparable harm absent an injunction and that the balance of

**ADD18**

GARCIA V. GOOGLE, INC.                    19

equities and the public interest favor her position.    The
district court abused its discretion in finding otherwise.

**REVERSED AND REMANDED[9]**

---

N.R. SMITH, Circuit Judge, dissenting

Because the facts and law do not "clearly favor" issuing
a preliminary injunction to Garcia, the district court did not
abuse its discretion in denying Garcia's requested relief. As
a result, I must dissent.

## I.  Standard of Review

The majority opinion omits applying the requisite
standard of review that is especially pertinent to Garcia's
requested relief. Mandatory preliminary injunctions, similar
to the one issued today, are "particularly disfavored." *Stanley
v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).

Different from the usual "prohibitory injunction," a
"mandatory injunction goes well beyond simply maintaining
the status quo *pendente lite*." *Id.* (internal quotation marks
omitted). As an example, requiring a university to reappoint
a faculty member whose contract had expired constitutes a

---

[9] Concurrent with this opinion, we have issued an order directing Google
to take down all copies of "Innocence of Muslims" from YouTube and
any other platforms within its control and to take all reasonable steps to
prevent further uploads.  This temporary injunction shall remain in place
until the district court is able to enter a preliminary injunction consistent
with our opinion.

mandatory injunction. *Id.*; *see also, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) ("[T]he affirmative step of recalling [a] product" is also a mandatory injunction.). In the instant dispute, Garcia requests relief through a mandatory injunction. Rather than asking to maintain the status quo pending litigation, Garcia demands Google immediately remove a film from YouTube. Therefore, her request must be "subject to a higher degree of scrutiny because such relief is particularly disfavored under the law of this circuit."*Stanley*, 13 F.3d at 1320. This higher degree of scrutiny requires courts to be "extremely cautious" and "deny such relief unless the facts and law *clearly favor* the moving party." *Id.* at 1319–20 (internal quotation marks omitted, emphasis added). Indeed, mandatory injunctions "are not issued in doubtful cases." *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (internal quotation marks omitted).

This standard's importance must be appreciated in conjunction with the general standard with which this court reviews a district court's decision to deny preliminary injunctive relief: "abuse of discretion." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). As a result, the majority may only reverse if it were illogical or implausible, *United States v. Hinkson*, 585 F.3d 1247, 1263–64 (9th Cir. 2009), for the district court to conclude that the law and facts did not *clearly favor* Garcia, *Stanley*, 13 F.3d at 1320.[1]

Given this standard, the majority errs in requiring Google to pull the film from YouTube—at this stage of the litigation.

---

[1] Given this is the relevant standard of review, the district court's application of it is hardly "equivocation." *See* maj. op. at 6 n.2.

The district court did not abuse its discretion in concluding that the law and facts did not clearly favor Garcia. Instead, the majority makes new law in this circuit in order to reach the result it seeks. We have never held that an actress's performance could be copyrightable. Indeed, "[t]here is little case law or statutory authority as to the position of performers as authors of an audiovisual work under U.S. law." F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law*, 49 UCLA L. Rev. 225, 300 (2001).

## II. Application of the *Winter* Factors

### A. Garcia's Likely Success on the Merits of Her Copyright Claim

The district court concluded that it was unclear whether Garcia had a copyright interest in her acting performance. The district court's discretionary conclusion hardly appears illogical or implausible.

### 1. Copyright Interest

A protected interest under the Copyright Act must be an "original work[] of authorship fixed in any tangible medium of expression. . . ." 17 U.S.C. § 102(a). Garcia does not clearly have a copyright interest in her acting performance, because (1) her acting performance is not a work, (2) she is not an author, and (3) her acting performance is too personal to be fixed.[2]

---

[2] The majority relies solely on a showing of originality to conclude Garcia has a copyrightable interest in her acting performance, maj. op. at 8 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345

22          GARCIA V. GOOGLE, INC.

### a. Work

To be protected, Garcia's acting performance must be a "work." *Id*. Congress has listed examples of copyrightable works, like architectural works, motion pictures, literary works, and pictorial or sculptural works. *Id*. The nature of these works is significantly different from an actress's individual performance in a film, casting doubt on the conclusion that the latter can constitute a work. *See Microsoft Corp. v. C.I.R.*, 311 F.3d 1178, 1184–85 (9th Cir. 2002) ("The doctrine of *noscitur a sociis* counsels that words should be understood by the company they keep.").

Section 101 of the Act is also instructive, because it differentiates a work from the performance of it. It defines "perform a 'work'" to mean "to recite, render, play, dance or *act it*." 17 U.S.C. § 101 (emphasis added). Given this provision, it is difficult to understand how Congress intended to extend copyright protection to this acting performance. While Congress distinguishes the performance from the work itself, the majority blurs this line. Its position contemplates something very different from amalgamating independently copyrightable interests into a derivative work. *See id.* at § 103(b).

Consistent with section 101, section 102(b) outlines that which is not given copyright protection. It states: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." *Id.* at § 102(b). An acting

---

(1991)), but the Constitution and the Copyright Act require much more.

performance resembles the "procedure" or "process" by which "an original work" is performed. *Id.* Therefore, "[i]n no case does copyright protection" extend to an acting performance, "regardless of the form in which it is described, illustrated, or embodied in" the original work. *Id.*

In sum, a motion picture is a work. *Id.* at § 102(a). A segment independently produced and then incorporated into a motion picture is also a work. *See, e.g.*, *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 556 (9th Cir. 1990)*.* However, the Copyright Act does not clearly place an acting performance within its sphere of copyrightable works. As a result, the law and facts do not clearly favor finding a copyrightable interest in Garcia's acting performance.

#### b.  Authorship

Like the work requirement, the Copyright Act also premises copyright protection on authorship. 17 U.S.C. § 102(a). Authorship is also a constitutional copyright requirement. *See* U.S. Const. Art. I, § 8, cl. 8; *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 56 (1884). *Aalmuhammed v. Lee* is the most relevant case in this circuit on the question of authorship. 202 F.3d 1227 (9th Cir. 2000). Though the *Aalmuhammed* court discussed authorship in the context of joint authors of a film (which Garcia does not claim to be), it articulated general principles of authorship that assist in analyzing Garcia's interest in her acting performance.[3]

---

[3] Furthermore, Garcia's interest in her acting performance may best be analyzed as a joint work with Youssef, considering she relied on Youssef's script, equipment, and direction. *See* 17 U.S.C. § 101 ("A 'joint work' is a work prepared by two or more authors with the intention that

24    GARCIA V. GOOGLE, INC.

The *Aalmuhammed* court explained that "[t]he word [author] is traditionally used to mean the originator or the person who causes something to come into being." *Id.* at 1232. In other words, the author is the "person with creative control." *Id.* Thus, "an author 'superintends' the work by exercising control." *Id.* at 1234 (quoting *Burrow-Giles*, 111 U.S. at 61) (alteration omitted). Another framing by the court defined an author as "'he to whom anything owes its origin.'" *Id.* at 1233 (quoting *Burrow-Giles*, 111 U.S. at 58). An author might also be "'the inventive or master mind' who 'creates, or gives effect to the idea.'" *Id.* at 1234 (quoting *Burrow-Giles*, 111 U.S. at 61). Indeed, authorship "requires *more* than a minimal creative or original contribution to the work." *Id.* at 1233 (citing *Burrow-Giles*, 111 U.S. at 58) (emphasis added).[4] These principles comport with the "general rule," that "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Commty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).

In concluding that Aalmuhammed was not a joint author of the film, *Malcolm X*, the court found that he (1) "did not at any time have superintendence of the work," (2) "was not the person 'who . . . actually formed the picture by putting the persons in position, and arranging the place,'" (3) could not "benefit" the work "in the slightest unless [the director] chose to accept [his recommendations]," and (4) made "valuable

---

their contributions be merged into inseparable or interdependent parts of a unitary whole.").

[4] The majority opinion cannot coexist with this statement. *See* maj. op. at 8.

**ADD24**

GARCIA V. GOOGLE, INC.                    25

contributions to the movie," but that alone was "not enough for co-authorship of a joint work." *Aalmuhammed*, 202 F.3d at 1235.

Garcia's contribution is less significant than Aalmuhammed's. She conceded in her complaint and affidavit that she had no creative control over the script or her performance. Youssef provided the script, the equipment, and the direction. As a result, Garcia was not the originator of ideas or concepts. She simply acted out others' ideas or script. Her brief appearance in the film, even if a valuable contribution to the film, does not make her an author. Indeed, it is difficult to understand how she can be considered an "inventive or master mind" of her performance under these facts.

The majority dismisses *Aalmuhammed* as inapposite, instead bolstering its conclusion with reference to acting manuals and treatises. *See* maj. op. at 8–9. In so doing, it goes too far in attempting to distinguish *Aalmuhammed*. First, the *Aalmuhammed* court articulated general principles of authorship that it pulled from the Supreme Court case, *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884). *See, e.g.*, *Aalmuhammed*, 202 F.3d at 1233 ("*Burrow-Giles* is still good law. . . ."). *Burrow-Giles* has nothing to do with joint works; instead, the Court interpreted "author" as featured in Article I, Section 8, Clause 8 of the U.S. Constitution. *See* 111 U.S. at 56. Second, the majority's one quotation from *Aalmuhammed*, maj. op. at 8, is taken out of context. The very next line in that opinion makes clear that copyright protection is premised on authorship, whether the work is joint or otherwise:

> We hold that authorship is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution. We recognize that a contributor of an expression may be deemed to be the "author" of that expression for purposes of determining whether it is independently copyrightable.

*Aalmuhammed*, 202 F.3d at 1232. Finally, Section 102(a) of the Copyright Act and Article I, Section 8, Clause 8 of the U.S. Constitution both premise copyright protection on authorship. Therefore, not only does the majority decline to apply the most relevant precedent in this circuit on the question before it, it also reads the authorship requirement out of the Copyright Act and the Constitution.[5]

Even the commentators agree that *Aalmuhammed* not only applies to Garcia's claim, but also forecloses her realization of a copyrightable interest in her acting performance. *See, e.g.*, Dougherty, *Not a Spike Lee Joint?*, 49 UCLA L. Rev. at 306 ("Under the judicially enhanced joint work requirements," an actress's performance would be "physically inseparable from other cinematic contributions." (citing *Aalmuhammed*, 202 F.3d at 1232)); Lee, *Entertainment and Intellectual Property Law* § 12:7 (2013) ("Under [*Aalmuhammed*], . . . individual contributors will rarely qualify as joint authors").

---

[5] The majority's sole reliance on *Feist Publications* to conclude that an acting performance is copyrightable, maj. op. at 8–9, gives insufficient weight to the constitutional and statutory authorship requirement. In *Feist Publications*, the specific question was not of authorship but of originality. *See* 499 U.S. at 347.

The majority lauds an actress's creative role in a film, maj. op. at 8, but the practical impact of its decision must not be ignored. Garcia's role in the film is minimal. Yet the majority concludes that she somehow created a work Congress intended to protect under the Copyright Act. Considering the number of contributors who inject the same or a greater amount of creativity into a film, the majority's omission of any inquiry into authorship indeed creates "an impenetrable thicket of copyright." Maj. op. at 11. Meanwhile, though *Aalmuhammed*'s interpretation of the Copyright Act has been debated in academic circles, "it adopts a standard that promotes clarity in the motion picture industry." Lee, *Entertainment and Intellectual Property Law* § 12:7.

Because Garcia does not qualify as an author under *Aalmuhammed*, the law and facts do not clearly favor protecting her acting performance under the Copyright Act.

### c.  Fixation

Lastly, the subject matter protected by the Copyright Act must also be "fixed in [a] tangible medium of expression. . . ." 17 U.S.C. § 102(a). Copyright preemption cases are instructive on the question of fixation.

For preemption purposes, the courts generally agree that "the scope of the subject matter of copyright law is broader than the protection it affords." *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (en banc); *see U.S. ex rel Berge v. Bd. of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997). In other words, the subject matter underlying a state law claim *preempted* by the Copyright Act may nevertheless not be protected by the Copyright Act. By

28          GARCIA V. GOOGLE, INC.

implication, subject matter supporting a *non-preempted* state law claim is definitely not protected by the Copyright Act. A number of cases from this circuit discuss subject matter akin to an acting performance and prove useful on the question of fixation.[6]

In *Midler v. Ford Motor Co.*, Bette Midler sued Ford for misappropriating her voice in a commercial. 849 F.2d 460, 462 (9th Cir. 1988). Although Ford properly had a license from the song's copyright holder, it paid someone to imitate Midler in singing the song Midler made famous. *Id.* Although ultimately holding for Ford, the court rejected its argument that Midler's claim was preempted by copyright law. "A voice is not copyrightable. The sounds are not 'fixed.' What is put forward . . . here is more personal than any work of authorship." *Id.*; *see also Sinatra v. Goodyear Tire & Rubber Co.*, 435 F.2d 711 (9th Cir. 1970).

In *Laws v. Sony Music Entertainment*, we distinguished *Midler* from its facts in holding that the plaintiff's claim was preempted by the Copyright Act, because "Sony was not imitating 'Very Special' as [the plaintiff] might have sung it. Rather, it used a portion of 'Very Special' as sung by [the plaintiff]." 448 F.3d 1134, 1141 (9th Cir. 2006). Where Sony had a license to the entire song, its use of a portion of it under

---

[6] The majority opinion dismisses the line of copyright preemption precedent. Maj. op. at 9 ("*Midler* isn't a copyright case at all—it's a right of publicity case that happens to discuss copyright in the context of preemption."). However, these cases feature the same judges interpreting the same Copyright Act, whether the question is one of copyright infringement or copyright preemption. Thus, the majority's distinction is without difference; it fails to overcome the fact that subject matter underlying a *non-preempted* state law claim, like that in *Midler*, is *clearly* without the Copyright Act's protection. *See Montz*, 649 F.3d at 979.

**ADD28**

GARCIA V. GOOGLE, INC.                    29

that license could not be attacked outside the copyright laws.
*Id.*

Jules Jordan Video, Inc. v. 144942 Canada, Inc.,
617 F.3d 1146 (9th Cir. 2010), is like *Laws*. Defendants in
*Jules Jordan* copied (without authorization) pornographic
DVDs produced and copyrighted by Jules Jordan Video, then
reproduced, counterfeited, and sold their copies to third
parties. *Id.* at 1153. Because Jules Jordan held a copyright in
the original DVDs, this court found that the Copyright Act
preempted its state law right of publicity claim against
Defendants.

The subject matter in *Jules Jordan* and *Laws* concerned
entire copyrighted works—video and music recordings.
Differently, *Midler* involved the imitation of a singer's voice.
Combined, these cases show that, just as the *singing* of a song
is not copyrightable, while the entire song recording is
copyrightable, the *acting* in a movie is not copyrightable,
while the movie recording is copyrightable.[7]

A musical recording involves many moving parts,
including the tune, lyrics, instrumental musicians, vocalists,
and a production team that edits and prepares the final song.
While the ultimate product is copyrightable, Ninth Circuit
precedent dictates that a vocalist's singing of the song is not
copyrightable. *See Midler*, 849 F.2d at 462. An acting
performance depends upon similar moving parts: a script,

---

[7] This is not the case where an independently authored clip is used in a
film, as in *Effects Assocs.*, 908 F.2d at 557–58. Rather, this analogy
assumes facts similar to the instance case: an actress acting out a script she
did not write under the direction of someone else who provides all of the
instruments, tools, and leadership.

**ADD29**

30            GARCIA V. GOOGLE, INC.

multiple actors' and actresses' performances, guidance from directors and staff, and editing and other production preparation. The movie is ultimately copyrightable. *See* 17 U.S.C. § 102(a). But one actress's individual acting performance in the movie, like a vocalist singing a song, "is more personal than any work of authorship." *Midler*, 849 F.2d at 462. As a result, it is not fixed. *See id.*

Just as "an actor does far more than speak words on a page," maj. op. at 8, so too does a vocalist. Indeed, one might say that otherwise, "every schmuck" is a vocalist, "because everyone . . . knows how to read." *Id.* at 8 (quoting Sanford Meisner & Dennis Longwell, *Sanford Meisner on Acting* 178 (1987)) (quotation marks omitted). An actress like Garcia makes a creative contribution to a film much like a vocalist's addition to a musical recording. Garcia did not write the script; she followed it. Garcia did not add words or thoughts to the film. She lent her voice to the words and her body to the scene. Her creativity came in the form of facial expression, body movement, and voice. Similarly, a singer's voice is her personal mobilization of words and musical notes to a fluid sound. Inflection, intonation, pronunciation, and pitch are the vocalist's creative contributions. Yet, this circuit has determined that such, though perhaps creative, is too personal to be fixed. *See Midler*, 849 F.2d at 462.

Under this line of cases, an actress's performance in a film is more like the personal act of singing a song than the complete copyrighted works in *Laws* and *Jules Jordan*. As a result, it does not seem copyrightable. Thus, the law and facts do not clearly support Garcia's claim that her acting performance is protected under the Copyright Act.

**ADD30**

Considering work, authorship, and fixation, Garcia has not demonstrated how the facts and law clearly favor her claim of a copyrightable interest in her acting performance.

### 2. Work for Hire Doctrine

Even if the majority were correct in finding a copyrightable interest in Garcia's acting performance, preliminary injunctive relief would be unwarranted. The district court did not address the application of the work for hire doctrine. Yet, the law and facts do not clearly show that Garcia was not working for hire.

"In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title. . . ." 17 U.S.C. § 201(b). "A 'work made for hire' is a work prepared by an employee within the scope of his or her employment. . . ." *Id.* at § 101. Therefore, "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751.

> Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is

> part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751–52 (internal citations omitted). Though "[n]o one of these factors is determinative," *id.* at 752, the hiring party's control "is the central inquiry here." *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125 (9th Cir. 2010).

The work for hire doctrine "is important in the analysis of motion picture authorship because in the United States most contributions to a motion picture are created as works made for hire." Dougherty, *Not a Spike Lee Joint?*, 49 UCLA L. Rev. at 238. Here, Garcia conceded in her complaint and affidavit that Youssef "managed all aspects of production," controlling both the manner and means of making the film, including the scenes featuring Garcia. Further, this "central" factor is not the only one supporting a work for hire finding here. The bulk of the other factors also suggest that Garcia is an employee. Youssef provided the instrumentalities and tools, dictated the filming location, decided when and how long Garcia worked, and was engaged in the business of film making at the time. Additionally, Garcia did not hire or pay assistants. Contrary to the majority's conclusion, maj. op. at 11–13, the facts and law do not clearly favor finding that Garcia was not working for hire.[8]

In *Reid*, the Court decided a sculptor was not an employee, even though Community for Creative Non-

---

[8] While the majority may dispute which person was actually directing the film, it cannot overcome Garcia's own admissions in her complaint that substantiate these facts; she was not in control.

Violence "directed enough of Reid's work to ensure that he produced a sculpture that met their specifications." *Reid*, 490 U.S. at 752. However, "all the other circumstances weigh[ed] heavily against finding an employment relationship." *Id.* This case differs considerably from *Reid*. The central factor of control and many other factors "weigh heavily" *for* finding an employment relationship.

In sum, the majority gives zero deference to the district court's position on the likelihood for success factor. To justify its opinion, the majority must show the district court abused its discretion in determining the law and facts did not clearly show Garcia was likely to succeed on the merits. This, the majority has failed to do.

## B. Irreparable Harm

The district court decided that because "[t]he Film was posted for public viewing on YouTube" five months prior to Garcia bringing suit, she "has not demonstrated that the requested preliminary relief would prevent any alleged harm." The majority has failed to demonstrate how the district court abused its discretion in so holding.

Indeed, the district court's application of the law to the facts of this case here was not an abuse of discretion. A "[p]laintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). The district court gave significant weight to Garcia's delay in filing suit, even given Garcia's explanation for her delay. *See* maj. op. at 15–16. This is not illogical or implausible. Were Garcia really trying to protect her purported copyright interest in her acting performance,

34         GARCIA V. GOOGLE, INC.

one would expect her to have brought this action immediately after learning of the alleged infringing behavior. Considering "[t]he relevant harm is the harm that . . . occurs to the parties' legal interests," Garcia has failed to explain her delay in terms of harm to her alleged copyright interest. *See Salinger v. Colting*, 607 F.3d 68, 81 & n.9 (2d Cir. 2010) ("[T]he justification of the copyright law is the protection of the *commercial* interest of the artist/author. It is not to coddle artistic vanity or to protect secrecy, but to stimulate creation by protecting its rewards." (internal quotation marks omitted)).

Further, by Garcia's own admission, the film has been widely discussed and disseminated; Garcia admits in her affidavit that she "went public and advised the world through media that [she] did not condone the film." Thus, while Garcia has provided undisputed evidence of past threats and injuries, she has failed to link her allegations of future harm to potential future viewings of the film on YouTube. *See Perfect 10 v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011); *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173 (9th Cir. 2011).

Therefore, it is not illogical or implausible to conclude that the law and facts do not clearly demonstrate how Garcia will suffer continued irreparable harm caused by the presence of the film on YouTube. *See Small v. Operative Plasterers' and Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 494 (9th Cir. 2010).

Rather than focusing on the logic or plausibility of the district court's decision, the majority substitutes its own explanation of why Garcia's delay should not be held against her. Maj. op. at 15–17. However, the weight attached by the

GARCIA V. GOOGLE, INC.                    35

district court to certain facts when measuring irreparable harm is not for this court to second guess. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).

## C. Balancing the Equities

When considering the propriety of preliminary injunction relief, "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 632 F.3d at 1131. The district court applied this concept in concluding preliminary injunctive relief was unwarranted without considering the balance of the equities or the public interest.

However, the balance of the equities does not clearly favor Garcia. A court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

Google argues that the balance of the equities does not clearly favor Garcia, because "[a] court order requiring removal from YouTube of the Film or any portion thereof would impose a substantial burden on free expression, without preventing any future harm to Appellant." Garcia is only faced with *potential* infringement of her *potential* copyright interest *pending* a final disposition of this lawsuit. Further, she is not completely without fault in these circumstances. If she valued her acting performance to the extent she now claims, why didn't she protect her performance by contract? The facts evidence that she acted for three days and was paid $500 dollars. Balancing the harm faced by both Garcia and Google, the law and facts do not clearly favor Garcia.

**ADD35**

In its basis concerning the balance of the equities, the majority discusses Youssef's reproachable conduct. Maj. op. at 17–18. However, Youssef is not a party to this appeal, and Google was not a party to any of Youssef's actions.

Therefore, the balance of the equities does not clearly favor Garcia.

### D.  Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the *extraordinary* remedy of injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1082 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24(2008)) (emphasis added). In fact, "'the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'" *Stormans*, 586 F.3d at 1139 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–313 (1982)).

The public's interest in a robust First Amendment cannot be questioned. *See Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Opposite this vital public interest is Garcia's allegation of copyright infringement. Properly enforcing the Copyright Act is also an important public interest. *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011). Indeed, if Google were actually infringing Garcia's copyright, the First Amendment could not shelter it. *See Eldred v. Ashcroft*, 537 U.S. 186, 219–20 (2003).

GARCIA V. GOOGLE, INC.                    37

But the case at bar does not present copyright infringement per se. Instead (in an unprecedented opinion), the majority concludes that Garcia *may* have a copyright interest in her acting performance. Maj. op. at 10. As a result, Google's contention, that issuing a preliminary injunction on these facts may constitute a prior restraint of speech under the First Amendment, identifies an important public interest.

Thus, the law and facts do not clearly demonstrate how granting a preliminary injunction in Garcia's favor would serve the public interest.

**III.     Conclusion**

The *Stanley* standard counseling extreme caution when considering granting a mandatory preliminary injunction is premised on principles of judicial restraint. Instead, the majority abandons restraint to procure an end (ordering the film be taken down) by unsuitable means (the Copyright Act).

FILED

NOT FOR PUBLICATION

FEB 19 2014

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| **CINDY LEE GARCIA,** | No. 12-57302 |
| Plaintiff - Appellant, | D.C. No. 2:12-cv-08315-MWF-VBK |
| v. | |
| **GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company,** | **ORDER** |
| Defendants - Appellees, | |
| and | |
| **NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; MARK BASSELEY YOUSSEF; ABANOB BASSELEY NAKOULA; MATTHEW NEKOLA; AHMED HAMDY; AMAL NADA; DANIEL K. CARESMAN; KRITBAG DIFRAT; SOBHI BUSHRA; ROBERT BACILY; NICOLA BACILY; THOMAS J. TANAS; ERWIN SALAMEH; YOUSSEFF M. BASSELEY; MALID AHLAWI,** | |
| Defendants. | |

Before:    **KOZINSKI**, Chief Judge, **GOULD** and **N.R. SMITH**, Circuit Judges.

**ADD38**

page 2

Google, Inc. shall take down all copies of "Innocence of Muslims" from YouTube.com and from any other platforms under Google's control, and take all reasonable steps to prevent further uploads of "Innocence of Muslims" to those platforms.  Google shall comply with this order within twenty-four hours of the issuance thereof.

Neither the parties nor counsel shall disclose this order, except as necessary to the takedown process, until the opinion in this case issues.  This order will remain in effect until such time as the district court enters a preliminary injunction consistent with our opinion.

FILED

**NOT FOR PUBLICATION**

FEB 21 2014

**UNITED STATES COURT OF APPEALS**

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| **CINDY LEE GARCIA,** | No. 12-57302 |
| Plaintiff - Appellant, | D.C. No. 2:12-cv-08315-MWF-VBK |
| v. | |
| **GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company,** | **ORDER** |
| Defendants - Appellees, | |
| And | |
| **NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; MARK BASSELEY YOUSSEF; ABANOB BASSELEY NAKOULA; MATTHEW NEKOLA; AHMED HAMDY; AMAL NADA; DANIEL K. CARESMAN; KRITBAG DIFRAT; SOBHI BUSHRA; ROBERT BACILY; NICOLA BACILY; THOMAS J. TANAS; ERWIN SALAMEH; YOUSSEFF M. BASSELEY; MALID AHLAWI,** | |
| Defendants. | |

Before:    **KOZINSKI**, Chief Judge, **GOULD** and **N.R. SMITH**, Circuit Judges.

**ADD40**

page 2

Appellees' emergency stay motion is denied.

The opinion in this case is currently scheduled to issue on Wednesday, February 26, 2014.  The opinion reverses the denial of the preliminary injunction and provides a detailed explanation.  The order of February 19, 2014, was issued in advance of the opinion to prevent a rush to copy and proliferate the film before Google can comply with the order.

Neither the parties nor counsel shall disclose this order or the order of February 19 until the opinion is actually published.

FILED

NOT FOR PUBLICATION

FEB 28 2014

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| CINDY LEE GARCIA, | No. 12-57302 |
| **Plaintiff - Appellant,** | D.C. No. 2:12-cv-08315-MWF-VBK |
| v. | |
| GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company, | ORDER |
| **Defendants - Appellees,** | |
| and | |
| NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; MARK BASSELEY YOUSSEF; ABANOB BASSELEY NAKOULA; MATTHEW NEKOLA; AHMED HAMDY; AMAL NADA; DANIEL K. CARESMAN; KRITBAG DIFRAT; SOBHI BUSHRA; ROBERT BACILY; NICOLA BACILY; THOMAS J. TANAS; ERWIN SALAMEH; YOUSSEFF M. BASSELEY; MALID AHLAWI, | |
| **Defendants.** | |

Before:     **KOZINSKI,** Chief Judge, **GOULD** and **N.R. SMITH,** Circuit
Judges.

ADD42

page 2

Appellees' second emergency stay motion is denied. The order of February 19, 2014, is modified as follows:

Google, Inc. shall take down all copies of "Innocence of Muslims" from YouTube.com and from any other platforms under Google's control, and take all reasonable steps to prevent further uploads of "Innocence of Muslims" to those platforms. Google shall comply with this order within twenty-four hours of the issuance thereof. This order does not preclude the posting or display of any version of "Innocence of Muslims" that does not include Cindy Lee Garcia's performance.

This order will remain in effect until such time as the district court enters a preliminary injunction consistent with our opinion.



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

December 18, 2012

The Armenta Law Firm
Attn: M Armenta
11900 Olympic Blvd Suite 730
Los Angeles, CA 90064
United States

Correspondence ID:   1-EBE2DM
RE:    Desert Warrior

Dear M Armenta:

We are writing because of questions about the authorship and ownership of this work. The application names Cindy Lee Garcia as the sole author of "dramatic performance fixed in tangible medium of expression." The copy you sent contains no credits, but online sources indicate that Ms. Garcia is an actress in the film "Innocence of Muslims," which appears to be the same as the motion picture on the disc you submitted for registration under the title "Desert Warrior." Online sources indicate that the film was written and produced by Nakoula Basseley Nakoula under the pseudonym Sam Bacile.

For copyright registration purposes, a motion picture is a single integrated work. You stated that Ms. Garcia did not sign an agreement or a release for her rights when she acted in 'Desert Warrior.' Copyrightable authorship in a motion picture may include production, direction, camerawork, editing and script. Assuming Ms. Garcia's contribution was limited to her acting performance, we cannot register her performance apart from the motion picture. Nor does it seem likely that she is entitled to register a claim in the motion picture as a whole in her name. Please see the enclosed Motion Picture Authorship Leaflet for more information.

If you feel that Ms. Garcia has the right to claim copyright in the entire motion picture, please state the reasons for your position. Otherwise, we must refuse registration. Where registration is refused, we close our file without further action and keep the copy and non-refundable filing fee according to our practices.

Sincerely,


Laura Lee Fischer
Chief, Performing Arts Division
U.S. Copyright Office

**ADD44**



# The Armenta Law Firm

A PROFESSIONAL CORPORATION

Via USPS

March 13, 2013

Laura Lee Fischer
Chief, Performing Arts Division
U.S. Copyright Office
Library of Congress
101 Independence Avenue SE
Washington DC 20559-6000

Re:    Desert Warrior, Correspondence ID: 1-EBE2DM

Dear Ms. Fischer:

Thank you for your letter of December 18, 2012.  I am writing to provide the reasons that we believe that Ms. Garcia has a copyrightable interest in her dramatic performance in the work, "Desert Warrior."  Enclosed is a copy of Ms. Garcia's brief filed before the United States Court of Appeals for the Ninth Circuit.  The matter is fully briefed and pending.  We are awaiting a hearing date.  I am requesting that the Copyright Office await the decision of the Ninth Circuit before taking any action.  We believe that the Court will decide the very issue that was raised in your letter.  If you have any questions or concerns or need any additional paperwork or information concerning the status of the appeal, please feel free to contact me directly.

Sincerely,

M. Cris Armenta

11900 Olympic Boulevard, Suite 730  ▪  Los Angeles, CA 90064
www.crisarmenta.com  ▪  telephone (310) 826-2826  ▪  facsimile (310) 826-5456



**United States Copyright Office**
Library of Congress    101 Independence Avenue SE    Washington, DC 20559-6000    www.copyright.gov

Mr. M. Cris Armenta
The Armenta Law Firm
11900 Olympic Blvd., Suite 730
Los Angeles, CA 90064

March 6, 2014

Dear Mr. Armenta:

On December 18, 2012, Ms. Laura Lee Fischer, Chief of the Performing Arts Division of the United States Copyright Office's Registration Program, wrote to you in response to the claim by Ms. Garcia in a copyrightable interest in her dramatic performance in a motion picture, "Desert Warrior." Ms. Fischer's letter stated that "[f]or copyright registration purposes, a motion picture is a single integrated work." It went on to state that "[a]ssuming Ms. Garcia's contribution was limited to her acting performance, we cannot register her performance apart from the motion picture." The letter concluded by stating that "[i]f you feel that Ms. Garcia has the right to claim copyright in the entire motion picture, please state the reasons for your position. Otherwise, we must refuse registration."

On March 13, 2013, you replied to Ms. Fischer by stating that you believed that Ms. Garcia "has a copyrightable interest in her dramatic performance in the work, 'Desert Warrior,'" and attached a brief to the United States Court of Appeals for the Ninth Circuit that you stated "fully briefed" the matter. You did not, however, respond to Ms. Fischer's specific question or acknowledge that the U.S. Copyright Office clearly stated that it views dramatic performances in motion pictures to be only a part of the integrated work -- the motion picture.

In accordance with the Office's previous letter, the Office must refuse registration. Although you asked the Office to await the decision of the Ninth Circuit before taking any action, the Office finds that the Copyright Act vests exclusive authority in the Register of Copyrights to render a decision as to whether to issue a certificate of registration or refuse an application for registration. 17 U.S.C. § 410. Moreover, Congress expressly envisioned that registration decisions by the Register of Copyrights would precede adjudication in the courts. 17 U.S.C. § 411. If infringement actions are instituted prior to registration determinations by the Register of Copyrights, not only will the evidentiary presumption be lost when certificates are issued, but more importantly, where the Office finds a claim to be invalid, the Register's statutory right to intervene in an action instituted pursuant to a refusal to register is nullified. 17 U.S.C. § 411(a).

1

**ADD46**

The U.S. Copyright Office's longstanding practices do not allow a copyright claim by an individual actor or actress in his or her performance contained within a motion picture. The rationale behind this position is clear: an actor or actress in a motion picture is either a joint author in the entire work or, as most often is the case, is not an author at all by virtue of a work made for hire agreement. This view is supported by the legislative history of section 201 of the Copyright Act:

> The definition of "joint works" has prompted some concern lest it be construed as converting the authors of previously written works, such as plays, novels, and music, into coauthors of a motion picture in which their work is incorporated. *It is true that a motion picture would normally be a joint rather than a collective work with respect to those authors who actually work on the film, although their usual status as employees for hire would keep the question of coownership from coming up.* On the other hand, although a novelist, playwright, or songwriter may write a work with the hope or expectation that it will be used in a motion picture, this is clearly a case of separate or independent authorship *rather than one where the basic intention behind the writing of the work was for motion picture use.* In this case, the motion picture is a derivative work within the definition of that term, and section 103 makes plain that copyright in a derivative work is independent of, and does not enlarge the scope of rights in, any pre-existing material incorporated into it. There is thus no need to spell this conclusion out in the definition of "joint work."

> H.R. Rep. 94–1476 at 120 (emphasis added).

While a novelist, playwright, or screenwriter may create distinct works that are later adapted or incorporated into a motion picture, i.e., a new derivative work, an actor's or actress' performance in the making of a motion picture is an integrated part of the resulting work, the motion picture as a whole. An actor's or actress' performance is either joint authorship or is a contribution under a work made for hire agreement. There is no question that Ms. Garcia's performance was not a stand-alone motion picture that was subsequently adapted into another motion picture. Rather, it was a part of the creation of "Desert Warrior", subsequently re-named, "Innocence of Muslims". There is also no question that Ms. Garcia intended her contribution or performance to "be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. §101. If her contribution was not as a work made for hire, she may assert a claim in joint authorship in the motion picture, but not sole authorship of her performance in a portion of the work. If her contribution was neither a work made for hire nor the requisite authorship to warrant a claim in a joint work, Ms. Garcia has no separable claim to copyrightable authorship in her performance.

The Office has identified at least one exception to the general rule on treating motion pictures as integrated works. Where a separate portion of a motion picture is commissioned, such as a special effects scene that qualifies as a discrete work in itself that is later incorporated into a motion picture, such a separate work may be neither a joint work nor a work made for hire, but rather a work created by an independent contractor. Such an exception is premised on the creation of a stand-alone work that is independently authored, fixed, and sufficiently creative to

2

**ADD47**

be considered a separate claim within one or more of the statutory categories of authorship in section 102(a).

The Office's view on this matter is not limited to motion pictures. The same reasoning would apply to the musicians, vocalists or production specialists on a sound recording. The Office would refuse an authorship claim by an individual musician who contributed an individual performance to a sound recording unless the claim was as a joint author. An exception would exist where a discrete sound recording was made by a musician that was later incorporated into a new, derivative sound recording.

Ms. Garcia's performance was not a discrete or separate motion picture that was incorporated into "Desert Warrior". Instead, her performance was one of many actors' performances that went into the making of the integrated motion picture that was fixed by others in the creation of the motion picture as a whole. As such, the Office must refuse registration in Ms. Garcia's claim in her individual performance in the motion picture.

Sincerely,

Robert J. Kasunic
Associate Register of Copyrights and
Director of Registration Policy and Practices
United States Copyright Office

3

**ADD48**