No. 12-57302

IN THE

# United States Court of Appeals
# for the Ninth Circuit

CINDY LEE GARCIA,

Plaintiff-Appellant,

v.

GOOGLE INC. AND YOUTUBE, LLC,

Defendants-Appellees,

On Appeal from the United States District Court
for the Central District of California, CV-12-8315-MWF (VBKx)
District Judge Michael W. Fitzgerald

## GOOGLE INC. AND YOUTUBE, LLC'S PETITION FOR REHEARING EN BANC

TIMOTHY L. ALGER
SUNITA BALI
PERKINS COIE LLP
1305 Porter Drive
Palo Alto, California 94306
(650) 838-4334
TAlger@perkinscoie.com
Sbali@perkinscoie.com

March 12, 2014

NEAL KUMAR KATYAL
CHRISTOPHER T. HANDMAN
DOMINIC F. PERELLA
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Defendants-Appellees
Google Inc. and YouTube, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION AND RULE 35 STATEMENT .................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...............................................3

REASONS WHY REHEARING EN BANC SHOULD BE GRANTED ...............7

I.      THE PANEL'S MANDATORY INJUNCTION BREAKS WITH
        CIRCUIT AND SUPREME COURT PRECEDENT ....................................7

II.     THE PANEL'S NOVEL COPYRIGHT ANALYSIS DEPARTS
        FROM PRECEDENT AND CREATES UNWORKABLE RULES............11

        A.      The Copyright Office Disagrees With The Majority's
                Copyright Holding...............................................................12

        B.      Garcia Owns No Copyright................................................13

        C.      Even If She Had A Copyright Interest In Her Own
                Performance, Garcia Granted Youssef An Implied License
                To Use It...............................................................16

        D.      The Majority's Opinion Is Unworkable.............................17

CONCLUSION .......................................................................................19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page

CASES:

*Aalmuhammed* v. *Lee*,
  202 F.3d 1227 (9th Cir. 2000) ........................................................6, 15

*Batjac Prods. Inc.* v. *GoodTimes Home Video Corp.*,
  160 F.3d 1223 (9th Cir. 1998) ...............................................................13

*Burrow-Giles Lithographic Co.* v. *Sarony*,
  111 U.S. 53 (1883)..................................................................................15

*Cole* v. *Oroville Union High Sch. Dist.*,
  228 F.3d 1092 (9th Cir. 2000) ...............................................................10

*Community for Creative Non-Violence* v. *Reid*,
  490 U.S. 730 (1989)................................................................................16

*Effects Assocs. Inc.* v. *Cohen*,
  908 F.2d 555 (9th Cir. 1990) ..................................................................16

*Kyjen Co., Inc.* v. *Vo-Toys, Inc.*,
  223 F. Supp. 2d 1065 (C.D. Cal. 2002) ..................................................15

*Lakedreams* v. *Taylor*,
  932 F.2d 1103 (5th Cir. 1991) ................................................................15

*Martinez* v. *Mathews*,
  544 F.2d 1233 (5th Cir. 1976) ..................................................................9

*O Centro Espirita Beneficiente Uniao Do Vegetal* v. *Ashcroft*,
  389 F.3d 973 (10th Cir. 2004) (en banc) ..................................................9

*Oddo* v. *Ries*,
  743 F.2d 630 (9th Cir. 1984) ..................................................................15

*Overstreet* v. *United Bhd. of Carpenters & Joiners of Am.*,
  409 F.3d 1199 (9th Cir. 2005) ........................................................2, 3, 10

*Park Vill. Apartment Tenants Ass'n* v. *Mortimer Howard Trust*,
  636 F.3d 1150 (9th Cir. 2011) ..................................................................9

ii

# TABLE OF AUTHORITIES—Continued

Page

*Sammartano* v. *First Judicial Dist. Court*,
   303 F.3d 959 (9th Cir. 2002) ................................................................10

*Sports Form, Inc.* v. *United Press Int'l, Inc.*,
   686 F.2d 752 (9th Cir. 1982) ...............................................................11

*Stanley* v. *University of S. Cal.*,
   13 F.3d 1313 (9th Cir. 1994) ...........................................................2, 8, 9

*Sunward Elecs., Inc.* v. *McDonald*,
   362 F.3d 17 (2d Cir. 2004) ....................................................................9

*Taylor* v. *Freeman*,
   34 F.3d 266 (4th Cir. 1994) ...................................................................9

*Transwestern Pipeline Co.* v. *17.19 Acres of Property
Located in Maricopa County*, 550 F.3d 770 (9th Cir. 2008)................8

*United Commercial Ins. Serv., Inc.* v. *Paymaster Corp.*,
   962 F.3d 853 (9th Cir. 1992) ...............................................................17

*United States* v. *Parish*,
   308 F.3d 1025 (9th Cir. 2002) .............................................................11

*Winter* v. *NRDC*,
   555 U.S. 7 (2008).....................................................................................8

**STATUTES:**

17 U.S.C. § 101 ......................................................................................14

17 U.S.C. § 102(a) .................................................................................14

17 U.S.C. § 201(b) .................................................................................16

17 U.S.C. § 411(a) ..............................................................................7, 13

**RULES:**

Fed. R. App. P. 35(b)(1)(A).....................................................................3

## TABLE OF AUTHORITIES—Continued

Page

Fed. R. App. P. 35(b)(1)(B) .........................................................................3

**OTHER AUTHORITIES:**

Eric Goldman, *In Its "Innocence of Muslims" Ruling, the Ninth Circuit is Guilty of Judicial Activism*, Technology & Marketing Law Blog (Feb. 27, 2014) ..............................................................................18, 19

Google, *Transparency Report* .....................................................................4

Jonathan Handel, *Hollywood Experts Divided on Implications of 'Muslims' Ruling*, The Hollywood Reporter, Feb. 28, 2014 ...............................17

3 Melville B. Nimmer & David Nimmer,
    *Nimmer on Copyright* § 6.10[A][1][a] (1989)....................................15

IN THE

# United States Court of Appeals for the Ninth Circuit

––––––––––––––

No. 12-57302

––––––––––––––

CINDY LEE GARCIA,

Plaintiff-Appellant,

v.

GOOGLE INC. AND YOUTUBE, LLC,

Defendants-Appellees,

––––––––––––––

On Appeal from the United States District Court
for the Central District of California, CV-12-8315-MWF (VBKx)
District Judge Michael W. Fitzgerald

––––––––––––––

## GOOGLE INC. AND YOUTUBE, LLC'S PETITION FOR REHEARING EN BANC

––––––––––––––

## INTRODUCTION AND RULE 35 STATEMENT

Two weeks ago, a divided panel of this Court silenced speech based on a novel theory of copyright law that even the panel conceded was "fairly debatable." ADD10-11. That was an understatement. Since the panel ruled, the U.S. Copyright Office has refused registration of the very copyright claimed in this case. It concluded— in a decision Appellant failed to even *mention* in her brief filed today in this Court—that Garcia's copyright claim was contrary to the Copyright Act and to the Office's "longstanding practices." ADD47.

1

And for good reason: The panel majority held that Cindy Lee Garcia, an actress who appeared in a film for all of five seconds, likely had a separate copyright in her brief performance. On that basis, the majority issued a mandatory injunction requiring Google and YouTube to scrub her performance from their platforms. But as the Copyright Office has now explained, federal law provides that "dramatic performances in motion pictures" are "part of the integrated work— the motion picture." ADD46. As a result, it held, "*Ms. Garcia has no separable claim to copyright authorship in her performance.*" ADD47 (emphasis added). Although the panel lacked access to the Copyright Office's considered judgment when it ruled, the en banc Court is not so hamstrung. It should grant rehearing and follow the Copyright Office's lead.

Rehearing en banc is warranted for several independent reasons. First, as the dissent recognized, ADD19-21, the majority's decision to impose a mandatory injunction silencing speech on such an equivocal record splits from the precedent of this and other Circuits. This Court has held that mandatory injunctions can issue only if the facts and law "clearly favor" the movant. *Stanley* v. *University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994). When it comes to injunctions restricting speech, these constitutionally sensitive judicial orders can be entered only if the movant demonstrates "a particularly strong likelihood of success" on the merits. *Overstreet* v. *United Bhd. of Carpenters & Joiners of Am.*, 409 F.3d 1199, 1208

n.13 (9th Cir. 2005). By stating that the merits here were "fairly debatable," the majority effectively conceded that neither standard was met—and yet concluded that the District Court abused its discretion by declining to order such extraordinary relief, and imposed the injunction itself. The essence of abuse-of-discretion review under this Court's cases is that debatable questions are resolved in favor of the decision below. Rehearing en banc is essential "to secure and maintain uniformity of the court's decisions." Fed. R. App. P. 35(b)(1)(A).

Additionally, the majority's substantive copyright holding is contrary to the Copyright Act, breaks with established Ninth Circuit precedent, and now conflicts with the Copyright Office's expert views. Not surprisingly, the majority's opinion has triggered deep concern in the entertainment and video industries—industries centered within this Circuit. As commentators have recognized, the majority's decision empowers even minor players in films to "wave around the threat of an injunction to shut down distribution." *See infra* at 18. For this reason, too, the it presents a "question[] of exceptional importance" calling out for the en banc Court's consideration. Fed. R. App. P. 35(b)(1)(B).

## FACTUAL AND PROCEDURAL BACKGROUND

**The Video.** YouTube is a video-sharing website on which individual users upload, share, and view videos. In July 2012, defendant Mark Basseley Youssef uploaded a 13-minute-and-51-second video entitled "Innocence of Muslims."

3

ER64, ER893.  As described in Garcia's Complaint, the video portrays the Prophet Mohammed, the founder of Islam, "as a child molester, sexual deviant, and barbarian."  ER64.[1]  An Arabic version became famous after it was broadcast on Egyptian television, sparking protests and violence.  *Id.*; ER247.

"Innocence of Muslims" attracted international media attention when the Obama Administration cited it as the flashpoint for the 2012 attack on the U.S. consulate in Benghazi, Libya.  ER64.  Congress questioned then-Secretary of State Hillary Clinton about the film at hearings on the Benghazi attacks.  Appellees' Motion for Judicial Notice ¶¶ 1-3.  Even YouTube's role in hosting the video has been in the public eye.  *See* ER64; *see also* Google, *Transparency Report*.[2]

**The Lawsuit.**  Plaintiff Garcia is an actress who appears in "Innocence of Muslims" for five seconds.  ER69, 193.  Garcia did not produce the film or write the script she performed; Youssef did.  ER65.  Nor did she direct her performance; Alan Roberts, a professional director Youssef hired, did.  ER241.  Garcia's creative contribution—at most—was to deliver the lines written by Youssef and to "seem[] concerned" while doing so, as Youssef's script dictated.  ER85.

---

[1] Because of the panel's take-down order, "Innocence of Muslims" is no longer on YouTube.  However, if the Court wishes to view the film, it is available at many other sites on the Internet.  Google will not list the URLs in this public document, but would be happy to file a representative list under seal at the Court's request.

[2] *Available at* http://www.google.com/transparencyreport/removals/government/US/?p=2012-12.

Garcia says she believed she was participating in a shoot for an action film called "Desert Warrior." ER69. She claims, however, that Youssef overdubbed her lines during post-production to make it look as if her character referred to Mohammed as a child molester. *Id.* Garcia asserts that, following the international outcry surrounding the film, she received death threats. ER197.

Three months after the video was uploaded to YouTube, Garcia commenced this action, alleging copyright claims against Google and YouTube. ER1-62. The District Court denied Garcia's motion for a preliminary injunction, finding that she had proven neither irreparable harm nor a likelihood of success on the merits. ER892-94. The court concluded that because the video had been available on YouTube for months, had been widely disseminated elsewhere on the web, and had received relentless media coverage, Garcia had not shown how a preliminary injunction "would prevent any alleged harm." ER893. In addition, the court concluded that Garcia was unlikely to succeed on the merits for two reasons: She had not shown that she was the "author" of her performance, as the Copyright Act requires; and even if she were, she had granted the film's author an implied license to use her performance. ER894. Garcia appealed.

**The Panel Opinion.** Over an 18-page dissent, the panel majority (Kozinski, C.J., and Gould, J.) held that the District Court abused its discretion in not issuing an injunction.

5

The majority suggested that—based on her five-second appearance in the film—Garcia "may have a copyright."  ADD10.  From that equivocal premise, it held she was likely to succeed, even though it conceded the question was "fairly debatable."  ADD7-10.  The majority also held that, absent an injunction, Garcia likely will suffer irreparable harm and that the equities favor a stay.  ADD15-18.

Judge Smith dissented.  Emphasizing that mandatory injunctions should be denied unless " 'the facts and law *clearly favor* the moving party,' " he found the outcome insufficiently clear to grant an injunction banning speech—much less to conclude that the District Court abused its discretion.  ADD20 (citation omitted). He also rejected the majority's copyright analysis, concluding that Garcia's acting performance was not a "work" and that, even if it were, she was not its "author." He wrote that the majority's holding "decline[d] to apply the most relevant precedent in this circuit on the question before it"—*Aalmuhammed* v. *Lee*, 202 F.3d 1227 (9th Cir. 2000)—and "read[] the authorship requirement out of the Copyright Act and the Constitution."  ADD26.  Judge Smith also disagreed with the majority that Garcia's work was not a work-for-hire.  ADD31-33.

The majority's opinion directed that YouTube and Google remove all copies of "Innocence of Muslims" and take steps to prevent it from being posted again. ADD19 n.9.  Google and YouTube moved for a stay.  The panel denied the motion,

but modified its order so that it does not apply to "Innocence of Muslims" uploads that do not include Garcia's performance.

**Copyright Office's Decision.** While her suit was pending, Garcia sought registration for her claimed copyright. On December 18, 2012, the Copyright Office told Garcia her performance was ineligible. It explained that "a motion picture is a single integrated work," such that if Garcia's "contribution was limited to her acting performance" it could not be registered "apart from the motion picture." *Id.* Garcia responded by asking the Office to delay adjudicating her application until this Court ruled. ADD45.

On March 6, 2014, the Copyright Office rejected Garcia's application. ADD46-48. It reiterated that the Office "views dramatic performances in motion pictures to be only part of the integrated work—the motion picture" and that the Office's "longstanding practices do not allow a copyright claim by an individual actor or actress in his or her performance contained within a motion picture." ADD46-47. It also explained that under 17 U.S.C. § 411(a), its decision should precede adjudication by the courts, not the other way around. ADD46.

### REASONS WHY REHEARING EN BANC SHOULD BE GRANTED

## I. THE PANEL'S MANDATORY INJUNCTION BREAKS WITH CIRCUIT AND SUPREME COURT PRECEDENT.

The majority's decision reshapes this Court's rules for issuing mandatory preliminary injunctions. Even a run-of-the-mill preliminary injunction "is an

7

extraordinary remedy never awarded as of right," demanding a "clear showing that the plaintiff is entitled to relief." *Winter* v. *NRDC*, 555 U.S. 7, 22, 24 (2008). And Circuit law required the panel to raise the bar three times over: First, because the injunction is mandatory, the panel had to conclude that the law and facts "clearly favor" Garcia. Second, because the injunction restricts speech, the panel had to conclude that Garcia had made a "particularly strong showing" of likely success and harm. And third, the panel had to conclude that the District Court abused its discretion in finding none of these tests satisfied. Because the majority's opinion heeded none of these requirements, rehearing en banc is warranted.

1. Mandatory injunctions, which compel parties to act in ways that alter the status quo,[3] are "particularly disfavored under the law of this Circuit." *Stanley*, 13 F.3d at 1320. The Court has insisted that mandatory injunctions should be denied "unless the facts and law *clearly favor* the moving party." *Id.* (emphasis added); *accord Transwestern Pipeline Co.* v. *17.19 Acres of Property Located in Maricopa*

---

[3] Garcia claims in her brief filed today that the panel's injunction is prohibitory, not mandatory. Br. 27-28. Not so. A mandatory injunction is one that " 'goes beyond simply maintaining the status quo *pendente lite*.' " *Stanley*, 13 F.3d at 1320. And the status quo is the " 'last uncontested status which preceded the pending controversy.' " *Tanner Motor Livery Ltd.* v. *Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963). Here, the status quo—for months before Garcia filed suit—was that "Innocence of Muslims" was available on YouTube. The panel's order changed that. Moreover, it imposed a *continuing affirmative obligation* on Google and YouTube to take steps to keep the film off their platforms. That is a mandatory injunction.

*County*, 550 F.3d 770, 776 (9th Cir. 2008).  The rule is the same elsewhere.  *See O Centro Espirita Beneficente Uniao Do Vegetal* v. *Ashcroft*, 389 F.3d 973, 975-976 (10th Cir. 2004) (en banc); *Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 24 (2d Cir. 2004); *Taylor* v. *Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994); *Martinez* v. *Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

Applying that test, this Court has held that courts cannot issue mandatory injunctions in "doubtful cases."  *Park Vill. Apartment Tenants Ass'n* v. *Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011).  But the panel majority did just that.  On a key merits question—whether Garcia is likely to prevail—the majority acknowledged the answer was "fairly debatable."  ADD10.  The law does not "clearly favor" a party's claim when the likelihood of success on that claim is only "fairly debatable."

The majority did not acknowledge this Circuit's mandatory-injunction precedent, even though Judge Smith led with it in dissent.  ADD19.  The majority's silence is telling.  As Judge Smith put it:  The "*Stanley* standard counseling extreme caution when considering granting a mandatory preliminary injunction is premised on principles of judicial restraint," and the majority "abandon[ed] restraint" here.  ADD37.

2.  The majority's diluted mandatory-injunction standard is particularly troubling because the injunction restricts speech.  This Court has held that where

9

"there is at least some risk that constitutionally protected speech will be enjoined, only a particularly strong showing of likely success, and of harm to the defendant as well, could suffice" to justify an injunction. *Overstreet*, 409 F.3d at 1208 n.13; *accord Sammartano* v. *First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).

The majority discounted this concern because "the First Amendment doesn't protect copyright infringement." ADD18. But that truism has no relevance here. The question now is whether a copyright violation is likely to exist. As the dissent recognized—and the majority acknowledged—"the case at bar does not present copyright infringement *per se*," but instead a mere possibility of infringement of a five-second performance in a 14-minute work. ADD37; *id.* at 10. That matters. Without an actual-infringement finding, the majority had to balance the grave harm that results when government restricts speech with whatever interest Garcia has in her five-second performance. Its failure to do so was contrary to Circuit precedent.

3. Finally, rehearing is warranted because the majority opinion reformulates appellate review of preliminary injunctions. A district court's grant or denial of a preliminary injunction is reviewed for abuse of discretion. *Cole* v. *Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1097-98 (9th Cir. 2000). This Court takes that standard seriously and will not reverse "simply because [it] would have arrived at a

10

different result if it applied the law to the facts of the case." *E.g. Sports Form, Inc.* v. *United Press Int'l, Inc.*, 686 F.2d 752 (9th Cir. 1982).

The majority did not respect this limitation. For instance, the majority brushed aside the District Court's conclusion (at ER893) that Garcia was dilatory in seeking a preliminary injunction, undermining her claim of irreparable harm. *See* ADD15-16. It likewise gave no deference to the District Court's conclusion that removing Garcia's performance from YouTube would not prevent the harms of which she complained. *See id.* Instead, the majority reached its conclusion as if it were evaluating the record in the first instance.

As the dissent observed, ADD34, that freewheeling approach conflicts with this Circuit's settled practice. In a case where even the majority concedes its rule was "fairly debatable," ADD10, it "cannot say that the district court abused its discretion." *United States* v. *Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002). But the majority did just that by "substitut[ing] its own explanation," ADD34, of why the record favors Garcia. Rehearing is warranted to realign Circuit jurisprudence.

## II.   THE PANEL'S NOVEL COPYRIGHT ANALYSIS DEPARTS FROM PRECEDENT AND CREATES UNWORKABLE RULES.

The panel majority held that actors in films and videos likely have separate copyrights in their performances, even when their contribution is a small part of a larger work created and controlled by others. Under the majority's rule, everyone from extras to backup dancers could control how (and whether) films get

11

distributed.  And platforms like YouTube would be caught in the middle, forced to adjudicate endless takedown requests that would turn on hard-to-resolve disputes of fact.  The panel majority could arrive at this counterintuitive outcome only by breaking with this Court's precedent and with fundamental copyright principles long-recognized by the Copyright Office.  The Court should grant rehearing en banc to resolve these splits of authority and restore certainty to the entertainment and distribution industries.

### A.    The Copyright Office Disagrees With The Majority's Copyright Holding.

The Copyright Office has succinctly explained the primary flaw in the panel majority's opinion:  Garcia has no copyright in her brief performance because it was never a stand-alone work.  Instead, her performance was designed to be merged into a unitary whole.  ADD47.  As the Office explained—and as we set forth in more detail below—"an actor or actress's performance in the making of a motion picture is an integrated part of the resulting work, the motion picture as a whole."  *Id.*  The Office emphasized that its view is supported by the statutory definition of "joint work" and by the Copyright Act's legislative history, which states that movies typically are a single joint work.  *Id.*  It concluded that allowing Garcia to register a copyright in her five-second performance would contradict "[t]he U.S. Copyright Office's longstanding practices."  *Id.*

The Copyright Office's refusal carries significant weight.  The Office's refusal to register a copyright is " 'entitled to judicial deference if reasonable.' " *Batjac Prods. Inc.* v. *GoodTimes Home Video Corp.*, 160 F.3d 1223, 1230 (9th Cir. 1998).  Indeed, Congress strove to ensure that the Office's registration decisions are taken into account by the courts:  Once the Office rejects an application, the claimant can sue on the purported copyright only "if" she has served the Office with the complaint.  17 U.S.C. § 411(a).  (Google and YouTube have no knowledge of Garcia having done so here.)  At that point, the Office has the statutory right to intervene to defend its refusal, *see id.*—a right violated here because judicial determination preceded the Office's decision.[4]

## B.    Garcia Owns No Copyright.

The Copyright Office's decision was correct for several separate reasons, set forth fully in Google and YouTube's Brief in Response to Suggestion of Rehearing En Banc ("Stay Br.").  We summarize them below.

---

[4]  In her brief filed today, Garcia relies on a Patent and Trademark Office "fact sheet" regarding the Beijing Treaty on Audiovisual Performances to argue that actors have copyrights in their performances.  Br. 23.  But that treaty has not gone into effect because only two countries—Botswana and Syria—have ratified it, *see* http://www.wipo.int/treaties/en/ShowResults.jsp?lang=en&treaty_id=841, and the PTO's passing statements in a fact sheet warrant no deference.  Besides, the Copyright Office, not the PTO, administers the Copyright Act.  And the Copyright Office has resoundingly rejected Garcia's copyright arguments.  ADD46-48.

1.      <u>"Work."</u>  First, Garcia's five-second cameo is not a separately copyrightable "work," as the text of the Copyright Act and canons of interpretation demand.  17 U.S.C. § 102(a); *see also* Stay Br. 23-26.  The panel majority thought otherwise, but only because it embraced an unprecedented concept of film copyright: that movies are just dozens—if not hundreds—of separately copyrighted works hopefully stitched together by written contracts and implied licenses.  But that would be news to Hollywood—just as it was news to the Copyright Office.  Indeed, as the majority itself acknowledged, "[a] film is typically conceived of as 'a joint work.' "  ADD6.  There's a good reason why:  A "joint work" is "a work prepared by two or more authors with the intention that their contributions will be *merged into inseparable or interdependent parts of a unitary whole*." 17 U.S.C. § 101 (emphasis added).  That description fits moviemaking to a T.

The panel majority's conclusion that individual performances within a film constitute distinct "works" would trigger bizarre real-world consequences.  For one thing, under Garcia's theory—that she has a copyright in her brief performance, but is not a joint author—it is possible for a director to own the copyright to scattered bits and pieces, but not all, of his own film.  Francis Ford Coppola, for example, might own the copyright to "The Godfather"—minus a six-second piece here, a 30-second piece there, and a two-minute portion at the end.  Federal law does not make Swiss cheese of copyrights in this way.

14

For another, it is black-letter law that one co-author has no ability to prevent another from using or licensing a joint work in ways that she finds objectionable. *Oddo* v. *Ries*, 743 F.2d 630, 633 (9th Cir. 1984); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.10[A][1][a] (1989). The panel majority's decision unsettles this carefully crafted scheme. If Garcia and Youssef were co-authors of the *entire* film "Innocence of Muslims"—a proposition Garcia emphatically denies—she would be just like any other co-author: powerless to prevent Youssef from uploading the film to YouTube or licensing others to do so. Yet under the majority's approach, Garcia was granted precisely that power on the theory that she was the sole owner of *five seconds* of "Innocence of Muslims." The majority's holding turns joint-authorship law on its head.

2.     "Author." Garcia's claim separately fails because even if her performance were a separate copyrightable "work," she would not be the work's author. The Supreme Court has defined an "author as the person to whom the work owes its origin and who superintended the whole work, the 'master mind.'" *Aalmuhammed*, 202 F.3d at 1234 (quoting *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U.S. 53, 61 (1883)). By contrast, "the creator of a work at another's direction, without contributing intellectual modification, is not an author." *Kyjen Co., Inc.* v. *Vo-Toys, Inc.*, 223 F. Supp. 2d 1065, 1068 (C.D. Cal. 2002); *accord Lakedreams* v. *Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991). Garcia cannot satisfy

15

that standard.  As explained in detail in the Stay Brief (pp. 28-30), she "had no creative control over the script or her performance."  ADD25.

Second, and in any event, Garcia was not an author because any work she created here would be a "work made for hire," and her employer the author.  17 U.S.C. § 201(b).  As Judge Smith explained, her arrangement with Youssef meets the work-for hire test set forth by the Supreme Court in *Community for Creative Non-Violence* v. *Reid*, 490 U.S. 730, 741 (1989).  *See* ADD32; Stay Br. 30-31.

### C. Even If She Held A Copyright Interest In Her Own Performance, Garcia Granted Youssef An Implied License To Use It.

Even if Garcia had a copyright in her own performance, there still would be no infringement because she granted Youssef an implied license to use the footage.

Such a license " 'may be granted orally' " or " 'implied from conduct.' " *Effects Assocs. Inc.* v. *Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (citation omitted). Here, the panel majority agreed that Garcia granted Youssef an implied license that "must be construed broadly," because otherwise "actors could leverage their individual contributions into de facto authorial control over the film."  ADD13-14. Yet it held that Youssef exceeded the scope of the implied license because his film "differ[ed] so radically from anything Garcia could have imagined when she was cast."  ADD13-15.

In so holding, the majority limited Garcia's nonexclusive license in a way Garcia never did:  granting consent to use her performance for all purposes *except*

16

ones she did not contemplate. But courts cannot give effect to licensors'
"unexpressed intent." *United Commercial Ins. Serv., Inc.* v. *Paymaster Corp.*, 962
F.3d 853, 857 (9th Cir. 1992). Although Garcia avers that she asked Youssef
about the movie's content, she never claims that she expressed to Youssef—by
words or conduct—that use of her performance was conditioned on his description
of that content, or that Youssef could not exercise final authorial control over the
finished product. *See* ER194-195. And the majority's except-in-circumstances-
the-actor-couldn't-have-imagined caveat on implied licenses may have significant
effects, as oftentimes day players and extras participate in isolated scenes whose fit
with the overall project is unclear. *See* Stay Br. 34.

### D.     The Majority's Opinion Is Unworkable.

The majority's opinion is not just wrong on the law; it is also unworkable.

1. The panel's holdings create new risks to movie studios, documentary
filmmakers, and other creative enterprises by giving their most minor contributors
control over their works. As commentators have noted, the majority's decision
means that "anyone whose expression appears in a film and who doesn't have a
signed work-for-hire agreement has a sufficiently plausible copyright claim to
wave around the threat of an injunction to shut down distribution." Jonathan

17

Handel, *Hollywood Experts Divided on Implications of 'Muslims' Ruling*, The Hollywood Reporter, Feb. 28, 2014.[5]

The panel airbrushed this problem by suggesting that "copyright interests in the vast majority of films" are covered by contract and the work-for-hire doctrine. ADD11.  But most of the millions of amateur filmmakers who upload videos to the Internet do not have bulletproof written agreements.  And even for professional filmmakers, the majority's assurances ring hollow.  Although many try to obtain releases from participants, perfection is impossible and long-term retention and location of these agreements is often difficult.  Stay Br. 36-37.

The majority fell back on implied licenses.  ADD13-15.  But that creates its own difficulties.  By shifting to a case-by-case implied-license regime with intent requirements and the like, the majority's system allows actors to "claim copyright and set up a fact dispute that will be hard to predict and expensive to resolve." Eric Goldman, *In Its "Innocence of Muslims" Ruling, the Ninth Circuit is Guilty of Judicial Activism*, Technology & Marketing Law Blog (Feb. 27, 2014).[6]  That will put YouTube and services like it in an intractable bind.  Faced with a takedown notice from a minor player in a film, platforms will need to either defer to the

---

[5] *Available at* http://www.hollywoodreporter.com/thr-esq/hollywood-experts-divided-implications-muslims-684607.

[6] *Available at* http://blog.ericgoldman.org/archives/2014/02/in-its-innocence-of-muslims-ruling-the-ninth-circuit-is-guilty-of-judicial-activism-garcia-v-google.htm.

copyright claim or attempt the impossible task of untangling the chains of title for

countless video clips.  And although some services may choose to risk suits, they

on balance "will err on the side of actors' assertions rather than do the fact

investigation." *Id.*  That understandable reticence will chill speech.

## CONCLUSION

For the foregoing reasons, rehearing en banc should be granted.

Respectfully submitted,

/s/ Neal Kumar Katyal

TIMOTHY L. ALGER
SUNITA BALI
PERKINS COIE LLP
1305 Porter Drive
Palo Alto, California 94306
(650) 838-4334
TAlger@perkinscoie.com
Sbali@perkinscoie.com

NEAL KUMAR KATYAL
CHRISTOPHER T. HANDMAN
DOMINIC F. PERELLA
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Defendants-Appellees*
*Google Inc. and YouTube, LLC*

March 12, 2014

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Circuit Rule 35-4 that the attached petition for rehearing en banc is proportionately spaced, has a typeface of 14 points or more, and contains 4,196 words.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 12, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>/s/ Neal Kumar Katyal</u>
Neal Kumar Katyal

# ADDENDUM

# TABLE OF CONTENTS

Page

**PANEL ORDERS:**

Panel Opinion .................................................................................. ADD1

Panel Pre-Opinion Takedown Order (Feb. 19, 2014) .................................... ADD38

Panel Order Denying Pre-Opinion Emergency Stay Motion
  (Feb. 21, 2014) ............................................................................ ADD40

Panel Order Denying Post-Opinion Emergency Stay Motion
  (Feb. 28, 2014) ............................................................................ ADD42

**COPYRIGHT OFFICE DOCUMENTS:**

Letter from Laura Lee Fischer, Chief, Performing Arts Division, U.S.
  Copyright Office, to M. Cris Armenta, Counsel for Cindy Lee Garcia
  (Dec. 18, 2013) ............................................................................ ADD44

Letter from M. Cris Armenta, Counsel for Cindy Lee Garcia, to Laura Lee
  Fischer, Chief, Performing Arts Division, U.S. Copyright Office (Mar.
  13, 2013) ................................................................................... ADD45

Letter from Robert J. Kasunic, Associate Register of Copyrights and
  Director of Registration Policy and Practices, U.S. Copyright Office, to
  M. Cris Armenta, Counsel for Cindy Lee Garcia (Mar. 6, 2014) ............. ADD46

**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CINDY LEE GARCIA, *Plaintiff-Appellant*, | No. 12-57302 |
| v. | D.C. No. 2:12-cv-08315-MWF-VBK |
| GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company, *Defendants-Appellees*, | OPINION |
| and | |
| NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; MARK BASSELEY YOUSSEF; ABANOB BASSELEY NAKOULA; MATTHEW NEKOLA; AHMED HAMDY; AMAL NADA; DANIEL K. CARESMAN; KRITBAG DIFRAT; SOBHI BUSHRA; ROBERT BACILY; NICOLA BACILY; THOMAS J. TANAS; ERWIN SALAMEH; YOUSSEFF M. BASSELEY; MALID AHLAWI, *Defendants*. | |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

**ADD1**

2                    GARCIA V. GOOGLE, INC.

Argued and Submitted
June 26, 2013—Seattle, Washington

Filed February 26, 2014

Before: Alex Kozinski, Chief Judge, Ronald M. Gould
and N. Randy Smith, Circuit Judges.

Opinion by Chief Judge Kozinski;
Dissent by Judge N.R. Smith

## SUMMARY[*]

### Copyright / Preliminary Injunction

The panel reversed the district court's denial in a copyright case of a preliminary injunction requiring the removal from YouTube.com of an anti-Islamic film that used a performance that the plaintiff made for a different film.

The panel concluded that the plaintiff established a likelihood of success on the merits of her claim of infringement of her performance within the film because she proved that she likely had an independent interest in the performance and that the filmmaker did not own an interest as a work for hire and exceeded any implied license to use the plaintiff's performance.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

GARCIA V. GOOGLE, INC.                    3

The panel held that the plaintiff established the likelihood that irreparable harm would result if an injunction did not issue because she was subject to death threats and took action as soon as she began receiving the threats. The plaintiff also established sufficient causal connection between the infringement of her copyright and the harm she alleged.

The panel also held that the balance of the equities and the public interest weighed in favor of injunctive relief.

Dissenting, Judge N.R. Smith wrote that the facts and law did not clearly favor issuing a mandatory preliminary injunction to the plaintiff. He wrote that the plaintiff did not establish a likelihood that she had a copyrightable interest in her acting performance, nor did she clearly show that the performance was not a work made for hire. In addition, the district court did not abuse its discretion in its ruling on irreparable harm, and the balance of the equities and the public interest did not favor the issuance of a preliminary injunction.

---

## COUNSEL

M. Cris Armenta (argued), The Armenta Law Firm APC, Los Angeles, California and Credence Sol, Chauvigng, France, for Plaintiff-Appellant.

Timothy L. Alger (argued) and Sunita Bali, Perkins Coie LLP, Palo Alto, California, for Defendants-Appellees.

---

**ADD3**

4                    GARCIA V. GOOGLE, INC.

**OPINION**

KOZINSKI, Chief Judge:

While answering a casting call for a low-budget amateur film doesn't often lead to stardom, it also rarely turns an aspiring actress into the subject of a fatwa. But that's exactly what happened to Cindy Lee Garcia when she agreed to act in a film with the working title "Desert Warrior."

The film's writer and producer, Mark Basseley Youssef—who also goes by the names Nakoula Basseley Nakoula and Sam Bacile—cast Garcia in a minor role. Garcia was given the four pages of the script in which her character appeared and paid approximately $500 for three and a half days of filming. "Desert Warrior" never materialized. Instead, Garcia's scene was used in an anti-Islamic film titled "Innocence of Muslims." Garcia first saw "Innocence of Muslims" after it was uploaded to YouTube.com and she discovered that her brief performance had been partially dubbed over so that she appeared to be asking, "Is your Mohammed a child molester?"

These, of course, are fighting words to many faithful Muslims and, after the film aired on Egyptian television, there were protests that generated worldwide news coverage. An Egyptian cleric issued a fatwa, calling for the killing of everyone involved with the film, and Garcia soon began receiving death threats. She responded by taking a number of security precautions and asking that Google remove the video from YouTube.

In all, Garcia filed eight takedown notices under the Digital Millenium Copyright Act. *See generally* 17 U.S.C.

**ADD4**

§ 512. When Google resisted, she supplied substantive explanations as to why the film should be taken down. Google still refused to act, so Garcia applied for a temporary restraining order seeking removal of the film from YouTube, claiming that the posting of the video infringed her copyright in her performance.[1] The district court treated the application as a motion for a preliminary injunction, and denied it because Garcia had delayed in bringing the action, had failed to demonstrate "that the requested preliminary relief would prevent any alleged harm" and was unlikely to succeed on the merits because she'd granted Youssef an implied license to use her performance in the film.

## I.  Discussion

While we review the denial of a preliminary injunction for abuse of discretion, *Alliance for the Wild Rockies* v. *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011), the "legal premises underlying a preliminary injunction" are reviewed de novo. *A&M Records, Inc.* v. *Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002). In granting or denying a preliminary injunction, the district court must consider four factors: a plaintiff's likely success on the merits, the likelihood that irreparable harm will result if an injunction doesn't issue, the balance of equities and the public interest. *Winter* v. *Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The district court

---

[1] Although Garcia's suit also named the film's producers, only Google, which owns YouTube, answered the complaint.

found against Garcia on the first two factors and didn't consider the last two.[2]

## A.  Likelihood of Success on the Merits

Garcia doesn't claim a copyright interest in "Innocence of Muslims" itself; far from it.  Instead, she claims that her performance within the film is independently copyrightable and that she retained an interest in that copyright.  To succeed on this claim, Garcia must prove not only that she likely has an independent interest in her performance but that Youssef doesn't own any such interest as a work for hire and that he doesn't have an implied license to use her performance.

### 1.  An Independent Copyright Interest

A film is typically conceived of as "a joint work consisting of a number of contributions by different 'authors.'"  1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.05 at 6–14 (1990).  Garcia argues that she never intended her performance to be part of a joint work, and under our precedent she doesn't qualify as a joint author.  *See*

---

[2] The dissent suggests that we must defer to the district court's statement that "the nature of [Garcia's] copyright interest is not clear."  But we defer to a lower court's *decision*, not its equivocation.

It's worth noting what the district court's three-page order doesn't do: It doesn't decide whether Garcia has a copyright interest in her performance, whether her performance is a "work," whether Garcia is the "author" of her performance or whether her performance is a work for hire.  Nor does it address the balance of the equities or the public interest, despite the fact that a district court must "weigh in its analysis the public interest implicated by [an] injunction, as *Winter* now requires."  *Stormans, Inc.* v. *Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

*Aalmuhammed* v. *Lee*, 202 F.3d 1227, 1231–36 (9th Cir. 2000). But just because Garcia isn't a joint author of "Innocence of Muslims" doesn't mean she doesn't have a copyright interest in her own performance within the film.[3]

Whether an individual who makes an independently copyrightable contribution to a joint work can retain a copyright interest in that contribution is a rarely litigated question. *See Thomson* v. *Larson*, 147 F.3d 195, 206 (2d Cir. 1998) (dismissing similar argument on procedural grounds); *see also* David Nimmer, Address, *Copyright in the Dead Sea Scrolls: Authorship and Originality*, 38 Hous. L. Rev. 1, 186–87 & n.942 (2001). But nothing in the Copyright Act suggests that a copyright interest in a creative contribution to a work simply disappears because the contributor doesn't qualify as a joint author of the entire work. 17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium . . . ."). Where, as here, the artistic contribution is fixed, the key question remains whether it's sufficiently creative to be protectible.[4]

Google argues that Garcia didn't make a protectible contribution to the film because Youssef wrote the dialogue

---

[3] Although the dissent claims that "Garcia's interest in her acting performance may best be analyzed as a joint work with Youssef," Dissent 23 n.3, it doesn't explain why. A work is joint only if the authors involved in its creation *intend* that it be so. *See* 17 U.S.C. § 101. Garcia expressly disclaims such intent and there is no evidence in the record that Youssef intended to create a joint work.

[4] Neither party raised the issue of whether the author of a dramatic performance must personally fix his work in a tangible medium. Because the question is not properly before us, we do not decide it. The parties are free to raise it in the district court on remand.

8            GARCIA V. GOOGLE, INC.

she spoke, managed all aspects of the production and later dubbed over a portion of her scene. But an actor does far more than speak words on a page; he must "live his part inwardly, and then . . . give to his experience an external embodiment." Constantin Stanislavski, *An Actor Prepares* 15, 219 (Elizabeth Reynolds Hapgood trans., 1936). That embodiment includes body language, facial expression and reactions to other actors and elements of a scene. *Id.* at 218–19. Otherwise, "every shmuck . . . is an actor because everyone . . . knows how to read." Sanford Meisner & Dennis Longwell, *Sanford Meisner on Acting* 178 (1987).

An actor's performance, when fixed, is copyrightable if it evinces "some minimal degree of creativity . . . 'no matter how crude, humble or obvious' it might be." *Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (quoting 1 *Nimmer on Copyright* § 1.08[C][1]). That is true whether the actor speaks, is dubbed over or, like Buster Keaton, performs without any words at all. *Cf.* 17 U.S.C. § 102(a)(4) (noting "pantomimes and choreographic works" are eligible for copyright protection). It's clear that Garcia's performance meets these minimum requirements.

*Aalmuhammed* isn't to the contrary because it does not, as the dissent would have it, "articulate[] general principles of authorship." Dissent 25. *Aalmuhammed* only discusses what is required for a contributor to a work to assert joint ownership over the *entire* work: "We hold that authorship is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution." 202 F.3d at 1232. *Aalmuhammed* plainly contemplates that an individual *can* make a "copyrightable contribution" and yet not become a joint author of the whole work. *Id.* For example, the author

**ADD8**

of a single poem does not necessarily become a co-author of the anthology in which the poem is published.  It makes sense to impose heightened requirements on those who would leverage their individual contribution into ownership of a greater whole, but those requirements don't apply to the copyrightability of all creative works, for which only a "minimal creative spark [is] required by the Copyright Act and the Constitution."  *Feist Publ'ns*, 499 U.S. at 363.[5]

Nor does *Midler* v. *Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988), speak to the problem before us.  First, of course, *Midler* isn't a copyright case at all—it's a right of publicity case that happens to discuss copyright in the context of preemption, not infringement.  Second, *Midler* discusses the copyrightability of a performer's *voice*—not her performance.  *See* 849 F.2d at 462.  A performer's voice is analogous to her image, which we've said "is not a work of authorship" under the Copyright Act.  *Downing* v. *Abercrombie & Fitch*, 265 F.3d 994, 1004 (9th Cir. 2001).  But that doesn't answer the question of whether the artist's creativity, expressed *through* her voice or image, is protected by copyright.  Just because someone's voice—its particular timber and quality—can't be copyrighted, doesn't mean that a performance made using that voice can never be protected.  In fact, many vocal performances *are* copyrighted.  *See, e.g.*,

---

[5] Our decision today does not "read[] the authorship requirement out of the Copyright Act and the Constitution."  Dissent 26.  An author "in a constitutional sense" is one "'to whom anything owes its origin; originator; maker.'"  *Feist Publ'ns*, 499 U.S. at 346 (quoting *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U.S. 53, 58 (1884)).  In other words, the creator of copyrightable artistic expression is an author.  Which is why, for example, Sinéad O'Connor can claim a copyright in her performance of "Nothing Compares 2 U" even though the song was written by Prince.

10              GARCIA V. GOOGLE, INC.

*Laws* v. *Sony Music Entm't, Inc.*, 448 F.3d 1134, 1141 (9th Cir. 2006).

Recognizing that Garcia may have a copyright interest in her performance isn't the end of the inquiry. A screenplay is itself a copyrightable creative work and a film is a derivative work of the screenplay on which it is based. *See Gilliam* v. *Am. Broad. Cos.*, 538 F.2d 14, 20 (2d Cir. 1976); *see also* 17 U.S.C. § 101; 2 *Nimmer on Copyright* § 2.10[A] n.8. Where, as here, an actor's performance is based on a script, the performance is likewise derivative of the script, such that the actor might be considered to have infringed the screenwriter's copyright. And an infringing derivative work isn't entitled to copyright protection. *See* 17 U.S.C. § 103(a); *see also U.S. Auto Parts Network, Inc.* v. *Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012).

Of course, by hiring Garcia, giving her the script and turning a camera on her, Youssef implicitly granted her a license to perform his screenplay. *See Effects Assocs., Inc.* v. *Cohen*, 908 F.2d 555, 558–59 (9th Cir. 1990). This doesn't mean that Garcia owns a copyright interest in the entire scene: She can claim copyright in her own contribution but not in "preexisting material" such as the words or actions spelled out in the underlying script. 17 U.S.C. § 103(b); *see also U.S. Auto Parts Network, Inc.*, 692 F.3d at 1016. Garcia may assert a copyright interest only in the portion of "Innocence of Muslims" that represents her individual creativity, but even if her contribution is relatively minor, it isn't de minimis. *See Feist*, 499 U.S. at 359, 363. We need not and do not decide whether every actor has a copyright in his performance within a movie. It suffices for now to hold that, while the matter is fairly debatable, Garcia is likely to prevail.

**ADD10**

As the above discussion makes clear, any analysis of the rights that might attach to the numerous creative contributions that make up a film can quickly become entangled in an impenetrable thicket of copyright. But it rarely comes to that because copyright interests in the vast majority of films are covered by contract, the work for hire doctrine or implied licenses. *See* F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures Under U.S. Copyright Law*, 49 UCLA L. Rev. 225, 238, 317–18, 327–33 (2001). Here, Google argues that Garcia's performance was a work made for hire or, alternatively, that she granted Youssef an implied license to use her performance in "Innocence of Muslims."

## 2. Work For Hire

Under the work for hire doctrine, the rights to Garcia's performance vested in Youssef if Garcia was Youssef's employee and acted in her employment capacity or was an independent contractor who transferred her interests in writing. *See* 17 U.S.C. §§ 101, 201(b); *see also Cmty. for Creative Non-Violence* v. *Reid*, 490 U.S. 730, 751 (1989).

The "term 'employee'" refers "to a hired party in a conventional employment relationship," and the question of employment is analyzed under traditional principles of agency. *Reid*, 490 U.S. at 743, 751. Garcia's case is a good example of why it is difficult to categorize an actor, particularly one in a small role, as a conventional employee. Youssef hired Garcia for a specific task, she only worked for three days and she claims she received no health or other traditional employment benefits. *See id.* at 751–52. As we've recognized, this difficulty is why 17 U.S.C. § 101 "specifically addresses the movie . . . industr[y], affording

moviemakers a simple, straightforward way of obtaining ownership of the copyright in a creative contribution— namely, a written agreement." *Effects Assocs.*, 908 F.2d at 558. Youssef didn't obtain a written agreement,[6] and Garcia simply doesn't qualify as a traditional employee on this record.

The dissent believes Garcia was an employee primarily because "Youssef controll[ed] both the manner and means of making the film, including the scenes featuring Garcia" and Youssef "was engaged in the business of film making at the time." Dissent 32. But there's no evidence in the record that Youssef directed the film or that he controlled the manner in which any part of the film—much less Garcia's scene—was shot. In fact, Youssef has claimed only that he wrote the screenplay.

There's nothing in the record to suggest that Youssef was in the "regular business" of making films. *Reid*, 490 U.S. at 752. He'd held many jobs, but there's no indication he ever worked in the film industry. And there's no evidence he had any union contracts, relationships with prop houses or other film suppliers, leases of studio space or distribution agreements. The dissent would hold that Youssef was in the "regular business" of filmmaking simply because he made "Innocence of Muslims." But if shooting a single amateur

---

[6] Neither party claims that Garcia signed a work for hire agreement. In the district court, Google produced an agreement, purportedly signed by Garcia, that transferred all of her rights in her performance to the film's producers. Garcia responded by submitting the declaration of a handwriting expert opining that Garcia's signature had been forged. The district court didn't address the agreement or its authenticity.

film amounts to the regular business of filmmaking, every schmuck with a videocamera becomes a movie mogul.

### 3.   Implied License

A non-exclusive license may be implied from conduct and arises where a plaintiff "create[s] a work at defendant's request and hand[s] it over, intending that defendant copy and distribute it." *Effects Assocs.*, 908 F.2d at 558. We've found an implied license where the plaintiff's contribution to a film or other work would otherwise be worthless or of "minimal value." *Id.* at 559; *see also Oddo* v. *Ries*, 743 F.2d 630, 634 (9th Cir. 1984). That is the case here. Garcia auditioned for a role in a particular film, was paid for her performance and had every reason to believe Youssef would eventually release the film. Without an implied license, the performance for which she was paid would be unusable. Therefore, we agree with Google that Garcia granted Youssef an implied license.

Any such license must be construed broadly. If the scope of an implied license was exceeded merely because a film didn't meet the ex ante expectation of an actor, that license would be virutally meaningless. *See Foad Consulting Grp., Inc.* v. *Azzalino*, 270 F.3d 821, 837–38 (9th Cir. 2001) (Kozinski, J., concurring). A narrow, easily exceeded license could allow an actor to force the film's author to re-edit the film—in violation of the author's exclusive right to prepare derivative works. *See* 17 U.S.C. § 106(2). Or the actor could prevent the film's author from exercising his exclusive right to show the work to the public. *See* 17 U.S.C. § 106(4). In other words, unless these types of implied licenses are

construed very broadly, actors could leverage their individual contributions into de facto authorial control over the film.[7]

Nevertheless, even a broad implied license isn't unlimited. *See Oddo*, 743 F.2d at 634. Garcia was told she'd be acting in an adventure film set in ancient Arabia. Were she now to complain that the film has a different title, that its historical depictions are inaccurate, that her scene is poorly edited or that the quality of the film isn't as she'd imagined, she wouldn't have a viable claim that her implied license had been exceeded. But the license Garcia granted Youssef wasn't so broad as to cover the use of her performance in *any* project. Here, the problem isn't that "Innocence of Muslims" is not an Arabian adventure movie: It's that the film isn't intended to entertain at all. The film differs so radically from anything Garcia could have imagined when she was cast that it can't possibly be authorized by any implied license she granted Youssef.

A clear sign that Youssef exceeded the bounds of any license is that he lied to Garcia in order to secure her participation, and she agreed to perform in reliance on that lie. Youssef's fraud alone is likely enough to void any agreement he had with Garcia. *See* 26 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 69:4 (4th ed. 2003). But even if it's not, it's clear evidence that his inclusion of her performance in "Innocence of Muslims"

---

[7] Construing such implied licenses narrowly would also undermine our joint authorship jurisprudence. Most actors don't qualify as joint authors. *See Aalmuhammed*, 202 F.3d at 1232–33. Yet, if any actor who doesn't like the final version of a movie could keep it from being released, he'd have more control over the film than a joint author. *See* 1 *Nimmer on Copyright* § 6.10[A][1][a], at 6–36 ("[A] joint owner may exploit the work himself, without obtaining the consent of the other joint owners.").

exceeded the scope of the implied license and was, therefore, an unauthorized, infringing use.

The situation in which a filmmaker uses a performance in a way that exceeds the bounds of the broad implied license granted by an actor will be extraordinarily rare. But this is such a case. Because it is, Garcia has demonstrated that she's likely to succeed on the merits of her claim. *Winter*, 555 U.S. at 20.

## B. Irreparable Harm

Garcia argues that she suffers irreparable harm both because of the ongoing infringement of her copyright and because that infringement subjects her to continuing, credible death threats. Irreparable harm isn't presumed in copyright cases. *Perfect 10, Inc.* v. *Google, Inc.*, 653 F.3d 976, 980–81 (9th Cir. 2011). Therefore, Garcia must show that the damage to her reputation and threats against her life constitute irreparable harm.

The district court found that Garcia failed to make this required showing, primarily because she didn't bring suit until several months after "Innocence of Muslims" was uploaded to YouTube. It's true that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc.* v. *Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). But this is so because a preliminary injunction is based "'upon the theory that there is an urgent need for speedy action'" and by "'sleeping on its rights a plaintiff demonstrates [a] lack of'" urgency. *Lydo Enters., Inc.* v. *City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quoting *Gillette Co.* v. *Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)).

16          GARCIA V. GOOGLE, INC.

There's no dispute that, here, Garcia took legal action as soon as the film received worldwide attention and she began receiving death threats—in other words, as soon as there was a "need for speedy action."  *Id.*  Because the need for immediate action didn't arise until she was threatened, Garcia wasn't dilatory in bringing the lawsuit.

The harm Garcia complains of is real and immediate.  *See City of L.A.* v. *Lyons*, 461 U.S. 95, 111 (1983).  She has provided unrefuted evidence that the threats against her are ongoing and serious, she has already been forced to take significant security precautions when traveling and she moved to a new home and relocated her business as a safety measure.  Although past injuries aren't sufficient to establish irreparable harm for purposes of an injunction, *id.* at 103, Garcia has amply demonstrated that, absent an injunction, she'll continue to suffer concrete harms—whether in the form of ongoing security requirements or actual harm to her person.

Beyond establishing that she faces an imminent harm, Garcia must show a "sufficient causal connection" between that harm and the conduct she seeks to enjoin such that the injunction would effectively curb the risk of injury.  *Perfect 10*, 653 F.3d at 981–82.  Despite her understandable focus on the threats against her life, Garcia has brought a copyright action.  Therefore, she needs to show that the harm she alleges is causally related to the infringement of her copyright.

She's made such a showing.  Youssef's unauthorized inclusion of her performance in "Innocence of Muslims" undisputedly led to the threats against Garcia.  Google argues that any harm arises solely out of Garcia's participation in

**ADD16**

"Innocence of Muslims" and not out of YouTube's continued hosting of the film.  But Garcia has shown that removing the film from YouTube will help disassociate her from the film's anti-Islamic message and that such disassociation will keep her from suffering future threats and physical harm. Although Google asserts that the film is so widespread that removing it from YouTube will have no effect, it has provided no evidence to support this point.[8]  Taking down the film from YouTube will remove it from a prominent online platform—the platform on which it was first displayed—and will curb the harms of which Garcia complains.

It is not irrelevant that the harm Garcia complains of is death or serious bodily harm, which the dissent fails to mention.  Death is an "irremediable and unfathomable" harm, *Ford* v. *Wainwright*, 477 U.S. 399, 411 (1986), and bodily injury is not far behind.  To the extent the irreparable harm inquiry is at all a close question, we think it best to err on the side of life.

### C.  Balance of the Equities and The Public Interest

Youssef lied to Garcia about the project in which she was participating.  Her performance was used in a way that she

---

[8] Contrary to the dissent's suggestion, Garcia's affidavit doesn't establish that the film has been "widely discussed and disseminated." Dissent 34.  It states only that Garcia reached out to the media to let the world know that she "d[id] not condone the film."  We reject the dissent's uncharitable argument that Garcia should be penalized for attempting to protect her life and reputation by distancing herself from "Innocence of Muslims."  We also reject Google's preposterous argument that any harm to Garcia is traceable to her filing of this lawsuit.  Any publicity generated by Garcia's lawsuit is a necessary product of her attempt to protect herself and her legal rights after Google refused to do so.

18          GARCIA V. GOOGLE, INC.

found abhorrent and her appearance in the film subjected her to threats of physical harm and even death. Despite these harms, and despite Garcia's viable copyright claim, Google refused to remove the film from YouTube. It's hard to see how Google can defend its refusal on equitable grounds and, indeed, it doesn't really try. Instead, it argues that an injunction would be inequitable because of the overwhelming public interest in the continued hosting of "Innocence of Muslims" on YouTube.

The problem with Google's position is that it rests entirely on the assertion that Garcia's proposed injunction is an unconstitutional prior restraint of speech. But the First Amendment doesn't protect copyright infringement. *Cf. Eldred* v. *Ashcroft*, 537 U.S. 186, 219–220 (2003). Because Garcia has demonstrated a likelihood of success on her claim that "Innocence of Muslims" infringes her copyright, Google's argument fails. The balance of equities therefore clearly favors Garcia and, to the extent the public interest is implicated at all, it, too, tips in Garcia's direction.

\*          \*          \*

This is a troubling case. Garcia was duped into providing an artistic performance that was used in a way she never could have foreseen. Her unwitting and unwilling inclusion in "Innocence of Muslims" led to serious threats against her life. It's disappointing, though perhaps not surprising, that Garcia needed to sue in order to protect herself and her rights.

But she has sued and, more than that, she's shown that she is likely to succeed on her copyright claim, that she faces irreparable harm absent an injunction and that the balance of

**ADD18**

GARCIA V. GOOGLE, INC.                    19

equities and the public interest favor her position.    The
district court abused its discretion in finding otherwise.

### REVERSED AND REMANDED[9]

---

N.R. SMITH, Circuit Judge, dissenting

Because the facts and law do not "clearly favor" issuing
a preliminary injunction to Garcia, the district court did not
abuse its discretion in denying Garcia's requested relief. As
a result, I must dissent.

## I.    Standard of Review

The majority opinion omits applying the requisite
standard of review that is especially pertinent to Garcia's
requested relief. Mandatory preliminary injunctions, similar
to the one issued today, are "particularly disfavored." *Stanley
v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).

Different from the usual "prohibitory injunction," a
"mandatory injunction goes well beyond simply maintaining
the status quo *pendente lite*." *Id.* (internal quotation marks
omitted). As an example, requiring a university to reappoint
a faculty member whose contract had expired constitutes a

---

[9] Concurrent with this opinion, we have issued an order directing Google
to take down all copies of "Innocence of Muslims" from YouTube and
any other platforms within its control and to take all reasonable steps to
prevent further uploads.  This temporary injunction shall remain in place
until the district court is able to enter a preliminary injunction consistent
with our opinion.

20          GARCIA V. GOOGLE, INC.

mandatory injunction. *Id.*; *see also, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) ("[T]he affirmative step of recalling [a] product" is also a mandatory injunction.). In the instant dispute, Garcia requests relief through a mandatory injunction. Rather than asking to maintain the status quo pending litigation, Garcia demands Google immediately remove a film from YouTube. Therefore, her request must be "subject to a higher degree of scrutiny because such relief is particularly disfavored under the law of this circuit."*Stanley*, 13 F.3d at 1320. This higher degree of scrutiny requires courts to be "extremely cautious" and "deny such relief unless the facts and law *clearly favor* the moving party." *Id.* at 1319–20 (internal quotation marks omitted, emphasis added). Indeed, mandatory injunctions "are not issued in doubtful cases." *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (internal quotation marks omitted).

This standard's importance must be appreciated in conjunction with the general standard with which this court reviews a district court's decision to deny preliminary injunctive relief: "abuse of discretion." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). As a result, the majority may only reverse if it were illogical or implausible, *United States v. Hinkson*, 585 F.3d 1247, 1263–64 (9th Cir. 2009), for the district court to conclude that the law and facts did not *clearly favor* Garcia, *Stanley*, 13 F.3d at 1320.[1]

Given this standard, the majority errs in requiring Google to pull the film from YouTube—at this stage of the litigation.

---

[1] Given this is the relevant standard of review, the district court's application of it is hardly "equivocation." *See* maj. op. at 6 n.2.

**ADD20**

GARCIA V. GOOGLE, INC.                    21

The district court did not abuse its discretion in concluding that the law and facts did not clearly favor Garcia. Instead, the majority makes new law in this circuit in order to reach the result it seeks. We have never held that an actress's performance could be copyrightable. Indeed, "[t]here is little case law or statutory authority as to the position of performers as authors of an audiovisual work under U.S. law." F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law*, 49 UCLA L. Rev. 225, 300 (2001).

## II. Application of the *Winter* Factors

### A. Garcia's Likely Success on the Merits of Her Copyright Claim

The district court concluded that it was unclear whether Garcia had a copyright interest in her acting performance. The district court's discretionary conclusion hardly appears illogical or implausible.

### 1. Copyright Interest

A protected interest under the Copyright Act must be an "original work[] of authorship fixed in any tangible medium of expression. . . ." 17 U.S.C. § 102(a). Garcia does not clearly have a copyright interest in her acting performance, because (1) her acting performance is not a work, (2) she is not an author, and (3) her acting performance is too personal to be fixed.[2]

---

[2] The majority relies solely on a showing of originality to conclude Garcia has a copyrightable interest in her acting performance, maj. op. at 8 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345

**ADD21**

22          GARCIA V. GOOGLE, INC.

### a.  Work

To be protected, Garcia's acting performance must be a "work." *Id.* Congress has listed examples of copyrightable works, like architectural works, motion pictures, literary works, and pictorial or sculptural works. *Id.* The nature of these works is significantly different from an actress's individual performance in a film, casting doubt on the conclusion that the latter can constitute a work. *See Microsoft Corp. v. C.I.R.*, 311 F.3d 1178, 1184–85 (9th Cir. 2002) ("The doctrine of *noscitur a sociis* counsels that words should be understood by the company they keep.").

Section 101 of the Act is also instructive, because it differentiates a work from the performance of it. It defines "perform a 'work'" to mean "to recite, render, play, dance or *act it*." 17 U.S.C. § 101 (emphasis added). Given this provision, it is difficult to understand how Congress intended to extend copyright protection to this acting performance. While Congress distinguishes the performance from the work itself, the majority blurs this line. Its position contemplates something very different from amalgamating independently copyrightable interests into a derivative work. *See id.* at § 103(b).

Consistent with section 101, section 102(b) outlines that which is not given copyright protection. It states: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." *Id.* at § 102(b). An acting

_____

(1991)), but the Constitution and the Copyright Act require much more.

**ADD22**

performance resembles the "procedure" or "process" by which "an original work" is performed. *Id.* Therefore, "[i]n no case does copyright protection" extend to an acting performance, "regardless of the form in which it is described, illustrated, or embodied in" the original work. *Id.*

In sum, a motion picture is a work. *Id.* at § 102(a). A segment independently produced and then incorporated into a motion picture is also a work. *See, e.g.*, *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 556 (9th Cir. 1990). However, the Copyright Act does not clearly place an acting performance within its sphere of copyrightable works. As a result, the law and facts do not clearly favor finding a copyrightable interest in Garcia's acting performance.

### b.  Authorship

Like the work requirement, the Copyright Act also premises copyright protection on authorship. 17 U.S.C. § 102(a). Authorship is also a constitutional copyright requirement. *See* U.S. Const. Art. I, § 8, cl. 8; *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 56 (1884). *Aalmuhammed v. Lee* is the most relevant case in this circuit on the question of authorship. 202 F.3d 1227 (9th Cir. 2000). Though the *Aalmuhammed* court discussed authorship in the context of joint authors of a film (which Garcia does not claim to be), it articulated general principles of authorship that assist in analyzing Garcia's interest in her acting performance.[3]

---

[3] Furthermore, Garcia's interest in her acting performance may best be analyzed as a joint work with Youssef, considering she relied on Youssef's script, equipment, and direction. *See* 17 U.S.C. § 101 ("A 'joint work' is a work prepared by two or more authors with the intention that

The *Aalmuhammed* court explained that "[t]he word [author] is traditionally used to mean the originator or the person who causes something to come into being." *Id.* at 1232. In other words, the author is the "person with creative control." *Id.* Thus, "an author 'superintends' the work by exercising control." *Id.* at 1234 (quoting *Burrow-Giles*, 111 U.S. at 61) (alteration omitted). Another framing by the court defined an author as "'he to whom anything owes its origin.'" *Id.* at 1233 (quoting *Burrow-Giles*, 111 U.S. at 58). An author might also be "'the inventive or master mind' who 'creates, or gives effect to the idea.'" *Id.* at 1234 (quoting *Burrow-Giles*, 111 U.S. at 61). Indeed, authorship "requires *more* than a minimal creative or original contribution to the work." *Id.* at 1233 (citing *Burrow-Giles*, 111 U.S. at 58) (emphasis added).[4] These principles comport with the "general rule," that "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Commty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).

In concluding that Aalmuhammed was not a joint author of the film, *Malcolm X*, the court found that he (1) "did not at any time have superintendence of the work," (2) "was not the person 'who . . . actually formed the picture by putting the persons in position, and arranging the place," (3) could not "benefit" the work "in the slightest unless [the director] chose to accept [his recommendations]," and (4) made "valuable

---

their contributions be merged into inseparable or interdependent parts of a unitary whole.").

[4] The majority opinion cannot coexist with this statement. *See* maj. op. at 8.

contributions to the movie," but that alone was "not enough for co-authorship of a joint work." *Aalmuhammed*, 202 F.3d at 1235.

Garcia's contribution is less significant than Aalmuhammed's. She conceded in her complaint and affidavit that she had no creative control over the script or her performance. Youssef provided the script, the equipment, and the direction. As a result, Garcia was not the originator of ideas or concepts. She simply acted out others' ideas or script. Her brief appearance in the film, even if a valuable contribution to the film, does not make her an author. Indeed, it is difficult to understand how she can be considered an "inventive or master mind" of her performance under these facts.

The majority dismisses *Aalmuhammed* as inapposite, instead bolstering its conclusion with reference to acting manuals and treatises. *See* maj. op. at 8–9. In so doing, it goes too far in attempting to distinguish *Aalmuhammed*. First, the *Aalmuhammed* court articulated general principles of authorship that it pulled from the Supreme Court case, *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884). *See, e.g.*, *Aalmuhammed*, 202 F.3d at 1233 ("*Burrow-Giles* is still good law. . . ."). *Burrow-Giles* has nothing to do with joint works; instead, the Court interpreted "author" as featured in Article I, Section 8, Clause 8 of the U.S. Constitution. *See* 111 U.S. at 56. Second, the majority's one quotation from *Aalmuhammed*, maj. op. at 8, is taken out of context. The very next line in that opinion makes clear that copyright protection is premised on authorship, whether the work is joint or otherwise:

> We hold that authorship is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution. We recognize that a contributor of an expression may be deemed to be the "author" of that expression for purposes of determining whether it is independently copyrightable.

*Aalmuhammed*, 202 F.3d at 1232. Finally, Section 102(a) of the Copyright Act and Article I, Section 8, Clause 8 of the U.S. Constitution both premise copyright protection on authorship. Therefore, not only does the majority decline to apply the most relevant precedent in this circuit on the question before it, it also reads the authorship requirement out of the Copyright Act and the Constitution.[5]

Even the commentators agree that *Aalmuhammed* not only applies to Garcia's claim, but also forecloses her realization of a copyrightable interest in her acting performance. *See, e.g.*, Dougherty, *Not a Spike Lee Joint?*, 49 UCLA L. Rev. at 306 ("Under the judicially enhanced joint work requirements," an actress's performance would be "physically inseparable from other cinematic contributions." (citing *Aalmuhammed*, 202 F.3d at 1232)); Lee, *Entertainment and Intellectual Property Law* § 12:7 (2013) ("Under [*Aalmuhammed*], . . . individual contributors will rarely qualify as joint authors").

---

[5] The majority's sole reliance on *Feist Publications* to conclude that an acting performance is copyrightable, maj. op. at 8–9, gives insufficient weight to the constitutional and statutory authorship requirement. In *Feist Publications*, the specific question was not of authorship but of originality. *See* 499 U.S. at 347.

The majority lauds an actress's creative role in a film, maj. op. at 8, but the practical impact of its decision must not be ignored. Garcia's role in the film is minimal. Yet the majority concludes that she somehow created a work Congress intended to protect under the Copyright Act. Considering the number of contributors who inject the same or a greater amount of creativity into a film, the majority's omission of any inquiry into authorship indeed creates "an impenetrable thicket of copyright." Maj. op. at 11. Meanwhile, though *Aalmuhammed*'s interpretation of the Copyright Act has been debated in academic circles, "it adopts a standard that promotes clarity in the motion picture industry." Lee, *Entertainment and Intellectual Property Law* § 12:7.

Because Garcia does not qualify as an author under *Aalmuhammed*, the law and facts do not clearly favor protecting her acting performance under the Copyright Act.

### c.  Fixation

Lastly, the subject matter protected by the Copyright Act must also be "fixed in [a] tangible medium of expression. . . ." 17 U.S.C. § 102(a). Copyright preemption cases are instructive on the question of fixation.

For preemption purposes, the courts generally agree that "the scope of the subject matter of copyright law is broader than the protection it affords." *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (en banc); *see U.S. ex rel Berge v. Bd. of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997). In other words, the subject matter underlying a state law claim *preempted* by the Copyright Act may nevertheless not be protected by the Copyright Act. By

28          GARCIA V. GOOGLE, INC.

implication, subject matter supporting a *non-preempted* state law claim is definitely not protected by the Copyright Act. A number of cases from this circuit discuss subject matter akin to an acting performance and prove useful on the question of fixation.[6]

In *Midler v. Ford Motor Co.*, Bette Midler sued Ford for misappropriating her voice in a commercial. 849 F.2d 460, 462 (9th Cir. 1988). Although Ford properly had a license from the song's copyright holder, it paid someone to imitate Midler in singing the song Midler made famous. *Id.* Although ultimately holding for Ford, the court rejected its argument that Midler's claim was preempted by copyright law. "A voice is not copyrightable. The sounds are not 'fixed.' What is put forward . . . here is more personal than any work of authorship." *Id.*; *see also Sinatra v. Goodyear Tire & Rubber Co.*, 435 F.2d 711 (9th Cir. 1970).

In *Laws v. Sony Music Entertainment*, we distinguished *Midler* from its facts in holding that the plaintiff's claim was preempted by the Copyright Act, because "Sony was not imitating 'Very Special' as [the plaintiff] might have sung it. Rather, it used a portion of 'Very Special' as sung by [the plaintiff]." 448 F.3d 1134, 1141 (9th Cir. 2006). Where Sony had a license to the entire song, its use of a portion of it under

---

[6] The majority opinion dismisses the line of copyright preemption precedent. Maj. op. at 9 ("*Midler* isn't a copyright case at all—it's a right of publicity case that happens to discuss copyright in the context of preemption."). However, these cases feature the same judges interpreting the same Copyright Act, whether the question is one of copyright infringement or copyright preemption. Thus, the majority's distinction is without difference; it fails to overcome the fact that subject matter underlying a *non-preempted* state law claim, like that in *Midler*, is *clearly* without the Copyright Act's protection. *See Montz*, 649 F.3d at 979.

**ADD28**

GARCIA V. GOOGLE, INC.                          29

that license could not be attacked outside the copyright laws. *Id.*

*Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146 (9th Cir. 2010), is like *Laws*. Defendants in *Jules Jordan* copied (without authorization) pornographic DVDs produced and copyrighted by Jules Jordan Video, then reproduced, counterfeited, and sold their copies to third parties. *Id.* at 1153. Because Jules Jordan held a copyright in the original DVDs, this court found that the Copyright Act preempted its state law right of publicity claim against Defendants.

The subject matter in *Jules Jordan* and *Laws* concerned entire copyrighted works—video and music recordings. Differently, *Midler* involved the imitation of a singer's voice. Combined, these cases show that, just as the *singing* of a song is not copyrightable, while the entire song recording is copyrightable, the *acting* in a movie is not copyrightable, while the movie recording is copyrightable.[7]

A musical recording involves many moving parts, including the tune, lyrics, instrumental musicians, vocalists, and a production team that edits and prepares the final song. While the ultimate product is copyrightable, Ninth Circuit precedent dictates that a vocalist's singing of the song is not copyrightable. *See Midler*, 849 F.2d at 462. An acting performance depends upon similar moving parts: a script,

---

[7] This is not the case where an independently authored clip is used in a film, as in *Effects Assocs.*, 908 F.2d at 557–58. Rather, this analogy assumes facts similar to the instance case: an actress acting out a script she did not write under the direction of someone else who provides all of the instruments, tools, and leadership.

multiple actors' and actresses' performances, guidance from directors and staff, and editing and other production preparation. The movie is ultimately copyrightable. *See* 17 U.S.C. § 102(a). But one actress's individual acting performance in the movie, like a vocalist singing a song, "is more personal than any work of authorship." *Midler*, 849 F.2d at 462. As a result, it is not fixed. *See id.*

Just as "an actor does far more than speak words on a page," maj. op. at 8, so too does a vocalist. Indeed, one might say that otherwise, "every schmuck" is a vocalist, "because everyone . . . knows how to read." *Id.* at 8 (quoting Sanford Meisner & Dennis Longwell, *Sanford Meisner on Acting* 178 (1987)) (quotation marks omitted). An actress like Garcia makes a creative contribution to a film much like a vocalist's addition to a musical recording. Garcia did not write the script; she followed it. Garcia did not add words or thoughts to the film. She lent her voice to the words and her body to the scene. Her creativity came in the form of facial expression, body movement, and voice. Similarly, a singer's voice is her personal mobilization of words and musical notes to a fluid sound. Inflection, intonation, pronunciation, and pitch are the vocalist's creative contributions. Yet, this circuit has determined that such, though perhaps creative, is too personal to be fixed. *See Midler*, 849 F.2d at 462.

Under this line of cases, an actress's performance in a film is more like the personal act of singing a song than the complete copyrighted works in *Laws* and *Jules Jordan*. As a result, it does not seem copyrightable. Thus, the law and facts do not clearly support Garcia's claim that her acting performance is protected under the Copyright Act.

GARCIA V. GOOGLE, INC.                    31

Considering work, authorship, and fixation, Garcia has not demonstrated how the facts and law clearly favor her claim of a copyrightable interest in her acting performance.

### 2. Work for Hire Doctrine

Even if the majority were correct in finding a copyrightable interest in Garcia's acting performance, preliminary injunctive relief would be unwarranted. The district court did not address the application of the work for hire doctrine. Yet, the law and facts do not clearly show that Garcia was not working for hire.

"In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title. . . ." 17 U.S.C. § 201(b). "A 'work made for hire' is a work prepared by an employee within the scope of his or her employment. . . ." *Id.* at § 101. Therefore, "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751.

> Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is

**ADD31**

> part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751–52 (internal citations omitted). Though "[n]o one of these factors is determinative," *id.* at 752, the hiring party's control "is the central inquiry here." *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125 (9th Cir. 2010).

The work for hire doctrine "is important in the analysis of motion picture authorship because in the United States most contributions to a motion picture are created as works made for hire." Dougherty, *Not a Spike Lee Joint?*, 49 UCLA L. Rev. at 238. Here, Garcia conceded in her complaint and affidavit that Youssef "managed all aspects of production," controlling both the manner and means of making the film, including the scenes featuring Garcia. Further, this "central" factor is not the only one supporting a work for hire finding here. The bulk of the other factors also suggest that Garcia is an employee. Youssef provided the instrumentalities and tools, dictated the filming location, decided when and how long Garcia worked, and was engaged in the business of film making at the time. Additionally, Garcia did not hire or pay assistants. Contrary to the majority's conclusion, maj. op. at 11–13, the facts and law do not clearly favor finding that Garcia was not working for hire.[8]

In *Reid*, the Court decided a sculptor was not an employee, even though Community for Creative Non-

---

[8] While the majority may dispute which person was actually directing the film, it cannot overcome Garcia's own admissions in her complaint that substantiate these facts; she was not in control.

Violence "directed enough of Reid's work to ensure that he produced a sculpture that met their specifications." *Reid*, 490 U.S. at 752. However, "all the other circumstances weigh[ed] heavily against finding an employment relationship." *Id.* This case differs considerably from *Reid*. The central factor of control and many other factors "weigh heavily" *for* finding an employment relationship.

In sum, the majority gives zero deference to the district court's position on the likelihood for success factor. To justify its opinion, the majority must show the district court abused its discretion in determining the law and facts did not clearly show Garcia was likely to succeed on the merits. This, the majority has failed to do.

### B.  Irreparable Harm

The district court decided that because "[t]he Film was posted for public viewing on YouTube" five months prior to Garcia bringing suit, she "has not demonstrated that the requested preliminary relief would prevent any alleged harm." The majority has failed to demonstrate how the district court abused its discretion in so holding.

Indeed, the district court's application of the law to the facts of this case here was not an abuse of discretion. A "[p]laintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). The district court gave significant weight to Garcia's delay in filing suit, even given Garcia's explanation for her delay. *See* maj. op. at 15–16. This is not illogical or implausible. Were Garcia really trying to protect her purported copyright interest in her acting performance,

34          GARCIA V. GOOGLE, INC.

one would expect her to have brought this action immediately after learning of the alleged infringing behavior. Considering "[t]he relevant harm is the harm that . . . occurs to the parties' legal interests," Garcia has failed to explain her delay in terms of harm to her alleged copyright interest. *See Salinger v. Colting*, 607 F.3d 68, 81 & n.9 (2d Cir. 2010) ("[T]he justification of the copyright law is the protection of the *commercial* interest of the artist/author. It is not to coddle artistic vanity or to protect secrecy, but to stimulate creation by protecting its rewards." (internal quotation marks omitted)).

Further, by Garcia's own admission, the film has been widely discussed and disseminated; Garcia admits in her affidavit that she "went public and advised the world through media that [she] did not condone the film." Thus, while Garcia has provided undisputed evidence of past threats and injuries, she has failed to link her allegations of future harm to potential future viewings of the film on YouTube. *See Perfect 10 v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011); *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173 (9th Cir. 2011).

Therefore, it is not illogical or implausible to conclude that the law and facts do not clearly demonstrate how Garcia will suffer continued irreparable harm caused by the presence of the film on YouTube. *See Small v. Operative Plasterers' and Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 494 (9th Cir. 2010).

Rather than focusing on the logic or plausibility of the district court's decision, the majority substitutes its own explanation of why Garcia's delay should not be held against her. Maj. op. at 15–17. However, the weight attached by the

GARCIA V. GOOGLE, INC.                    35

district court to certain facts when measuring irreparable harm is not for this court to second guess. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).

## C.  Balancing the Equities

When considering the propriety of preliminary injunction relief, "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 632 F.3d at 1131. The district court applied this concept in concluding preliminary injunctive relief was unwarranted without considering the balance of the equities or the public interest.

However, the balance of the equities does not clearly favor Garcia. A court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

Google argues that the balance of the equities does not clearly favor Garcia, because "[a] court order requiring removal from YouTube of the Film or any portion thereof would impose a substantial burden on free expression, without preventing any future harm to Appellant." Garcia is only faced with *potential* infringement of her *potential* copyright interest *pending* a final disposition of this lawsuit. Further, she is not completely without fault in these circumstances. If she valued her acting performance to the extent she now claims, why didn't she protect her performance by contract? The facts evidence that she acted for three days and was paid $500 dollars. Balancing the harm faced by both Garcia and Google, the law and facts do not clearly favor Garcia.

**ADD35**

In its basis concerning the balance of the equities, the majority discusses Youssef's reproachable conduct. Maj. op. at 17–18. However, Youssef is not a party to this appeal, and Google was not a party to any of Youssef's actions.

Therefore, the balance of the equities does not clearly favor Garcia.

### D. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the *extraordinary* remedy of injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1082 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24(2008)) (emphasis added). In fact, "'the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'" *Stormans*, 586 F.3d at 1139 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–313 (1982)).

The public's interest in a robust First Amendment cannot be questioned. *See Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Opposite this vital public interest is Garcia's allegation of copyright infringement. Properly enforcing the Copyright Act is also an important public interest. *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011). Indeed, if Google were actually infringing Garcia's copyright, the First Amendment could not shelter it. *See Eldred v. Ashcroft*, 537 U.S. 186, 219–20 (2003).

But the case at bar does not present copyright infringement per se. Instead (in an unprecedented opinion), the majority concludes that Garcia *may* have a copyright interest in her acting performance. Maj. op. at 10. As a result, Google's contention, that issuing a preliminary injunction on these facts may constitute a prior restraint of speech under the First Amendment, identifies an important public interest.

Thus, the law and facts do not clearly demonstrate how granting a preliminary injunction in Garcia's favor would serve the public interest.

### III.    Conclusion

The *Stanley* standard counseling extreme caution when considering granting a mandatory preliminary injunction is premised on principles of judicial restraint. Instead, the majority abandons restraint to procure an end (ordering the film be taken down) by unsuitable means (the Copyright Act).

FILED

**NOT FOR PUBLICATION**

FEB 19 2014

**UNITED STATES COURT OF APPEALS**

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| **CINDY LEE GARCIA,** | No. 12-57302 |
| Plaintiff - Appellant, | D.C. No. 2:12-cv-08315-MWF-VBK |
| v. | |
| **GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company,** | **ORDER** |
| Defendants - Appellees, | |
| and | |
| **NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; MARK BASSELEY YOUSSEF; ABANOB BASSELEY NAKOULA; MATTHEW NEKOLA; AHMED HAMDY; AMAL NADA; DANIEL K. CARESMAN; KRITBAG DIFRAT; SOBHI BUSHRA; ROBERT BACILY; NICOLA BACILY; THOMAS J. TANAS; ERWIN SALAMEH; YOUSSEFF M. BASSELEY; MALID AHLAWI,** | |
| Defendants. | |

Before:    **KOZINSKI**, Chief Judge, **GOULD** and **N.R. SMITH**, Circuit Judges.

**ADD38**

page 2

Google, Inc. shall take down all copies of "Innocence of Muslims" from YouTube.com and from any other platforms under Google's control, and take all reasonable steps to prevent further uploads of "Innocence of Muslims" to those platforms.  Google shall comply with this order within twenty-four hours of the issuance thereof.

Neither the parties nor counsel shall disclose this order, except as necessary to the takedown process, until the opinion in this case issues.  This order will remain in effect until such time as the district court enters a preliminary injunction consistent with our opinion.

FILED

NOT FOR PUBLICATION

FEB 21 2014

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| **CINDY LEE GARCIA,** | No. 12-57302 |
| Plaintiff - Appellant, | D.C. No. 2:12-cv-08315-MWF-VBK |
| v. |  |
| **GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company,** | **ORDER** |
| Defendants - Appellees, |  |
| And |  |
| **NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; MARK BASSELEY YOUSSEF; ABANOB BASSELEY NAKOULA; MATTHEW NEKOLA; AHMED HAMDY; AMAL NADA; DANIEL K. CARESMAN; KRITBAG DIFRAT; SOBHI BUSHRA; ROBERT BACILY; NICOLA BACILY; THOMAS J. TANAS; ERWIN SALAMEH; YOUSSEFF M. BASSELEY; MALID AHLAWI,** |  |
| Defendants. |  |

Before:    **KOZINSKI**, Chief Judge, **GOULD** and **N.R. SMITH**, Circuit
Judges.

**ADD40**

page 2

Appellees' emergency stay motion is denied.

The opinion in this case is currently scheduled to issue on Wednesday, February 26, 2014. The opinion reverses the denial of the preliminary injunction and provides a detailed explanation. The order of February 19, 2014, was issued in advance of the opinion to prevent a rush to copy and proliferate the film before Google can comply with the order.

Neither the parties nor counsel shall disclose this order or the order of February 19 until the opinion is actually published.

FILED

**NOT FOR PUBLICATION**

FEB 28 2014

**UNITED STATES COURT OF APPEALS**

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| **CINDY LEE GARCIA,** | No. 12-57302 |
| **Plaintiff - Appellant,** | D.C. No. 2:12-cv-08315-MWF-VBK |
| v. | |
| **GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company,** | **ORDER** |
| **Defendants - Appellees,** | |
| and | |
| **NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; MARK BASSELEY YOUSSEF; ABANOB BASSELEY NAKOULA; MATTHEW NEKOLA; AHMED HAMDY; AMAL NADA; DANIEL K. CARESMAN; KRITBAG DIFRAT; SOBHI BUSHRA; ROBERT BACILY; NICOLA BACILY; THOMAS J. TANAS; ERWIN SALAMEH; YOUSSEFF M. BASSELEY; MALID AHLAWI,** | |
| **Defendants.** | |

Before: **KOZINSKI,** Chief Judge, **GOULD** and **N.R. SMITH,** Circuit Judges.

**ADD42**

page 2

Appellees' second emergency stay motion is denied.  The order of February 19, 2014, is modified as follows:

Google, Inc. shall take down all copies of "Innocence of Muslims" from YouTube.com and from any other platforms under Google's control, and take all reasonable steps to prevent further uploads of "Innocence of Muslims" to those platforms.  Google shall comply with this order within twenty-four hours of the issuance thereof.  This order does not preclude the posting or display of any version of "Innocence of Muslims" that does not include Cindy Lee Garcia's performance.

This order will remain in effect until such time as the district court enters a preliminary injunction consistent with our opinion.



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

December 18, 2012

The Armenta Law Firm
Attn: M Armenta
11900 Olympic Blvd Suite 730
Los Angeles, CA 90064
United States

Correspondence ID:   1-EBE2DM
RE:    Desert Warrior

Dear M Armenta:

We are writing because of questions about the authorship and ownership of this work. The application names Cindy Lee Garcia as the sole author of "dramatic performance fixed in tangible medium of expression." The copy you sent contains no credits, but online sources indicate that Ms. Garcia is an actress in the film "Innocence of Muslims," which appears to be the same as the motion picture on the disc you submitted for registration under the title "Desert Warrior." Online sources indicate that the film was written and produced by Nakoula Basseley Nakoula under the pseudonym Sam Bacile.

For copyright registration purposes, a motion picture is a single integrated work. You stated that Ms. Garcia did not sign an agreement or a release for her rights when she acted in 'Desert Warrior.' Copyrightable authorship in a motion picture may include production, direction, camerawork, editing and script. Assuming Ms. Garcia's contribution was limited to her acting performance, we cannot register her performance apart from the motion picture. Nor does it seem likely that she is entitled to register a claim in the motion picture as a whole in her name. Please see the enclosed Motion Picture Authorship Leaflet for more information.

If you feel that Ms. Garcia has the right to claim copyright in the entire motion picture, please state the reasons for your position. Otherwise, we must refuse registration. Where registration is refused, we close our file without further action and keep the copy and non-refundable filing fee according to our practices.

Sincerely,

Laura Lee Fischer
Chief, Performing Arts Division
U.S. Copyright Office

**ADD44**



# The Armenta Law Firm

A PROFESSIONAL CORPORATION

Via USPS

March 13, 2013

Laura Lee Fischer
Chief, Performing Arts Division
U.S. Copyright Office
Library of Congress
101 Independence Avenue SE
Washington DC 20559-6000

Re:    Desert Warrior, Correspondence ID: 1-EBE2DM

Dear Ms. Fischer:

Thank you for your letter of December 18, 2012.  I am writing to provide the reasons that we believe that Ms. Garcia has a copyrightable interest in her dramatic performance in the work, "Desert Warrior."  Enclosed is a copy of Ms. Garcia's brief filed before the United States Court of Appeals for the Ninth Circuit.  The matter is fully briefed and pending.  We are awaiting a hearing date.  I am requesting that the Copyright Office await the decision of the Ninth Circuit before taking any action.  We believe that the Court will decide the very issue that was raised in your letter.  If you have any questions or concerns or need any additional paperwork or information concerning the status of the appeal, please feel free to contact me directly.

Sincerely,

M. Cris Armenta

11900 Olympic Boulevard, Suite 730 ■ Los Angeles, CA 90064
www.crisarmenta.com ■ telephone (310) 826-2826 ■ facsimile (310) 826-5456

ADD45



**United States Copyright Office**
Library of Congress   101 Independence Avenue SE   Washington, DC 20559-6000   www.copyright.gov

Mr. M. Cris Armenta
The Armenta Law Firm
11900 Olympic Blvd., Suite 730
Los Angeles, CA 90064

March 6, 2014

Dear Mr. Armenta:

On December 18, 2012, Ms. Laura Lee Fischer, Chief of the Performing Arts Division of the United States Copyright Office's Registration Program, wrote to you in response to the claim by Ms. Garcia in a copyrightable interest in her dramatic performance in a motion picture, "Desert Warrior." Ms. Fischer's letter stated that "[f]or copyright registration purposes, a motion picture is a single integrated work." It went on to state that "[a]ssuming Ms. Garcia's contribution was limited to her acting performance, we cannot register her performance apart from the motion picture." The letter concluded by stating that "[i]f you feel that Ms. Garcia has the right to claim copyright in the entire motion picture, please state the reasons for your position. Otherwise, we must refuse registration."

On March 13, 2013, you replied to Ms. Fischer by stating that you believed that Ms. Garcia "has a copyrightable interest in her dramatic performance in the work, 'Desert Warrior,'" and attached a brief to the United States Court of Appeals for the Ninth Circuit that you stated "fully briefed" the matter. You did not, however, respond to Ms. Fischer's specific question or acknowledge that the U.S. Copyright Office clearly stated that it views dramatic performances in motion pictures to be only a part of the integrated work -- the motion picture.

In accordance with the Office's previous letter, the Office must refuse registration. Although you asked the Office to await the decision of the Ninth Circuit before taking any action, the Office finds that the Copyright Act vests exclusive authority in the Register of Copyrights to render a decision as to whether to issue a certificate of registration or refuse an application for registration. 17 U.S.C. § 410. Moreover, Congress expressly envisioned that registration decisions by the Register of Copyrights would precede adjudication in the courts. 17 U.S.C. § 411. If infringement actions are instituted prior to registration determinations by the Register of Copyrights, not only will the evidentiary presumption be lost when certificates are issued, but more importantly, where the Office finds a claim to be invalid, the Register's statutory right to intervene in an action instituted pursuant to a refusal to register is nullified. 17 U.S.C. § 411(a).

1

**ADD46**

The U.S. Copyright Office's longstanding practices do not allow a copyright claim by an individual actor or actress in his or her performance contained within a motion picture. The rationale behind this position is clear: an actor or actress in a motion picture is either a joint author in the entire work or, as most often is the case, is not an author at all by virtue of a work made for hire agreement. This view is supported by the legislative history of section 201 of the Copyright Act:

> The definition of "joint works" has prompted some concern lest it be construed as converting the authors of previously written works, such as plays, novels, and music, into coauthors of a motion picture in which their work is incorporated. *It is true that a motion picture would normally be a joint rather than a collective work with respect to those authors who actually work on the film, although their usual status as employees for hire would keep the question of coownership from coming up.* On the other hand, although a novelist, playwright, or songwriter may write a work with the hope or expectation that it will be used in a motion picture, this is clearly a case of separate or independent authorship *rather than one where the basic intention behind the writing of the work was for motion picture use.* In this case, the motion picture is a derivative work within the definition of that term, and section 103 makes plain that copyright in a derivative work is independent of, and does not enlarge the scope of rights in, any pre-existing material incorporated into it. There is thus no need to spell this conclusion out in the definition of "joint work."

H.R. Rep. 94–1476 at 120 (emphasis added).

While a novelist, playwright, or screenwriter may create distinct works that are later adapted or incorporated into a motion picture, i.e., a new derivative work, an actor's or actress' performance in the making of a motion picture is an integrated part of the resulting work, the motion picture as a whole. An actor's or actress' performance is either joint authorship or is a contribution under a work made for hire agreement. There is no question that Ms. Garcia's performance was not a stand-alone motion picture that was subsequently adapted into another motion picture. Rather, it was a part of the creation of "Desert Warrior", subsequently re-named, "Innocence of Muslims". There is also no question that Ms. Garcia intended her contribution or performance to "be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. §101. If her contribution was not as a work made for hire, she may assert a claim in joint authorship in the motion picture, but not sole authorship of her performance in a portion of the work. If her contribution was neither a work made for hire nor the requisite authorship to warrant a claim in a joint work, Ms. Garcia has no separable claim to copyrightable authorship in her performance.

The Office has identified at least one exception to the general rule on treating motion pictures as integrated works. Where a separate portion of a motion picture is commissioned, such as a special effects scene that qualifies as a discrete work in itself that is later incorporated into a motion picture, such a separate work may be neither a joint work nor a work made for hire, but rather a work created by an independent contractor. Such an exception is premised on the creation of a stand-alone work that is independently authored, fixed, and sufficiently creative to

2

be considered a separate claim within one or more of the statutory categories of authorship in section 102(a).

The Office's view on this matter is not limited to motion pictures. The same reasoning would apply to the musicians, vocalists or production specialists on a sound recording. The Office would refuse an authorship claim by an individual musician who contributed an individual performance to a sound recording unless the claim was as a joint author. An exception would exist where a discrete sound recording was made by a musician that was later incorporated into a new, derivative sound recording.

Ms. Garcia's performance was not a discrete or separate motion picture that was incorporated into "Desert Warrior". Instead, her performance was one of many actors' performances that went into the making of the integrated motion picture that was fixed by others in the creation of the motion picture as a whole. As such, the Office must refuse registration in Ms. Garcia's claim in her individual performance in the motion picture.

Sincerely,

Robert J. Kasunic
Associate Register of Copyrights and
Director of Registration Policy and Practices
United States Copyright Office

3

**ADD48**