

RECEIVED
OFFICE OF THE CLERK
U.S. COURT OF APPEALS

2014 MAR 13 PM 2: 49

FILED _____  _____
DOCKETED _____ _____
DATE   INITIAL

1925 CENTURY PARK EAST, SUITE 800
LOS ANGELES, CA 90067
424.203.1600 · WWW.HMAFIRM.COM

March 13, 2014

**VIA HAND DELIVERY**
Ms. Molly C. Dwyer
Clerk of the Court
United States Court of Appeals
    for the Ninth Circuit
95 Seventh Street
San Francisco, California

      Re: *Garcia v. Google, Inc.*
      Case No. 12-57302

Dear Ms. Dwyer:

      I write to express my support for the Ninth Circuit opinion in *Garcia v. Google, Inc.*, written by Judge Alex Kozinski, and to advocate that *en banc* review by the Court is unnecessary. I was asked only *today* to write this letter and submit it to the Court. If I had more time, the letter would be longer, more researched, and certainly more articulate.

      <u>First</u>, a brief statement of my background: I have been an attorney licensed in all courts of the State of California since 1996. I am admitted to practice before the Ninth Circuit, and most or all U.S. District Courts within California. I also am a member of the bar of the District of Columbia. I graduated from Loyola Law School in Los Angeles in 1996 and immediately served as a post-graduate Judicial Law Clerk for a United States District Judge (Chief Judge Emeritus) of the Central District of California in downtown Los Angeles. Following that one-year clerkship, I entered private practice at a boutique business litigation firm which represented a few entertainment clients, including The Walt Disney Company. I later became General Counsel of a media company (and its affiliated media companies) which had a combined work force of about 150 employees, working out of 4 facilities located throughout the U.S. including California, New York and Maryland. I later returned to working at law firms and focused my practice almost exclusively on entertainment and intellectual property litigation.

Ms. Molly C. Dwyer
March 13, 2014
Page 2

I serve as the Editor and Co-Author of the law treatise *Entertainment Litigation*, which was first published in 2011 by Oxford University Press. The title was acquired by LexisNexis last year and the Second Edition (which I recently completed) is scheduled for publication later this year. The book covers all or virtually all areas of entertainment litigation including copyright, trademark, right of publicity, right of privacy, Talent Agencies Act, labor and employment, profit participation, defamation, anti-SLAPP, and insurance law. While the book focuses on Federal and California substantive law and civil procedure, it also has chapters dedicated to New York law, Canadian law, and the laws of the United Kingdom, regarding many of the subject areas listed above.

I am currently a co-founder and partner of the law firm Harder Mirell & Abrams LLP, based in Century City (Los Angeles), California. We practice, almost exclusively, entertainment and intellectual property litigation. Within the past three years or so, I have served as lead litigation counsel in civil lawsuits on behalf of Halle Berry, Sandra Bullock, George Clooney, Bradley Cooper, Cameron Diaz, Clint Eastwood, Jude Law, Julia Roberts, Hilary Swank, Reese Witherspoon, and many other actors, as well as entertainment companies of varying sizes and business areas. (To be clear, I am not writing this letter on behalf of any of my clients, nor do I even know the views of any of my clients regarding the *Garcia v. Google, Inc.* case. Rather, I am writing this letter individually, as a legal practitioner and author.) Lastly, certain entertainment law and intellectual property publications have placed me within their rankings. Among others, *The Hollywood Reporter* has placed me on their annual list of the "Top 100 Power Lawyers in America" for the past two years; my name appears among only 30 litigation attorneys on that list.

Second, I have followed – simply as a spectator – the *Garcia v. Google, Inc.* case. I found it interesting when I read about the case first being filed. When the U.S. District Court ruled against the plaintiff, Cindy Lee Garcia, I thought that it was unfortunate that a film production company would be able to escape liability for its apparent actions of representing to Ms. Garcia, an actor, that her performance would be used for a specific type of film, namely, an adventure film made for entertainment purposes, when apparently all along the production company intended to use her performance for ~~something completely different: an extremist political film that would have the potential~~ of causing an adverse, and possibly even violent response, by extremist political and/or religious groups internationally. Beyond the basic unfairness of making a knowingly false representation to the actor, the production company placed the actor's life and well-being at risk, potentially for many years to come, if not for the rest of her life. Ms. Garcia was paid only a few hundred dollars, and acted for only a few days. Any person who believes in justice would agree that she should have a viable cause of action against the production company, and also anyone who distributes or publishes the film, at the very least to obtain an injunction to stop the distribution of *her performance* in the film,

Ms. Molly C. Dwyer
March 13, 2014
Page 3

and as well to obtain appropriate damages to address the harm that the film's publication has caused to her.

Third, Ms. Garcia never signed a written agreement giving the production company, or anyone else, any rights to her performance. Thus, it would seem that she has a viable claim that she did not consent to allowing the production company any license at all to use her performance for any purpose, and certainly not for the film that ultimately was published.

Fourth, even if Ms. Garcia had signed a written agreement granting a license to her performance, or perhaps even assigning all of her rights to that performance, Judge Kozinski's opinion is correct that the production company (according to the plaintiff's allegations) engaged in a species of fraud, and therefore its false representations to Ms. Garcia have the potential to void any contract that she might have signed.

Fifth, the First Amendment has many limitations. The classic example is that a person may not shout "Fire!" in a crowded theater when there is not a fire. The facts in this case present other limitations, namely, the right of a person to enjoin the use of her performance in a video that she never authorized. In *Aguilar v. Avis Rent a Car Sys., Inc.,* 21 Cal. 4th 121, 134, 87 Cal. Rptr. 2d 132, 980 P.2d 846 (1999), the California Supreme Court noted several limitations to the First Amendment:

> Although stated in broad terms, the right to free speech is not absolute. (*Near v. Minnesota* (1931) 283 U.S. 697, 708, 51 S.Ct. 625, 75 L.Ed. 1357 ["Liberty of speech and of the press is also not an absolute right, and the state may punish its abuse. *Whitney v. California* [(1927) 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095]; *Stromberg v. California* [ (1931) 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117]."].) Many crimes can consist solely of spoken words, such as soliciting a bribe (Pen.Code, § 653f), perjury (Pen.Code, § 118), or making a terrorist threat (Pen.Code, § 422). As we stated in *In re M.S.* (1995) 10 Cal.4th 698, 42 Cal.Rptr.2d 355, 896 P.2d 1365: "[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, "'communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs....' ' [Citations.]" (See also *NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 916, 102 S.Ct. 3409, 73 L.Ed.2d 1215; *Milk Wagon Drivers v. Meadowmoor Dairies, Inc.* (1941)

Ms. Molly C. Dwyer
March 13, 2014
Page 4

312 U.S. 287, 292, 295, 61 S.Ct. 552, 85 L.Ed. 836; Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark* (1994) 1994 Sup.Ct.Rev. 1, 13.) Civil wrongs also may consist solely of spoken words, such as slander and intentional infliction of emotional distress. A statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity. (*Roberts v. United States Jaycees* (1984) 468 U.S. 609, 628, 104 S.Ct. 3244, 82 L.Ed.2d 462 [" [A]cts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent— wholly apart from the point of view such conduct may transmit. Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, such practices are entitled to no constitutional protection."].)

The foregoing high court decisions recognize that once a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting the repetition, perpetuation, or continuation of that practice is not a prohibited "prior restraint" of speech.

Likewise, our jurisprudence is saturated with examples of video content being enjoined because it infringes (or allegedly infringes) on another's intellectual property rights. As one of perhaps hundreds of examples, in early 2013, U.S District Judge Philip S. Gutierrez of the Central District of California granted Warner Bros.' application for an injunction against the distribution of a film called *Age of Hobbits* because it allegedly infringed on Warner Bros.' intellectual property rights for a similarly titled film, *The Hobbit* (Case No. CV 12-9547 PSG).

Sixth, it is unfortunate that Google did not simply remove the video in the first place, when Ms. Garcia first explained the situation and asked Google to remove the video. A prompt removal would have saved Google, Ms. Garcia, and the Federal court system over a year of expensive and time consuming litigation. At the heart of this case is a woman who never signed up for a lifetime of death threats, and simply sought to unwind a fraud that had been committed upon her, and be left alone by those who sought her harm through no fault of her own.

Seventh, I would encourage the Court to see past what I can only imagine are legions of the finest legal practitioners and scholars representing Google – one of the world's wealthiest companies, with limitless financial resources that surpass most industrialized countries. Lady Liberty is blind. She should advocate for justice, first,

Ms. Molly C. Dwyer
March 13, 2014
Page 5

last, and always, and not be swayed by the skills of the finest lawyers that money can buy. As Judge Kozinski correctly found, justice is and should be on the side of Ms. Garcia who thought she was being cast in a B-movie adventure film, only to have her life turned upside-down by an unscrupulous film producer and one of the world's wealthiest corporations that, on principal, refuses to remove a video that was created based on a fraud, and has subjected her to perpetual death threats and hate speech. Under the circumstances, Google should be ordered to remove the video, and to compensate Ms. Garcia for the damages that its refusal have caused her, including full reimbursement of her legal fees and costs.

    Eighth, *The Hollywood Reporter* published an article on February 28, 2014, regarding the Ninth Circuit's opinion in *Garcia v. Google, Inc.*, with the below quotes attributed to UCLA Law Professor David Nimmer (who writes the 11-volume law treatise *Nimmer on Copyright*), Law Professor Jay Dougherty who serves as Director of the Entertainment & Media Law Institute at Loyola Law School in Los Angeles, and Duncan Crabtree-Ireland, the General Counsel of Screen Actors Guild-American Federation of Television and Radio Artists (SAG-AFTRA), all supportive of the Ninth Circuit's ruling in *Garcia v. Google, Inc.*:

> David Nimmer, co-author (with his late father) of an eleven-volume treatise on copyright that's been cited several thousand times by courts . . . [and] also teaches at UCLA and is of counsel at Irell & Manella – told THR that he agrees with the decision, although he added that the facts of the case were "as squirrely as you could imagine." "Whether an actor's performance contributes copyrightable expression (is) a serious matter of first impression," said Nimmer. "This is a square ruling that it does." But, he acknowledged, "the dissent raises cogent questions." Said Loyola Law School's Jay Dougherty, "limited to this unusual fact pattern, the copyright ownership ruling seems correct." Dougherty is the author of a comprehensive law review article, Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law, cited in both the majority and dissent on Wednesday.

                              * * *

> "SAG-AFTRA is gratified that the Court recognized that an audiovisual producer cannot rely on copyright law as a shield against those whose performances are used without their consent," said Duncan Crabtree-Ireland, the union's chief operating officer and general counsel. "This case underscores the need for all parties on a film project to have adequate

Ms. Molly C. Dwyer
March 13, 2014
Page 6

contractual protections, such as those set forth in the SAG-AFTRA agreements."

In light of the foregoing, I submit that *Garcia v. Google, Inc.* was correctly decided by the Ninth Circuit panel led by Judge Alex Kozinski and, therefore, *en banc* review of that decision is unnecessary.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**

Enclosure
cc:    M. Cris Armenta, Esq.

http://www.hollywoodreporter.com/thr-esq/hollywood-experts-divided-implications-muslims-684607  Thu Mar 13 2014 13:21:43 GMT-0700 (Pacific Daylight Time)

MOVIES ▾   TV ▾   MUSIC ▾   TECH ▾   THE BUSINESS ▾   STYLE ▾   CULTURE ▾   AWARDS ▾   VIDEO ▾

# Hollywood, Esq. *the intersection of entertainment and law*

POWER LAWYERS    POWER BUSINESS MANAGERS    TOP ENTERTAINMENT LAW SCHOOLS

POSTED
FEB
**28**
2 wks

# Hollywood Experts Divided on Implications of 'Muslims' Ruling

    

f 31   66   2   in 3   0   Email   Print        **Comments**

**Some agree with the decision, others don't; most doubt an increase in litigation, but several experts are concerned; and one has advice for transactional lawyers.**



"Hard cases make bad law," says an old legal adage, and that applies to the *Innocence of Muslims* case, according to several experts The Hollywood Reporter spoke to in the wake of the court's ruling in *Garcia v. Google*. Others, however, agreed with the ruling. But the facts of the case are so unusual – allegedly, an egregious fraud and a lack of written agreement – that most of the same experts say the practical implications of the case are limited.

### OUR EDITOR RECOMMENDS

Google **Google Warns 'Muslims' Ruling Will Create Hollywood Chaos**

 **Secret 'Innocence of Muslims' Order Caused Google to Go Ballistic**

 **'Innocence of Muslims' Actress Scores Huge Victory at Appeals Court**

And yet, three of the experts we spoke to warned that the case would lead to more lawsuits. That's the same position taken by Google, which argues that the decision portends "uncertainty and chaos for the entertainment industry, documentary filmmakers, amateur content creators, and for online hosting services like YouTube," as the company put it in a filing that sought review of the 2-1 decision by the 9th Circuit.

STORY: Google Warns 'Muslims' Ruling Will Create Hollywood Chaos

The crux of the case is whether an actor's performance is protected by a copyright independent of the copyright in the script and the movie itself.


'Lindsay' Recap: Lohan Attempts Career Comeback With Self-Proclaimed 'New Chapter'


'How I Met Your Mother': Cristin Milioti Debunks Morbid Finale Theory (Video)


POWER *Stylists* 2014
The Hollywood Reporter's 25 Most Powerful Stylists, Revealed


A Train, a Trestle and 60 Seconds to Escape: How 'Midnight Rider' Victim Sarah Jones Lost Her Life


'Divergent' Star Shailene Woodley: The Next Jennifer Lawrence?

MOST SHARED   **MOST POPULAR**

1  Demi Moore Makes a Spectacle of Herself at Chanel Bash in Miami Beach (Poll)

2  CBS Renews 18 More Shows for 2014-15 Season

3  Syfy's Plan: More Space Operas, Less 'Sharknado'

4  'Enlisted' Creator Opens Up About Life, Death and Friday's PTSD Episode (Guest Column)

That sounded like an "angels dancing on the head of a pin" distinction to some of the experts we spoke to.

"It is a terrible ruling," said UCLA School of Law professor **Neil Netanel**. "The better view, as well expressed by the dissent, is that actors' performances are not independent copyrightable works."

However, others were supportive of the decision, notably including **David Nimmer**, co-author (with his late father) of an eleven-volume treatise on copyright that's been cited several thousand times by courts. Nimmer – who also teaches at UCLA and is of counsel at Irell & Manella – told *THR* that he agrees with the decision, although he added that the facts of the case were "as squirrely as you could imagine."

"Whether an actor's performance contributes copyrightable expression (is) a serious matter of first impression," said Nimmer. "This is a square ruling that it does." But, he acknowledged, "the dissent raises cogent questions."

Said Loyola Law School's **Jay Dougherty**, "limited to this unusual fact pattern, the copyright ownership ruling seems correct." Dougherty is the author of a comprehensive law review article, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law*, cited in both the majority and dissent on Wednesday.

PHOTOS: 35 of 2014's Most Anticipated Movies

"This is clearly an ends-driven opinion," countered Davis Wright's **Alonzo Wickers**, who represents content creators and distributors. "The plaintiff is very sympathetic." (Cindy Lee Garcia received numerous death threats as a result of the film.)

University of Maryland law professor **James Grimmelmann** was blunt. "It's amateur hour at the Ninth Circuit," he said. "The opinion features the kind of reasoning I'd expect from a bright but careless student, someone who knows the basic concepts of copyright but not how they fit together."

(In this case, the "careless student" who wrote the majority opinion is none other than **Alex Kozinski**, chief judge of the 9th Circuit, a former Supreme Court law clerk who was appointed to the appellate bench a mere ten years out of law school.)

**James Janowitz**, chair of the entertainment group at New York's Pryor Cashman, said "sometimes people will twist themselves into a pretzel" to reach a desired decision. Janowitz represents production companies and networks.

Representatives of talent, not surprisingly, supported the decision.

"SAG-AFTRA is gratified that the Court recognized that an audiovisual producer cannot rely on copyright law as a shield against those whose performances are used without their consent," said **Duncan Crabtree-Ireland**, the union's chief operating officer and general counsel. "This case underscores the need for all parties on a film project to have adequate contractual protections, such as those set forth in the SAG-AFTRA agreements."

"I was pleased to read Judge Kozinski's opinion, and feel that it is the correct view of the law," said **Charles Harder**, whose firm Harder Mirell & Abrams represents numerous celebrities. "What the producer did . . . is a species of fraud, and, according to the opinion, severe enough to even void a written acting contract between the actor and the production company, had the actor signed one."

One thing most of the experts agreed on was that the sky was not going to fall -- at least, not on Hollywood. Is the decision likely to lead to more litigation? Netanel, Nimmer, Dougherty, Janowitz and Harder all said no.

PHOTOS: 2014 Oscar Nominees

"There's no need to get too worried about this decision," said Janowitz.

But don't try telling that to Grimmelmann. He's quite concerned.

"Now anyone whose expression appears in a film and who doesn't have a signed work-for-hire agreement has a sufficiently plausible copyright claim to wave around the threat of an injunction to shut down distribution," he said. "Even if only one in twenty of those claims succeeds, that's enough of a threat to coerce settlements from studios who have committed to a release and can't afford to miss their launch window. And that one case in twenty will

5  **Rooney Mara Cast as Tiger Lily in 'Pan'**

6  **'Captain America: The Winter Soldier' Tracking Huge for $80 Million-Plus Debut**

7  **Kaskade, Avicii, Armin Van Buuren to Release EDM Remixes of Disney Songs**

8  **SXSW Car Accident Leaves 2 Dead, 23 Injured**

9  **A Train, a Narrow Trestle and 60 Seconds to Escape: How 'Midnight Rider' Victim Sarah Jones Lost Her Life**

10  **Jimmy Fallon Mocks Vladimir Putin, Begins Kickstarter for New Cold War (Video)**

## RELATED VIDEOS



**Women in Entertainment 2012**
THR's 21st annual Women in Entertainment Breakfast at the Beverly Hills Hotel, honoring the 100 most powerful women in the industry.

RELATED
- Kerry Washington on Female Superheroes
- Sandra Fluke on the Women in Entertainment Event

MORE VIDEOS



**The Agents: Misconceptions About Being an Agent**
Our roundtable guests talk about their roles as agents and being acknowledged by their clients.

RELATED
- 5 Top Animators on Collaborating and Using Celebrity Voices
- Animator Roundtable Full Interview

MORE VIDEOS



to a release and can't afford to miss their launch window. And that one case in twenty will wreak havoc."

He adds, "It's not just actors. It's set dressers, Foley artists, camera operators, even the guy playing the bassoon on the soundtrack."

Wickers too thought there would be an increase in litigation, telling *THR,* "I think it would likely increase litigation. I think that Judge Kozinski was trying to craft something very, very narrow that would not have broad application, but I doubt he succeeded."

Another entertainment litigator, who declined to be quoted, also said that more litigation might result.

Several observers thought there might be an increase in takedown requests, which is one of Google's concerns – presumably its main concern.

What can transactional lawyers do to reduce the litigation risk? For studio lawyers, who have the luxury of crafting 30-page agreements, Janowitz suggests a possible tweak to the already protective language: add a sentence in which the actor waives any copyright interest that may exist in his or her performance (but be careful not to imply in the new language that such an interest does, in fact, exist).

But for smaller productions – independent films, reality shows, web productions and the like – the problem is more difficult. Because of their smaller budgets, those projects typically use shorter agreements and are less likely to be rigorously lawyered, as Grimmelmann points out:

"(This decision) elevates the consequences of screwing up even one piece of paperwork from 'mild hassle' to 'potentially catastrophic.' Smaller, low-budget, independent, and student productions – ones that don't have experienced lawyers crossing every *t* and dotting every *i* – are most at risk."

Nor is it clear that paperwork can be 100 percent effective.

Suppose, for instance, that Garcia had signed an acting agreement or a release, but had still been deceived about the nature of the film, as she alleges. Would she have still prevailed? It becomes a harder case, but the issue doesn't necessarily disappear. After all, even a written agreement is subject to attack for fraud. "This case gives a little ammunition" for such an argument, Nimmer acknowledged.

And what if the fraud weren't as shocking as alleged here, where Garcia's performance was allegedly turned into an anti-Mohammed slur? Here too, one has to wonder. The majority opinion says, "Garcia was duped into providing an artistic performance that was used in a way she never could have foreseen." Is that phrasing broad enough to encompass the frat boys and others who were ~~~~~~~~ in **Sacha Baron Cohen**'s film *Borat* under false pretenses?

Those are questions with no easy answers – unless, that is, a larger panel of the 9th Circuit takes the case and decides to reverse. Google has filed its appeal for what is called *en banc* review. Those appeals are rarely granted, but this case, with a flurry of amicus briefs likely, may be an exception.

*Email: jhandelg at gmail dot com*
*Twitter:*

INNOCENCE OF MUSLIMS

 31   66   2   3   0   Email  Print    **Comments**

## THR VIDEOS


Cristin Milioti on the 'How I Met Your Mother'


Sarah Jones' Father: Tearful Tribute at Memorial Day


Kristen Stewart on Why She Works Well With Jodie Foster


'The Other Woman' Trailer



**VIDEO: Next Gen Photo Shoot**
Check out what went on behind the scenes of our photo shoot for the Next Gen class of 2010.

**RELATED**
• 'Divergent' Star Shailene Woodley on Who Would Win a Fight Between Tris and Katniss
• The Making of the Oscar Statue



See All Videos

## FOLLOW ESQ.

 Follow @THREsq    12.6K followers

 THR. Esq.
Like

3,183 people like THR, Esq



## RELATED VIDEOS


Cristin Milioti on the 'How I Met Your

Sarah Jones' Father: Tearful Tribute at

Kristen Stewart on Why She Works Well

'The Other Woman' Trailer

## FROM OUR PARTNERS

**THE HUFFINGTON POST**
**ENTERTAINMENT**
• Why Ashlee Simpson's 'Autobiography' Was The Best Angry Pop Album Ever
• Emma Watson Reveals Why She's Jealous Of Other Actresses To Elle Magazine
• CBS Renews Basically Everything For Fall 2014
• Aaron Paul's Top 5 Tips For Meeting The Love Of Your Life

Conspiracy Theories a...  Memorial Rally        Stylist Tara Swennen

## THR'S DAILY MUST FEEDS



Renee Zellweger & Amber Riley Step Out for The Painted Turtle's Starry Evening!

Lena Dunham Opens Up About Hollywood Sexism at SXSW!

Frank Ocean Told Chipotle to 'Fuck Off'

Watch a 25-Minute-Long Game of Thrones Season 3 Recap

Rachel Canning: Her Parents Should Be Fighting to Bring Her Home

Geneva Auto Show: Mercedes Introduces First S-Class Coupe In Over A Decade

## ★ VULTURE

- CBS Renews Almost All of Its Shows
- Shrinking Sitcom Ratings May Be the Best Thing to Happen to Smart Comedies
- Only Nostalgia? As If: A New Documentary Analyzes the Teen-Movie Canon
- Listen to Jason Schwartzman and Katy Perry Read a Story From B.J. Novak's One More Thing

## 🐷 JUST JARED

- Sandra Bullock's Stylist Elizabeth Stewart Awarded THR's Top Stylist Ranking!
- Emma Watson Begins 'Noah' Press Tour, Premieres Film in Berlin!
- Kanye West & Jay Z Perform 'Otis', 'Gotta Have It' & More at SXSW - Watch Now!
- 'Two & a Half Men,' 'Good Wife' & Many Others Renewed By CBS, 'Crazy Ones,' Left Off List

---

**0 Comments**



Be the first to comment.

---

## WHAT'S HOT ON THE HOLLYWOOD REPORTER



**Meet the Kids From 'Slumdog Millionaire,' Five Years Later**
⊕ VIEW GALLERY



**The Faces of Pilot Season 2014**
⊕ VIEW GALLERY



**35 of 2014's Most Anticipated Movies: 'X-Men: Days of Future Past,' 'Mockingjay,' 'Spider-Man 2'**
⊕ VIEW GALLERY



**'Breaking Bad': 25 Most Badass Quotes**
⊕ VIEW GALLERY

---

About Us
Subscribe
Subscriber Services
Back Issues
FAQs
Advertising
Contact Us
Entertainment News RSS

Follow Us On
TWITTER

Find us On
FACEBOOK

Watch us On
YOUTUBE

billboard
ADWEEK

©2014 The Hollywood Reporter
All rights reserved

Terms of Use  |  Privacy Policy