No. 12-57302

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

CINDY LEE GARCIA,

*Plaintiff-Appellant,*

*v.*

GOOGLE INC. AND YOUTUBE, INC.,

*Defendants-Appellees,*

*and*

NAKOULA BASSELEY NAKOULA AKA SAM BACILE, MARK BASSELEY YOUSSEF, ABANOB BASSELEY NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, AMAL NADA, DANIEL K. CARESMAN, KRITBAG DIFRAT, SOBHI BUSHRA, ROBERT BACILY, NICOLA BACILY, THOMAS J. TANAS, ERWIN SALAMEH, YOUSSEFF M. BASSELEY, AND MALID AHLAWI

*Defendants.*

—————————

On Appeal from the United States District Court for the Central District of California

## BRIEF OF AMICUS CURIAE NETFLIX, INC. IN SUPPORT OF DEFENDANTS-APPELLEES

Michael H. Page
Joseph C. Gratz
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
415-362-6666

*Attorneys for Amicus Curiae Netflix, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Amicus Curiae certifies that Netflix has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

PAGE NO.

CORPORATE DISCLOSURE STATEMENT.......................................... i

INTEREST OF NETFLIX ........................................................1

ARGUMENT ..............................................................1

    I.    Appellant's Radical Reworking of Copyright Law
Would Create Uncertainty for Established
Business Models. ...............................................1

        A.    Appellant seeks to create a new species of
copyright. ................................................ 2

        B.    Appellant's copyright rule would place
distributors such as Netflix in an
untenable position. .................................. 13

        C.    Appellant's position risks requiring third-
party distributors to grant an effective veto
right to any performer............................ 18

    II.    The Court Should Leave Copyright Law in Its
Proper State. .......................................................19

        A.    The Copyright Office's decision to deny Ms.
Garcia's copyright application was correct
and should be afforded substantial weight. .......... 20

        B.    There is no need to upset controlling
precedent..............................................24

CONCLUSION ................................................................25

CERTIFICATE OF COMPLIANCE .....................................29

CERTIFICATE OF SERVICE...............................................30

# TABLE OF AUTHORITIES

PAGE NO(S).

**Cases**

*Aalmuhammed v. Lee,*
  202 F.3d 1227 (9th Cir. 2000) .........................................................25, 26

*Batjac Productions, Inc.* v. *GoodTimes Home Video Corp.,*
  160 F.3d 1223 (9th Cir. 1998) ...............................................................22

*Clean Flicks of Colo., LLC v. Soderbergh,*
  433 F. Supp. 2d 1236 (D. Colo. 2006) ....................................................15

*Cosmetic Ideas, Inc. v. IAC/InteractiveCorp,*
  606 F.3d 612 (9th Cir. 2010) .................................................................23

*Effects Associates, Inc. v. Cohen,*
  908 F.2d 555 (9th Cir. 1990) ..................................................9, 10, 14, 21

*Facenda v. NFL Films, Inc.,*
  542 F.3d 1007 (3rd Cir. 2008) ................................................................7

*Fleet v. CBS, Inc.,*
  50 Cal. App. 4th 1911 (1996)..................................................................6

*Flynn v. Nakoula,*
  Case No. 5:14-cv-0901 (C.D. Cal. Sept. 11, 2014) ................................27

*Gaiman v. McFarlane,*
  360 F.3d 644 (7th Cir. 2004) .................................................................25

*Gilliam v. Am. Broad. Cos., Inc.,*
  538 F.2d 14 (2d Cir. 1976)....................................................................15

*Harper & Row, Publishers, Inc. v. Nation Enterprises,*
  723 F.2d 195 (2nd Cir. 1983),
  *rev'd on other grounds*, 471 U.S. 539 (1985)......................................4, 5

iii

*Inhale, Inc. v. Starbuzz Tobacco, Inc.*,
739 F.3d 446 (9th Cir. 2014) ...............................................................22

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*,
617 F.3d 1146 (9th Cir. 2010) ..............................................................7

*Laws v. Sony Music Entertainment, Inc.*,
448 F.3d 1134 (9th Cir. 2006) ..............................................................6

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
105 F.3d 841, 849 (2d Cir. 1997) .........................................................6

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
134 S. Ct. 1962 (2014) .......................................................................23

*ProCD, Inc. v. Zeidenberg*,
86 F.3d 1447 (7th Cir. 1996) ...............................................................5

*Rice v. Fox Broadcasting Co.*,
330 F.3d 1170 (9th Cir. 2003) ..............................................................8

*Rossi v. Motion Picture Ass'n of Am. Inc.*,
391 F.3d 1000 (9th Cir. 2004) ............................................................19

*Stanford v. Caesars Entertainment, Inc.*,
430 F. Supp. 2d 749 (W.D. Tenn. 2006)...............................................7

*Thomson v. Larson*,
147 F.3d 195 (2d Cir. 1998)..........................................................11, 18

*TMTV Corp. v. Pegasus Broadcasting of San Juan*,
490 F. Supp. 2d 228 (D.P.R. 2007).......................................................8

*Wrench LLC v. Taco Bell Corp.*,
256 F.3d 446 (6th Cir. 2001) ...............................................................5

**Statutes**

17 U.S.C. § 101...........................................................................9, 11

iv

17 U.S.C. § 102(a) ............................................................... 3

17 U.S.C. § 106A ............................................................... 16

17 U.S.C. § 203 ................................................................. 17

17 U.S.C. § 203(a)(4) ........................................................ 17

17 U.S.C. § 301 ................................................................... 4

17 U.S.C. § 411(a) ................................................... 22, 23, 24

17 U.S.C. § 512 ......................................................... 18, 19

47 U.S.C. § 230 ............................................................... 20

**Other Authorities**

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 120 (1976) .............5, 11, 21

S. Rep. No. 473, 94th cong., 1st Sess. 103-04 (1975)................................ 11

**Rules**

F.R.A.P. 26.1 ...................................................................... i

F.R.A.P. 29(a) ................................................................... 1

F.R.A.P. 29(c)(5) ............................................................... 1

Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief.

## INTEREST OF NETFLIX[1]

Netflix is a pioneer in the Internet delivery of movies and TV shows. Since launching in 2007, Netflix's streaming business has become one of the primary means by which American consumers watch movies and television shows. Netflix now has over 53 million subscribers worldwide who watch more than two billion hours of content each month. Netflix licenses its content from a wide variety of distributors—while some are major studios, many others are smaller, independent producers—and depends on those distributors to have in turn licensed any underlying rights.

## ARGUMENT

### I.   Appellant's Radical Reworking of Copyright Law Would Create Uncertainty for Established Business Models.

Appellees and numerous *amici* have ably briefed many of the doctrinal and statutory problems with Appellant's claims, and with the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), Netflix hereby certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than Netflix contributed money intended to fund preparing or submitting the brief.

relief she seeks. Netflix joins in that analysis, and will not repeat it herein, but instead focuses on the practical (or rather impractical) effects of the rule she advocates. By creating a new species of copyright, which would arm even a minor performer in a motion picture or television program with a credible threat of both suit and injunction against downstream distributors for any use of her performance of which she does not approve, Appellant urges a holding and remedy that would wreak havoc with established copyright and business rules on which all third-party distributors, including Netflix, depend. While Netflix has no doubt that Ms. Garcia was mistreated by the filmmakers here, bad facts should not be allowed to make bad law: this Court should not upend copyright law in its search for a remedy.

### A. Appellant seeks to create a new species of copyright.

Ms. Garcia urges this Court to craft new species of exclusive right, untethered to the Copyright Act, by recognizing an amorphous form of copyright: "her copyright interest in the dramatic performance that she gave . . . ." Appellant's Opening Brief ("AOB") at 10. According to Ms. Garcia, "[t]he first legal issue presented by this appeal is whether Plaintiff Garcia established that, in the absence of an injunction, she

will suffer irreparable harm." AOB at 11. Not so: the *first* legal issue is to identify what copyrighted work, if any Ms. Garcia owns, and *thereafter* (1) whether she has established a likelihood of successfully establishing infringement of that work, and (2) whether she faces irreparable harm in the absence of preliminary injunctive relief and can meet the other requirements for such relief. But step one is to determine what copyright the plaintiff owns and is asserting. In this case, the answer is straightforward: "none." A work of authorship is not eligible for copyright protection until it is "fixed in any tangible medium of expression . . . ." 17 U.S.C. § 102(a). But Appellant has expressly disclaimed joint authorship of *The Innocence of Muslims* as a whole, and the only other fixation anyone has identified is the script, to which Appellant makes no claim. As a result, and as the Copyright Office has since confirmed,[2] Appellant is not the author of *any* copyrighted work to begin with. The analysis ends there. Whatever wrongs were perpetrated against Ms. Garcia by the filmmaker or others—and we do not doubt she has ample grounds to feel wronged—those wrongs had

---

[2] A copy of the Copyright Office's letter, which this Court previously held was properly subject to judicial notice, is attached hereto as Appendix A and discussed *infra*.

3

nothing whatsoever to do with copyright infringement, federal law, or downstream distributors.

The cases Ms. Garcia cites regarding the supposed copyrightability of actors' performances are not to the contrary. None of them holds that an actor holds an independent copyright in his or her performance, somehow separate from the film itself; instead, each either discusses whether a performer's state-law claims for misappropriation of his or her performance are preempted by operation of 17 U.S.C. § 301, or (in the case of *Effects Associates)* concerns the licensing of a preexisting, fixed set of scenes for inclusion in a larger film. But the scope of copyright *preemption* is much broader than the scope of copyright *protection*, and so Ms. Garcia's reliance on a set of preemption cases is misplaced. As the Second Circuit explained in *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 200 (2nd Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985), the fact that the expression at issue may constitute uncopyrightable ideas or facts does not remove the work from the subject matter of copyright under § 301, because otherwise "states would be free to expand the perimeters of copyright protection to their own liking, on the theory

4

that preemption would be no bar to state protection of material not meeting federal statutory standards." *Id.* (quoting H.R. Rep. No. 94-1476 at 130 (1976)). Similarly, the Seventh Circuit in *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996), held that "[o]ne function of § 301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain, which it can accomplish only if 'subject matter of copyright' includes all works of a type covered by sections 102 and 103, even if federal law does not afford protection to them." *See also Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 455 (6th Cir. 2001) ("We join our sister circuits in holding that the scope of the Copyright Act's subject matter is broader than the scope of the Act's protections.").

In other words, copyrightability is a sufficient, but not necessary, condition for preemption. Conversely, preemption is insufficient to establish copyrightability. Garcia cannot rely on copyright preemption law to establish the copyrightablility of her individual, unfixed performance. Preemption cases tell us nothing about whether an actor's performance is separately copyrightable, because "Section 301 preemption bars state law misappropriation claims with respect to

5

uncopyrightable as well as copyrightable elements." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997).

None of the cases on which Ms. Garcia relies supports her position. For example, in *Fleet v. CBS, Inc.,* 50 Cal. App. 4th 1911 (1996), two actors brought right of publicity claims, not copyright claims (thus in state court), and the court found the claims preempted on the unremarkable basis that the performances, once fixed in a tangible medium, were copyrightable, and thus claims based on their reproduction were preempted. *Id.* at 1919-20. The case neither raised nor answered the question of who owned that copyright, or whether (if there was more than one author) it was a work of joint authorship.

*Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134 (9th Cir. 2006), is another preemption case, in which a singer who had assigned the copyrights in her songs to her record label attempted to bring state law right of publicity and misappropriation of likeness claims based on subsequent uses of a song. Again, the court found those claims preempted, and again, there was neither a dispute over the ownership of the copyright nor a claim that there was more than a single work or

author.  Her performance, once recorded, was plainly copyrightable, but she had sold any right to that copyright.

*Jules Jordan Video, Inc. v. 144942 Canada Inc.,* 617 F.3d 1146 (9th Cir. 2010), is similarly inapposite:  it is another case finding right of publicity claims preempted, in which the plaintiff was both the filmmaker and primary actor in adult films, and thus the sole author. In *Stanford v. Caesars Entertainment, Inc.*, 430 F. Supp. 2d 749 (W.D. Tenn. 2006), the court similarly found right of publicity claims preempted, on a motion for remand, when brought by an actor playing a fictional character "Loose Slot Louie" in a series of casino advertisements.  There was no dispute that the defendant owned the copyrights in the advertisements, and no claim that the actor had any sort of independent copyright.

*Facenda v. NFL Films, Inc.*, 542 F.3d 1007 (3rd Cir. 2008), presented the same issue, but with the opposite result:  the estate of the late John Facenda, famous for decades as the voice of NFL Films, brought both federal and state trademark and unfair competition claims when NFL Films reused clips of Facenda's narration in the course of marketing the popular Madden series of video games.  Finding

7

that the use at issue exceeded the contract between Facenda and the league, the court found no copyright preemption. But there was no claim that Facenda had owned any copyright in his voiceovers, and no dispute that the copyrights in the original works belonged solely to the filmmakers.

And in *TMTV Corp. v. Pegasus Broadcasting of San Juan*, 490 F. Supp. 2d 228 (D.P.R. 2007), a Puerto Rico district court, relying on *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170 (9th Cir. 2003), observed that there are rare instances in which, "[w]hile characters are ordinarily not afforded copyright protection, characters that are 'especially distinctive' or the 'story being told' receive protection apart from the copyrighted work." *Rice* at 1175 (citations omitted). The examples cited of such separately copyrightable fictional characters typically include James Bond, Tarzan, and Sherlock Holmes. But the *TMTV* court merely denied summary judgment without either deciding if the characters at issue were sufficiently distinctive to enjoy copyright protection or addressing who the author or authors were. And in *Rice*, the court held that the character at issue was not sufficiently distinctive, and the issue of authorship was never raised, as the filmmaker was also the actor. In

8

short, even if this were a case of a fictional character sufficiently central to a story or series to be separately copyrightable (and clearly she is not), that does nothing to advance a claim that *Ms. Garcia* owns a copyright in that character, any more than Sean Connery owns a copyright in James Bond, Johnny Weissmuller owned a copyright in Tarzan, or Basil Rathbone owned a copyright in Sherlock Holmes. The estates of Ian Fleming, Edgar Rice Burroughs, and Arthur Conan Doyle would (and in the latter case, actively does) lay prior claim.

There are, to be sure, situations where individual works of authorship can be fixed "by or under the authority of the author," 17 U.S.C. § 101, and thus subject to copyright, and then later assembled into a separately copyrightable compilation. That is the precise fact pattern in the final case on which Appellant relies. In *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990), a low-budget-movie producer commissioned a special effects house to create a series of special effects segments (buildings exploding and the like) to be incorporated into his horror movie. The filmmaker failed to obtain an assignment of the copyright in the special effects film segments, and when the director underpaid the special effects house for the segments

9

based on his dissatisfaction with the work, the plaintiff sued for copyright infringement. The court had no difficulty finding both that the separately-created and fixed special effects segments were separately copyrightable, and that the finished film was a separate derivative work based on its incorporation of those segments, but found that use to have been impliedly licensed.[3]

But this is not such a case: Ms. Garcia does not claim to have created and fixed a shorter work, which was then combined with the rest of *Innocence of Muslims*. Her performance was always intended to be part of a single work. A typical motion picture, if there is more than one author, is a joint work, "prepared by two or more authors with the

_____

[3] In denying the copyright claim, this Court noted (*id.* at 559):

> We affirm the district court's grant of summary judgment in favor of Cohen and the other defendants. We note, however, that plaintiff doesn't leave this court empty-handed. Copyright ownership is comprised of a bundle of rights; in granting a nonexclusive license to Cohen, Effects has given up only one stick from that bundle—the right to sue Cohen for copyright infringement. It retains the right to sue him in state court on a variety of other grounds, including breach of contract.

intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. One is either a *joint* author of a motion picture, or one is not an author *at all*.[4] Ms. Garcia, by advocating a non-joint-author, unfixed species of copyright, seeks to turn copyright law on its head, by giving minor participants in copyrighted works far greater power over the distribution of those works than a coauthor. A joint author has no power to prevent another joint author from licensing their work, but instead is entitled only to an accounting of his share of the proceeds, *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998).

Lennon could not prevent McCartney from licensing their songs to anyone he chose; he could only claim half the proceeds. Joel Coen can't tell Ethan Coen not to display their films anywhere he chooses, subject

---

[4] The Copyright Act defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. And the committee reports on the Copyright Act expressly include "motion picture[s]" among their examples of such joint works. H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 120 (1976); *accord* S. Rep. No. 473, 94th cong., 1st Sess. 103-04 (1975).

to his right to half the money. And Abbott could license the script for "Who's On First" without asking Costello.[5]

Under Ms. Garcia's unfixed, non-joint-author view of copyright, however, any actress or background singer or spear carrier is granted veto power over the use of copyrighted works—including, as sought in this case, outright injunctions against their performance, distribution, or reproduction—far beyond the rights afforded either coauthor of a joint work. It is a view of copyright law under which Keith Richard cannot enjoin Mick Jagger's use of *You Can't Always Get What You Want* in a car commercial, but any member of the boys' choir in the background can. Similarly, an actor with only one line of dialogue might wield far greater power than a full joint author. If this Court accepts Ms. Garcia's position, downstream, licensed distributors such as Netflix face the threat of costly suits seeking injunctions preventing those legitimate distributors from exhibiting films and television shows to millions of consumers.

---

[5] All of these examples, of course, assume only copyright law strictures, with no contractual agreements or assignments to the contrary. In practice, coauthors often assign copyrights in their joint works to a corporate entity.

**B.    Appellant's copyright rule would place distributors such as Netflix in an untenable position.**

Allowing copyright claims untethered to fixation and authorship places third-party content distributors such as Netflix in an untenable position:  where under established copyright law Netflix is able to rely on licenses granted by a film's producer, it is now potentially subject to suit and injunction at the hands of almost any actor in a film or television program.  Netflix makes available for streaming thousands of works, of every stripe, from more than 200 suppliers in the United States alone.  For virtually all of those works, Netflix has no role in their creation, and no independent knowledge of the licenses and contracts between the copyright holder and each actor in each work. Under Ms. Garcia's view of copyright, however, Netflix may now be at risk of being sued by any of those actors.

It has been suggested that a ruling in Ms. Garcia's favor is unlikely to have more than occasional effects at the margins, based on two arguments:  the assumption (without evidence) that there are near-universal practices of contractual agreement in Hollywood, and the likelihood a copyright holder has, in any event, an implied license to an actor's performance.  Neither argument, however, cures the potentially

13

serious problems that would flow from allowing Ms. Garcia's claim to proceed.

The first argument is that any problem created by Ms. Garcia's species of copyright is easily solved by the filmmaker obtaining written licenses or work-for-hire agreements from each performer. Many major studios may now be diligent in doing so, although this Court in the past has posited precisely the opposite view of the facts, noting that "Moviemakers do lunch, not contracts." *Effects Associates* at 556. Moreover, even if major studio paperwork is thorough on their own productions, those same studios redistribute finished films and programs, both fictional and documentary, acquired from all over world, having had no hand in their creation. Moreover, copyright is not just for Hollywood: In today's world "every schmuck with a videocamera" is indeed a filmmaker, and popular works are created by all sorts of artists. As technology makes it easier for even small-scale productions to garner audiences in the millions, copyright rules that work across the board are more important than ever. Like all other licensees of film and television shows not of its own creation, Netflix has no ability to determine whether licensing niceties have been observed for each of the

tens of thousands of works it distributes, and no easy way to assess or defend against a claim they have not.

Nor do contractual indemnities from content suppliers solve this problem. Even an indemnity from a well-heeled studio would not prevent a suit against a distributor like Netflix, or shield Netflix from the trouble and distraction of litigating such a claim to conclusion and the harm that would come from an injunction requiring the removal of content enjoyed by millions of subscribers. Because these claims are often fact-intensive, they are expensive and unlikely to be resolved short of a trial in many cases. The financial and logistical burdens imposed are not cured by indemnities, no matter how broad.

Neither can distributors like Netflix protect their right to distribute popular films by bowdlerizing them to remove a claimant's performance when a dispute arises; to do so might be found to infringe the producer's own copyright. *See, e.g.*, *Gilliam v. Am. Broad. Cos., Inc.*, 538 F.2d 14 (2d Cir. 1976) (enjoining broadcast of edited version of *Monty Python's Flying Circus* as an infringing derivative work); *Clean Flicks of Colo., LLC v. Soderbergh*, 433 F. Supp. 2d 1236 (D. Colo. 2006) (enjoining a video rental service from making available edited versions

15

of movies on copyright grounds).  Similarly, such alterations could run afoul of contractual agreements between copyright holders and distributors, which frequently contain provisions prohibiting abridgement, editing, or other alteration of the licensed works.

The second argument, that the implied license inherent in the act of performing will protect most filmmakers and distributors, is at best optimistic.  That license certainly exists, but Ms. Garcia proposes to limit it in a way inconsistent with the Copyright Act, by suggesting that a use of which the actor does not approve is beyond its scope.  Nor is she alone in doing so:  As noted above, for example, the Third Circuit in *Facenda* held that the implied license to NFL Films did not allow uses that had not been contemplated or approved by Mr. Facenda.  This view—that the implied license extends only so far as the actress intended or approved of—imports a type of "moral rights" into the Copyright Act:  rights not to enjoy the economic fruits of one's creation, but to ensure the artistic integrity of the presentation of that creation. The United States does not recognize moral rights for movies and television programs.  *Cf.* 17 U.S.C. § 106A (establishing limited moral rights for works of visual art).  And the rule urged by Ms. Garcia

creates such rights here: it limits the scope of the implied license to uses Ms. Garcia expected or approved of, giving her an effective veto right over edits to which she objects. Where are the limits to that doctrine, and how can such a claim be determined short of discovery and trial? Can a bit-part actor in *Gone With the Wind* now seek an injunction because he does not approve of the use of his performance in a piece of "Yankee propaganda"? What about his heirs? And even if he signed some agreement in 1939 defining the scope of the license, what are the chances that the studio (to say nothing of Netflix) can lay its hands on it?

The implied license solution fails, at least in certain situations, for yet another reason: Under 17 U.S.C. § 203, any copyright license (written or implied) may be terminated by the author or her heirs after 35 years. Thus even if the implied license were sufficient protection, it is evanescent. And once again, Netflix and other downstream distributors have no way of knowing whether—for any of the tens of thousands of works in their catalogs—an actor has exercised her right of termination. *See* 17 U.S.C. § 203(a)(4) (requiring that notice of

termination be served on the "grantee" of the license but not on any downstream sublicensees, such as distributors).

### C. Appellant's position risks requiring third-party distributors to grant an effective veto right to any performer.

In the face of the copyright regime Ms. Garcia urges, Netflix and other third-party distributors are left with increasingly constrained choices. Under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, there is already a strong bias towards removal of content. In order to take advantage of DMCA safe harbors, a third party must take down content upon receipt of a takedown notice. For service providers such as YouTube, the safer course in close calls thus is already to take down rather than risk liability. But—until now, at least—a third party such as Netflix, with an express license from the registered copyright holder, could confidently decline to remove content from its service: Even if the sender of the DMCA notice was herself a coauthor, no copyright claim would lie against the third party, since her remedy would lie against her coauthor for an accounting. *Thomson*, 147 F.3d at 199.

Ms. Garcia's theory, if adopted, would work a profound change, skewing the balance for online distributors even further towards a default rule where almost any takedown notice is best treated as fiat. If Appellant's view is adopted, one DMCA-compliant email notification from the actor who played Juror Number Four could be enough to justify removal of *My Cousin Vinny* from Netflix—and Netflix would be unlikely to recover its litigation costs from that actor even if it prevailed in a resulting lawsuit. *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1004 (9th Cir. 2004) (senders of DMCA notices are not liable for damages resulting even from objectively baseless notices if they subjectively acted in good faith). Placing an effective veto right in the hands of every actor is a recipe for endless litigation, and for uncertainty about the availability of popular movies and television shows.

## II. The Court Should Leave Copyright Law in Its Proper State.

There is no doubt that Ms. Garcia was ill used by Mr. Youssef, and no doubt that the resulting work is an odious piece of racist invective. Nor is there doubt that Ms. Garcia has suffered real harm as a result. But copyright law is not the correct remedy, and YouTube is not the

correct target.  If—as it appears from the allegations of the complaint—Mr. Youssef defrauded Ms. Garcia into performing, or violated her right of publicity, or placed her in a false light, existing non-copyright laws can address those wrongs.

But those claims lie against the person who committed the alleged torts, not against any and all Internet sites where the resulting work was posted.  Congress enacted 47 U.S.C. § 230 for good reason:  to protect innocent third-party service providers from state-law claims that should be brought against the tortfeasor instead, lest the spectre of unlimited liability for acts beyond the knowledge or control of those providers deter or cripple the growth of online commerce.  Ms. Garcia should not be able to circumvent that congressional intent by artfully disguising a tort claim against Mr. Youssef as a copyright claim against YouTube.

## A.    The Copyright Office's decision to deny Ms. Garcia's copyright application was correct and should be afforded substantial weight.

The Copyright Office concurs.  Since this appeal was initially briefed, the Copyright Office has rejected Ms. Garcia's application for copyright in her performance, as explained in correspondence of which

this Court has already taken judicial notice. *See* Appendix 1 hereto;

Appellees' Request for Judicial Notice (Docket Nos. 55, 71). As the

Copyright Office explained (citing H.R. Rep. 94-1476 at 20):

> The U.S. Copyright Office's longstanding practices do
> not allow a copyright claim by an individual actor or
> actress in his or her performance contained within a
> motion picture. The rationale behind this position is
> clear: an actor or actress in a motion picture is either
> a joint author in the entire work or, as most often is
> the case, is not an author at all by virtue of a work
> made for hire agreement. . . . If her contribution was
> not as a work made for hire, she may assert a claim in
> joint authorship in the motion picture, but not sole
> authorship of her performance in a portion of the
> work. If her contribution was neither a work made
> for hire nor the requisite authorship to warrant a
> claim in a joint work, Ms. Garcia has no separable
> claim to copyright authorship in her performance.

*Id.*, March 6, 2014 letter at 2. The Copyright Office went on to explain

"one exception to the general rule on treating motion pictures as

integrated works": where—as in *Effects Associates*—"a separate portion

of a motion picture is commissioned, such as a special effects scene that

qualifies as a discrete work in itself that is later incorporated into a motion picture," *id.*, but correctly held that this is not such a case.[6]

Moreover, the Copyright Office's views should in this case be afforded special deference, beyond even the normal deference afforded a regulatory agency with direct responsibility over the subject matter.[7]  In *this* case, it is only a rare confluence of Ninth Circuit copyright jurisprudence and timing that precludes the Copyright Office from being a full party, and precludes the conclusions expressed in its letters from being a party brief.

There is a circuit split on the question whether, under 17 U.S.C. § 411(a)'s registration requirement, one may file a copyright infringement action as soon as one has submitted an application to Copyright Office (the "application approach"), or must instead wait until the Copyright

---

[6] The Copyright Office noted that this rule is not limited to motion pictures, but that similarly "[t]he Office would refuse an authorship claim by an individual musician who contributed an individual performance to a sound recording unless the claim was as a joint author."  *Id.* at 3.

[7] *See Batjac Productions, Inc.* v. *GoodTimes Home Video Corp.*, 160 F.3d 1223, 1230 (9th Cir. 1998) (Copyright Office's views are "entitled to judicial deference if reasonable"); *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 739 F.3d 446, 448-49 (9th Cir. 2014) (same).

Office has issued a registration certificate (the "registration approach").

This Circuit is on the application approach side of the split, *see Cosmetic*

*Ideas, Inc. v. IAC/InteractiveCorp*, 606 F.3d 612 (9th Cir. 2010),[8] and

thus Ms. Garcia's suit was filed, the injunctive request was heard and

denied below, and the injunction was appealed, all before the Copyright

Office had acted.

In many cases, it is a foregone conclusion that a copyright

registration will issue—that is the justification for the application

approach. But in this case, the Copyright Office *denied* the registration,

leaving a pending copyright suit that fails to satisfy Section 411(a)'s

registration prerequisite.

The Copyright Act does not bar suit by plaintiffs whose copyright

applications have been denied. But in order to do so, one must serve

the initial complaint on the Register of Copyrights, and "[t]he Register

may, at his or her option, become a party to the action with respect to

---

[8] *But see Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1977 (2014) ("Although registration is 'permissive,' both the [copyright registration] certificate and the original work must be on file with the Copyright Office before a copyright owner can sue for infringement.").

the issue of registrability of the copyright claim . . . ." 17 U.S.C. §
411(a).

Thus in a registration-approach circuit, the Copyright Office
would have been entitled to party status at the outset.  There does not
appear to be any reported law on the proper procedure in this or any
other application approach circuit when an application is rejected
during a pending action, but—were this case not on appeal—the
District Court would at a minimum have the option of either ordering
the case dismissed and refiled with proper notice to the Register of
Copyrights, or perhaps instead staying the case for sixty days in order
to allow time for the statutory notice and opportunity to appear.  In any
event, once the Copyright Office denies an application, the Register of
Copyrights is entitled to party status, and we submit that this panel
should consider the Office's view, as reflected in Appendix A, in that
light.

### B. There is no need to upset controlling precedent.

This case has garnered an inordinate amount of attention and
notoriety, but presents no novel issue that is not already covered by
controlling precedent.  As the District Court correctly held, and as

Appellees have urged, the question whether Ms. Garcia is entitled to copyright ownership is not a close one under *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000). Even had Ms. Garcia not disclaimed joint author status—and she has—she clearly did not "superintend the work . . . . by putting the persons in position, and arranging the place where people are to be . . . ." *Id.* at 1234 (internal quotations and citations omitted). Under *Aalmuhammed*, Mr. Youssef, not Ms. Garcia, was the author of the work, and thus free to distribute it as he chose, subject to whatever contractual and tort liability to Ms. Garcia that distribution created. There is no need to revisit settled copyright law in order to adopt a rule under which every contributor to a collaborative work is an author—a rule under which, as the Seventh Circuit put it in *Gaiman v. McFarlane*, 360 F.3d 644, 658 (7th Cir. 2004), "copyright would explode."

## CONCLUSION

It is true in the modern Internet age that content, once disseminated, is difficult if not impossible to erase. It is also true that, in many cases, remedies against the actual tortfeasor may seem hollow. But the proper course remains an action against the true tortfeasor,

even if he cannot pay a judgment. An injunction against the true tortfeasor can still achieve the desired effect, since third parties will generally take down material that has been adjudicated unlawful. The instinct to distort the Copyright Act beyond recognition, in order to reach third party defendants who had nothing to do with the actual torts alleged, should be resisted.

The correct decision here, which the District Court reached and the Copyright Office has recently affirmed, is that Ms. Garcia has no copyright to assert, and thus her claims lie against Youssef, not YouTube. She has no copyright in her individual performance, because it was never fixed in a copy, separate from *The Innocence of Muslims*, at her direction. Neither does she have a copyright in the film as a whole, because under this Circuit's controlling precedent of *Aalmuhammed v. Lee*, 202 F.3d 1227, 1232 (9th Cir. 2000), Ms. Garcia is simply not "the person to whom the work owes its origin and who superintended the whole work, the 'master mind.'"

Ms. Garcia's claim thus rests on air: she has no underlying copyright to assert. Rather than accept the result of that analysis, however, Appellant seeks to bend copyright to the breaking point to

26

achieve rough justice.  But rough justice for Ms. Garcia cannot come at the cost of upending decades of established copyright law and settled business practices.  The suggestion that this is an anomalous edge case, unlikely to be repeated, must not be credited:  we live in a world where each year the cost of making a film decreases, and the number of filmmakers expands exponentially.  Creative, vital speech in cinematic form is no longer the exclusive province of large studios with staffs of careful lawyers buttoning down releases from every performer.  Every schmuck with a camcorder may indeed now be a filmmaker, but not every schmuck with a camcorder has a legal department.  The rule Ms. Garcia urges puts all downstream distributors, as well as all but the largest filmmakers, at risk of a lawsuit by anyone in front of the camera.  Indeed, during the pendency of this appeal, another actor in *The Innocence of Muslims* has already filed suit against Appellees and others on the same theory.  *Flynn v. Nakoula*, Case No. 5:14-cv-0901 (C.D. Cal. Sept. 11, 2014).

Accordingly, Netflix joins Appellants in urging affirmance of the District Court's and the Copyright Office's findings that Ms. Garcia has no copyright to assert.

DATED:  November 25, 2014            Respectfully submitted,

                                     */s/ Michael H. Page*
                                     Michael H. Page
                                     Joseph C. Gratz
                                     DURIE TANGRI LLP
                                     *Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A), because it is written in 14-point Century Schoolbook font, and with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and this Court's Order of November 12, 2014 Order, ECF No. 131, because it contains 5,593 words, excluding the portions excluded under Fed. R. App. P. 32(a)(7)(B)(iii). This count is based on the word-count feature of Microsoft Word.


DATED: November 25, 2014          */s/ Michael H. Page*
                                  Michael H. Page
                                  Joseph C. Gratz
                                  DURIE TANGRI LLP
                                  *Attorneys for Amici Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 25, 2014.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that, for any participants in the case who are not registered CM/ECF users, I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days.

DATED:  November 25, 2014         */s/ Michael H. Page*
                                          Michael H. Page
                                          Joseph C. Gratz
                                          DURIE TANGRI LLP
                                          *Attorneys for Amici Curiae*

# APPENDIX A



**United States Copyright Office**
Library of Congress   101 Independence Avenue SE   Washington, DC 20559-6000   www.copyright.gov

Mr. M. Cris Armenta
The Armenta Law Firm
11900 Olympic Blvd., Suite 730
Los Angeles, CA 90064

March 6, 2014

Dear Mr. Armenta:

On December 18, 2012, Ms. Laura Lee Fischer, Chief of the Performing Arts Division of the United States Copyright Office's Registration Program, wrote to you in response to the claim by Ms. Garcia in a copyrightable interest in her dramatic performance in a motion picture, "Desert Warrior." Ms. Fischer's letter stated that "[f]or copyright registration purposes, a motion picture is a single integrated work." It went on to state that "[a]ssuming Ms. Garcia's contribution was limited to her acting performance, we cannot register her performance apart from the motion picture." The letter concluded by stating that "[i]f you feel that Ms. Garcia has the right to claim copyright in the entire motion picture, please state the reasons for your position. Otherwise, we must refuse registration."

On March 13, 2013, you replied to Ms. Fischer by stating that you believed that Ms. Garcia "has a copyrightable interest in her dramatic performance in the work, 'Desert Warrior,'" and attached a brief to the United States Court of Appeals for the Ninth Circuit that you stated "fully briefed" the matter. You did not, however, respond to Ms. Fischer's specific question or acknowledge that the U.S. Copyright Office clearly stated that it views dramatic performances in motion pictures to be only a part of the integrated work -- the motion picture.

In accordance with the Office's previous letter, the Office must refuse registration. Although you asked the Office to await the decision of the Ninth Circuit before taking any action, the Office finds that the Copyright Act vests exclusive authority in the Register of Copyrights to render a decision as to whether to issue a certificate of registration or refuse an application for registration. 17 U.S.C. § 410. Moreover, Congress expressly envisioned that registration decisions by the Register of Copyrights would precede adjudication in the courts. 17 U.S.C. § 411. If infringement actions are instituted prior to registration determinations by the Register of Copyrights, not only will the evidentiary presumption be lost when certificates are issued, but more importantly, where the Office finds a claim to be invalid, the Register's statutory right to intervene in an action instituted pursuant to a refusal to register is nullified. 17 U.S.C. § 411(a).

1

The U.S. Copyright Office's longstanding practices do not allow a copyright claim by an individual actor or actress in his or her performance contained within a motion picture. The rationale behind this position is clear: an actor or actress in a motion picture is either a joint author in the entire work or, as most often is the case, is not an author at all by virtue of a work made for hire agreement. This view is supported by the legislative history of section 201 of the Copyright Act:

> The definition of "joint works" has prompted some concern lest it be construed as converting the authors of previously written works, such as plays, novels, and music, into coauthors of a motion picture in which their work is incorporated. *It is true that a motion picture would normally be a joint rather than a collective work with respect to those authors who actually work on the film, although their usual status as employees for hire would keep the question of coownership from coming up.* On the other hand, although a novelist, playwright, or songwriter may write a work with the hope or expectation that it will be used in a motion picture, this is clearly a case of separate or independent authorship *rather than one where the basic intention behind the writing of the work was for motion picture use.* In this case, the motion picture is a derivative work within the definition of that term, and section 103 makes plain that copyright in a derivative work is independent of, and does not enlarge the scope of rights in, any pre-existing material incorporated into it. There is thus no need to spell this conclusion out in the definition of "joint work."

H.R. Rep. 94–1476 at 120 (emphasis added).

While a novelist, playwright, or screenwriter may create distinct works that are later adapted into or incorporated into a motion picture, i.e., a new derivative work, an actor's or actress' performance in the making of a motion picture is an integrated part of the resulting work, the motion picture as a whole. An actor's or actress' performance is either joint authorship or is a contribution under a work made for hire agreement. There is no question that Ms. Garcia's performance was not a stand-alone motion picture that was subsequently adapted into another motion picture. Rather, it was a part of the creation of "Desert Warrior", subsequently re-named, "Innocence of Muslims". There is also no question that Ms. Garcia intended her contribution or performance to "be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. §101. If her contribution was not as a work made for hire, she may assert a claim in joint authorship in the motion picture, but not sole authorship of her performance in a portion of the work. If her contribution was neither a work made for hire nor the requisite authorship to warrant a claim in a joint work, Ms. Garcia has no separable claim to copyrightable authorship in her performance.

The Office has identified at least one exception to the general rule on treating motion pictures as integrated works. Where a separate portion of a motion picture is commissioned, such as a special effects scene that qualifies as a discrete work in itself that is later incorporated into a motion picture, such a separate work may be neither a joint work nor a work made for hire, but rather a work created by an independent contractor. Such an exception is premised on the creation of a stand-alone work that is independently authored, fixed, and sufficiently creative to

2

be considered a separate claim within one or more of the statutory categories of authorship in section 102(a).

The Office's view on this matter is not limited to motion pictures. The same reasoning would apply to the musicians, vocalists or production specialists on a sound recording. The Office would refuse an authorship claim by an individual musician who contributed an individual performance to a sound recording unless the claim was as a joint author. An exception would exist where a discrete sound recording was made by a musician that was later incorporated into a new, derivative sound recording.

Ms. Garcia's performance was not a discrete or separate motion picture that was incorporated into "Desert Warrior". Instead, her performance was one of many actors' performances that went into the making of the integrated motion picture that was fixed by others in the creation of the motion picture as a whole. As such, the Office must refuse registration in Ms. Garcia's claim in her individual performance in the motion picture.

Sincerely,

Robert J. Kasunic
Associate Register of Copyrights and
Director of Registration Policy and Practices
United States Copyright Office

3