## No. 12-57302

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CINDY LEE GARCIA,

*PLAINTIFF-APPELLANT,*

v.

GOOGLE INC. AND YOUTUBE, LLC,

*DEFENDANTS-APPELLEES.*

**On Appeal from the United States District Court**
**For the Central District of California**
**Case No. CV-12-8315-MWF (VBKx)**
**Honorable Michael W. Fitzgerald, District Court Judge**

**BRIEF OF *AMICUS CURIAE* INTERNATIONAL DOCUMENTARY
ASSOCIATION, FILM INDEPENDENT, FREDRIK GERTTEN AND
MORGAN SPURLOCK IN SUPPORT OF APPELLEES GOOGLE, INC. AND
YOUTUBE, LLC ON REHEARING EN BANC**

| **GARY L. BOSTWICK** | **JACK I. LERNER** | **MICHAEL C. DONALDSON** |
|---|---|---|
| BOSTWICK LAW | UCI INTELL. PROP., ARTS, | DONALDSON + CALLIF, LLP |
| 12400 WILSHIRE BLVD., | & TECH. CLINIC | 400 S. BEVERLY DRIVE, |
| SUITE 400 | 401 E. PELTASON DR. | SUITE 400 |
| LOS ANGELES, CA 90025 | IRVINE, CA 92697 | BEVERLY HILLS, CA 90212 |
| (310) 979-6059 | (949) 824-7684 | (310) 277-8394 |
| gbostwick@B1Law.com | jlerner@law.uci.edu | michael@donaldsoncallif.com |

| **LINCOLN D. BANDLOW** | **ROM BAR-NISSIM** |
|---|---|
| LATHROP & GAGE LLP | 826 1/2 N. CORONADO ST. |
| 1888 CENTURY PARK EAST, | LOS ANGELES, CA 90026 |
| SUITE 1000 | (773) 420-7330 |
| LOS ANGELES, CA 90067 | rbarnissim@gmail.com |
| (310) 789-4600 | |
| lbandlow@lathropgage.com | |

*Counsel for Amici Curiae*

**IDENTITY OF AMICI**

This brief of amici curiae is submitted on behalf of the following persons or entities: International Documentary Association, Film Independent, Fredrik Gertten, and Morgan Spurlock.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned states that none of the amici is a corporation that issues stock or has a parent corporation that issues stock.

Dated: November 25, 2014

LINCOLN D. BANDLOW
ROM BAR-NISSIM
GARY L. BOSTWICK
MICHAEL C. DONALDSON
JACK LERNER


By: ___s/ Gary L. Bostwick_____
Attorneys for Amici Curiae

## STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)

This brief is submitted pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. All parties have consented to its filing.

No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief and no person or entity – other than the amicus curiae, its members, or its counsel – contributed money intended to fund preparing or submitting the brief.

Dated: November 25, 2014        LINCOLN D. BANDLOW
ROM BAR-NISSIM
GARY L. BOSTWICK
MICHAEL C. DONALDSON
JACK LERNER

By:   s/ Gary L. Bostwick    
Attorneys for Amici Curiae

# TABLE OF CONTENTS

IDENTITY OF AMICI ........................................................................ i

CORPORATE DISCLOSURE STATEMENT ................................ i

STATEMENT OF COMPLIANCE WITH RULE 29(c)(5) ............. ii

INTEREST OF AMICI CURIAE ...................................................... 1

ARGUMENT .................................................................................... 2

    I. Chaos Caused by the Outcome Appellant Proposes – Easily
    Preventable – Will Deter Honest Filmmaking ...................... 3

        A. "Copyrightable Interests" in performances will create
        uncertainty in filmmaking and should not be recognized
        on the facts of this case ...................................................... 4

            1. Filmmakers must be able to confidently gauge when a
            person's mere appearance on screen creates a
            "copyrightable contribution." ...................................... 4

            2. This Court should not disturb settled law: By
            exercising primary artistic control, the filmmaker is
            the author of a single work and creative contributions
            of other collaborators do not result in a series of
            independently copyrightable works ........................... 7

        B. Filmmakers must be able to determine when they are
        "employers." ...................................................................... 8

            1. Appellant urges a ruling that would leave start-up
            filmmakers without the certainty crucial to them on
            this issue ...................................................................... 9

            2. The *Community for Creative Non-Violence* factors
            allow beginning filmmakers to commission works for
            hire without a written agreement; they also dictate
            that Appellant's performance is a work for hire ..... 13

        C. How do post-filming changes in the work alter an
        implied license? ................................................................19

**II. Risk of Legal Threat to a Filmmaker Must Not Become So Difficult to Calculate That a Chilling Effect on Creative Works Is Certain; If It Does, All but Well-Established and Well-Heeled Production Enterprises Will Be Discouraged from Filmmaking** ............................................................ **22**

**III. Copyright Interests Often Are Not Addressed Beforehand in a Film Production as to Actors Appearing in Film and Rarely for Interviewees Appearing in Documentaries, Even If a Written Agreement Exists** ............................................ **23**

**IV. The Court Should Not Issue an Injunction Prior to Considering Fair Use** ...................................................... **24**

**V. A Remedy Based on Fraud and Related Theories Would Provide a More Appropriate Remedy for the Wrongs Garcia Suffered and Would Cause Less Collateral Damage to the Nation's Cultural Development** ............................... **28**

**CONCLUSION** ........................................................................ **30**

**CERTIFICATE OF COMPLIANCE** ................................... **31**

**CERTIFICATE OF SERVICE** ............................................ **32**

# TABLE OF AUTHORITIES

Cases

*Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000)............................................7,8

*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884) ...........................7,8

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ..........................25,26,27

*Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2nd Cir. 1995) ..................................14

*Childress v. Taylor*, 945 F.2d 500 (2nd Cir. 1991) ...................................................5

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ............*passim*

*Einhorn v. Mergatroyd Productions,* 426 F.Supp.2d 189 (S.D.N.Y. 2006) .............5

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ................................................................25

*Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994) ..............................5

*Garcia v. Nakoulah,*
    No. CV-12-08315-MWF (VBKx) (C.D. Cal. filed Nov. 30, 2012) ............24

*Golan v. Holder,* 132 S.Ct. 873 (2012) ..................................................................25

*Johannsen v. Brown,* 797 F.Supp. 835 (D. Or. 1992) ............................................14

*JustMed, Inc. v. Byce,* 600 F.3d 1118 (9th Cir. 2010) .................................13,17,18

*Mason v. New Yorker Magazine, Inc.*, 832 F.Supp. 1350 (N.D.Cal. 1993) ...........14

*McKinney v. Morris*, B240830,
    2013 WL 5617125 (Cal. Ct. App. Oct. 15, 2013) ........................................21

*Publication v. Rural Telephone Service Co*., 499 U.S. 340 (1991) .........................5

*Seltzer v. Green Day, Inc*., 725 F.3d 1170 (9th Cir. 2013) ....................................26

*SOFA Entertainment, Inc. v. Dodger Productions*,
    709 F.3d 1273 (9th Cir. 2013) ....................................................................26

*Sony Corp. of America v. Universal City Studios, Inc.,*
    465 U.S. 417 (1984)......................................................................................25

*Storey v. Comm'r of Internal Revenue*, 103 T.C.M. (CCH) 1631 (T.C. 2012) ......12

*Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2004) ..............27

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. S.Ct. 559 (1980) ................5

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977) ..................27

<u>Statutes</u>

17 U.S.C. § 101 ................................................................................................13

17 U.S.C. § 102 ..................................................................................................7

17 U.S.C. § 106A ............................................................................................27

17 U.S.C. § 107 ..........................................................................................25,26

17 U.S.C. § 203 ..............................................................................................23

Cal. Bus. & Prof. Code § 17200 ...................................................................29

Cal. Bus. & Prof. Code § 17203 ...................................................................29

Cal. Civ. Code § 1572 ...................................................................................29

Cal. Civ. Code § 3294(a) ...............................................................................29

<u>Other Authorities</u>

*Ambassador Rice: Benghazi attack began spontaneously*, NBC News (Sept. 16, 2012) .................................................................................................. 26

Andrew C. Revkin, *'Gasland' Filmmaker Takes on Cuomo and 'Dot.FlatEarth'*, N.Y. Times, June 28, 2012 .................................................12

*Controversial film sparks protests and violence in the Muslim world*, The Guardian (Sept. 14, 2012) ........................................................................ 26

Easy Rider: Shaking the Cage (Columbia TriStar Home Video 1999)...........6,20

Jonathan Rosenbaum, Jim Jarmusch: Interviews (Ludvig Hertzberg 2001) ..........11

Library of Congress, National Film Registry Titles 1989-2013 ........................19,21

Mark Litwak, Contracts for the Film & Television Industry (3rd ed. 2012) ..........23

Mark Litwak, *Do Your Actors Own Your Film?* IFP RESOURCES (March 3, 2014) ................................................................................ 2

Michael C. Donaldson, Clearance and Copyright: Everything You Need to Know for Film and Television (3rd ed. 2008) ..............................23

Nancy Tartaglione, *'Interstellar' At $226M Overseas As China, Korea Show Endurance: Intl' Box Office FINAL* DEADLINE (Nov. 18 2014) ................ 11

SAG-AFTRA, Day Performer Contract Low Budget ...........................................23

SAG-AFTRA, Member Benefits ........................................................................18

SAG-AFTRA, Performer Contract Student Film ...............................................23

SAG-AFTRA, Performer Contract Ultra Low Budget .........................................23

Slamdance, Christopher Nolan Interview, Vimeo ..................................................10

The Robert Rodriguez Ten-Minute Film School (Los Hooligans Productions 1998) ........................................................................11

## INTEREST OF AMICI CURIAE

The International Documentary Association is a nonprofit §501(c)(3) organization that supports nonfiction filmmaking and the documentary genre.

Film Independent is a §501(c)(3) nonprofit organization that champions the cause of independent film and a community of artists who embody diversity, innovation and uniqueness of vision.

Morgan Spurlock is an Academy Award-nominated documentary filmmaker, television producer, director and screenwriter best known for the documentary film "Super-Size Me" and the currently-airing CNN documentary series "Inside Man."

Fredrik Gertten is a Swedish documentary filmmaker and journalist who has produced and/or directed over twenty documentary films, including the Academy Award-nominated "Burma VJ: Reporting from a Closed Country."

Amici and their members collectively represent thousands of independent and documentary filmmakers alarmed that the result urged by Appellant will create significant uncertainty and additional burden, so much so it may prevent future meritorious projects important to this nation's culture and advancement.

## ARGUMENT

Appellant Garcia was seriously harmed by a filmmaker who recklessly ignored her safety. But, in response, she urges this Court to create unprecedented standards detrimental to the rest of us. To do so would create crippling uncertainty as to concepts fundamental to creative filmmaking, uncertainty that would erect imposing barriers to the advancement of culture and innovation the Copyright Act encourages.[1]

The uncertainty would threaten these Amici filmmakers; but the cloud would loom over a landscape much broader than just their parochial interests. The lack of clarity that could be caused threatens to keep worldwide audiences in the millions from experiencing imaginative and important works advancing understanding, insight and development. The urge to find a remedy for one harmed person threatens to stunt the growth of creative films and deprive the public of works of tremendous insight, inspiration and importance.[2] Appellant cannot avail herself of copyright protection, because her performance does not qualify as a work of authorship independent from "Innocence of Muslims", was a work for hire

---

[1] *See* Mark Litwak, *Do Your Actors Own Your Film?* IFP RESOURCES (March 3, 2014), http://www.ifp.org/resources/do-your-actors-own-your-film/#.U0lnMJ6wWZ ("This single decision is remarkable by changing a number of basic principles on which the movie industry operates.").

[2] Steven Spielberg: "I think documentaries are the greatest way to educate an entire generation that doesn't often look back to learn anything about the history that provided a safe haven for so many of us today." IMDB, http://www.imdb.com/name/nm0000229/bio.

and the subject of an implied license. Amici do not say her injury is without remedy; Appellant can avail herself of state law claims directly designed to remedy the conduct. But Amici argue her remedy should not be based in copyright law, causing collateral damage to filmmakers (and their prospective audiences) who did nothing to injure Appellant.

## I.  Chaos Caused by the Outcome Appellant Proposes – Easily Preventable – Will Deter Honest Filmmaking.

Appellant urges the Court to veer from the virtues of certainty and predictability in seeking justice for this highly rarefied confluence of bad behavior and harm. Abandoning certainty and predictability might help her, but not Amici and not the future of creative filmmaking that brings so much to our nation.

The chaos caused by following Appellant's reasoning arises out of three areas of uncertainty:

1) When a copyrightable interest arises. Vague standards of what constitutes a copyrightable interest in a film will baffle and deter filmmakers considering new creative projects, so much so that they may give up any thought of creation;

2) When a filmmaker qualifies as an "employer." Amici and others must not be uncertain about the precise circumstances that give rise to their being "employers," with the attendant protection for their work under the work for hire doctrine;

3) <u>The scope of an implied license.</u> Amici and other filmmakers cannot be left fumbling in the dark about what eventual edits or changes in a work of art might violate contracts with other participants in the work.

    **A.**    **"Copyrightable Interests" in performances will create uncertainty in filmmaking and should not be recognized on the facts of this case.**

As set forth below, accepting Appellant's position that she has a "copyrightable interest" would be pernicious to filmmaking and the law does not support such a proposition.

      **1.**    **Filmmakers must be able to confidently gauge when a person's mere appearance on screen creates a "copyrightable contribution."**

A filmmaker, tyro or veteran, faced with the rules Appellant proposes, will be plagued by new and uncertain formulae to determine whether a contribution by a person appearing on screen is copyrightable. The new ambiguity will burden all films, not just scripted works. Filmmakers using interviews in a documentary must be certain those on screen, even if their embodiment of recollections are creative, have no copyright interest that could halt release of the project – or even threaten to do so. One need only consider reality TV of the unscripted variety. If Appellant's proposed ruling were adopted, before releasing any episode to be aired

filmmakers would be forced to agonize about whether the contribution of anyone appearing on the show could support legal threats, even an injunction.

A producer will not be able to know with the predictability the law strives to achieve how much "contribution" creates a "copyrightable interest." Predictability in the legal system "allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). If Appellant's argument prevails, a producer will not have objective parameters to assess this issue; neither the lines spoken nor screen time will be of aid. If producers receive counsel on this question applied in other contexts, they will be confused and mystified by cases rejecting a "copyrightable interest" of actors in other media. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994), *Childress v. Taylor*, 945 F.2d 500 (2nd Cir. 1991), *Einhorn v. Mergatroyd Productions,* 426 F.Supp.2d 189 (S.D.N.Y. 2006).

As just one example, consider the simple case of amateurs filming the next viral video on Venice Beach skateboarding ramps. If only a "minimal degree of creativity" is required "no matter how crude, humble or obvious" (*Feist Publication v. Rural Telephone Service Co.,* 499 U.S. 340, 345 (1991), as Appellant proposes, filmmakers will fear complaints and injunctions, not just from the skater-performers, but from every extra in a long-shot, every onlooker

watching the chainsaw juggler, will doom the project. A gesticulation from afar, unique and creative but silent, may establish a "copyrightable contribution" under the standard proposed by Appellant.

Consider the groundbreaking and influential film "Easy Rider" which allegorizes the death of the hippie movement, is in the National Film Registry, and is an important contribution to American culture. Persons appearing in the film included professional actors, locals who were not actors, and street performers. Many scenes were scripted; many were improvised. If Appellant's theories were to become law, a producer would question who had a copyrightable interest in some scenes; some occurred while the actors were on drugs, making it debatable whether any creative embodiment occurred, while others showed innumerable street performers filmed without permission or direction.[3] Would those persons have a copyrightable interest today if Appellant's arguments were the law of the land?

---

[3] EASY RIDER: SHAKING THE CAGE (Columbia TriStar Home Video 1999).

**2.** **This Court should not disturb settled law: By exercising primary artistic control, the filmmaker is the author of a single work and creative contributions of other collaborators do not result in a series of independently copyrightable works.**

Appellant cannot avail herself of copyright protection because an actor's performer in a film does not create an "original work of authorship." 17. U.S.C. § 102. Over 125 years ago, the Supreme Court instructed that the author of the work is

> the person who effectively is as near as he can be, the cause of the picture which is produced, that is, the person who has superintended the arrangement, who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be — the man who is the effective cause of that.

*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61 (1884) (quoting *Nottage v. Jackson,* 11 Q.B. Div. 627 (1883)). In other words, "an author 'superintend[s]' the work by *exercising control*." *Aalmuhammed v. Lee,* 202 F.3d 1227, 1234 (9th Cir. 2000) (emphasis added).

Performers in films do not exercise artistic control over the film. Nor, in most cases, do they exercise control over essential aspects of their performance within the film. First, the performance must be directed (i.e. controlled) by someone else. Someone else must provide the performer blocking (i.e. tell him or her where to move and stand); tell the performer what the performance is meant to convey; and decide which choices will work and not work within the context of the

story being told. Second, the performer has little or no say regarding how the performance is fixed. Someone else decides the location, camera angle, framing, lighting, when to say "action" and when to say "cut," and number of takes. Third, someone else selects which parts of the performance, if any, shall appear in the final film.[4]

The certainty created by the *Burrow-Giles* and *Aalmuhammed* decisions has been essential to filmmaking for decades. Filmmaking is a collaborative art form that incorporates several creative contributions from the producer all the way down to the extra. But a film reflects the vision not of each individual collaborator, but of the person who exercises artistic control. If this Court were to decide to fragment a film into separate copyrightable works, each with a separate sole author, it will turn filmmaking on its head.

### B. Filmmakers must be able to determine when they are "employers."

Appellant's suggested approach would create paralyzing uncertainty in any filmmaker's mind as to this crucial characteristic of a proposed endeavor — enough to deter many from embarking at all. Amici urge the Court to consider that

---

[4] Nor should performances within a film lead to a separate work of authorship. If a creative contribution to a work is inextricably intertwined with the contributions of others, it should not be viewed as separate work—particularly where, as here, the contribution was not fixed elsewhere.

copyright law is designed to promote the creation of new works; any barriers creating confusion about how to move forward on a project are contrary to this nation's policy regarding new ideas and creations.

1. **Appellant urges a ruling that would leave start-up filmmakers without the certainty crucial to them on this issue.**

Amici do not urge that simply capturing images on film or video renders someone a filmmaker who is in the regular business of filmmaking. Filmmakers need to do much more than grab a camera and start filming. They cannot proceed without securing all the proper rights to exploit their films. Distributors, exhibitors and insurers will not expose themselves to liability if there is a defect in the chain of title. Where the filmmaker cannot secure a release of a "copyrightable interest," "employer" status has for decades served as a safety net. Without it, first-time filmmakers will face expensive procedures to determine chain of title, if they can do so at all.

In this case, Appellant urges an outcome that prevents first-time and burgeoning filmmakers from being considered "employers" for "work made for hire" purposes, because these filmmakers, it is contended, are not in the "regular

business of filmmaking."[5] A filmmaker on his first film would be deterred even from embarking on a project unless he is convinced he can distinguish himself from Garcia's adversary, Youssef, in order to achieve "employer" status. The argument against Youssef appears to turn on Appellant having worked for "three days for a job that required specialized acting skills" and "Youssef had no right to assign additional projects, he did not add her to any payroll system, filmmaking was not his regular business, he did not give Garcia employee benefits, and Garcia was not treated as an employee for tax purposes."[6]

It is irrelevant that Youssef did not work in the film industry before and had no union contracts, relationships with prop houses or other film suppliers, leases of studio space or distribution agreements. Many great filmmakers started with equal deficiencies but made important films. But even after a successful film, a filmmaker should not have to fear that if his next project is low-budget and without industrial trappings, he will be unworthy of "employer" status.

Christopher Nolan wrote, directed and produced an early film, "Following", for an estimated $6,000;[7] he produced the "Batman" trilogy and is the writer, director and producer of "Interstellar", a feature film in theatres as this is written,

---

[5] Response to Petition of Rehearing En Banc, *Garcia v. Google,* CV-12-57302 (9th Cir. filed April 4, 2014) (hereinafter "Garcia's Response).

[6] *Id*.

[7] Slamdance, CHRISTOPHER NOLAN INTERVIEW, VIMEO, 0:25-0:40, http://vimeo.com/28828816.

reportedly already cumulating a mounting international box office gross of over

$200 million.[8] Robert Rodriguez made "El Mariachi" for an estimated $7,000;[9]

later he produced the "Spy Kids" and "Sin City" franchises and went on to create

his own television network, "El Rey." Jim Jarmusch made "Permanent Vacation"

for an estimated $12,000[10] and now is considered to have blazed a trail of

creativity for filmmakers like Spike Lee and Quentin Tarantino. Critical to this

Court in these Horatio Alger tales are not the Horatios, but their audiences. Had the

filmmakers not felt the freedom and protective cloak provided by copyright law,

now under threat by Appellant's argument, it is likely our culture would be

deprived of their later successes.

Josh Fox ran a small theater and film production company in New York

when he investigated fracking. He had not made a feature-length documentary

before, had no union contracts and had no distribution agreements. He still had

none when he wrote, produced, and directed the Academy Award-nominated

documentary "GasLand" – a film that won the Special Jury Prize at the prestigious

---

[8] Nancy Tartaglione, *'Interstellar' At $226M Overseas As China, Korea Show Endurance: Intl' Box Office FINAL,* DEADLINE (Nov. 18 2014) http://deadline.com/2014/11/international-box-office-interstellar-penguins-of-madagascar-china-dumb-and-dumber-to-big-hero-6-1201286020/.

[9] THE ROBERT RODRIGUEZ TEN-MINUTE FILM SCHOOL 0:10-0:15 (Los Hooligans Productions 1998).

[10] Jonathan Rosenbaum, Jim Jarmusch: Interviews 113 (Ludvig Hertzberg 2001).

Sundance Film Festival in 2010.[11] The film later aired on HBO and is credited with raising international public awareness about the issues surrounding fracking.[12]

Lee Storey is a law firm partner who took six years to make her film, "Smile 'Til it Hurts: The Up With People Story", while working full-time as an attorney. The United States Tax Court, rightly so, held she was engaged "in the trade or business of film production" for tax purposes.[13] Now, faced with the prospect this Court will transform Appellant's theories into law, how can she or any of the filmmakers cited above know with reliable predictability when they metamorphose into "employers" in the "regular business of filmmaking"?

The uncertainties created by trying to distinguish themselves from Youssef will cause most filmmakers to consider engaging counsel. The prospect of great expense and effort looms, potentially killing a film before a frame is shot. Looking forward to visualize when the film is finished, a filmmaker is bound to tremble at the specter of distribution delays inevitably caused by possible specious claims that, under Appellant's proposed standards, are much more likely to rear their ugly

---

[11] Statement authorized by Mr. Fox.

[12] Andrew C. Revkin, *'Gasland' Filmmaker Takes on Cuomo and 'Dot.FlatEarth'*, N.Y. TIMES, June 28, 2012, *available at* http://dotearth.blogs.nytimes.com/2012/06/28/gasland-filmmaker-takes-on-cuomo-and-dot-earth/.

[13] *Storey v. Comm'r of Internal Revenue*, 103 T.C.M. (CCH) 1631 (T.C. 2012).

heads. Our society depends upon more protection for creative artists than the Appellant's argument provides.

**2.    The *Community for Creative Non-Violence* factors allow beginning filmmakers to commission works for hire without a written agreement; they also dictate that Appellant's performance is a work for hire.**

Appellant cannot be deemed an independent contractor just because no written agreement existed or by arguing her performance was <u>not</u> a work made for hire. Absent a writing, the Supreme Court has held courts should use the principles of agency to determine whether a work is a work made for hire. *Community for Creative Non-Violence v. Reid* ("*CCNV*"), 490 U.S. 730 (1989). It laid out a multi-factored balancing test to assess under the totality of the circumstances whether a work qualifies as a work made for hire under 17 U.S.C. § 101. "No one of these factors is determinative." *CCNV, supra,* 490 U.S. at 752. "While no one factor is decisive, we draw some guidance in weighing the factors from [the hiring party's] status as a . . . start-up company." *JustMed, Inc. v. Byce,* 600 F.3d 1118, 1126 (9th Cir. 2010). "[A] small start-up company . . . conduct[s] its business more informally than an established enterprise might." *Id.* at 1128. "[S]ome of the factors . . . are entitled to little weight when viewed in light of [start-up status]." *Id.* at 1126. Amici, steeped in the realities of these factors every day in their work, discuss below each *CCNV* factor and how it is applied to filmmaking, particularly to burgeoning and documentary filmmakers.

- 13 -

Factor One: "[T]he hiring party's right to control the manner and means by which the product is accomplished." *CCNV, supra*, 450 U.S. at 751. This factor will often help decide who the author of the work is. *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 80 (2nd Cir. 1995); *Johannsen v. Brown*, 797 F.Supp. 835 840-41 (D. Or. 1992); *Mason v. New Yorker Magazine*, *Inc.,* 832 F.Supp. 1350 (N.D.Cal. 1993). Appellant's complaint alleges "[Youssef] managed all aspects of the production, and as far as [Appellant] observed, was in charge of all aspects of the production."[14] Even if Youssef did not author the film, Garcia is not the author of her performance by default. The reality of filmmaking requires someone to direct the performer. As Amici discuss above, *see supra* Part I.A.2., the performer must be given blocking instructions, and has no say over location, camera angle, lighting, framing, or even whether the performance is included in the final version of the film. Garcia makes no claim to controlling any of these aspects of her performance. If she did not exercise such control, someone else did.

Factor Two: "[T]he skill required by the employee." *CCNV*, *supra,* 490 U.S. at 751. A production's union or non-union status can indicate the desired skill level of the performer. Union affiliation can indicate an actor's professional experience and whether they view their acting as a career or as a hobby. Appellant is a "non-

---

[14] First Amended Complaint, *Garcia v. Nakoula*, No. CV-12-8315-MWF(VBKx) (C.D. Cal filed .Oct. 14, 2012) (hereinafter "Garcia's Complaint").").

union" actress.[15] Appellant claims the job required "specialized acting skills."[16] While previous production experience and formal acting training is certainly probative of an actor's skill level, Appellant offers no information as to how she obtained her acting skills.[17]

Factor Three: "[T]he source of the instrumentalities and tools." *Id.* Filmmaking requires cameras, lights, sets, costumes, props, editing and sound equipment. Appellant did not supply this equipment, the costume, the editing tools to combine her portion with others, or makeup she wore, or the sets she appeared on; someone else did all that.

Factor Four: "[T]he location of the work." *Id.* Filmmaking requires shooting on location or at a soundstage. The decision is made in accordance with the director's vision and the producer's budgetary approval. Given the backgrounds in "Innocence of Muslims," it is clear the film was shot on a soundstage with a green screen. Appellant did not rent out the sound stage and create the backgrounds; someone else did.

---

[15] Garcia's Complaint, *supra,* n. 14.

[16] Response to Petition of Rehearing En Banc, *Garcia v. Google,* CV-12-57302 (9th Cir. filed April 4, 2014) (hereinafter "Garcia's Response").

[17] A review of Garcia's IMDB profile shows only one credit from 2012. Her demo reels consist of webcam performances. No information is provided regarding formal training. Cindy Lee Davis Garcia, IMDB http://www.imdb.com/name/nm4555815/.

Factor Five: "[T]he duration of the relationship between the parties." *Id.* Appellant states she "worked for Youssef for three days."[18] The shooting of a film is of limited duration. Due to limited resources, independent filmmaking necessitates shorter shooting schedules and shorter contractual relationships. This factor should be given less weight to accommodate the reality of filmmaking.

Factor Six: "[W]hether the hiring party has the right to assign additional projects to the hired party." *Id.* Appellant states "Youssef had no right to assign additional projects." In the context of filmmaking, this factor is irrelevant. Films, by their very nature, are one-time projects; and studios long ago abandoned the practice of having a stable of actors on contract. This factor should be given little or no weight given the present-day reality of filmmaking.

Factor Seven: "[T]he extent of the hired party's discretion over when and how long to work." *Id.* Performers rarely have a say over their shooting schedule, call times or working conditions (e.g., night, day, rain, sun, wind, cold, heat, etc.). Appellant did not dictate what days she would perform, for how long and under what conditions; someone else did. Even the lowest budget film has a call sheet dictating precisely these details to get the film crew on the same page.[19]

---

[18] Garcia's Response, *supra*, n. 16.

[19] "Call sheets are pretty essential to any shoot. They tell you where to be and when, who's who in the production, how to contact them, and all sorts of other important details you might need to know." *See* http://nofilmschool.com/2014/05/download-free-call-sheet-template-cast-crew-call.

Factor Eight: "[T]he method of payment." *Id.* Performers are paid, irrespective of whether their performance is actually used in the film. Larger roles may be paid through periodic payments or profit participation; smaller roles may be paid in one lump sum.

Factor Nine: "[T]he hired party's role in hiring and paying assistants." *Id.* Only major stars may successfully request control over who does their hair and makeup. No evidence in the record suggests Appellant had the luxury of hiring assistants.

Factor Ten: "[W]hether the work is part of the regular business of the hiring party." *Id.* at 752. The law must give some leeway for a person who is making a film for the first time. *See JustMed, supra,* 600 F.3d at 1126 & 1128. First-time and burgeoning filmmakers are akin to "start-ups," and where such filmmakers are involved, this factor should be given less weight.

Factor Eleven: "[W]hether the hiring party is in business." *CCNV, supra,* 490 U.S. at 752. Often in independent films, the production company is a separately created business entity solely devoted towards producing an individual production. Once the work is distributed, the entity has little or no business dealings. This factor should be given less weight to factor in the reality of independent filmmaking.

Factor Twelve: "[T]he provision of employee benefits." *Id.* "Start-up status" lowers the weight of this factor. *JustMed, supra,* 600 F.3d at 1128. Appellant states "[Youssef] did not give Garcia employee benefits."[20] In the film industry, actors receive benefits from the actor's union SAG-AFTRA, not the production company.[21] Garcia was not a member of any union, so she did not receive such benefits. That does not affect whether the filmmaker employed her. This factor should also be given less weight given the reality of the film industry.

Factor Thirteen: "[T]he tax treatment of the hired party." *CCNV, supra*, 490 U.S. at 752. Appellant states she "was not treated as an employee for tax purposes." But a first-time filmmaker's "start-up status" lowers the weight of this factor. *JustMed, supra,* 600 F.3d at 1128. In fact, performers who are under total control of the filmmaker are often not treated as employees for tax purposes. The pervasiveness of "loan out companies" in the film industry is a prime example. Loan out companies are legal entities separate from the artist that "loan out" an artist's services. Producers will make an agreement with the loan out company, not the artist directly. The loan out company will pay taxes, not the producer or artist. Again, this factor should be given less weight, given the reality of the film industry and "start-up status."

---

[20] Garcia's Response, *supra*, n. 16.

[21] *See* SAG-AFTRA, Member Benefits, http://www.sagaftra.org/content/member-benefits.

Such arrangements may mischaracterize an employee relationship as an independent contractor relationship. As with Factor 11, this factor should be given less weight, given the reality of the film industry.

A close examination of the *CCNV* factors reveals Appellant's performance was a work made for hire. "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *CCNV, supra*, 490 U.S. at 737. The most relevant factors, particularly those relating to creative control, were factors controlled by and at the discretion of others, not Appellant.

### C. <u>How do post-filming changes in the work alter an implied license?</u>

Appellant urges a rule that, absent a writing addressing the scope of consent, would require filmmakers to determine beforehand what alterations "exceed the bounds of any implied license.[22] Absent a writing addressing the scope of consent, a filmmaker would be required to determine beforehand what alterations "exceed the bounds of any implied license." That requirement would render the implied license so subjective, weak and uncertain it could not be relied upon. In "Easy Rider",[23] Dennis Hopper filmed locals already sitting in a diner when the crew

---

[22] Garcia's Response, *supra*, n. 16.

[23] Library of Congress, National Film Registry Titles 1989-2013, http://www.loc.gov/film/registry_titles.php.

arrived to shoot the scene. On camera, they improvised lines like, "You name it –
I'll throw rocks at it Sheriff" and "Look like a bunch of refugees from a gorilla
love in." Dennis Hopper told them before filming that Peter Fonda's and Jack
Nicholson's characters "had just raped a little girl outside of town." That was not
in the script.[24] Without the protection of certainty urged by Amici here, someone in
Hopper's shoes today has good reason to worry that the diners could seek to have
distribution and performance banned based on copyright infringement, because he
exceeded the bounds of any implied license in order to secure their participation,
and they agreed to perform in reliance on a lie (using the Appellant's phrasing, his
"intention was to distort and misappropriate [their] performance," and they "could
not have imagined that [their] performance would be used in this manner.").[25]
Often, particularly with documentaries, the narrative does not fully materialize
until the filmmaker is in the editing room, long after shooting is over and the
filmed subjects have disappeared. Filmmakers regularly must radically alter the
narrative to tell the most truthful or compelling story.

Academy Award winning documentarian Errol Morris, whose film "The Fog
of War" won an Oscar and whose "Thin Blue Line" is part of the National Film

---

[24] Easy Rider: Shaking The Cage, *supra,* n. 4.
[25] Garcia's Response, *supra*, n. 16.

Registry,[26] faced attacks upon his work illustrating this point. He set out to make a film about tabloid journalism and celebrity. *McKinney v. Morris*, B240830, 2013 WL 5617125 (Cal. Ct. App. Oct. 15, 2013) (unpublished opinion cited not for precedential value, but for factual summary of aid to this Court). Joyce McKinney and the "Manacled Mormon" scandal received widespread tabloid coverage in the 1970s and allegations of kidnapping and rape were bandied about. Morris interviewed McKinney for the film. She signed a standard release form. She testified later that she agreed to the interview because Morris promised her an opportunity to clear her name and that he would not use the tabloid articles about her. After the interview, Morris changed the focus of his film to McKinney and the scandal. McKinney sought an injunction under state law theories.

"Tabloid" illustrates the difficulty determining when the use of a person's contribution exceeds the bounds of any implied license. Morris stated McKinney was a "natural, animated storyteller who used interesting turns of phrase and allusions." *Id.* Assuming no conditions for the interview were given, did "Tabloid" differ so radically from anything McKinney could have imagined, because it was critical of her instead of positive, or an academic piece about tabloid journalism? Can subjects like Joyce McKinney block release or win damages? Can someone

---

[26] Library of Congress, National Film Registry Titles 1989-2013, http://www.loc.gov/film/registry_titles.php.

like McKinney create a factual dispute about what was promised and block distribution? The position urged by Appellant makes it harder than ever for amici to answer these questions. If they cannot be answered, the film may not be made.

## II. Risk of Legal Threat to a Filmmaker Must Not Become So Difficult to Calculate That a Chilling Effect on Creative Works Is Certain; If It Does, All but Well-Established and Well-Heeled Production Enterprises Will Be Discouraged from Filmmaking.

If Appellant's theories become law, it will chill filmmaking, particularly those of amateur, non-profit and student filmmakers. Future films – the next "Easy Rider" or "Tabloid" – may not materialize if their makers fear they have failed to secure the proper rights. First-time filmmakers who cannot determine what rights to secure or who now cannot secure such rights, will opt to abandon projects instead of risking an injunction or damages. Filmmakers with paltry budgets will be burdened with legal costs associated with the uncertainties caused by the decision. It may now be safer not to make a film, if potential claimants, even those honestly treated, can make claims when disgruntled by an editorial decision. Insurers will not underwrite a film unless all "necessary releases" have been secured – filmmakers will be uncertain what those are, and how to get them. Only filmmakers with great resources – well-established studios and production companies that already enjoy certifiable "employer" status – will make movies. Even they will hesitate when the cost-benefit balance slides downward.

### III. Copyright Interests Often Are Not Addressed Beforehand in a Film Production as to Actors Appearing in Film and Rarely for Interviewees Appearing in Documentaries, Even If a Written Agreement Exists.

Sample contracts provided by the leading performers' union for low budget and student filmmakers omit reference to license, transfer of interest in the performance[27] or release of any kind.[28] Leading practitioners who authored books with contract forms for filmmakers include forms referring only to name and likeness in documentary releases and low-budget actor agreements, omitting any "copyrightable interest."[29] Under Appellant's theories, any filmmaker who relies on these contracts – or who has relied on them up to now – will be thrust into the impenetrable thicket of copyright law; no one can confidently assure them they will not.

Scott Hamilton Kennedy, Academy Award-nominated director of several documentaries including "The Garden", incorporated performing arts elements into

---

[27] No matter how it is accomplished, transfer of a copyright is cold comfort because it can be terminated after 35 years. 17 U.S.C. § 203.

[28] *See* SAG-AFTRA, Day Performer Contract Low Budget, http://www.sagaftra.org/files/sag/day_performer_contract_low_budget_6_28.pdf, SAG-AFTRA, Performer Contract Student Film, http://www.sagaftra.org/files/sag/performer_contract_student_film_6_34.pdf, SAG- AFTRA, Performer Contract Ultra Low Budget, http://www.sagaftra.org/files/sag/performer_contract_ultra_low_budget_6_32.pdf.

[29] MICHAEL C. DONALDSON, CLEARANCE AND COPYRIGHT: EVERYTHING YOU NEED TO KNOW FOR FILM AND TELEVISION 257 & 342 (3rd ed. 2008); MARK LITWAK, CONTRACTS FOR THE FILM & TELEVISION INDUSTRY 28 & 86-87 (3rd ed. 2012).

two of his films. After considering the relief sought by Appellant, he fears complications if a performer he captures dancing claims copyright/ownership of that footage. He believes it is implicitly understood by all parties in the industry these performers are being captured for a film he is creating, not a film by or for them.[30]

## IV.   The Court Should Not Issue an Injunction Prior to Considering Fair Use.

It is urgent that the injunction presently in force be reconsidered. Amici respectfully request this Court to reconsider the effect its order of injunction has had (and will continue to have) on public welfare. The damage amici face, and to the world's cultural advancement through film, far outweighs prospective damage on the other side of the equation. The record shows Garcia waited five months to bring suit and had access to outlets disavowing her connection to the film.[31] Moreover, the prospect of harm to her was far from clear.

Injunctions are not favored when fair use is an adequate defense to an infringement claim. Given the harm caused by this ban on expression, anathema to

---

[30] Statement authorized by Mr. Kennedy.

[31] *Garcia v. Nakoulah,* No. CV-12-08315-MWF (VBKx) (C.D. Cal. filed Nov. 30, 2012).

this nation's jurisprudence, the panel could and should have remanded the case for expedited determination on the fair use issue, with full factual exposition.

"Fair use of a copyrighted work . . . is not an infringement." 17 U.S.C. § 107. The doctrine is a "built-in First Amendment accommodation" to copyright infringement. *Golan v. Holder,* 132 S.Ct. 873, 890 (2012); *Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003). A finding of fair use is dispositive of whether the plaintiff's copyright infringement claim is likely to succeed. *Sony Corp. of America v. Universal City Studios, Inc.* 465 U.S. 417, 545-56 (1984). Given its constitutional import and dispositive nature, a fair use determination should occur prior to the issuance of an injunction.

Injunctions are important when an allegedly infringing work threatens to supplant the market for a work and destroy its economic value, not when fair use may be present.

> [W]hile in the "vast majority of cases, an injunctive remedy is justified because most infringements are simple piracy," such cases are "worlds apart from . . . those raising reasonable contentions of fair use," [and] where "there may be a strong public interest in the publication of the secondary work."

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578 n. 10 (1994) (original brackets omitted) (quoting Pierre Leval, *Towards a Fair Use Standard*, 103 HARV. L. REV. 1105, 1132 (1990)). There was strong public interest in "Innocence of

Muslims." It sparked violent protests in the Muslim world.[32] It was initially blamed for causing a riot leading to U.S. Ambassador Stephens' murder.[33] In light of the public interest, Amici urge this Court to remand for a fair use analysis before continuing the injunction.

Fair use determinations are guided by the four fair use factors in 17 U.S.C. § 107. Central to the fair use inquiry is whether the secondary work is "transformative." *Campbell, supra*, 510 U.S. at 579. A secondary work is transformative if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.*; *Seltzer v. Green Day, Inc.,* 725 F.3d 1170, 1176 (9th Cir. 2013); *SOFA Entertainment, Inc. v. Dodger Productions,* 709 F.3d 1273, 1278 (9th Cir. 2013). "[T]he more transformative the new work, the less . . . significanc[ant] [the] other factors." *Campbell, supra,* 510 U.S. at 579.

Appellant's performance was used in such a transformative manner that it appeared fraudulent. "Garcia could not have imagined that her performance would

---

[32] *Controversial film sparks protests and violence in the Muslim world*, THE GUARDIAN (Sept. 14, 2012), http://www.theguardian.com/world/2012/sep/14/islam-film-muslim-protests.

[33] *Ambassador Rice: Benghazi attack began spontaneously,* NBC NEWS (Sept. 16, 2012), http://usnews.nbcnews.com/_news/2012/09/16/13896494-ambassador-rice-benghazi-attack-began-spontaneously?lite.

be used in this manner."[34] While the conduct was reprehensible, outrage is irrelevant in this determination; reprehensibility of the use does not affect the inquiry as to transformation.[35] The use was not commercial; the filmmakers put her performance on YouTube, freely accessible to the public. After three days of shooting, only a few seconds of her performance were used. Undoubtedly, the filmmakers' use affected Appellant; she was associated with an incendiary film, and it may have affected her acting career. But copyright does not protect reputational interests; it protects the author's ability to market the work.[36] The filmmaker's conduct did not affect any independent market for Appellant's "Desert Warrior" performance, something important to the fourth factor of the analysis. Taken together, the factors make a plausible showing of fair use. At the least, this Court should stay the injunction and remand to the trial court for a determination of the fair use issue.

---

[34] Garcia's Response, *supra*, n. 16.

[35] The United States does not extend moral rights protection to performances. *See* 17 U.S.C. § 106A.

[36] *Campbell, supra,* 510 U.S. at 592 (There is a "distinction between potentially remediable displacement and unremediable disparagement"); *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 573 (1977) ("[T]he goals of patent and copyright law . . . focus[] on the right of the individual to reap the reward of his endeavors and hav[e] little to do with protecting feelings or reputation."); *Suntrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1280 (11th Cir. 2004) (Marcus J. Concurring) ("[I]t is not copyright's job to 'protect the reputation of a work or guard it from 'taint' in any sense except an economic one").

## V.    A Remedy Based on Fraud and Related Theories Would Provide a More Appropriate Remedy for the Wrongs Garcia Suffered and Would Cause Less Collateral Damage to the Nation's Cultural Development.

Using copyright law to address Appellant's harms is like firing an 8" nuclear shell from a howitzer into an historic town to neutralize an opposing sniper threatening friendly forces. It solves the problem, but a lot of intolerable damage occurs.

It is obvious that the outrage over what occurred to Appellant is justified. Appellant alleges she was lied to at the onset, misrepresented in the film and exposed to danger. These acts alone give her a right to seek remedy from the filmmaker, but the punishment should fit the crime – and not punish parties who did no harm. She can be recompensed and protected using remedies appropriate to the harm without enormous fallout damaging the nation's cultural interests.

Alternative remedies give Appellant civil recourse and target specifically what caused her harm. Fraud remedies and consumer statutes have elements of proof focused on precisely the type of conduct Appellant alleges. Appellant alleges the elements of "actual fraud", requiring (1) that an act was committed by a party to the contract[37]; (2) with an intent to deceive another party . . . or to induce him to enter into the contract[38]; (3) by "any of the following acts":

---

[37] Garcia's Complaint, *supra,* n. 14.

[38] Garcia's Response, *supra*, n. 16.

(a) The suggestion, as a fact, of that which is not true, by

one who does not believe it to be true;[39]

(b). The suppression of that which is true, by one having

knowledge or belief of the fact;[40] or

(c) [a]ny other act fitted to deceive.

CAL. CIV. CODE § 1572.

Appellant's allegations constitute a claim of "actual fraud" against the

filmmakers and would be entitled to actual and punitive damages.[41] That would be

aiming at the target, not the bystanders.

Appellant allegations may also support a cause under California's Unfair

Competition Law. "[U]nfair competition shall mean and include any unlawful,

unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200.[42]

---

[39] *Id.*

[40] Garcia's Complaint, *supra,* n. 14.

[41] CAL. CIV. CODE § 3294(a) ("In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of . . . fraud . . ., the plaintiff, in addition to actual damages, may recover damages for the sake of example and by way of punishing the defendant.").

[42] California's Unfair Competition Law also authorizes injunctions under Cal. Bus. & Prof. Code § 17203, however, the inunction is limited to "prevent[ing] the use or employment by any person of any practice which constitutes unfair competition."

## CONCLUSION

Amici urge this Court, in pursuing whatever inclination it may have to fashion a remedy that brings justice to Appellant, to adopt a maxim from medical ethics: First, do no harm.

Of all the many remedies the Court considers to do justice, Amici urge the Court to abhor the remedy that renders creative endeavor more unpredictable, more complex, less protective of the delicate process. Generations that will never know Amici's works depend upon this Court to avoid those harms. Amici wish by way of this brief to advocate for them as much as for themselves.

Dated: November 25, 2014            LINCOLN D. BANDLOW
                                         ROM BAR-NISSIM
                                         GARY L. BOSTWICK
                                         MICHAEL C. DONALDSON
                                         JACK LERNER

                                         By:    s/ Gary L. Bostwick
                                         Attorneys for Amici Curiae

## CERTIFICATE OF COMPLIANCE

I certify this brief has been prepared in a proportionally spaced typeface using MS-Word in 14-point Times New Roman font and contains 6,483 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and the Interest of the Amici section.


Dated: November 25, 2014                    LINCOLN D. BANDLOW
                                            ROM BAR-NISSIM
                                            GARY L. BOSTWICK
                                            MICHAEL C. DONALDSON
                                            JACK LERNER


                                            By:   s/ Gary L. Bostwick
                                            Attorneys for Amici Curiae

## CERTIFICATE OF SERVICE

I certify that on November 25, 2014, I electronically filed the foregoing brief of amicus curiae with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 25, 2014        LINCOLN D. BANDLOW
ROM BAR-NISSIM
GARY L. BOSTWICK
MICHAEL C. DONALDSON
JACK LERNER

By:   s/ Gary L. Bostwick    
Attorneys for Amici Curiae