**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CINDY LEE GARCIA,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>GOOGLE, INC., a Delaware<br>Corporation; YOUTUBE, LLC, a<br>California limited liability company,<br>*Defendants-Appellees*,<br><br>and<br><br>NAKOULA BASSELEY NAKOULA, an<br>individual, AKA Sam Bacile; MARK<br>BASSELEY YOUSSEF; ABANOB<br>BASSELEY NAKOULA; MATTHEW<br>NEKOLA; AHMED HAMDY; AMAL<br>NADA; DANIEL K. CARESMAN;<br>KRITBAG DIFRAT; SOBHI BUSHRA;<br>ROBERT BACILY; NICOLA BACILY;<br>THOMAS J. TANAS; ERWIN<br>SALAMEH; YOUSSEFF M. BASSELEY;<br>MALID AHLAWI,<br>*Defendants*. | No. 12-57302<br><br>D.C. No.<br>2:12-cv-08315-<br>MWF-VBK<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted En Banc
December 15, 2014—Pasadena California

Filed May 18, 2015

Before: Sidney R. Thomas, Chief Judge, and Alex
Kozinski, M. Margaret McKeown, Marsha S. Berzon,
Johnnie B. Rawlinson, Richard R. Clifton, Consuelo M.
Callahan, N. Randy Smith, Mary H. Murguia, Morgan
Christen and Paul J. Watford, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Watford;
Dissent by Judge Kozinski

**SUMMARY**[*]

**Copyright / Preliminary Injunction**

The en banc court affirmed the district court's denial of
Cindy Lee Garcia's motion for a preliminary injunction
requiring Google, Inc., to remove the film *Innocence of
Muslims* from all of its platforms, including YouTube.

A movie producer transformed Garcia's five-second
acting performance for a film titled *Desert Warrior* into part
of a blasphemous video proclamation against the Prophet
Mohammed. *Innocence of Muslims* was credited as a source

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

of violence in the Middle East, and Garcia received death threats.

The en banc court held that the district court did not abuse its discretion in denying Garcia's motion for a mandatory preliminary injunction because the law and facts did not clearly favor her claim to a copyright in her acting performance as it appeared in *Innocence of Muslims*. The en banc court credited the expert opinion of the Copyright Office, which had refused to register Garcia's performance apart from the film. The en banc court also held that in the context of copyright infringement, the only basis upon which the preliminary injunction was sought, Garcia failed to make a clear showing of irreparable harm to her interests as an author.

The en banc court dissolved the three-judge panel's amended takedown injunction against the posting or display of any version of *Innocence of Muslims* that included Garcia's performance. The en banc court held that the injunction was unwarranted and incorrect as a matter of law and was a prior restraint that infringed the First Amendment values at stake.

Concurring in the judgment, Judge Watford wrote that the majority should not have reached the issue of copyright law, but rather should have affirmed, without controversy, on the basis of Garcia's failure to establish a likelihood of irreparable harm.

Dissenting, Judge Kozinski wrote that Garcia's dramatic performance met all of the requirements for copyright protection. He wrote that her copyright claim was likely to

succeed and that she had made an ample showing of
irreparable harm.

## COUNSEL

M. Cris Armenta, The Armenta Law Firm ACP, Los Angeles,
California; Credence Sol, La Garenne, Chauvigng, France;
and Jason Armstrong, Bozeman, Montana, for Plaintiff-
Appellant.

Neal Kumar Katyal, Christopher T. Handman, Dominic F.
Perella, and Sean Marotta, Hogan Lovells US LLP,
Washington, D.C.; and Timothy Alger and Sunita Bali,
Perkins Coie LLP, Palo Alto, California, for Defendants-
Appellees Google, Inc. and YouTube LLC.

Michael H. Page and Joseph C. Gratz, Durie Tangrie LLP,
San Francisco, California, for Amicus Curiae Netflix, Inc..

Christopher Jon Sprigman, New York University School of
Law, New York, New York; Christopher Newman, George
Mason University School of Law, Arlington, Virginia; and
Jennifer S. Grannick, Stanford Law School, Stanford,
California, for Amici Curiae Professors of Intellectual
Property.

Matt Schruers, Washington, D.C., for Amicus Curiae
Computer & Communications Industry Association.

Corynne McSherry and Vera Ranieri, Electronic Frontier
Foundation, San Francisco, California; Lee Rowland and
Brian Hauss, American Civil Liberties Union, New York,
New York; Sherwin Siy and John Bergmayer, Public

Knowledge, Washington, D.C.; Art Neill and Teri Karobonik, New Media Rights, San Diego, California; Erik Stallman, Center for Democracy & Technology, Washington, D.C.; and Jonathan Band, Jonathan Band PLLC of Washington, D.C., for Amici Curiae Electronic Frontier Foundation, American Civil Liberties Union, Public Knowledge, Center for Democracy and Technology, New Media Rights, American Library Association, Association of College and Research Libraries, and Association of Research Libraries.

Catherine R. Gellis, Sausalito, California, for Amici Curiae Floor 64, Inc., and Organization for Transformative Works.

Christopher S. Reeder, Robins, Kaplan, Miller & Ciresi LLP, Los Angeles, California; David Leichtman and Michael A. Kolcun, Robins, Kaplan, Miller & Ciresi LLP, New York, New York; and Kathryn Wagner, Stacy Lefkowitz, and Kristine Hsu, New York, New York, for Amicus Curiae Volunteer Lawyers for the Arts, Inc.

Andrew P. Bridges, David L. Hayes, Kathryn J. Fritz, and Todd R. Gregorian, Fenwick & West LLP, San Francisco California, for Amici Curiae Adobe Systems, Inc., Automattic, Inc., Facebook, Inc., Gawker Media, LLC, IAC/Interactive Corp., Kickstarter, Inc., Pinterest, Inc., Tumblr, Inc., and Twitter, Inc.

Venkat Balasubramani, Focal PLLC, Seattle, Washington; Eric Goldman, Santa Clara University School of Law, Santa Clara, California, for Amici Curiae Internet Law Professors.

Gary L. Bostwick, Bostwick Law, Los Angeles, California; Jack I. Lerner, UCI Intell. Prop., Arts & Tech. Clinic, Irvine, California; Michael C. Donaldson, Donaldson + Callif, LLP,

Beverly Hills, California; Lincoln D. Bandlow, Lanthrop & Gage LLP, Los Angeles, California; and Rom Bar-Nissim, Los Angeles, California, for Amici Curiae International Documentary Association, Film Independent, Fredrik Gertten and Morgan Spurlock.

Kelli L. Sager, Dan Laidman and Brendan N. Charney, Davis Wright Tremaine LLP, Los Angeles, California, for Amici Curiae Los Angeles Times Communications LLC; The E.W. Scripps Company; Advance Publications, Inc.; The New York Times Company; The Washington Post; the Reporters Committee for Freedom of the Press; National Public Radio, Inc.; the National Press Photographers Association; the California Newspaper Publishers Association; and the First Amendment Coalition.

Duncan Crabtree-Ireland and Danielle S. Van Lier, SAG-AFTRA, Los Angeles, California; Thomas R. Carpenter, Actors' Equity Association, New York, New York; Jennifer P. Garner, American Federation of Musicians of the United States and Canada, New York, New York; Dominick Luquer, International Federation of Actors, Brussels, Belgium; and Elichai Shaffir, Counsel for Alliance of Canadian Cinema, Television, and Radio Artists, Toronto, Ontario, for Amici Curiae Screen Actors Guild–American Federation of Television and Radio Artists; Actors' Equity Association; American Federation of Musicians of the United States and Canada; International Federation of Actors; Alliance of Canadian Cinema, Television, and Radio Artists; Equity UK; Media, Entertainment and Arts Alliance–Equity Division (Australia & New Zealand); and South African Guild of Actors.

Paul Alan Levy and Scott Michelman, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Public Citizen.

Justin Hughes, Loyola Law School, Los Angeles, California, for Amici Curiae Professors Shyamkrishna Balganesh, Justin Hughes, Pete Menell, and David Nimmer.

---

**OPINION**

McKEOWN, Circuit Judge:

In this case, a heartfelt plea for personal protection is juxtaposed with the limits of copyright law and fundamental principles of free speech. The appeal teaches a simple lesson—a weak copyright claim cannot justify censorship in the guise of authorship.

By all accounts, Cindy Lee Garcia was bamboozled when a movie producer transformed her five-second acting performance into part of a blasphemous video proclamation against the Prophet Mohammed.[1] The producer—now in jail on unrelated matters—uploaded a trailer of the film, *Innocence of Muslims*, to YouTube. Millions of viewers soon watched it online, according to Garcia. News outlets credited the film as a source of violence in the Middle East. Garcia received death threats.

---

[1] We use the transliteration "Mohammed" because both parties use this spelling. We note that, according to the American Library Association-Library of Congress Arabic Romanization Table, *available at* http://www.loc.gov/catdir/cpso/roman.html, an alternate transliteration is "Muhammad."

Asserting that she holds a copyright interest in her fleeting performance, Garcia sought a preliminary injunction requiring Google to remove the film from all of its platforms, including YouTube. The district court denied the injunction, finding that Garcia did not establish likely success on the merits for her copyright claim. Nor did she demonstrate that the injunction would prevent any alleged harm in light of the film's five-month presence on the Internet. A divided panel of our court reversed, labeled her copyright claim as "fairly debatable," but then entered a mandatory injunction requiring Google to remove the film. That injunction was later limited to versions of the film featuring Garcia's performance.

As Garcia characterizes it, "the main issue in this case involves the vicious frenzy against Ms. Garcia that the Film caused among certain radical elements of the Muslim community." We are sympathetic to her plight. Nonetheless, the claim against Google is grounded in copyright law, not privacy, emotional distress, or tort law, and Garcia seeks to impose speech restrictions under copyright laws meant to foster rather than repress free expression. Garcia's theory can be likened to "copyright cherry picking," which would enable any contributor from a costume designer down to an extra or best boy to claim copyright in random bits and pieces of a unitary motion picture without satisfying the requirements of the Copyright Act. Putting aside the rhetoric of Hollywood hijinks and the dissent's dramatics, this case must be decided on the law.

In light of the Copyright Act's requirements of an "original work[] of authorship fixed in any tangible medium," 17 U.S.C. § 102(a), the mismatch between Garcia's copyright claim and the relief sought, and the Copyright Office's rejection of Garcia's application for a copyright in her brief

performance, we conclude that the district court did not abuse its discretion in denying Garcia's request for the preliminary injunction. As a consequence, the panel's mandatory injunction against Google was unjustified and is dissolved upon publication of this opinion.

## BACKGROUND AND PROCEDURAL HISTORY

In July 2011, Cindy Lee Garcia responded to a casting call for a film titled *Desert Warrior*, an action-adventure thriller set in ancient Arabia. Garcia was cast in a cameo role, for which she earned $500. She received and reviewed a few pages of script. Acting under a professional director hired to oversee production, Garcia spoke two sentences: "Is George crazy? Our daughter is but a child?" Her role was to deliver those lines and to "seem[] concerned."

Garcia later discovered that writer-director Mark Basseley Youssef (a.k.a. Nakoula Basseley Nakoula or Sam Bacile) had a different film in mind: an anti-Islam polemic renamed *Innocence of Muslims*. The film, featuring a crude production, depicts the Prophet Mohammed as, among other things, a murderer, pedophile, and homosexual. Film producers dubbed over Garcia's lines and replaced them with a voice asking, "Is your Mohammed a child molester?" Garcia appears on screen for only five seconds.

Almost a year after the casting call, in June 2012, Youssef uploaded a 13-minute-and-51-second trailer of *Innocence of Muslims* to YouTube, the video-sharing website owned by Google, Inc., which boasts a global audience of more than

one billion visitors per month.[2]  After it was translated into Arabic, the film fomented outrage across the Middle East, and media reports linked it to numerous violent protests.  The film also has been a subject of political controversy over its purported connection to the September 11, 2012, attack on the United States Consulate in Benghazi, Libya.

Shortly after the Benghazi attack, an Egyptian cleric issued a fatwa against anyone associated with *Innocence of Muslims*, calling upon the "Muslim Youth in America[] and Europe" to "kill the director, the producer[,] and the actors and everyone who helped and promoted this film."  Garcia received multiple death threats.

Legal wrangling ensued.  Garcia asked Google to remove the film, asserting it was hate speech and violated her state law rights to privacy and to control her likeness.  Garcia also sent Google five takedown notices under the Digital Millenium Copyright Act, 17 U.S.C. § 512, claiming that YouTube's broadcast of *Innocence of Muslims* infringed her copyright in her "audio-visual dramatic performance." Google declined to remove the film.

On September 19, 2012, Garcia first sued Google, Youssef, and other unnamed production assistants in Los Angeles Superior Court.   Her complaint alleged a compendium of torts and assorted wrongdoing under California law.  As against Google, Garcia made claims for invasion of privacy, false light, and violating her right to publicity.  She brought the same claims against Youssef and added fraud, unfair business practices, slander, and

---

[2] *See* YouTube.com Press Statistics, https://www.youtube.com/yt/press/statistics.html (last visited May 13, 2015).

intentional infliction of emotional distress. The state court denied Garcia's motion for a "temporary restraining order and for an order to show cause re preliminary injunction," because she had "not shown a likelihood of success on the merits." On September 25, 2012, Garcia voluntarily dismissed her state court suit.

One day later, Garcia turned to federal court. She filed suit in the United States District Court for the Central District of California and again named Google and Youssef as co-defendants. Garcia alleged copyright infringement against both defendants and revived her state law claims against Youssef for fraud, unfair business practices, libel, and intentional infliction of emotional distress.

Garcia then moved for a temporary restraining order and for an order to show cause on a preliminary injunction—but only on the copyright claim. She sought to bar Google from hosting *Innocence of Muslims* on YouTube or any other Google-run website.

On November 30, 2012, the district court denied Garcia's motion for a preliminary injunction. As an initial matter, the court concluded that "Garcia ha[d] not demonstrated that the requested relief would prevent any alleged harm," because, by that point, the film trailer had been on the Internet for five months. Nor did Garcia establish a likelihood of success on the merits. In particular, the district court found that the nature of Garcia's copyright interest was unclear, and even if she could establish such a copyright, she granted the film directors an implied license to "distribute her performance as a contribution incorporated into the indivisible whole of the Film."

A divided panel of our court reversed.  More than a year and a half after the film was first uploaded, the panel majority first issued a secret takedown order, giving Google twenty-four hours to remove all copies of *Innocence of Muslims* from YouTube and other Google-controlled platforms.  The panel embargoed disclosure of the order until it issued its opinion. The panel later amended the order to allow YouTube to post any version of the film that did not include Garcia's performance.

In its later-issued opinion, the panel majority reversed the district court and granted Garcia's preliminary injunction. *Garcia v. Google, Inc.*, 743 F.3d 1258, *amended by Garcia v. Google, Inc.*, 766 F.3d 929 (9th Cir. 2014).  Despite characterizing Garcia's copyright claim as "fairly debatable," the panel majority nonetheless concluded that Garcia was likely to prevail on her copyright claim as to her individual performance in *Innocence of Muslims*.  766 F.3d at 935.  In contrast to the district court's factual finding of an implied license from Garcia to Youssef, the panel opinion held that the license ran in the opposite direction: "Youssef implicitly granted [Garcia] a license to perform his screenplay," and that Garcia did *not* grant Youssef an implied license to incorporate her performance into the film.  *Id.* at 935–38. Finally, the panel majority held that, because of the death threats against her, Garcia had established irreparable harm and the equities and public interest favored an injunction.  *Id.* at 938–40.  The opinion did not address the First Amendment consequences of the mandatory takedown injunction, beyond stating that the First Amendment does not protect copyright infringement.

Judge N.R. Smith dissented.  He wrote that Garcia had not met the high burden required for a mandatory preliminary

injunction because she was unlikely to succeed on her copyright claim. *Id.* at 941 (N.R. Smith, J., dissenting). Specifically, Garcia was not likely to prove her performance was a "work," nor would she likely meet the copyright requirements of authorship and fixation, among other shortcomings with her claim. *Id.* at 946. In sum, "[b]ecause the facts and law do not 'clearly favor' issuing a preliminary injunction to Garcia, the district court did not abuse its discretion in denying Garcia's requested relief." *Id.* at 940.

We granted rehearing en banc.[3] *Garcia v. Google, Inc.*, 771 F.3d 647 (9th Cir. 2014).

## ANALYSIS

## I. THE DISTRICT COURT'S DECISION

Garcia sued under a slew of legal theories, but she moved for a preliminary injunction on just one of them: the copyright claim. Hence, copyright is the only basis for the appeal. Garcia's tort allegations—and claimed harm resulting from those torts, such as emotional distress—do not figure into our analysis.

We begin with the basics.

---

[3] In connection with en banc proceedings, we received thirteen amicus briefs from a broad array of interested parties, including copyright and Internet law scholars; content, Internet service, and technology providers; actors; media organizations; and nonprofit groups. The briefs were helpful to our understanding of the implications of this case from various points of view. We thank amici for their participation.

The district court's order denying Garcia's motion for a preliminary injunction is reviewed for abuse of discretion. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Because our review is deferential, "[w]e will not reverse the district court where it 'got the law right,' even if we 'would have arrived at a different result,' so long as the district court did not clearly err in its factual determinations." *Id.* (internal citation omitted).

The Supreme Court has emphasized that preliminary injunctions are an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). The district court correctly identified that Garcia must satisfy *Winter's* four-factor test. "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. at 20).

The first factor under *Winter* is the most important— likely success on the merits. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) ("We begin with the first and most important factor: whether petitioners have established a likelihood of success on the merits."). Because it is a threshold inquiry, when "a plaintiff has failed to show the likelihood of success on the merits, we 'need not consider the remaining three [*Winter* elements].'" *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (quoting *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776–77 (9th Cir. 2011)).

Garcia's burden here is doubly demanding: Because Garcia seeks a mandatory injunction, she must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed.

Why? Garcia's requested injunction required Google to take affirmative action—to remove (and to keep removing) *Innocence of Muslims* from YouTube and other sites under its auspices, whenever and by whomever the film was uploaded. This relief is treated as a mandatory injunction, because it "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted). As we have cautioned, a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored."[4] *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal citations omitted)). The "district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979)). In plain terms, mandatory injunctions should not issue in "doubtful cases." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011).

As we shall see, the district court did not abuse its discretion in concluding that Garcia was not likely to succeed on her copyright claim—much less that the law and facts

---

[4] "The status quo means the last, uncontested status which preceded the pending controversy." *N.D. ex rel. Parents v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1112 n.6 (9th Cir. 2010) (internal citation and quotation marks omitted). The status quo preceding this litigation was that *Innocence of Muslims* was uploaded to and available for viewing on YouTube. The preliminary injunction issued by the panel majority disrupted that status quo by ordering Google to remove the film.

*clearly* compel suppression of a controversial and politically significant film.

## A. COPYRIGHT

The central question is whether the law and facts clearly favor Garcia's claim to a copyright in her five-second acting performance as it appears in *Innocence of Muslims*. The answer is no. This conclusion does not mean that a plaintiff like Garcia is without options or that she couldn't have sought an injunction against different parties or on other legal theories, like the right of publicity and defamation.[5]

Under the Copyright Act, "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . [including] motion pictures." 17 U.S.C. § 102(a). That fixation must be done "by or under the authority of the author." 17 U.S.C. § 101. Benchmarked against this statutory standard, the law does not clearly favor Garcia's position.

---

[5] Down the road, Garcia also may have a contract claim. She recalls signing some kind of document, though she cannot find a copy. We take no position on this claim. Nor do we consider whether Garcia's performance was a work made for hire. *See* 17 U.S.C. § 101 (defining "work made for hire" as work "prepared by an employee within the scope of his or her employment" or, where both parties sign a written agreement, a work "specially ordered or commissioned . . . as a part of a motion picture. . ."); *see also* § 201(b) (in case of work made for hire, the employer or person for whom the work is prepared is the author, subject to express agreement otherwise). In district court proceedings, the parties disputed whether Garcia signed a work-made-for-hire agreement, and the issue is not before us on appeal.

The statute purposefully left "works of authorship" undefined to provide for some flexibility. *See* 1 Nimmer on Copyright § 2.03. Nevertheless, several other provisions provide useful guidance. An audiovisual work is one that consists of "a series of related images which are intrinsically intended to be shown" by machines or other electronic equipment, plus "accompanying sounds." 17 U.S.C. § 101. In turn, a "motion picture" is an "audiovisual work[] consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any." *Id.* These two definitions embody the work here: *Innocence of Muslims* is an audiovisual work that is categorized as a motion picture and is derivative of the script. Garcia is the author of none of this and makes no copyright claim to the film or to the script.[6] Instead, Garcia claims that her five-second performance itself merits copyright protection.

In the face of this statutory scheme, it comes as no surprise that during this litigation, the Copyright Office found that Garcia's performance was not a copyrightable work when it rejected her copyright application. The Copyright Office explained that its "longstanding practices do not allow a copyright claim by an individual actor or actress in his or her performance contained within a motion picture." Thus, "[f]or copyright registration purposes, a motion picture is a single integrated work. . . . Assuming Ms. Garcia's contribution was limited to her acting performance, we

---

[6] In another odd twist, one of Garcia's primary objections rests on the words falsely attributed to her via dubbing. But she cannot claim copyright in words she neither authored nor spoke. That leaves Garcia with a legitimate and serious beef, though not one that can be vindicated under the rubric of copyright.

cannot register her performance apart from the motion picture."

We credit this expert opinion of the Copyright Office—the office charged with administration and enforcement of the copyright laws and registration.[7] *See Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038, 1041–42 (9th Cir. 2014). The Copyright Office's well-reasoned position "reflects a 'body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 286 n.5 (3d Cir. 2004) (en banc) (Alito, J.) (quoting *Yates v. Hendon*, 541 U.S. 1, 3 (2004)).[8]

In analyzing whether the law clearly favors Garcia, *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000),

_____

[7] As Nimmer notes, when "the question as to copyrightabilty forms the core of the dispute between the parties, . . . input from the Copyright Office—the governmental agency that possesses special expertise in determining the bounds of copyright protection—[can] be of great value." 2 Nimmer on Copyright § 7.16[B][3][b][vi].

[8] The dissent's suggestion that this case is somehow governed by the Beijing Treaty on Audiovisual Performances is misplaced. *See* Dissent at 38–39. At present, the treaty is aspirational at best. It has yet to take effect because only six countries have ratified or acceded to the treaty—well short of the thirty it needs to enter into force. *See* World Intellectual Property Organization, *Summary of the Beijing Treaty on Audiovisual Performances (2012)*, *available at* www.wipo.int/treaties/en/ip/beijing/summary_beijing.html (last visited May 13, 2015). Although the United States signed the treaty in 2012, it has not been ratified by the U.S. Senate. Article II, Section 2 of the Constitution requires the concurrence of a two-thirds majority of that body. The dissent's reference to the fact sheet from the Patent and Trademark Office, which unlike the Copyright Office lacks legal authority to interpret and administer the Copyright Act, is similarly inapposite. *See* Dissent at 39.

provides a useful foundation. There, we examined the meaning of "work" as the first step in analyzing joint authorship of the movie *Malcolm X*. The Copyright Act provides that when a work is "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary *whole*," the work becomes a "joint work" with two or more authors. 17 U.S.C. § 101 (emphasis added). Garcia unequivocally disclaims joint authorship of the film.

In *Aalmuhammed*, we concluded that defining a "work" based upon "some minimal level of creativity or originality . . . would be too broad and indeterminate to be useful."[9] 202 F.3d at 1233 (internal quotation marks omitted). Our animating concern was that this definition of "work" would fragment copyright protection for the unitary film *Malcolm X* into many little pieces:

> So many people might qualify as an "author" if the question were limited to whether they made a substantial creative contribution that that test would not distinguish one from another. Everyone from the producer and director to casting director, costumer,

---

[9] Although the ultimate issue in *Aalmuhammed* pertained to joint authorship, the definition of "work" was essential, just as in our case, to the analysis. 202 F.3d at 1233–34; *see also Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008) (relying on *Aalmuhammed* in reasoning that to determine authorship, the court must first determine the "work" to be examined).

> hairstylist, and "best boy" gets listed in the movie credits because all of their creative contributions really do matter.

*Id.*

Garcia's theory of copyright law would result in the legal morass we warned against in *Aalmuhammed*—splintering a movie into many different "works," even in the absence of an independent fixation. Simply put, as Google claimed, it "make[s] Swiss cheese of copyrights."

Take, for example, films with a large cast—the proverbial "cast of thousands"[10]—such as *Ben-Hur* or *Lord of the Rings*.[11] The silent epic *Ben-Hur* advertised a cast of 125,000 people. In the *Lord of the Rings* trilogy, 20,000 extras tramped around Middle-Earth alongside Frodo Baggins (played by Elijah Wood). Treating every acting performance as an independent work would not only be a logistical and financial nightmare, it would turn cast of thousands into a new mantra: copyright of thousands.

---

[10] The term "cast of thousands" originated as a Hollywood "[a]dvertising come-on referring to the crowds of background players in a spectacular epic film." Blumenfeld's Dictionary of Acting and Show Business 48 (Hal Leonard Corp. 2009).

[11] For information on *Ben-Hur*, see *Ben-Hur*, IMDb, http://www.imdb.com/title/tt0052618/ (last visited Jan. 21, 2015), and *Ben-Hur: A Tale of the Christ, Trivia*, IMDb, http://www.imdb.com/title/tt0016641/trivia (last visited Jan. 30, 2015). For information on *Lord of the Rings*, see *Lord of the Rings: The Fellowship of the Ring*, IMDb, http://www.imdb.com/title/tt0120737/ (last visited Jan. 21, 2015), and *Lord of the Rings: The Fellowship of the Ring, Trivia*, IMDb, http://www.imdb.com/title/tt0120737/trivia (last visited Jan. 30, 2015).

The dissent spins speculative hypotheticals about copyright protection for book chapters, movie outtakes, baseball games, and Jimi Hendrix concerts. *See* Dissent at 35, 38. This hyperbole sounds a false alarm. Substituting moral outrage and colorful language for legal analysis, the dissent mixes and matches copyright concepts such as collective works, derivative works, the requirement of fixation, and sound recordings. The statutory definitions and their application counsel precision, not convolution. *See, e.g.*, 17 U.S.C. §§ 101, 103, 114, 201. The citation to *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) (Kozinski, J.), is particularly puzzling. There, neither party disputed the plaintiff's copyright, and the plaintiff independently fixed the special-effects footage and licensed it to the filmmakers. *See id.* at 556 n.2

The reality is that contracts and the work-made-for-hire doctrine govern much of the big-budget Hollywood performance and production world. *See* 1 Nimmer on Copyright § 6.07[B][2]. Absent these formalities, courts have looked to implied licenses. *See Effects Assocs.*, 908 F.2d at 559–60. Indeed, the district court found that Garcia granted Youssef just such an implied license to incorporate her performance into the film.[12] But these legal niceties do not necessarily dictate whether something is protected by copyright, and licensing has its limitations. As filmmakers

---

[12] Any copyright claim aside, the district court found that Garcia granted Youssef a non-exclusive implied license to use her performance in the film. Although Garcia asked Youssef about *Desert Warrior*'s content, she in no way conditioned the use of her performance on Youssef's representations. On this record, we cannot disturb the district court's finding as clearly erroneous. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, at *2 (9th Cir. 2014) (noting that factual findings reviewed for clear error).

warn, low-budget films rarely use licenses. Even if filmmakers diligently obtain licenses for everyone on set, the contracts are not a panacea. Third-party content distributors, like YouTube and Netflix, won't have easy access to the licenses; litigants may dispute their terms and scope; and actors and other content contributors can terminate licenses after thirty five years. *See* 17 U.S.C. § 203(a)(3). Untangling the complex, difficult-to-access, and often phantom chain of title to tens, hundreds, or even thousands of standalone copyrights is a task that could tie the distribution chain in knots. And filming group scenes like a public parade, or the 1963 March on Washington, would pose a huge burden if each of the thousands of marchers could claim an independent copyright.

Garcia's copyright claim faces yet another statutory barrier: She never fixed her acting performance in a tangible medium, as required by 17 U.S.C. § 101 ("A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, *by or under the authority of the author*, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.") (emphasis added). According to the Supreme Court, "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). Garcia did nothing of the sort.[13]

---

[13] The Copyright Office draws a distinction between acting performances like Garcia's, which are intended to be an inseparable part of an integrated film, and standalone works that are separately fixed and incorporated into a film. We in no way foreclose copyright protection for the latter —any "discrete work in itself that is later incorporated into a

For better or for worse, Youssef and his crew "fixed" Garcia's performance in the tangible medium, whether in physical film or in digital form. However one might characterize Garcia's performance, she played no role in fixation. On top of this, Garcia claims that she never agreed to the film's ultimate rendition or how she was portrayed in *Innocence of Muslims*, so she can hardly argue that the film or her cameo in it was fixed "by or under [her] authority." 17 U.S.C. § 101.

In sum, the district court committed no error in its copyright analysis. Issuance of the mandatory preliminary injunction requires more than a possible or fairly debatable claim; it requires a showing that the law "clearly favor[s]" Garcia. *See Stanley*, 13 F.3d at 1320. Because neither the Copyright Act nor the Copyright Office's interpretation supports Garcia's claim, this is a hurdle she cannot clear.

## B. IRREPARABLE HARM

Although we could affirm the district court solely on the copyright issue, *see DISH Network*, 653 F.3d at 776–77, we address irreparable harm because the grave danger Garcia claims cannot be discounted and permeates the entire lawsuit.

At first blush, irreparable harm looks like Garcia's strongest argument. Garcia understandably takes seriously the fatwa and threats against her and her family, and so do we. The difficulty with Garcia's claim is that there is a mismatch between her substantive copyright claim and the

---

motion picture," as the Copyright Office put it. *See Effects Assocs.*, 908 F.2d at 558–59 (recognizing independent copyrightability of special effects footage incorporated into film).

dangers she hopes to remedy through an injunction. Garcia seeks a preliminary injunction under copyright law, not privacy, fraud, false light or any other tort-based cause of action. Hence, Garcia's harm must stem from copyright—namely, harm to her legal interests *as an author*. *Salinger v. Colting*, 607 F.3d 68, 81 & n.9 (2d Cir. 2010) ("The relevant harm is the harm that . . . occurs to the parties' legal interests . . . .").

Looking to the purpose of copyright underscores the disjunction Garcia's case presents. Article 1, Section 8 of the U.S. Constitution provides that copyrights "promote the Progress of Science and useful arts." Hence, the "Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985); *see also Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (noting that "copyright's purpose is to *promote* the creation and publication of free expression") (emphasis in original). In keeping with copyright's function, "the justification of the copyright law is the protection of the *commercial* interest of the []author. It is not to . . . protect secrecy, but to stimulate creation by protecting its rewards." *Salinger*, 607 F.3d at 81 n.9 (quoting *New Era Publ'ns Int'l, ApS v. Henry Holt & Co*., 695 F. Supp. 1493, 1526 (S.D.N.Y. 1988)).

As Garcia frames it, "the main issue in this case involves the vicious frenzy against Ms. Garcia that the Film caused among certain radical elements of the Muslim community," which has caused "severe emotional distress, the destruction of her career and reputation" and credible death threats. With respect to irreparable harm, she argues that "[t]he injuries she

seeks to avoid—damage to her reputation, unfair[,] forced promotion of a hateful Film, and death—will be avoided if any injunction issues."

This relief is not easily achieved under copyright law. Although we do not take lightly threats to life or the emotional turmoil Garcia has endured, her harms are untethered from—and incompatible with—copyright and copyright's function as the engine of expression.

In broad terms, "the protection of privacy is not a function of the copyright law. . . .  To the contrary, the copyright law offers a limited monopoly to encourage ultimate *public access* to the creative work of the author." *Bond v. Blum*, 317 F.3d 385, 395 (4th Cir. 2003); *see also Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012) (quoting *Bond* and "pointedly" noting copyright cases are analyzed "only under copyright principles, not privacy law").

Likewise, authors cannot seek emotional distress damages under the Copyright Act, because such damages are unrelated to the value and marketability of their works.  *See In re Dawson*, 390 F.3d 1139, 1146 n.3 (9th Cir. 2004) (noting that "'actual damages' in the context of the Copyright Act . . . cover only economic damages" (internal citation omitted)); *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002) (rejecting copyright damages where "the infringement did not in any way influence the market value" of a piece of outdoor artwork but instead boiled down to the author's "personal objections to the manipulation of his artwork").

By way of example, erstwhile professional wrestler and reality TV star Hulk Hogan wanted to enjoin Gawker.com from posting a sex tape of Hogan with a mistress, claiming

copyright infringement. *Bollea v. Gawker Media, LLC*, 913 F. Supp. 2d 1325, 1327 (M.D. Fla. 2012). The district court found an absence of irreparable harm because Hogan "produced no evidence demonstrating that he will suffer irreparable harm in the copyright sense absent a preliminary injunction. The only evidence in the record reflecting harm to [Hogan] relates to harm suffered by him personally and harm to his professional image due to the 'private' nature of the Video's content. This evidence does not constitute irreparable harm in the context of copyright infringement." *Id.* at 1329; *cf. New Era Publ'ns*, 695 F. Supp. at 1499 (denying injunction sought "not in good faith for its intended purpose of protecting the value of publication rights, but rather to suppress a derogatory study of the founder of the Church of Scientology").

Privacy laws, not copyright, may offer remedies tailored to Garcia's personal and reputational harms. On that point, we offer no substantive view. Ultimately, Garcia would like to have her connection to the film forgotten and stripped from YouTube. Unfortunately for Garcia, such a "right to be forgotten," although recently affirmed by the Court of Justice for the European Union, is not recognized in the United States. *See* Case C-131/12, *Google Spain SL v. Agencia Española de Protección de Datos* (AEPD), ECLI:EU:C:2014:616 (May 13, 2014) (requiring Google to consider individual requests to remove personal information from its search engine); *Internet Law—Protection of Personal Data—Court of Justice of the European Union Creates Presumption that Google Must Remove Links to Personal Data Upon Request*, 128 Harv. L. Rev. 735 (2014).

Nor is Garcia protected by the benefits found in many European countries, where authors have "moral rights" to

control the integrity of their works and to guard against distortion, manipulation, or misappropriation. *See Kelley v. Chicago Park Dist.*, 635 F.3d 290, 296 (7th Cir. 2011) (describing differences in moral rights in American copyright law versus other countries). Except for a limited universe of works of visual art, such as paintings and drawings protected under the Visual Artists Rights Act of 1990, United States copyright law generally does not recognize moral rights. 17 U.S.C. § 106A. Motion pictures specifically are excluded from moral rights protection. § 106A; § 101 ("[W]ork of visual art does not include . . . any . . . motion picture or other audiovisual work . . . .").

In short, Garcia's harms are too attenuated from the purpose of copyright. We do not foreclose that in a different circumstance with a strong copyright claim, a court could consider collateral consequences as part of its irreparable harm analysis and remedy. 17 U.S.C. § 502 (providing that the court may grant injunctions "as it may deem reasonable to prevent or restrain infringement of a copyright"). But such a case is not before us.

Garcia waited months to seek an injunction after *Innocence of Muslims* was uploaded to YouTube in July 2012; she did not seek emergency relief when the film first surfaced on the Internet. The district court did not abuse its discretion by finding this delay undercut Garcia's claim of irreparable harm. *See Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); 4 Nimmer on Copyright § 14.06[A][3][c] (noting unreasonable delay can defeat irreparable injury and the length of time "need not be great"). Garcia notes that she moved swiftly once the film

was translated into Arabic and sparked death threats against her. But that proves the point: the gravamen of Garcia's harm is untethered from her commercial interests as a performer, and instead focuses on the personal pain caused by her association with the film.

The district court did not abuse its discretion in determining that Garcia failed to muster a clear showing of irreparable harm. *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 999–1000 (9th Cir. 2011) ("Harm must be proved, not presumed." (quoting 4 Nimmer on Copyright § 14.06[A][5])).

In the face of a doubtful copyright claim and the absence of irreparable harm to Garcia's interests as an author, we need not consider the final two *Winter* factors, the balance of equities and public interest.

## II. THE PANEL'S INJUNCTION

In February 2014, the panel majority issued the following injunction: "Google, Inc. shall take down all copies of 'Innocence of Muslims' from YouTube.com and from any other platforms under Google's control, and take all reasonable steps to prevent further uploads of 'Innocence of Muslims' to those platforms." Soon after, the panel amended the order to state that the prohibition did "not preclude the posting or display of any version of 'Innocence of Muslims' that does not include Cindy Lee Garcia's performance."

Although the first order was more sweeping, the second cast the court in the uneasy role of film editor. The amendment only mattered if Google assumed authority to change the content of someone else's copyrighted film. To

no one's surprise, the end result was the same: the entire film remained removed from YouTube.

The takedown order was unwarranted and incorrect as a matter of law, as we have explained above.  It also gave short shrift to the First Amendment values at stake.  The mandatory injunction censored and suppressed a politically significant film—based upon a dubious and unprecedented theory of copyright.  In so doing, the panel deprived the public of the ability to view firsthand, and judge for themselves, a film at the center of an international uproar.

Although the intersection between copyright and the First Amendment is much-debated,[14] the Supreme Court teaches that copyright is not "categorically immune from challenges under the First Amendment."  *Eldred*, 537 U.S. at 221 (internal citation omitted).  To be sure, this is not a case of garden-variety copyright infringement, such as seeking to restrain the use of copyrighted computer code.  The panel's takedown order of a film of substantial interest to the public is a classic prior restraint of speech.  *Alexander v. United States*, 509 U.S. 544, 550 (1993) ("Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints.").  Prior restraints pose the "most serious and the least tolerable infringement on First Amendment rights," *Hunt v. NBC*, 872 F.2d 289, 293 (9th Cir. 1989) (citation omitted), and Garcia cannot overcome the historical and

---

[14] *See*, *e.g.*, Joseph P. Bauer, *Copyright and the First Amendment: Comrades, Combatants, or Uneasy Allies?*, 67 Wash. & Lee L. Rev. 831 (2010); Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147 (1998).

heavy presumption against such restraints with a thin copyright claim in a five-second performance.

The amended injunction issued February 28, 2014 is dissolved immediately and has no force or effect.

## CONCLUSION

At this stage of the proceedings, we have no reason to question Garcia's claims that she was duped by an unscrupulous filmmaker and has suffered greatly from her disastrous association with the *Innocence of Muslims* film. Nonetheless, the district court did not abuse its discretion when it denied Garcia's motion for a preliminary injunction under the copyright laws.

**AFFIRMED**.

---

WATFORD, Circuit Judge, concurring in the judgment:

We don't have to craft new rules of copyright law to resolve this appeal. We just have to follow the law we established a few years ago, without controversy, on the subject of irreparable harm. The majority's decision to do more is a mistake in my view, and not just because much of what the majority says about copyright law may be wrong. *See* Dissent at 34–38. We are usually well advised to decide no more than we need to, even when resolving routine appeals typical of those we're likely to see in the future. We should be all the more cautious when resolving an appeal like this one, a case that could not be more atypical as far as copyright infringement actions go and one that is highly

charged on both sides to boot.  Because the risk of making bad law in these circumstances is particularly high, we should aim to decide as narrowly as we can, leaving the task of crafting broad new rules for a case in which it is actually necessary to do so.  *See* Frederick Schauer, *Do Cases Make Bad Law?*, 73 U. Chi. L. Rev. 883, 916 (2006).

Had we chosen to decide narrowly here, we could have affirmed the district court's denial of a preliminary injunction by focusing solely on the irreparable harm prong.  Garcia bore the burden of showing that "irreparable injury is *likely* in the absence of" the requested injunction.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The only form of injury Garcia has alleged that could qualify as irreparable is the risk of death she faces as a result of the fatwa issued against her.  Unlike the majority, I'm willing to assume that the risk of death qualifies as irreparable injury in this context.  But under our decision in *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011), Garcia also had to prove a "causal connection" between the irreparable injury she faces and the conduct she hopes to enjoin.  *Id.* at 982.  In other words, she had to show that removing the film from YouTube would likely eliminate (or at least materially reduce) the risk of death posed by issuance of the fatwa.

The district court did not abuse its discretion by concluding, albeit for reasons different from those I offer here, that Garcia failed to satisfy the irreparable harm prong. The sad but unfortunate truth is that the threat posed to Garcia by issuance of the fatwa will remain whether *The Innocence of Muslims* is available on YouTube or not.  Garcia is subject to the fatwa because of her role in making the film, not because the film is available on YouTube.  The film will undoubtedly remain accessible on the Internet for all who

wish to see it even if YouTube no longer hosts it. Bottom line: Garcia's requested injunction won't change anything about the content of the film or the part, however limited, she played in its making.

Of course, Garcia's role in making the film has been completely misunderstood. She never actually uttered the highly offensive words her character speaks in the film. She had no idea that the scenes in which she appeared would later be used as part of an anti-Islam diatribe, and she strongly opposes the film's message. Correcting these misperceptions might well eliminate or reduce the threat Garcia faces, but she has already taken numerous steps to do just that. She has publicly denounced the film and done everything within her power—including bringing this lawsuit—to disassociate herself from the film's hateful message.

The declaration submitted by Garcia's expert on Islamic and Middle Eastern law—the only evidence she offered that addresses causation directly—candidly describes the tenuous causation theory Garcia relies on. Garcia's expert did not assert that removing the film from YouTube would likely cause the fatwa against her to be lifted. He instead noted that Garcia's "public statements condemning the film here have been received in the Muslim world with controversy," and opined that removing the film from YouTube would cause others to believe that Garcia's condemnations are sincere: "If she is successful in pulling the content down from the internet, it will likely help her in terms of *believability of her message* condemning the film and its message." (Emphasis added.)

In my view, this sparse evidence does not show that removing the film from YouTube would be likely to mitigate

the risk of death Garcia faces. At most, the expert's bare assertion establishes that granting the requested injunction will have an incremental but impossible-to-measure effect on Garcia's credibility. The declaration notably stops short of suggesting that the injunction would have any impact (let alone a likely impact) on the actions of the necessary audience: the cleric who issued the fatwa and those who would be inclined to carry it out. Nor is it obvious why *success* in getting the district court to order the film's removal from YouTube would be critical to bolstering the believability of Garcia's message. Demanding the take-down injunction seems to speak loudly and clearly in its own right about the sincerity of her views on the film.

The district court did not abuse its discretion in concluding that, on this record, Garcia failed to satisfy the irreparable harm prong. Under our decision in *Perfect 10*, that alone requires us to affirm the district court's denial of a preliminary injunction. 653 F.3d at 982. I concur in the judgment for that reason only.

KOZINSKI, Circuit Judge, dissenting:

Garcia's dramatic performance met all of the requirements for copyright protection: It was copyrightable subject matter, it was original and it was fixed at the moment it was recorded. So what happened to the copyright? At times, the majority says that Garcia's performance was not copyrightable at all. And at other times, it seems to say that Garcia just didn't do enough to gain a copyright in the scene. Either way, the majority is wrong and makes a total mess of copyright law, right here in the Hollywood Circuit. In its

haste to take internet service providers off the hook for infringement, the court today robs performers and other creative talent of rights Congress gave them. I won't be a party to it.

## I

Youssef handed Garcia a script. Garcia performed it. Youssef recorded Garcia's performance on video and saved the clip. Until today, I understood that the rights in such a performance are determined according to elementary copyright principles: An "original work[] of authorship," 17 U.S.C. § 102(a), requires only copyrightable subject matter and a "minimal degree of creativity." *Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). The work is "fixed" when it is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. And at that moment, the "author or authors of the work" instantly and automatically acquire a copyright interest in it. 17 U.S.C. § 201(a). This isn't exactly String Theory; more like Copyright 101.

Garcia's performance met these minimal requirements; the majority doesn't contend otherwise. The majority nevertheless holds that Garcia's performance isn't a "work," apparently because it was created during the production of a later-assembled film, *Innocence of Muslims*. Maj. Op. 17–20. But if you say something is not a work, it means that it isn't copyrightable by anyone. Under the majority's definition of "work," no one (not even Youssef) can claim a copyright in any part of Garcia's performance, even though it was recorded several months before *Innocence of Muslims* was assembled. Instead, *Innocence of Muslims*—the ultimate

film—is the only thing that can be a "work." If this is what my colleagues are saying, they are casting doubt on the copyrightability of vast swaths of material created during production of a film or other composite work.

The implications are daunting. If Garcia's scene is not a work, then every take of every scene of, say, *Lord of the Rings* is not a work, and thus not protected by copyright, unless and until the clips become part of the final movie. If some dastardly crew member were to run off with a copy of the Battle of Morannon, the dastard would be free to display it for profit until it was made part of the final movie. And, of course, the take-outs, the alternative scenes, the special effects never used, all of those things would be fair game because none of these things would be "works" under the majority's definition. And what about a draft chapter of a novel? Is there no copyright in the draft chapter unless it gets included in the published book? Or if part of the draft gets included, is there no copyright in the rest of it?

This is a remarkable proposition, for which the majority provides remarkably little authority. *Aalmuhammed* v. *Lee*, 202 F.3d 1227 (9th Cir. 2000), the only case that the majority cites, says just the opposite. In *Aalmuhammed*, we considered a claim by a contributor to the movie *Malcolm X* that he was a joint author of the entire movie. *Id.* at 1230. Everyone in *Aalmuhammed* agreed that the relevant "work" was *Malcolm X*. The only question was whether the contributor was a joint author of *that* work. We went out of our way to emphasize that joint authorship of a movie is a "different question" from whether a contribution to the movie can be a "work" under section 102(a). *Id.* at 1233. And we clearly stated that a contribution to a movie *can* be copyrightable (and thus can be a "work"). *Id.* at 1232.

The majority's newfangled definition of "work" is directly contrary to a quarter-century-old precedent that has never been questioned, *Effects Associates, Inc.* v. *Cohen*, 908 F.2d 555 (9th Cir. 1990). There, we held that a company that created special effects footage during film production retained a copyright interest in the footage even though it became part of the film. *Id.* at 556–58; *see also Oddo* v. *Ries*, 743 F.2d 630, 633–34 (9th Cir. 1984). The majority tries to distinguish *Effects Associates* by arguing that the footage there was a "standalone work[] that [was] separately fixed and incorporated into a film." Maj Op. 22 n.13. But Garcia's performance was also "separately fixed and incorporated into" *Innocence of Muslims*. Why then are the seven shots "featuring great gobs of alien yogurt oozing out of a defunct factory" interspersed in *The Stuff*, 908 F.2d at 559, any more a "standalone work" than Garcia's performance? Youssef wasn't required to use any part of Garcia's performance in the film; he could have sold the video clip to someone else. The clip might not have had much commercial value, but neither did the special effects scenes in *Effects Associates*. Nothing in the Copyright Act says that special effects scenes are "works" entitled to copyright protection but other scenes are not. And what about scenes that have actors *and* special effects? Are those scenes entitled to copyright protection (as in *Effects Associates*), or are they denied copyright protection like Garcia's scene?

## II

**A.** The majority also seems to hold that Garcia is not entitled to copyright protection because she is not an author of the recorded scene. According to the majority, Garcia can't be an author of her own scene because she "played no role in [her performance's] fixation." Maj. Op. 22–23.

But a performer need not operate the recording equipment to be an author of his own performance. *See* H.R. Rep. No. 94-1476, at 56 (1976); S. Rep. No. 94-473, at 53–54 (1975); *see also* 1 *Nimmer on Copyright* § 2.10[A][3] at 2-178.4 to 2-178.5. Without Garcia's performance, all that existed was a script. To convert the script into a video, there needed to be both an actor physically performing it and filmmakers recording the performance. Both kinds of activities can result in copyrightable expression. *See* 1 *Nimmer on Copyright* § 2.09[F] at 2-165 to 2-171 (discussing *Baltimore Orioles, Inc.* v. *Major League Baseball Players Ass'n*, 805 F.2d 663 (7th Cir. 1986)).[1] Garcia's performance had at least "some minimal degree of creativity" apart from the script and Youssef's direction. *See Feist*, 499 U.S. at 345. One's "[p]ersonality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something which is one man's alone." *Bleistein* v. *Donaldson Lithographing Co.*, 188 U.S. 239, 250 (1903). To dispute this is to claim that *Gone With the Wind* would be the same movie if Rhett Butler were played by Peter Lorre.

---

[1] Professor Nimmer agrees with the first premise of *Baltimore Orioles*, namely, that a contributor of a copyrightable expression that's captured on video may retain a copyright interest in it. 1 *Nimmer on Copyright* § 2.09[F] at 2-166. That's because both the underlying human activity and the creative aspects of the video itself may be copyrightable. *Id.* Professor Nimmer disagrees with the Seventh Circuit's decision in *Baltimore Orioles* on the basis that the underlying human activity in that case (the baseball game) didn't contain any creative elements. 1 *id.* § 2.09[F] at 2-167 to 2-171. But Garcia's acting performance is clearly copyrightable subject matter. *See Laws* v. *Sony Music Entm't, Inc.*, 448 F.3d 1134, 1142 (9th Cir. 2006) (citing *Fleet* v. *CBS, Inc.*, 58 Cal. Rptr. 2d 645, 651 (Ct. App. 1996)); 1 *Nimmer on Copyright* § 2.09[F] at 2-170 n.85.

Actors usually sign away their rights when contracting to do a movie, but Garcia didn't and she wasn't Youssef's employee. I'd therefore find that Garcia acquired a copyright in her performance the moment it was fixed. When dealing with material created during production of a film or other composite work, the absence of a contract always complicates things. *See Effects Associates*, 908 F.2d at 556 ("Moviemakers do lunch, not contracts."). Without a contract the parties are left with whatever rights the copyright law gives them. It's not our job to take away from performers rights Congress gave them. Did Jimi Hendrix acquire no copyright in the recordings of his concerts because he didn't run the recorder in addition to playing the guitar? Garcia may not be as talented as Hendrix—who is?—but she's no less entitled to the protections of the Copyright Act.

**B.**    While the Copyright Office claims that its "longstanding practices" don't recognize Garcia's copyright interest, it doesn't seem that the Register of Copyrights got the memo. The Register was a member of the U.S. delegation that signed the Beijing Treaty on Audiovisual Performances. *See* U.S. Copyright Office, *Annual Report of the Register of Copyrights* 8 (2012). The Treaty would recognize Garcia's rights in her performance. It provides that "performers" have the "exclusive right of authorizing . . . the fixation of their unfixed performances," and "reproduction of their performances fixed in audiovisual fixations, in any manner or form." World Intellectual Property Organization, *Beijing Treaty on Audiovisual Performances*, Art. 6(ii), 7 (2012).

The Patent Office, which led the delegation, states that U.S. law is "generally compatible" with the Treaty, as "actors and musicians are considered to be 'authors' of their performances providing them with copyright rights." U.S.

Patent & Trademark Office, *Background and Summary of the 2012 WIPO Audiovisual Performances Treaty* 2 (2012). Although the Copyright Office hasn't issued a statement of compatibility, it's hard to believe that it would sign on if it believed that the Treaty's key provisions are inconsistent with U.S. copyright law. In fact, the Copyright Office praised the Treaty as "an important step forward in protecting the performances of television and film actors throughout the world." U.S. Copyright Office, *NewsNet: Beijing Audiovisual Performances Treaty* (2012), http://copyright.gov/newsnet/2012/460.html. Except in the Ninth Circuit.

The Copyright Office's position is thus inconsistent at best. And, in any event, neither the Copyright Office's reasoning nor the authority it relies on in its letter to Garcia fare any better than the majority's. The Copyright Office would refuse copyright registration to an actor like Garcia because "an actor or an actress in a motion picture is either a joint author in the entire work or, as most often is the case, is not an author at all by virtue of a work made for hire agreement." However, Garcia isn't a joint author of the entire movie and didn't sign any agreements. She doesn't fit into either category. Like the majority, the Copyright Office would wish this problem away by refusing registration unless the copyright claimant personally recorded his performance. But nothing in the legislative history relied on by the Copyright Office (which concerned joint authorship of an entire film) suggests that a non-employee doesn't retain any copyright interest in a video clip of his acting performance because it's recorded by the film's producer. *See* H.R. Rep. No. 94-1476, at 120.

### III

The harm the majority fears would result from recognizing performers' copyright claims in their fixed, original expression is overstated. The vast majority of copyright claims by performers in their contributions are defeated by a contract and the work for hire doctrine. *See* 1 *Nimmer on Copyright* § 6.07[B][2] at 6-28 to 6-29; 2 William F. Patry, *Patry on Copyright* § 5:17 (2010). And most of the performers that fall through the cracks would be found to have given an implied license to the film's producers to use the contribution in the ultimate film. *See Effects Associates*, 908 F.2d at 558. Very few performers would be left to sue at all, and the ones that remain would have to find suing worth their while. They wouldn't be able to claim the valuable rights of joint authorship of the movie, such as an undivided share in the movie or the right to exploit the movie for themselves. *See* 1 *Nimmer on Copyright* § 6.08 at 6-34 to 6-36. Rather, their copyright claims would be limited to the original expression they created. *See Aalmuhammed*, 202 F.3d at 1232; *Effects Associates*, 908 F.2d at 559. Which is why filmmaking hasn't ground to a halt even though we held a quarter-century ago that "where a non-employee contributes to a book or movie, . . . the exclusive rights of copyright ownership vest in the creator of the contribution, unless there is a written agreement to the contrary." *Effects Associates*, 908 F.2d at 557.

Regardless, the Supreme Court has reminded us that "speculation about future harms is no basis for [courts] to shrink authorial rights." *N.Y. Times Co.* v. *Tasini*, 533 U.S. 483, 505–06 (2001). In *Tasini*, freelance authors argued that the inclusion in databases of their articles that originally appeared in periodicals infringed their copyrights in the

works.  *Id.* at 487.  Publishers warned that "'devastating' consequences," including massive damages awards, would result if the Court were to hold for the freelancers.  *Id.* at 504. The Court nonetheless held for the freelancers, turning back the parade of horribles deployed by the publishers.  The Court explained that there are "numerous models for distributing copyrighted works and remunerating authors for their distribution."  *Id.* at 504–05.  *Tasini* is a powerful reminder that movie producers, publishers and distributors will always claim that the sky is falling in cases that might recognize an individual contributor's copyright interest in material he created.[2]  They will always say, as Google says here, that holding in the contributor's favor will make "Swiss cheese" of copyrights.  Maj. Op. 20.

But under our copyright law, the creators of original, copyrightable material *automatically* acquire a copyright interest in the material as soon as it is fixed.  There's no exception for material created during production of a film or other composite work.  When modern works, such as films or plays, are produced, contributors will often create separate, copyrightable works as part of the process.  Our copyright law says that the copyright interests in this material vest

---

[2] Ditto in *Community for Creative Non-Violence* v. *Reid*, 490 U.S. 730 (1989), which concerned the scope of a "work made for hire."  *Id.* at 738. Amici representing, among others, publishers and technology companies advocated for a broad definition of "employee."  They predicted "ever-increasing interference with the dissemination of creative works" if the Court didn't adopt their definition of "employee."  Brief of the Computer & Business Equipment Manufacturers' Ass'n et al. in Support of Petitioners at 4–5, *Cmty. for Creative Non-Violence* v. *Reid*, 490 U.S. 730 (1989) (No. 88-293).  But the Court adopted the narrower definition of "employee" used in agency law.  *Reid*, 490 U.S. at 750–51.  It appears that creative works have been disseminating just fine in spite of *Reid*.

initially with its creators, who will then have leverage to obtain compensation by contract.  The answer to the "Swiss cheese" bugbear isn't for courts to limit who can acquire copyrights in order to make life simpler for producers and internet service providers.  It's for the parties to allocate their rights by contract.  *See Effects Associates*, 908 F.2d at 557. Google makes oodles of dollars by enabling its users to upload almost any video without pre-screening for potential copyright infringement.  Google's business model, like that of the database owners in *Tasini*, assumes the risk that a user's upload infringes someone else's copyright, and that it may have to take corrective action if a copyright holder comes forward.

The majority credits the doomsday claims at the expense of property rights that Congress created.  Its new standard artificially shrinks authorial rights by holding that a performer must personally record his creative expression in order to retain any copyright interest in it, speculating that a contrary rule might curb filmmaking and burden the internet. But our injunction has been in place for over a year; reports of the internet's demise have been greatly exaggerated.  For the reasons stated here and in the majority opinion in *Garcia* v. *Google, Inc.*, 766 F.3d 929, 933–36 (9th Cir. 2014), I conclude that Garcia's copyright claim is likely to succeed. I'd also find that Garcia has made an ample showing of irreparable harm.  It's her *life* that's at stake.  *See id.* at 938–39.